IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DELAWARE MARKETING PARTNERS,
LLC.,
      Plaintiff

v.          CIVIL ACTION NO. 04-263 ERIE

CREDITRON FINANCIAL SERVICES,
INC., et al.,
      Defendants


SETTLEMENT CONFERENCE



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers, U.S. Courthouse, Erie,

Pennsylvania, on Monday, September 18, 2006.




APPEARANCES:
      CHARLES SNYDERMAN, Esquire, appearing on behalf
      of the Plaintiff.

      BRETT W. FARRAR, Esquire, appearing on behalf of

the Plaintiff.

CRAIG A. MARKHAM, Esquire, appearing on behalf
of the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

1           P R O C E E D I N G S

2

3           (Whereupon, on the record proceedings began at

4    1:15 p.m., on Monday, September 18, 2006, in Judge's Chambers.)

5

6           THE COURT:  We're on the record.  Today is the day

7    that was set for a settlement conference at Civil Action

8    04-263.  And the background of this has already been put on the

9    record.  I had made it I thought crystal clear that I expected

10   Mr. Covatto to be here today and he's not.  I'm informed by his

11   counsel that yesterday he checked himself into the hospital,

12   where he is today.  I am going to direct that -- number one,

13   I'm going to order I receive and counsel for the plaintiff

14  receive within seven days of today a letter from his treating

15  physician which, one, explains precisely what his medical

16  problem or condition is.  The medical necessity for his most

17  recent hospitalization.  A statement by the physician as to the

18  reason or reasons that Mr. Covatto was incapable of

19  participating in this settlement conference today, either in

20  person or by telephone.  And that's that.

21        Barring the receipt of that letter one week from

22  today by the close of business, I'm going to direct that

23  counsel for the plaintiff submit and file their costs incurred

24  in this travel, as well as a reasonable statement of counsel

25  fees that were incurred in connection with this trip.  And

3

1  barring the receipt of that letter and presuming that

2  substantiates -- let me say that again.  If the letter is not

3  received or if a letter is received that does not substantiate

4  his inability to have attended, then I'm going to order your

5  client to pay all those fees and costs.  So that's it.

6        MR. SNYDERMAN:  Your Honor, may I also, in the event

7  that letter doesn't arrive, ask for reimbursement for my

8   clients for their traveling costs?

9        THE COURT:  Yes, traveling costs for anyone who was

10  required to come here today in anticipation of this.  Now,

11  let's clean up a few other loose ends before we return to the

12  subject that brought us here.  I am informed by Mr. Farrar that

13  there are some dangling discovery issues, is that right?

14        MR. FARRAR:  Yes.

15        THE COURT:  What are those?

16        MR. FARRAR:  Stemming from the ruling by the

17  magistrate judge dated June 13, 2006, with respect to providing

18  requested financial documentation to respond to Interrogatories

19  1(k) and 2.  Stemming from prior discovery sent to the

20  defendants.

21        THE COURT:  And in broad brush that requests

22  financial information, what specifically is the nature of it?

23        MR. FARRAR:  Specifically, the nature of it was for

24  each loan, we requested some information stated about them.

25        THE COURT:  Do you have those requests with you?

4

1        MR. SNYDERMAN:  This letter pretty much summarizes

2  it, if your Honor wants to take a moment to look at it.

3      THE COURT:  This is a letter of September 8, 2006,

4  relative to outstanding discovery?

5      MR. SNYDERMAN:  Yes, your Honor.

6      THE COURT:  Do you know what he's talking about

7  here?

8      MR. MARKHAM:  Yes, your Honor.  There is actually --

9  I may have a follow-up written on the same day relative to the

10  same information.

11      THE COURT:  Do I take it correctly that both counsel

12  then had a meet and confer telephonic, did you talk about this?

13      MR. SNYDERMAN:  We talked about it with the

14  confidentiality agreement and various things --

15      THE COURT:  Did you talk about your requests

16  relative to outstanding discovery?

17      MR. SNYDERMAN:  We've had discussions about it,

18  sure.

19      MR. MARKHAM:  When I wrote the response to specific

20  requests set forth in the September 8th letter, in terms of

21  documents -- let me back up.  I think it's important for

22  everyone to know where we're at here.  The requests

23  specifically asks us to identify all the disbursements we made

24  from the money which was paid to us by the lender as our

25  commission.  We had objected to that because it didn't make any

5

1  sense why they'd want that information.  What they're entitled

2  to on gross receipt, not what we paid or how we used the money.

3  In any event, the magistrate judge directed that we respond.

4  We responded.  We provided a stack of documents that reflected

5  invoices, costs, operating expenses, utility bills.  Because we

6  can't identify where, once a dollar goes into the bank, we lose

7  track of where, what its source was.  We just gave them all the

8  bills we had for the period of time they're talking about.  My

9  understanding, based upon Attorney Snyderman's September 8th

10  letter, what he's looking for now is our bank records to

11  further explain the checks we would have wrote from the funds

12  we received from the lender.  My response was well, you have

13  all the documents from the lender identifying the amounts that

14  we received.  The disbursements, I don't think they're

15  relevant.  But we gave him all the raw information about the

16  disbursements, the bills.  The utility bills, the paper bills,

17  all that stuff, now he wants our bank account.

18        THE COURT:  Was the bank account specifically

19   requested in the previous information?

20        MR. MARKHAM:  To produce copies of all books,

21   records, writings and other documents which refer or relate in

22   any way to payments identified.

23        THE COURT:  Why wouldn't a bank statement fall

24   within that -- I guess more particularly, although I think it's

25   water under the bridge at this point, what is the objection to


6


1   it?

2        MR. MARKHAM:  There's two objections.  One, I don't

3   see any relevance to where the money went.  We can't trace the

4   money to any particular receipt.  All we would give them is the

5   bank account information of disbursements, which would include

6   disbursements from all the funds the company received, from all

7   sources, not from this project alone.  How that would help

8   them, I don't know.  But they want that.

9        The second objection is one of confidentiality.

10   We've requested, I think the court directed they get one

11   together, they haven't signed it, at least I haven't seen it.

12  Those are the two objections we have about releasing bank

13  account information.

14       THE COURT:  I thought there was an agreement in

15  principal of confidentiality, it was perhaps going to be signed

16  today?

17       MR. SNYDERMAN:  We have a confidentiality agreement,

18  I'm not sure it relates to third parties.

19       MR. MARKHAM:  The confidentiality agreement, once

20  it's triggered by identifying something that is confidential,

21  that agreement would apply.

22       MR. SNYDERMAN:  The bank statements, however, not

23  only reflect -- it also reflects the money coming in.  You have

24  to understand -- let me make one point if I can, your Honor.

25  First, it's our position that verbally and by e-mail the


7


1  amounts, the wires coming from Brazos were misrepresented to

2  us.  Then we got this document which Joyce Covatto identified

3  as accounting, where again she admitted in deposition those

4  numbers were not intended to be accurate, were all

5  encompassing.  Then the only other thing we got was a

6  typewritten list that our client put together of the wires that

7  came in.  We still see no bank records that show the receipt of

8  money from Brazos.  Why would my clients want to take the word

9  of the defendants as to what the amounts were.  That's why we

10  need the statements.

11      MR. MARKHAM:  We sent you the actual wire transfer

12  documents, you've subpoenaed Brazos's records.  So you have the

13  source records or you're going to get them once the subpoena is

14  honored by Brazos, if it hasn't already.  You're going to get

15  the information from the horse's mouth.  The bank information

16  is going to be so generic and undistinguishable, where it's

17  coming from, what's going out, if you're going to rely on that,

18  I wish you a lot of luck.

19      THE COURT:  You're saying he already has the best

20  evidence of what it is?

21      MR. MARKHAM:  Yes.

22      MR. SNYDERMAN:  We asked for it from the defendants,

23  which it wasn't produced.  Then we issued a subpoena to Brazos,

24  which they objected.

25      THE COURT:  Who objected?

1      MR. SNYDERMAN:  Brazos, the attorney for Brazos.

2      THE COURT:  Did they file a motion to quash with me

3  or with the magistrate?

4      MR. SNYDERMAN:  They filed some sort of documents,

5  your Honor.

6      THE COURT:  This is still the magistrate judge's

7  case, I have not taken this back formally.  So are you telling

8  me there's a motion floating around out there that needs to be

9  resolved?

10      MR. MARKHAM:  They filed an objection, my

11  understanding is --

12      THE COURT:  How could they object, what is the basis

13  for their objection?

14      MR. MARKHAM:  Their objection, if I recall correctly

15  the basis of it, it's confidential information, which I can

16  understand.  I thought when we reached this confidential

17  agreement, that objection was resolved, that they can then

18  produce what's been requested of them.

19      THE COURT:  If you got the documents from Brazos,

20  wouldn't that pretty much be the bell ringer for what you need?

21        MR. SNYDERMAN:  Absolutely.

22        MR. MARKHAM:  Once the agreement is signed, I'm sure

23   Brazos will produce it.

24        THE COURT:  All right.  And then are these Brazos

25   documents, documents that both would have related to income

9

1   generated before the contract termination and subsequent

2   thereto?

3        MR. SNYDERMAN:  Yes.

4        THE COURT:  At least insofar as a resolution of the

5   discovery dispute, those are the keys to the kingdom.  If you

6   get those documents, are you satisfied?

7        MR. SNYDERMAN:  Yes.

8        THE COURT:  It sounds to me if we get the

9   confidential thing worked out here this afternoon, that will be

10   it?

11        MR. MARKHAM:  Yes, on that issue.

12        THE COURT:  We'll return to that later.  Let's go

13   off the record now.

14        (Discussion held off the record.)

15          THE COURT:  All right, this exercise here, Mr.

16   Markham, is for you to explain in bullet detail, if you would,

17   the defendants' position on liability as outlined in your

18   settlement papers to me.  And then I'm going to hear from Mr.

19   Snyderman as to his retort.  So go ahead.

20          MR. MARKHAM:  Thank you, your Honor.  The contract

21   with Delaware Marketing really arose from representations made

22   to us of their expertise, that the company could assist us with

23   the student loan origination work.  There are two main areas of

24   expertise.  One dealt with list procurement and the other was

25   mailing campaigns.  And the list procurement was to obtain for

10

1   us usable names and telephone numbers for telemarketing

2   purposes, for people who were potential customers for the loan

3   consolidations.  Before the contract was signed in February of

4   2003, Delaware Marketing makes a couple representations to us,

5   which we relied upon in entering into agreements into

6   percentages of payment that they were going to receive.  One of

7   the representations dealt with the mailing campaigns.  And they

8   put in writing what we could expect to receive, in terms of

9   income from the mailing campaign, consisting of 200,000 pieces

10   of separate mailing.

11          THE COURT:  Is that Mr. Estes's e-mail?

12          MR. MARKHAM:  Yes.

13          THE COURT:  Do you have that with you?

14          MR. MARKHAM:  Yes.

15          THE COURT:  Can I see it?

16          MR. MARKHAM:  Yes.  This was an e-mail sent to us at

17   the beginning of January, 2003.  Which in some detail provided

18   us with an expectation of what the gross revenue would be for

19   each particular mailing of 200,000 pieces.  And, roughly, the

20   income, gross income, would have almost been $2 million, based

21   upon the statements and assumptions set forth in the e-mail.

22   Also, before the contract was signed, we had some experience

23   with the list procurement that Delaware Marketing could

24   achieve.  There were several lists actually provided to us from

25   September through January that were actually used to solicit

11

1   individuals for the loan consolidations.  And those lists

2   provided usable names and numbers.  Names where we can actually

3    dial numbers, we can actuality dial upwards of 95 percent of

4    the total numbers granted to us.  Which was a pretty good

5    percentage in our view.  We were told of the quality and the

6    nature of the lists that they could provide.  So as we signed

7    the contract, we had these experiences and representations made

8    by going forward.  Based upon our reliance on their expertise,

9    we signed the contract.  Under which they're entitled to 28.57

10   percent of gross revenues.  In our view, unfortunately, things

11   didn't turn out as promised.

12          In terms of the mailings, there were only two

13   mailings during the life of this contract.  One was made in

14   March of 2003, one in June.  Neither of them were 200,000

15   pieces.  The one in March of 2003 was roughly 130,000 pieces.

16   The one in June was only 70,000 pieces.  Neither of them

17   produced the percentage of income that was promised to us.  If

18   we took the formulas set forth in Mr. Estes's e-mail and

19   applied it to these particular mailings, we should have had

20   much more gross income than was actually produced.  So we were

21   disappointed about that.  And the mailings are only done for

22   two months, as opposed to each month.  The numbers of the mail

23   pieces were lower than 200,000.

24          On the telemarket list procurement end of things

25  after the contract was signed, we dropped from 95 percent

12

1   usable on lists to 53, 57, 70 -- 35 percent in August, which is

2   much lower than what we had anticipated, what our experiences

3   were before the contract was signed.  So we have much less

4   income than we had expected based upon Delaware Marketing's

5   representations.

6           At the same time we had the same amount of expense

7   that we had anticipated at the beginning.  Because we had to

8   invest in purchases, as well as personnel.  Personnel was a big

9   end of the expense.  Hiring people and training them with the

10  expectation that a certain volume of responses would be

11  received.  So we have diminishing returns on a static expense,

12  and in many months we were unable to meet our operating

13  expenses.

14          Then we find in the course of discovery in this case

15  that as early as October of 2003, Delaware Marketing was

16  working towards competing against us, contrary to the terms of

17  our agreement, which contained a non-compete clause.  The

18  contract was terminated by Delaware Marketing on June 9, 2004.

19  As early as October of 2003, they were creating a new company.

20  They were beginning the steps to actually get up and running in

21  a competing business.  They had found clients.  They signed

22  contracts with ChoicePoint, the data procurement or the list

23  procurement company.  They canceled our contract without

24  warning and were up and running within a week, making their own

25  telephone calls, competing directly against us.  It's our


13


1  feeling that they violated the non-compete clause, they were

2  operating against us from as early as October, probably earlier

3  than that.  That may have accounted for some of the results

4  which we see here, which were contrary to the representations

5  made.

6        THE COURT:  What's the nature, I know it hasn't been

7  filed, an amended answer with counterclaim, what's the legal

8  basis for the counterclaim?

9        MR. MARKHAM:  Well, there's two of them.

10        THE COURT:  Proposed counterclaim?

11        MR. MARKHAM:  There's two main bases.  One is a

12  violation of the non-compete.  The second is their breach of

13  the contract dealing with these representations concerning the

14  quality of the mailings and revenue to be expected --

15      THE COURT:  What in broad brush, what would be the

16  theory of damages, what damages did you sustain, assuming that

17  that occurred?

18      MR. MARKHAM:  The damages are the income that they

19  had promised, compared to the income actually received.  It's

20  as if they said we have an automobile in good condition, we get

21  it and it's an old junker.  It's the difference in the income,

22  the difference between what was promised and what was delivered

23  in terms of income that we would receive from that.  So those

24  are the two bases of what we propose as the counterclaim; a

25  breach of the non-compete and a breach of representations made

14

1  that induced us to enter into this agreement giving them 28.57

2  percent of gross revenues.

3      THE COURT:  All right.  What do you have to say, Mr.

4  Snyderman?

5      MR. SNYDERMAN:  Well, there were 16 months from

6  October of '02 to January of '04, when moneys were received by

7  Telatron, based on the records that were provided.  Not once in

8  those 16 months, I might add that there were over 100 wires in

9  those 16 months, not once was 28.57 percent of the revenues

10  remitted to Delaware Marketing.  Not once.  In fact, there were

11  written e-mails stating that money had not come from Brazos

12  when in fact it had.  There were documents stating, using a

13  term there and this is an accounting from Joyce Covatto, which

14  misrepresented the moneys that had come in.  Trish, you know

15  very well how many times my clients called about the money.

16  And Delaware Marketing throughout the entire process kept

17  asking, share your data with us so we can see what's happening

18  with the lists we're providing and we can perhaps get you more

19  names, more productive names.  And not once was that data ever

20  shared with Delaware Marketing.  And it's clear to us that the

21  reason it wasn't shared was because if it was shared, then

22  Delaware Marketing would know that that money had in fact come

23  in from Brazos, when we were being told that Brazos was late.

24  And we would also have known how much money was coming in from

25  Brazos that wasn't being remitted to the plaintiff.

15

1        So if there's any fault for the results not being as

2    good as everybody had hoped they would be, it lies with

3    Telatron for not allowing Delaware Marketing to do what they

4    have the expertise to do, which is to analyze and make

5    recommendations.

6        Furthermore, a defendant has an obligation under the

7    law to mitigate its damages.  At no time --

8        THE COURT:  A plaintiff has an obligation to

9    mitigate its damages.

10        MR. SNYDERMAN:  Well, a defendant with a

11    counterclaim does.

12        THE COURT:  Right, go ahead.

13        MR. SNYDERMAN:  The point here is that plaintiff,

14    Delaware Marketing, is continuing to work in an attempt to

15    generate revenues all these many months.  At any time Teletron

16    could have easily said to Delaware Marketing this isn't working

17    out.  The 28.57 percent that Al Covatto came up with is too

18    high, let's renegotiate, let's make it lower.  Or this isn't

19    working out, we're going to cancel.  At no time did that

20    happen.  Here we have $9.4 million in gross revenues being

21    received by Teletron as a result of this program and at no time

22  was there ever a mention of this isn't working.  In fact, there

23  were promises that were made in e-mails, telephone calls, we

24  got the money, we're going to send it, and it doesn't come in.

25          THE COURT:  $9.4 million, that's gross revenue?


                                16


1          MR. SNYDERMAN:  Gross revenue.

2          THE COURT:  What percentage of the $9.4 million do

3   you believe you shared in?

4          MR. SNYDERMAN:  28.57 percent, comes to $2.6

5   million.

6          THE COURT:  You didn't understand my question.  Your

7   contention is you were not in fact paid your 28.57 percent.  My

8   understanding is you were paid something?

9          MR. SNYDERMAN:  $1.7 million.

10          THE COURT:  On $9 million gross?

11          MR. SNYDERMAN:  We have here on a monthly basis how

12  much should have been paid, have been sent and how much was

13  sent.  And that's only until January 9, 2004.  Now, we all know

14  that there's a cycle in this industry.  And that moneys, even

15  if Telatron on January 10, 2004 decides to start doing this on

16    its own, moneys that continued to come in for the rest of

17    January, February, March and probably even April, were the

18    result of what the plaintiff, Delaware Marketing, did and we'd

19    be entitled to 28.57 percent of that.  That is based on Joyce

20    Covatto's e-mail to Delaware Marketing indicating close to the

21    end that you had $75 million of loans in the pipeline, we

22    calculate that would generate approximately $800,000 to

23    $900,000 of additional fees at 28.57 percent to Delaware

24    Marketing.  Not to mention the fact that there were times when

25    Delaware Marketing proposed to, even without the data being


17


1    supplied, proposed to Teletron, let's get some others besides

2    Brazos.  Namely, if I'm not mistaken, GMAC and Ready Educate.

3    That was based on the fact that Brazos wasn't paying supposedly

4    or was paying late.  And Joyce Covatto turned that down, nixed

5    that, no, we're sticking with Brazos.  So with their hands tied

6    behind them, Delaware Marketing tried every way they could to

7    try to make this better and they ran into interference from

8    Telatron.

9          THE COURT:  Address, if you would, Mr. Markham's

10  point, however you characterize it, negligent or fraudulent

11  misrepresentation at the inception of the contract and his

12  theory of damages flowing from that?

13        MR. SNYDERMAN:  Your Honor, can I let my client do

14  that?

15        THE COURT:  However you feel you are most

16  comfortable.  What's your name again?

17        MR. METCALF:  Harry Edward Metcalf.  The discussions

18  around forming some type of venture together started before

19  August, started as early as late May, early June of 2002.  And

20  it was an exchange, initially started as effort to try to join

21  up some capabilities, some excess capabilities in some of the

22  areas.  They were having their business create something that

23  isolated themselves from the whims of their own clients.  When

24  we met in Erie prior to the start and had lengthy discussions,

25  we were told that members of Telatron had some significant


18


1  experience, in fact, it's referenced in the August 20th letter

2  from Al Covatto, the student loan experience that they had.

3  And based on that, we provided as much information as we could

4  about the process, what the expectations indicate.  And

5  launched into this, without a contract, based on the letter

6  agreement that Al Covatto had sent.  I don't believe we

7  misrepresented in any way what the performance assumptions

8  would be at the beginning when we first started.

9       THE COURT:  Not to interrupt you, so I understand

10  the background here -- upon what were those performance

11  assumptions based?

12       MR. METCALF:  Both myself and Brian Nelson were

13  working at a collegiate funding service at the time, we were

14  the second largest student loan consolidation company.  I ran

15  market strategy analysis for that company.  In that position I

16  was responsible for all their list acquisition, all their

17  marketing planning.  I knew all of their performance measures.

18  And was in a position to have a great deal of what to expect,

19  who to target, how to go about setting up credit bureau

20  relationships, which was part of our responsibility within the

21  contract.  The assumptions we initially provided to them were

22  based on a view of the student loan universe, that was a full

23  universe.  Student loan holders had balances, aggregate

24  balances, minimal balances to hundreds of thousands of dollars

25  for doctors and lawyers.  Between the time of the letter

19

1  agreement and when the ultimate discussions of the letter

2  agreement were finished and launched into the contract -- it

3  was focused on the very narrow band of the student loan

4  universe.  In fact, if we were to look at an average loan

5  holder's consolidation loan, to go back and look at numbers for

6  the last five years, you'll see about a $26,000 to $28,000

7  average balance.  The universe we were targeting had a minimum

8  balance of $35,000 to $40,000.  So we were looking at a very

9  narrow high-end pool, where the performance was going to be,

10  could be a little bit different, the expectation should be a

11  little different than a broader market.  However, with the

12  contract, as to sales, rates and returns, as they were shared

13  to us, the outer bound performance wasn't materially different

14  than what we had shared when you looked at the balances that

15  were being generated on the contract that was signed.

16  Specifically, as to this letter, I was asked about this in my

17  deposition, there's a step missing in the e-mail.  Again, there

18  is one e-mail to Terry from Alan, then forwarded to Joyce.

19  Alan missed a step.  He missed the conversion step.  Not

20   everyone you talk to is qualified.  You have to be out of

21   school at the time, you have to have multiple lenders.  There

22   are minimum balance requirements.  There are any number of

23   reasons why a person would not be eligible.  If we sent a

24   direct mail piece out and 20 to 30 percent of the population

25   comes back and calls in, responds, is actually going to be


                                    20


1    qualified.  That step was missing from these numbers.  As soon

2    as I saw the e-mail at deposition, I picked it up instantly.

3    I'm sure they weren't the final numbers that we launched the

4    campaign upon.  In addition, even if the performance for the

5    campaign was less than what we had expected, there were two

6    things that could have been made into.  One is on timing, that

7    didn't go out when originally planned.  Mostly because of

8    issues around payment.  Secondly, this program went out without

9    what we call borrower benefits.  When we gave the original

10   assumption of what the performance would be -- on the direct

11   mail campaign, it is based on borrower benefits.  Borrower

12   benefits are interest rate reductions of the borrowers.

13   Particularly based on different banks.  And the only way to

14   differentiate, other than your skill at selecting names -- is

15   on a true product differentiation you could have.  Basically, a

16   one percent disclosure on time payments.  Basically, the Erie

17   market hasn't fluctuated a lot of the time since we started the

18   contract.  This mailing went out with no borrower benefits.  Of

19   course, it's not going to have the same performance.  Only

20   after which we passionately argued that it made financial sense

21   with borrower benefits, to improve the sales and return rates,

22   did Teletron finally agree to start over with borrower

23   benefits.  But even after this program was launched -- the

24   second program, if they were so disappointed in the first

25   program, why approve and agree to do a second program months


21


1   after the first program.  If it was such a horrible failure, as

2   far as the original expectations, why do a second program.  At

3   any time they could have stopped us, could have cancelled the

4   contract, asked us to renegotiate, asked for a different share

5   of the agreement.  The story we were told the entire time, all

6   the way up until the fall, was that they were not being paid by

7   Brazos.  It went to the extent for us to find alternative

8  providers.  It came down to the point of making a decision

9  where we had seen, based on the information provided, that it

10  reached a point where it was absolutely absurd to stay with

11  someone who wasn't paying.  Joyce herself called the

12  relationship absurd in the e-mail sent to us in July, Joyce

13  Covatto talked about the relationship with Brazos as absurd --

14        THE COURT:  Brazos is, just so the record is clear?

15        MR. METCALF:  Brazos is a company that Telatron was

16  selling, it was a company that they contracted with.

17        THE COURT:  So I'm clear, so they're clear -- you're

18  saying that she was upset that they were not being paid by

19  Brazos?

20        MR. METCALF:  Exactly.  Exactly, that's what we were

21  being told repeatedly.  We were repeatedly told that Brazos was

22  paying late, not paying to the terms of their contract.  That

23  was the reason we were not being paid is because they weren't

24  being paid.  They also referenced the fact in other e-mails

25  there that other clients weren't paying them.  Specifically, an


22


1  e-mail references the fact we weren't being paid when the Bank

2    of America sent to them a $51,000 wire.  Which has absolutely

3    nothing to do with the relationship with, our relationship with

4    Teletron and the fee we should receive when they receive money

5    from Brazos.  It is only at the point where they weren't paying

6    on the contract, that we communicated we want three things from

7    Teletron.  One, we want to know when they were paid.  Two, we

8    wanted 28.57 percent.  Three, we wanted a plan as to when the

9    back payments, the back moneys they were promised to be paid

10   would in fact be paid.  The only things we received from them

11   was in November we received the reconciliation through the end

12   of October.  And that reconciliation, when compared to the

13   discovery materials, under reported on the revenue received by

14   Teletron by $1.1 million as of the date of that argument.

15        MR. SNYDERMAN:  Your Honor, if I may address two

16   other points.  One, you touched on borrower benefits.  Could

17   you also talk about after you turn over names, whose

18   responsibility it is to make the calls and follow-up; and the

19   second thing I want you to deal with is the stipulated judgment

20   and what you thought was happening around October of '03 and

21   what led to us terminating?

22        THE COURT:  Let's go off the record here a second.

23    (Discussion held off the record.)

24        THE COURT:  There is going to be a brief description

25  about the proposed stipulated judgment or stipulated agreement


23


1  that the parties had attempted to enter into at some point in

2  time.  To the extent that involves settlement negotiations and

3  to the further extent that both sides are going to discuss it

4  in some detail, that does not represent a waiver of your

5  ultimate position on both sides as to the inadmissibility of

6  those negotiations.  Go ahead.

7        MR. METCALF:  The first issue is with regard to what

8  happens when you turn lists over.  The quality or production

9  associated with any campaign is a function of many, many

10  things, not just list quality.  It's a function of how the reps

11  are trained.  It's a function of the scripting that is used.

12  It's a function of how the dialer is set, function of

13  scheduling.  There are a number of things that are completely

14  out of our control that influences the performance of the list.

15  It is equally as likely that any negative performance that was

16  seen was the result of the lack of effort asserted by Teletron

17   to optimally call these lists.  With the account data, we could

18   have done a much better job of targeting who was converted, who

19   wasn't converting and after asking repeatedly, we never

20   received the information or an adequate response as to why we

21   were not receiving information.  With regard to the stipulated

22   judgment, we had received the e-mail correspondence through

23   September into early October, information on what had been

24   funded again through a series of e-mails and phone

25   conversations.  I'd say the middle of October we received an

24

1   e-mail that listed the last three weeks of wires.  That

2   indicated that there was more money wired than was originally

3   communicated to us via e-mail and via phone conversations.  As

4   a result of that, we began discussions with our attorneys

5   regarding how we could resolve this.  Ultimately, that led to a

6   stipulated judgment or where we stipulated to what they owed us

7   back, based on reconciliation finally being provided.  In

8   exchange for that, they'd be able to pay over time.  We made an

9   effort at that point to try to resolve the dispute, to no

10   avail.  There was never any formal response to our offer.

11          MR. SNYDERMAN:  Was that what led you to decide to

12   terminate and strike out on your own?

13          MR. METCALF:  Exactly.

14          THE COURT:  All right, Mr. Markham, go ahead.

15          MR. MARKHAM:  There was an attempt to renegotiate

16   the arrangement.  At some point towards what turned out to be

17   the end of the relationship, Mrs. Covatto did propose to reduce

18   the payments that were going to be due to Delaware Marketing

19   based upon her experience and based upon the low revenues.  She

20   conveyed that to them.

21          THE COURT:  In writing or orally?

22          MR. MARKHAM:  I think it was a little bit of both.

23   She had sent them information or descriptions of problems she

24   was having.  I think the exact proposal was made orally.  The

25   way she described it to me, when she made this proposal, they

25

1   laughed at her.  And eventually it led to this proposed

2   judgment.  Which they rejected because not only did it involve

3   issues dealing with money owed, which they were disputing, but

4   other conditions and terms that they found unacceptable.

5          THE COURT:  If I could interrupt you just for one

6    second and ask a question.  As I understand it, there's a

7    contention on this side that Mrs. Covatto, when prompted by

8    inquiries from you as to where your money was, represented that

9    they had not been paid by their primary client, is that right?

10          MR. METCALF:  Correct.

11          THE COURT:  Did that occur, according to you, on

12    more than one occasion?

13          MR. METCALF:  Numerous occasions.

14          THE COURT:  Is that disputed by Mrs. Covatto?

15          MR. MARKHAM:  I don't think so.  I think Brazos was

16    paying slower than we expected them to pay.  The problem was at

17    the very beginning there was a big delay in getting any money.

18    We had expended all these funds to get up and running, with the

19    understanding, based upon what Delaware Marketing told us, that

20    payments would start coming in within a week.  Well, actually

21    it turned into months.  Not only because of Brazos, but because

22    of the other problems in getting things finalized.  Getting

23    certificates of accreditation, verification of outstanding

24    loans.  Instead of an initial window of reimbursement of funds

25    from Brazos being a couple weeks, it turned into two or three

26

1  weeks, two or three months without any payment at all or any

2  significant payments.  The problem with the delay in payments

3  were experienced, they were conveyed to Delaware Marketing.

4  Delaware Marketing was also told about what we viewed as an

5  inadequate performance of lists.  They were asked about that.

6  They were told about it and asked why it was happening.  We

7  didn't get any explanation as to why it was happening.  My

8  understanding is the information was given to them about the

9  actual performance, what was happening on our end of things.

10  To our view they were given the information they were

11  requesting to help them analyze what the results were and to

12  better formulate their criteria submissions to the company that

13  was selling the lists to them.  So it's not as if Teletron was

14  just sitting back and not doing anything with regard to any of

15  these problems as they were occurring.  I think they were being

16  told, I think Delaware Marketing was being told we were having

17  problems, and these were the problems they were having.  Not

18  only were the lists not performing, there were other problems

19  with expenses because revenues were not what they projected

20  them to be.  On that point I agree when Mr. Metcalf testified

21  when you look at it now, this e-mail, this is completely in

22  error by 70 percent overstating what the projections should

23  have been.

24          THE COURT:  Because of the missing step?

25          MR. MARKHAM:  They missed a step.  Mr. Metcalf says

27

1  he recognized it immediately.  It's unfortunate he didn't

2  recognize it until the time of his deposition.  That's what we

3  were living with.  A mistake on a mutual fact.  We thought it

4  was all inclusive, they thought it was all inclusive when he

5  sent it, I'm sure.  Nevertheless, we got that and relied upon

6  that as a basis for the determining how profitable is this

7  venture going to be.

8          THE COURT:  This is just in the interest of free

9  flow of information for future purposes of settlement.  Let me

10  ask you this question, whether you can answer it, I don't know.

11  If you had known then what you claim to know now, and that is

12  that the letter, the e-mail over-represented the picture, at

13  least facially by about 70 percent you said?

14          MR. MARKHAM:  Yes.

15        THE COURT:  If you had known, if the e-mail had

16  included the other step, which would have been, eliminated the

17  70 percent excess, to what extent, if you know, to what extent

18  would your gear-up costs have been different on a contract like

19  that, as opposed to a contract like that; do you understand my

20  question?

21        MR. MARKHAM:  I do.

22        THE COURT:  If so, how so?

23        MR. MARKHAM:  I'm not sure, frankly.  If we would

24  have hired less people, for instance, whether we would have

25  done the deal at all, whether we would have proposed a


                                    28


1  different range, given the numbers we were looking at.  If you

2  don't mind, Trish could explain, she was working with them at

3  the time?

4        THE COURT:  She's welcome to chime in anytime.

5        MS. DeSANTI-BOEHM:  I was not part of the original

6  negotiations between the individuals, but I do know that the

7  way the entire thing was presented to those of us who actually

8  were working on the program, is direct mail campaigns were

9   actually going to fund the entire program.  That's what was

10  driving everything.  Even though maybe with experience there

11  are ups and downs as part of productivity, the direct mail was

12  something that was constant, something that was successful and

13  something that was going to fund the entire program from start

14  to finish, which I think it would have a dramatic impact on

15  whether or not we went into the agreement at all.

16      THE COURT:  Go ahead, Mr. Markham, any other points

17  that you wanted to make?

18      MR. MARKHAM:  Nothing comes to mind.  I'm looking at

19  my notes, I don't see anything that jumps out that we haven't

20  already talked about.

21      THE COURT:  Is there, as we sit here today -- let's

22  now return to the confidentiality question.  Is there a

23  document someone prepared, a document for signature?

24      MR. MARKHAM:  Yes, I prepared it, Mr. Snyderman gave

25  me some suggested changes that were incorporated.


29


1       THE COURT:  Are you ready to sign that?

2       MR. MARKHAM:  I've signed it.

3        THE COURT:  Are you ready to sign, Mr. Snyderman?

4        MR. SNYDERMAN:  Yes, your Honor.  Let me make sure I

5   have the right one in front of me.

6        THE COURT:  Then my understanding is that

7   confidentiality order will serve to resolve the outstanding

8   subpoena that you served on the bank, is that right?

9        MR. SNYDERMAN:  I trust it will.

10       THE COURT:  All right.  Let's just flip around here.

11   Refresh my recollection on when discovery was to have closed?

12       MR. MARKHAM:  I don't have that part of the file.

13       THE COURT:  There had to be multiple extensions?

14       MR. MARKHAM:  There has been at least two, maybe

15   three.

16       THE COURT:  Is discovery over?

17       MR. MARKHAM:  The period has closed, but it's not

18   over.  They scheduled Mr. Covatto's deposition, as well as

19   three others, sometime ago.  They were scheduled.

20       MR. SNYDERMAN:  Mr. Covatto became ill.

21       MR. MARKHAM:  We need to schedule those at their

22   convenience.

23       THE COURT:  You have two or three others besides

24  him?

25       MR. SNYDERMAN:  Yes, your Honor.


                              30


1        MR. MARKHAM:  We need to follow-up with some of the

2  discovery already produced by the plaintiff dealing with

3  documentation.

4        THE COURT:  By follow-up, you need them to produce

5  it?

6        MR. MARKHAM:  I need to depose their people again on

7  documents that they have given to me under an agreement of

8  confidentiality, dealing with the list criteria.

9        THE COURT:  Putting aside Mr. Covatto, who may or

10  may not ever be available for deposition, putting aside him,

11  how long is it going to take to complete this; you're going to

12  get one last bite at this apple and that's the end?

13       MR. SNYDERMAN:  Your Honor, Joyce Covatto at her

14  discovery deposition said that the person who would have the

15  answers to the questions I have is Al Covatto.  If we're not

16  going to be able to depose him, I'm going to move that the

17  defendant be severely limited in whatever evidence they can put

18  forward and who's going to do it.

19      THE COURT:  That's a sanction bridge that we can

20  cross when we get to it, we're not there yet.  It does seem to

21  me in the abstract that, I'm not saying this is the case, but

22  if it would come to pass that Mr. Covatto is the only one in

23  the organization sufficient to bind the corporation on material

24  issues in this case, then his inability to make himself

25  available for deposition, perhaps through no fault of his own,

31

1  would have serious ramifications for, among other things, the

2  counterclaim.  As I say, we're not there yet.  Hopefully, his

3  health will improve.  Once again, discovery technically is

4  closed, but it's my understanding you would like to clean up

5  these things?

6      MR. MARKHAM:  I think at the end of discovery

7  motions were filed, subpoenas were issued --

8      THE COURT:  Are there any extent motions out there

9  right now that have not been ruled on?

10      MR. SNYDERMAN:  I don't believe so, your Honor,

11  we're in the process of preparing one if this didn't settle

12   today.

13         THE COURT:  What will that be?

14         MR. SNYDERMAN:  There's a second set of

15   interrogatories, we were only talking about the first set

16   earlier.  Those have not been addressed properly in our

17   opinion.  We want to get answers to questions that we've

18   raised.

19         THE COURT:  When was that set served?

20         MR. FARRAR:  I'm looking.

21         MR. MARKHAM:  They were answered, they don't think

22   we've answered them completely.

23         THE COURT:  I'm not going to ask you to dig through

24   there, nobody was anticipating we'd take it up today.  Here's

25   the bottom line.


                          32


1          MR. SNYDERMAN:  If I could say one more thing that

2    you just reminded me of.  I think your Honor highlighted

3    something very clearly in one of the last telephonic

4    conversations, that you were getting the impression that

5    everything just sort of went to a halt when we thought we were

6  going to mediate the last time, we sort of were waiting for

7  that. I think that's really a true assessment. I'm not sure

8  how long ago that first mediation was supposed to be. We'd

9  like to at least go back to the point of discovery that we had

10  put off doing, following up with the motions that we didn't

11  file if we know this isn't going to settle.

12      THE COURT: Put it this way. Barring a change of

13  heart on my part, and I don't at least at this point

14  necessarily see that happening, I'm disinclined to call another

15  settlement conference on this case. You folks are free to go

16  mediate wherever you want. I've now been burned twice, I'm

17  disinclined to set up yet a third. But in terms of slowing or

18  halting the case pending further mediation, that will not

19  happen. As a matter of fact, I'm going to clean up the

20  discovery schedule right now to this effect.

21      You have 60 days from today to complete any

22  additional discovery. With respect to outstanding discovery

23  requests, if you are thinking about filing a motion to compel,

24  you have 10 days to file a motion and a supporting brief, if

25  you think the issues are such that it requires it. You will

33

1  have seven days within which to respond to that motion.  I

2  think I will take that up telephonically and in all likelihood

3  just do an order on the record.  That will take care of that.

4        Plaintiff's pretrial narrative will be due 20 days

5  after the close of discovery.  You can figure these dates out

6  on your own.  In other words, 80 days from today.  Defendants'

7  pretrial narrative would be due 100 days from today, 20 days

8  after.  In the event there were to be a dispositive motion for

9  summary judgment, full or partial, it would be due on the same

10  day as the plaintiff's pretrial narrative statement.  In the

11  event a summary judgment motion is filed, any response would be

12  due on the same day as the defendants' pretrial, and 20 days

13  thereafter.  My Deputy Clerk will memorialize those dates in a

14  subsequent order.  Before we go off the record briefly, are

15  there any other issues that anyone needs to call to my

16  attention?

17        (No response.)

18        THE COURT:  Let's go off the record.

19        (Discussion held off the record.)

20        THE COURT:  The last issue I was reminded of when we

21  were off the record is this question of the defendants'

22  proposed counterclaim, which was raised in his settlement

23  letter to me.  Let me ask you, Mr. Markham, how quickly do you

24  anticipate -- let me make it clear, you don't need to file a

25  motion for leave to file the counterclaim, you just file the

34

1  counterclaim.  You pretty much know the substance of it.  If

2  once it's filed there are objections to it, substantive or

3  otherwise, you can raise that.  How quickly you can file it?

4          MR. MARKHAM:  I can probably file it tomorrow.

5          THE COURT:  Lest you come down with the flu or

6  something tomorrow, file the counterclaim no later than the end

7  of this week and preferably before.  In other words, no later

8  than Friday.  And then as quickly as you can conveniently get

9  an answer off.  It seems to me the issues in the counterclaim

10  are so intimately intertwined with the issues driving the main

11  case, that a 60-day discovery period is going to take care of

12  everything.  All right, thank you, counsel.

13

14          (Whereupon, at 2:20 p.m., the proceedings were

15  concluded.)

16

17

18              - - -

19

20

21

22

23

24

25


                        35


1          C E R T I F I C A T E

2

3

4

5     I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10

11  _____

12  Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25