A

```
 1              UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   DELAWARE MARKETING         :
 3 PARTNERS, LLC, a Delaware  :
   limited liability company, :
 4      Plaintiff             :
                              :
 5           v.               : C. A. No.: 04-263-Erie
                              :
 6 CREDITRON FINANCIAL        :
   SERVICES, INC., a          :
 7 Pennsylvania corporation,  :
   TELATRON MARKETING         :
 8 GROUP, INC., a             :
   Pennsylvania corporation,  : TRIAL BY JURY
 9      Defendants            : DEMANDED

10

11

12           Deposition of ALAN ESTES, taken before
      and by Sonya Hoffman, Notary Public in and for the
13    Commonwealth of Pennsylvania on Thursday, May 18,
      2006, commencing at 1:15 p.m., at the offices of
14    Elderkin Martin Kelly & Messina, 150 East Eighth
      Street, Erie, PA 16501.
15

16

17 For the Plaintiff:

18    Brett W. Farrar, Esquire
      Dickie McCamey & Chilcote, P.C.
19    Two PPG Place, Suite 400
      Pittsburgh, PA 15222
20

21 For the Defendant:

22    Craig A. Markham, Esquire
      Elderkin Martin Kelly & Messina
23    150 East Eighth Street
      Erie, PA 16501
24

25              Reported by Sonya Hoffman
            Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT A

1

```
 1          A L A N   E S T E S, first having
 2      been duly sworn, testified as follows:
 3
 4                    DIRECT EXAMINATION
 5   BY MR. MARKHAM:
 6
 7       Q.   Tell us your name, please.
 8       A.   Alan Estes.
 9       Q.   And where do you live?
10       A.   At 115 Interlocking Court, Avendale, Pennsylvania.
11       Q.   What's your date of birth?
12       A.   May 10, 1964.
13       Q.   Are you married?
14       A.   Yes.
15       Q.   What's your wife's name?
16       A.   Monica.
17       Q.   Where do you work?
18       A.   K2 Financial.
19       Q.   What's your job or position?
20       A.   I am director of business development.
21       Q.   What's the nature of the business of K2?
22       A.   It is a financial services marketing and
23   consulting firm.
24       Q.   What do you do?  Give me some examples of what you
25   do.
```

```
 1        A.    What K2 does?
 2        Q.    Yes.
 3        A.    It provides marketing analysis for a variety of
 4   clients.  On the acquisition side, we source and fund
 5   consolidated student loans.
 6        Q.    And we were told, I think, that K2 was formed in
 7   October 2003; does that coincide with your recollection?
 8        A.    Correct.
 9        Q.    Were you also one of the founding members?
10        A.    Yes.
11        Q.    And when did you start working for K2?
12        A.    When did I become an employee?
13        Q.    Yes.
14        A.    On March the 7th, 2005.
15        Q.    2005?
16        A.    Yeah.
17        Q.    When K2 started -- let me back up a second.  When
18   did K2 begin business operations?
19        A.    On the last few days of January, January 29th,
20   30th of 2004.
21        Q.    What were the nature of its operations at that
22   point?
23        A.    We were originating student loan applications.
24        Q.    When the doors opened that day, what activities
25   were being performed?
```

4

```
 1        A.    On January 29th?
 2        Q.    Yes.
 3        A.    We were originating student loan applications.
 4        Q.    What does that mean?
 5        A.    We were marketing prospects to consolidate their
 6   student loans.
 7        Q.    How do you do that?  Tell me exactly what was --
 8   from a mechanical standpoint, what was being done that day.
 9        A.    We were telemarketing for prospects, so we were
10   calling outbound telemarketing individuals to gage interest
11   in a consolidation product.
12        Q.    For student loan consolidation?
13        A.    Yes.
14        Q.    How many employees did you have that day, the day
15   that it began operations, in January of 2004?
16        A.    Employees?
17        Q.    Yes.
18        A.    There were none.
19        Q.    Who was making the calls?
20        A.    We had an outsource telemarketing vendor.
21        Q.    Who was that?
22        A.    It's a company called -- we had a couple of them.
23   The ones that I recall are TCIM and there was another one,
24   Intermedia.
25        Q.    At that point, of course, they would have had a
```

5

```
 1  list of people to call.
 2       A.   Yes.
 3       Q.   And was that a list given to them by K2?
 4       A.   Yes.
 5       Q.   And take me back in time, then, if they started
 6  dialing the phones the last weeks of January 2004, when were
 7  the lists obtained?
 8       A.   I got the list right before they started calling,
 9  a couple of days before.
10       Q.   When was the list requested?
11       A.   I don't know.  I don't know the exact date.
12       Q.   How much time do you think elapsed from requesting
13  the list and receipt?
14       A.   A couple of weeks.
15       Q.   And before the lists were requested, did K2 have
16  to qualify -- well, did K2 get a contract with ChoicePoint
17  before the lists were requested?
18       A.   Yes.  They would not have released the data if we
19  did not have a contract.
20       Q.   Do you know when the contract was signed --
21       A.   No.
22       Q.   -- and how much time before the request was made
23  for the first list?
24       A.   No.
25       Q.   And in order to get the contract signed, K2 would
```

6

```
 1   have had to get the documents together to qualify as a
 2   legitimate need for the list --
 3        A.   Okay.
 4        Q.   -- is that true?
 5        A.   That is true.
 6        Q.   And that would mean you have to get a lender in
 7   place; do you know that?
 8        A.   Yes.
 9        Q.   Okay.  Do you know when that was all done?
10        A.   We were working on behalf of another company, so I
11   don't know when they got their lender in place.
12        Q.   What other company were you working for?
13        A.   We were sourcing applications for a company called
14   Ed. Direct.
15        Q.   So that's the lender.
16        A.   (Witness shakes head.)
17        Q.   That's the customer.
18        A.   Correct.
19        Q.   So K2 at the beginning wasn't obtaining -- K2 was
20   doing basically what it was doing for Telatron at the
21   beginning.
22             MR. FARRAR:  Objection to form.
23        Q.   You can answer it.
24        A.   K2 was doing what they were doing at the
25   beginning?
```

7

```
 1      Q.    No.  K2 started operations.
 2      A.    Okay.
 3      Q.    The nature of its work was the same as it was when
 4   it was working for Telatron.
 5            MR. FARRAR:  Objection to form.  You can answer to
 6            the best of your ability.
 7      A.    What -- well --
 8      Q.    Well, let me back up.
 9      A.    Thank you.
10      Q.    I don't mean to make it more complicated than it
11   needs to be.  When K2 started its operations, was it acting
12   as a telemarketer?
13      A.    We were providing financial services, marketing
14   services.  We're not a marketer.
15      Q.    Well, you have to tell me a little more about what
16   exactly you were doing then.  What were you doing?
17      A.    We were contacting individuals throughout outbound
18   telemarketing to gage their interest in a consolidation loan
19   product.
20      Q.    And the loan product was being offered by a
21   customer of yours.
22      A.    Correct, a client.
23      Q.    And the client was not the lender, though.
24      A.    That's correct.
25      Q.    The client had its own lender.
```

```
 1        A.    Correct.
 2        Q.    Was then the contract with ChoicePoint with the
 3   client and ChoicePoint, not with K2 and ChoicePoint?
 4        A.    I don't know.
 5        Q.    Do you know when the contract with this client was
 6   signed?
 7        A.    No, I don't.
 8        Q.    Okay.  Now, before you became an employee of K2 in
 9   March of '05, were you working on behalf of K2 in some
10   capacity?
11        A.    Yes.
12        Q.    In March of '05, you were put on the payroll.
13        A.    Correct.
14        Q.    And before that, did you receive salary or payment
15   for K2 for the time you were spending?
16        A.    Not salary.  We were paid -- I don't know whether
17   you would call it a stipend, I guess, is a better term for
18   it.  We were paid a stipend.  But I was not an employee
19   prior to that date.
20        Q.    And your work on behalf of K2 started from the
21   formation of that entity.
22        A.    Yes.
23        Q.    And at that point in time, were you also working
24   for Delaware Marketing Partners?  Was there an overlap
25   there?
```

9

```
 1        A.    No.  Delaware Marketing Partners pretty much
 2   stopped operations and then K2 started operations.
 3        Q.    Do you recall when Delaware Marketing stopped
 4   operations?
 5        A.    January 9th, 2004.
 6        Q.    What period of time did you work for Delaware
 7   Marketing Partners?
 8        A.    We probably formed it around -- I don't recall the
 9   exact date, but it was around late summer 2003, I believe.
10        Q.    Well --
11        A.    Or 2000 --
12        Q.    2 probably, because the contract with Telatron was
13   February 2003.
14        A.    Okay.  Then it was late summer 2002.
15        Q.    So you were one of the founding members of that
16   group.
17        A.    Yes.
18        Q.    Were you on the payroll of Delaware Marketing?
19        A.    I was not an employee.
20        Q.    When you started doing work on behalf of Delaware
21   Marketing, were you employed somewhere else?
22        A.    No.
23        Q.    Before working on behalf of Delaware Marketing in
24   the summer of 2002, where were you employed before that?
25        A.    I owned my own company.
```

```
 1        A.    The phone number requirement wasn't -- you
 2   obviously don't need that if you want to mail them.
 3        Q.    Would there be any other differences between the
 4   two lists?
 5        A.    Not that I can recall.
 6        Q.    Were you involved in preparing projections on
 7   likely results of the mailings?
 8        A.    Yes.
 9        Q.    What was your involvement in that?
10        A.    Communicating to Telatron what we expected the
11   call -- the call volumes and the program -- the program
12   results might have looked like.
13        Q.    And had you calculated or come up with the
14   projections?
15        A.    Based on our experience and financial services
16   marketing and direction from the agency about their
17   experience with the product and direct mail.
18        Q.    What agency was that?
19        A.    Creative Solutions.
20        Q.    Let me show you what we marked previously as
21   Exhibit No. 2.  Have you seen this before?
22        A.    It appears it's an e-mail that I drafted.
23        Q.    And it's address to Terry Smith at Telatron.
24        A.    Yes.
25        Q.    Would it have been sent the date indicated here,
```

47

```
 1  January 7, 2003?
 2       A.   Yes.
 3       Q.   And you started off by saying, "Here's how we see
 4  the mail campaign shaking out."  Does this table provide us
 5  with your projection on what the results would likely be?
 6       A.   From the direct mail perspective?
 7       Q.   Right.
 8       A.   Right.  So I think we were -- yes.
 9       Q.   So you had anticipated, in this chart anyway, a
10  response rate of 1.33 percent.
11       A.   Right.
12       Q.   What did you characterize or define as a response?
13       A.   Someone calling in who received the mail piece.
14       Q.   Okay.  In the body of the e-mail, you say the
15  response rate could conceivably be as high as 2 percent.
16  Where did you get that figure from?
17       A.   Experience from the agency and our work -- from
18  our work in financial services marketing.
19       Q.   The next thing the table states, "Return," an
20  abbreviation for promissory, and, "Note."  That's a signed
21  note from the consumer; is that correct?
22       A.   Uh-huh, yes.
23       Q.   And you have 45 percent.  Again, that percentage
24  was from the same source as you've identified before.
25       A.   Correct.
```

48

49

1    Q.    And then funding, meaning that the loan actually
2    funds, the person is qualified and the bank lent the money,
3    70 percent, correct?

4    A.    Correct.

5    Q.    And then it has a line for, "Average Loan Amount,
6    $65,000." Do you know where that number came from?

7    A.    From the instruction that we were going to
8    coordinate with the credit bureau when we solicited the
9    names.

10    Q.    Mr. Metcalf had indicated, I think, that a part of
11    this analysis is missing dealing with unqualified responses.

12    A.    Correct.

13    Q.    Is he correct that that aspect or that component
14    is not factored in here?

15    A.    That's correct.

16    Q.    Do you know why that was?

17    A.    No -- an oversight.

18    Q.    He indicated that that could be as high as 20 to
19    30 percent. Would you agree with that statement?

20    A.    Uh-huh, yes.

21    Q.    After you sent this -- well, strike that. When
22    did you recognize that that component had not been factored
23    into this projection?

24    A.    I don't believe I recognized it until today.

25    Q.    Now, Exhibit No. 3 is a copy of another e-mail