B

```
 1                 UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   DELAWARE MARKETING        :
 3 PARTNERS, LLC, a Delaware :
   limited liability company,:
 4      Plaintiff            :
                             :
 5          v.               : C. A. No.: 04-263-Erie
                             :
 6 CREDITRON FINANCIAL       :
   SERVICES, INC., a         :
 7 Pennsylvania corporation, :
   TELATRON MARKETING        :
 8 GROUP, INC., a            :
   Pennsylvania corporation, : TRIAL BY JURY
 9      Defendants           : DEMANDED

10

11

12         Deposition of HARRY METCALF, taken before
     and by Sonya Hoffman, Notary Public in and for the
13   Commonwealth of Pennsylvania on Thursday, May 18,
     2006, commencing at 9:00 a.m., at the offices of
14   Elderkin Martin Kelly & Messina, 150 East Eighth
     Street, Erie, PA 16501.
15

16

17 For the Plaintiff:

18      Brett W. Farrar, Esquire
        Dickie McCamey & Chilcote, P.C.
19      Two PPG Place, Suite 400
        Pittsburgh, PA 15222
20

21 For the Defendant:

22      Craig A. Markham, Esquire
        Elderkin Martin Kelly & Messina
23      150 East Eighth Street
        Erie, PA 16501
24

25            Reported by Sonya Hoffman
         Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT B

1

```
                                                            3
 1         H A R R Y   M E T C A L F, first having
 2         been duly sworn, testified as follows:
 3
 4                        DIRECT EXAMINATION
 5    BY MR. MARKHAM:
 6
 7         Q.   Tell us your name, please.
 8         A.   Harry Edward Metcalf.
 9         Q.   Where do you live, Mr. Metcalf?
10         A.   519 High Park Circle, Lincoln University,
11    Pennsylvania.
12         Q.   What's your date of birth?
13         A.   7/12/71.
14         Q.   Are you married?
15         A.   Yes.
16         Q.   What's your wife's name?
17         A.   Celeste.
18         Q.   Where do you work?
19         A.   K2 Financial.
20         Q.   What's your position at K2 Financial?
21         A.   President and chief operating officer.
22         Q.   What is the nature of the business of K2
23    Financial?
24         A.   Marketing originations and marketing consulting.
25         Q.   With regard to what, anything in particular?
```

1       A.   Yes.  Marketing consulting is primarily, from
2  my -- campaign analysis, database analysis, processing
3  engineering, word processing, name selection and sourcing.
4  And on the origination side, it's primarily student loan
5  consolidation.
6       Q.   Okay.  And what type of work does K2 Financial do
7  with regard to student loan consolidation?
8       A.   We are an originator of student loan assets.
9       Q.   What does that mean?
10      A.   We market, process, and in some cases fund student
11 loans.
12      Q.   And these are for loan consolidations?
13      A.   At this point, yes.
14      Q.   At some point was it different?
15      A.   No.
16      Q.   How long have you been the president of K2
17 Financial?
18      A.   I don't know the exact date of the appointment,
19 but it would have been very early 2004.
20      Q.   Where is the office of K2 Financial?
21      A.   726 Workland Road, Suite 200 A, Hockessin,
22 Delaware.
23      Q.   Is that where it's always been?
24      A.   No.  It was 724 Workland Road, Suite 240.
25      Q.   Any other addresses for that company?

4

```
 1        A.   No.
 2        Q.   Were you one of the founding members of the
 3   company?
 4        A.   Yes.
 5        Q.   And when was it founded?
 6        A.   The company was originally formed on October 14th,
 7   I believe, 2003.
 8        Q.   At that point, did it have an office?
 9        A.   Yes.  It was the 724 location was the office.
10        Q.   When it was originally founded, you didn't have a
11   position with the company?
12        A.   We -- we didn't -- we didn't have a finalized
13   operating agreement at that point.
14        Q.   What does that mean?  What's a finalized operating
15   agreement?
16        A.   The agreement that rules -- that governs the
17   operation of the company.
18        Q.   Okay.
19        A.   The intention was that I would be the president of
20   the organization, but nothing had been signed at that point.
21        Q.   When did the company actually start doing
22   business?
23        A.   I believe our first activity was January 30th or
24   31st of 2004.
25        Q.   And what was the nature of the first operations
```

```
 1  that you just identified?
 2       A.    We began telemarketing for student loan
 3  consolidation.
 4       Q.    You mean actual calls were being made at that
 5  point?
 6       A.    Yes.
 7       Q.    When did you get the list to make the calls from?
 8       A.    I don't recall the specific date.
 9       Q.    Do you know how much before January 30th?
10       A.    It would have been a week and a half, maybe two
11  weeks before was typical timing.
12       Q.    Okay.  Was there any other business activity
13  relating to loan consolidation which was undertaken before
14  that point in time?
15       A.    I'm not sure what you mean by the question.
16       Q.    Let me try to approach it this way:  You indicated
17  that around the end of January 30th or the 31st of 2004,
18  actual calls started to be made, telemarketing calls.
19       A.    Right.
20       Q.    And this is for loan consolidations, correct?
21       A.    Yes.
22       Q.    And you say a week and a half or so before that
23  would have been K2 Financial would have received the list
24  from which the calls were made; is that correct?
25       A.    Correct.
```

6

```
 1        Q.    Before the lists were obtained, was any work done
 2   on behalf of K2 Financial with regard to loan consolidation
 3   work?
 4        A.    There was no active marketing prior to that point.
 5   But there was -- there were -- there was work to -- the
 6   company was being set up to perform those services at that
 7   point.
 8        Q.    And what type of things were needed to set up to
 9   perform the services?
10        A.    Contractual relationships, telemarketing vendors,
11   list providers, the operational ability to take an
12   application, the ability to process the application was
13   starting to be developed.
14        Q.    And when did that process start?
15        A.    I don't recall the specific date.  The planning
16   probably would have started sometime in December -- by
17   December I would say.
18        Q.    Who, if anyone, was involved with you in the
19   organizing or developing K2 Financial?
20        A.    Well, Alan Estes, Brian Nelson, William Keenan.
21   Primarily, those four (sic) would be the lead drivers.
22        Q.    Okay.  And do those four work for K2 Financial
23   today?
24        A.    Yes.
25        Q.    Before becoming the president of K2 Financial,
```

```
 1   going to happen or it was -- I didn't write the e-mail.
 2        Q.   Have you seen this before?
 3             MR. FARRAR:  Seen this particular e-mail before?
 4             MR. MARKHAM:  Yes.
 5        A.   I don't recall seeing it, no.  I can't say whether
 6   I did or I didn't, I just don't recall.
 7        Q.   You indicated that you did participate in putting
 8   together some projections for the mailing campaign; am I
 9   correct?
10        A.   Yes.
11        Q.   What we see here in Exhibit No. 2 in the table, is
12   there this the projection that you participated in?
13        A.   I don't believe so.
14        Q.   Do you recall what the projection was in which you
15   participated in preparing?
16        A.   I don't recall a specific response rate that was
17   thrown out.
18        Q.   Do you recall any discussions with Mr. Estes
19   around this time, January of 2003, about projections on the
20   mail?
21        A.   Nothing specific, no.
22        Q.   And you don't recall anything specific about the
23   projections that you made.
24        A.   They're relevant to what's all here.
25   They're what's in the exhibit.  I do know that there are
```

```
 1   steps that are missing within this process.  There's a
 2   qualification step that's missing.
 3       Q.   What does that mean?
 4       A.   You have a call-in response rate of people that
 5   would call in and respond to a campaign.  But the number of
 6   records that are eligible for that record, much like on
 7   outbound, is not 100 percent because of the requirement of
 8   eligibility.  And that piece of the puzzle -- that piece of
 9   the estimate is not reflected within this document.
10       Q.   Did your projection have a likely response rate?
11       A.   I would assume it did.
12       Q.   You don't remember that?
13       A.   I don't recall the numbers for either of the
14   campaigns.
15       Q.   In terms of the projections?
16       A.   Yes.  How the combination of the various
17   projections would come out.
18       Q.   Did you convey to Telatron your projection on the
19   mailings?
20            MR. FARRAR:  When you say "you", do you mean
21            specifically Mr. Metcalf?
22       Q.   Well, I guess -- no.  Did anyone, either you or
23   anyone else, convey to Telatron your projection on the
24   mailing?
25       A.   I'm sure we shared estimates on the mailings.  I
```

```
 1  don't recall specifically what they were.
 2        Q.   Okay.
 3        A.   And I know there were -- I'd imagine that there
 4  were projections for -- because there were two mail
 5  campaigns, but I don't recall the specifics on that.
 6        Q.   Did you do one yourself for both mailings?
 7        A.   I don't recall.  I know -- I can only imagine
 8  there would have been interaction back and forth between our
 9  groups around what expectations were.
10             (Deposition Exhibit No. 3 marked for
11              identification.)
12        Q.   I'm going to show you what I've marked as Exhibit
13  No. 3, which is also a one-page exhibit which seems to be
14  another e-mail from Alan Estes to JM Covatto, dated
15  December 19, 2002.  And in the cc line -- or in the to line,
16  I guess, does that reflect an e-mail address that you were
17  using?
18        A.   Yes.
19        Q.   And that's the HMCM56?
20        A.   Yes.
21        Q.   Do you remember getting this e-mail?
22        A.   (Witness reviews document.)  I'm sure I've seen
23  it, but I don't recall specifically.  I mean, I was copied
24  on it, but I don't specifically recall seeing it.
25        Q.   About the middle of the page, under Roman Numeral
```

```
 1  II, Direct Mail, under Subparagraph F, there's a heading of
 2  Expectations stating about 2 percent response expected,
 3  should mail out about 4,000 promissory notes.  About 1,200
 4  promissory notes should be returned.  About 840 loans should
 5  be funded.  Do you know where that information came from?
 6       A.   I don't recall the specific meeting that was
 7  referenced or whether I was one of the individuals that
 8  couldn't attend.  It's likely that I did not attend that
 9  meeting, my daughter had just been born.  So I don't know
10  what the specific source of these -- it's not my e-mail.
11       Q.   Okay.
12       A.   But I'd like to point out one thing about the
13  mailings that's referenced that never happened.
14       Q.   On that date, you mean?
15       A.   Yeah.  This mailing campaign didn't happen.  The
16  first mailing wasn't until later in 2003.
17       Q.   March.
18       A.   I don't know that this was March or April -- late
19  March or earlier April, I don't know the specific date.
20       Q.   Would the -- in your view, the expectations change
21  from January '03 to March '03?
22       A.   As I mentioned before, I believe there's a line
23  that's missing, which is the qualification.
24       Q.   What significance does that have to you?
25       A.   It would reduce the performance, the expectation
```

```
 1   of the campaign.  You'd mail out fewer promissory notes
 2   because you have fewer people that would actually qualify.
 3        Q.   Well, you're assuming that that qualification was
 4   not applied to these numbers?
 5        A.   Based on my experience, I don't believe it is.  I
 6   don't see it within the document.
 7        Q.   In your experience, it's not likely then that that
 8   qualification rate was applied, but just not stated to get
 9   to these numbers.
10        A.   No.  I think it was omitted.
11        Q.   But is there a standard qualification rate that
12   would apply to this type of --
13        A.   It would be -- 20 to 30 percent would be a
14   reasonable expectation given the time frame.
15        Q.   20 or 30 percent would qualify or not qualify.
16        A.   Would qualify.
17        Q.   Would qualify?
18        A.   Correct.
19        Q.   So if that rate was applied to these, we would
20   have 20 or 30 percent fewer promissory notes?
21        A.   No.  You'd have significantly fewer promissory
22   notes.  Only 20 to 30 percent would be qualified of the
23   call-in response.
24        Q.   And even -- you're saying more than 20 to 30 fewer
25   promissory notes then?
```

```
 1        A.    Yes.
 2        Q.    Do you know what the results of the first mailing
 3   were in terms of percentage of promissory notes?
 4        A.    I don't know the specifics.
 5        Q.    Do you know if it met expectations?
 6        A.    I believe it was under expectations.
 7        Q.    Do you know how much?
 8        A.    No.
 9        Q.    Do you know why it was under expectations?
10        A.    No, I do not.
11        Q.    And we know that the first mailing in March of
12   2003 was less than 200,000 pieces.
13        A.    Correct.
14        Q.    It was like 129,000 or so, that's my recollection.
15   Is that consistent with your recollection 126,000, 129,000?
16        A.    There were two campaigns.  I don't recall the
17   specifics, which was the bigger of the two, the first or the
18   second, I don't recall.
19        Q.    Do you recall why for the first one there was not
20   200,000 pieces dropped?
21        A.    I believe it was related to funding of the
22   campaign.
23        Q.    You mean there wasn't enough money?
24        A.    Yeah.  It wasn't agreed upon to fund that large of
25   a campaign.
```