Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 1 of 20

Mark Kiesel                                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

    DELAWARE MARKETING            : CA No. 04-263
 3  PARTNERS, LLC, a Delaware     :
    limited liability company,    :
 4       Plaintiff                : JUDGE MCLAUGHLIN AND
                                  : MAGISTRATE JUDGE
 5         v.                     : SUSAN PARADISE BAXTER
                                  :
 6  CREDITRON FINANCIAL           :
    SERVICES, INC., a             :
 7  Pennsylvania corporation      :
    and, TELATRON MARKETING       :
 8  GROUP, INC., a                :
    Pennsylvania corporation,     :
 9       Defendants               :

10          Deposition of MARK KISIEL, taken before
      and by Sonya Hoffman, Notary Public in and for the
11    Commonwealth of Pennsylvania on Tuesday, November
      14, 2006, commencing at 2:54 p.m., at the offices of
12    Elderkin Martin Kelly & Messina, 150 East Eighth
      Street, Erie, PA 16501.
13

14  For the Plaintiff:

15       Charles Snyderman, Esquire
         Charles Snyderman, PA
16       Stoney Batter Office Building
         5301 Linestone Rd., Suite 214
17       Wilmington, DE 19808

18       Brett W. Farrar, Esquire
         Dickie McCamey & Chilcote, P.C.
19       Two PPG Place, Suite 400
         Pittsburgh, PA 15222
20

21  For the Defendants:

22       Craig A. Markham, Esquire
         Elderkin Martin Kelly & Messina
23       150 East Eighth Street
         Erie, PA 16501

24

25                 Reported by Sonya Hoffman
              Ferguson & Holdnack Reporting, Inc.
```

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 2 of 20

Mark Kiesel                                              Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 9

1  Q. What do you mean?

2  A. The ownership of the companies, the stockholders

3  are the same -- or at least one of them is the same for

4  Creditron. There's only one stockholder for Financial

5  Services.

6  Q. Who is the stockholder?

7  A. Alfred Covatto.

8  Q. All right. In October of 2002, a company by the

9  name of Brazos started wiring funds to Creditron Financial

10 Services; are you aware of that?

11 A. Yes.

12 Q. To your knowledge, between September -- I'm sorry,

13 between October of 2002 and January of 2004, were all wires

14 received into that bank account of Creditron Financial

15 Services from Brazos?

16 A. No.

17 Q. So that account received wires from other sources,

18 as well.

19 A. Sure.

20 Q. Okay. Was it your responsibility to be aware of

21 the receipt of a wire from Brazos?

22 A. Yes.

23 Q. And how would you find out that funds had been

24 received from Brazos into that bank account?

25 A. I have access to the cash register, as well as

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 3 of 20

Mark Kiesel                                                  Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 10

1  Kathy would notify me of whatever is received.
2      Q.   When you say "cash register", you're not referring
3  to a machine that a store has with change in it.
4      A.   No.  A register, an actual journal.
5      Q.   And that's called cash register.
6      A.   Yes.
7      Q.   Is it known by any other name, to your knowledge?
8      A.   Cashbook.
9      Q.   Kathy refers to it as a cashbook.
10     A.   Yeah.
11     Q.   And what kind of things, just in general -- we
12 might get into more specifics, but, in general, what kind of
13 things or transactions are reflected in that cashbook?
14     A.   It's just like a checkbook, all funds in and out.
15     Q.   All right.  And when funds go out, is more than
16 just the amount and date recorded?  In other words, is it
17 broken down into categories; for example, postage, rent,
18 payroll, whatever?
19     A.   Not necessarily a category, payee or payor.
20     Q.   All right.  Are you familiar with the term
21 depreciation?
22     A.   Yes.
23     Q.   Do you know whether any funds that were spent or
24 came out of the bank account for Creditron Financial
25 Services were spent on things that the company could

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 4 of 20

Mark Kiesel

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 13

1    A.   It's possible. I don't recall specifically.
2    Q.   And if you paid them, it would have been at the
3    direction of Al Covatto?
4    A.   Yes.
5    Q.   Nobody else?
6    A.   Nobody else.
7    Q.   Now, let's talk about funds that were wired from
8    Brazos. They were wired into an account that was in the
9    name of Creditron Financial Services, Inc.
10   A.   Yes.
11   Q.   And how did you keep track of -- or did you keep
12   track of all of those funds that came in from Brazos as
13   opposed to just ones coming in from all sources?
14   A.   Again, back to that cashbook that we talked about,
15   it would have been recorded there.
16   Q.   So based on that response, would I be correct in
17   saying that what you didn't do was keep a record with a
18   running total or balance of all the wires received from
19   Brazos?
20   A.   Not on a day-to-day basis, no.
21   Q.   On any other basis?
22   A.   Monthly.
23   Q.   So on a monthly basis, you had records that showed
24   here's how much money came in this month from Brazos.
25   A.   Yes.

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 5 of 20

Mark Kiesel                                       Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 14

1    Q.    And when you prepared that, was it on paper, was
2    it electronic, how was it recorded?
3    A.    Electronic.
4    Q.    And you had access to it because you did it.
5    A.    Right.
6    Q.    And did you then share that information with
7    anybody else at the company?
8    A.    Not routinely, recently.
9    Q.    So in 2002 and 2003, did somebody direct you to
10   keep those balances monthly?
11   A.    No.  It was strictly a part of accounting.
12   Q.    And what record would you look at today,
13   electronic or otherwise, to be able to go back and see on a
14   monthly basis the totals that came in from Brazos?
15   A.    The file I just referred to, as well as the
16   cashbook.
17   Q.    And the file, does that have a name?
18   A.    I don't recall what it is.  It's on my computer.
19   It's ALC and something, I can't remember what the rest of
20   the file name is.
21   Q.    And what software program do you use?
22   A.    It's an Excel file.
23   Q.    Okay.  Now, were you ever involved in Creditron
24   Financial Services sending funds to Delaware Marketing?
25   A.    I'm sorry, would you repeat that.

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 6 of 20

Mark Kiesel                                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 17

1    A.   Yes.  If I knew of anyone -- you asked if I knew
2    of anyone that's done this work?
3    Q.   Yes.
4    A.   No, I don't.
5    Q.   The reason I asked you is because you shook your
6    head.
7    A.   Oh, sorry.
8    Q.   Did you ever have discussions in 2002, or 2003, or
9    even in early 2004 with Mr. Covatto about cash-flow related
10   issues?
11   A.   I'm sure.
12   Q.   Did he ever direct you to use funds from Telatron
13   Marketing Group's bank account to pay monies that were owed
14   by Creditron Financial Services?
15   A.   It's possible, yes.
16   Q.   And when that happened, there was, for want of a
17   better term, a reconciliation or detailed record that was
18   kept of that, right?
19   A.   There was an accounting.  There was always an
20   accounting for transactions like that, yes.
21   Q.   And then funds would be reimbursed at some point,
22   correct?
23   A.   Yes.
24   Q.   And is that -- that accounting, does that appear
25   in the cashbook or somewhere else?

Mark Kiesel　Case 1:04-cv-00263-SJM　Document 81-11　Filed 11/20/2006　Page 7 of 20

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 18

```
 1       A.    If it was a cash transaction, it would have.
 2       Q.    And what if it was -- it were a check or a wire
 3   transaction?
 4       A.    Yes.  I guess the answer to that would be, yes,
 5   because it all involves cash.
 6       Q.    Okay.  If there were expenses of Creditron
 7   Financial Services to be paid, who was it that determined
 8   which expenses got paid when?
 9       A.    Mr. Covatto.
10       Q.    So he had a hands-on role with those types of
11   decisions on a daily basis.
12       A.    Yes.
13       Q.    Are you familiar with any claim by Creditron
14   Financial Services or Telatron Marketing Group that Delaware
15   Marketing did not live up to its contractual obligations?
16       A.    Vaguely.
17       Q.    What's your understanding, as limited as it might
18   be?
19       A.    That's basically it.
20       Q.    Okay.  So you don't know what they might have
21   failed to do?
22       A.    No.  Just -- no.  Just vague.
23       Q.    Do you know what Delaware Marketing was -- I asked
24   you if you knew what they failed to do.  Now, I'm asking,
25   did you know anything or do you now know anything about what
```

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 8 of 20

Mark Kiesel                                                              Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 20

1    A.   No.  It's not our responsibility.
2    Q.   Whose responsibility is that?
3    A.   I'm not sure.
4    Q.   Tell me what the responsibilities, as you
5  understand them to be, are of the financial control
6  department?
7    A.   Basically, accounting, financial responsibilities.
8    Q.   And are you ever involved in the preparation of
9  income statements?
10   A.   Yes.
11   Q.   Balance sheets?
12   A.   Yes.
13   Q.   How often are they prepared?
14   A.   Internally?
15   Q.   Yes.
16   A.   Monthly.
17   Q.   And do you ever share them with anyone?
18   A.   Yes.
19   Q.   Who do you share them with?
20   A.   Sometimes with clients, if they're requested.  I
21  don't share them without authority, of course.
22   Q.   Do you ever give those reports to Mr. Covatto?
23   A.   Yes.
24   Q.   Mrs. Covatto?
25   A.   Yes.

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 9 of 20
Mark Kiesel                                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 21

1     Q.    On a monthly basis?

2     A.    Not necessarily.

3     Q.    When funds came in from Brazos in the form of
4  wires, did you ever communicate the receipt of those funds
5  to Mrs. Covatto?

6     A.    Occasionally.

7     Q.    And is that something that you did on your own
8  initiative, or had she asked you to do that?

9     A.    She'd asked us to let her know when they come.

10    Q.    Did she ask you just to let her know some of the
11 time or all of the time?

12    A.    No. She would like to know all of the time.

13    Q.    So your direction from Mrs. Covatto was, if we
14 receive a wire from Brazos, let me know.

15    A.    Yes.

16    Q.    All right. And how would you -- what method would
17 you use to communicate that information to Mrs. Covatto,
18 pick up the phone, or how would you do that?

19    A.    Actually, I would only do it if Kathy was absent.

20    Q.    All right.

21    A.    And usually that would involve an e-mail. I know
22 Kathy's been -- she doesn't always remember to notify
23 Mrs. Covatto, so she wouldn't know right away. And
24 sometimes a phone call or conversation.

25    Q.    And if Kathy would forget to notify Mrs. Covatto,

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 10 of 20

Mark Kiesel

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 22

1  would she then later remember and do it, or did you, then,
2  pick up the slack and do it?
3      A.   No.  I'm sure she'd remember or Mrs. Covatto would
4  ask specifically.  I'm not sure.
5      Q.   Do you keep the e-mails that you send to
6  Mrs. Covatto?
7      A.   Some, not all of them.  I have an auto purging on
8  my e-mail.  I think it only keeps it for three or four
9  months.
10     Q.   Do you have any other record of seeing, if you
11 wanted to today going back and looking, that you
12 communicated a particular receipt of a wire to Mrs. Covatto?
13     A.   Only if it was recently.  I wouldn't save those.
14     Q.   All right.  After that routine was set up of you
15 or Kathy reporting to Mrs. Covatto, did you ever get
16 chastised in some way by Mrs. Covatto for not doing what
17 she'd asked you to do?
18     A.   Sure.
19     Q.   And what would she say?
20     A.   That she had asked to be notified.
21     Q.   And you would say what?
22     A.   Well, again, I'm usually not responsible for that.
23     Q.   So she would tell Kathy that.
24     A.   Right.
25     Q.   How do you know that, Kathy told you?

Mark Kiesel  Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 11 of 20
Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 23

1    A.   Yes.

2    Q.   The same way that we talked about Mr. Covatto
3 being a hands on type of guy, in terms of what
4 Mrs. Covatto's responsibilities were, would you characterize
5 her as being hands on and sort of in control?

6    A.   Of the financial control area?

7    Q.   No, of the company that she worked for.

8    A.   I'm sorry, who are we talking about, again?

9    Q.   Now, Al Covatto was the guy who really had a very
10 firm grasp on what financial control was doing, right?

11    A.   Right.

12    Q.   In terms of your understanding of what
13 Mrs. Covatto's responsibilities were, was she sort of like
14 an absentee type of person, or was she there actively
15 working, doing the job?

16    A.   No, she's there.

17    Q.   Supervising the people that she's responsible for.

18    A.   Yes.

19    Q.   Could you explain to me, if you know, why it was
20 that you were asked to report those wires to Mrs. Covatto?

21    A.   I don't know why.

22    Q.   Did you also report the receipt of those wires to
23 Mr. Covatto?

24    A.   Yes.

25    Q.   And if you didn't, Kathy did.

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 12 of 20

Mark Kiesel

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 24

1   A.   Yes.
2   Q.   Say in October of 2003, Mrs. Covatto wanted to
3   know the total number of wires and amounts and dates from
4   Brazos, what record would she have access to that would
5   allow her to have done that?
6   A.   She would, I assume, have to come to financial
7   control for it, either myself or Kathy.
8   Q.   Or she could look at the e-mails, right, if she
9   had them?
10  A.   Right.  But I don't think that would be a
11  completely accurate record.
12  Q.   Why is that?
13  A.   Because there would be e-mails missing, like I
14  spoke of.
15  Q.   And do you work in the same building that
16  Mrs. Covatto works in?
17  A.   Yes.
18  Q.   Same floor?
19  A.   Yes.
20  Q.   How far apart are you from her?
21  A.   I'm not sure, not very far.
22  Q.   How long would it take you to walk there?
23  A.   A couple of minutes.
24  Q.   It would take her a couple of minutes to walk from
25  her office to yours.

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 13 of 20

Mark Kiesel

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 28

1    the number of sales, the number of contacts, the number of
2    refused for production hours; does that ring a bell?
3        A.    As it pertains to the Academic Learning Center?
4        Q.    Yes.
5        A.    No.  I wouldn't be involved in that.
6        Q.    Were you involved in terms of your job for
7    financial control in how many loans were funded through the
8    efforts of Academic Lending Center?
9        A.    Did I account for them?
10       Q.    No.  Did you get involved in the recordkeeping of
11   the loans that were funded?
12       A.    Yes.
13       Q.    Okay.  And what records show or reflect the
14   student loan consolidations that were funded through ALC?
15       A.    What records would show that?
16       Q.    Yes.
17       A.    In the beginning, I kept a manual spreadsheet of
18   all the loans we sent and when disbursed.  And then that
19   ended, it was all automated.
20       Q.    And what software system was used when it was
21   automated?
22       A.    When it was automated?
23       Q.    Yes.
24       A.    I don't know the answer to that.  It was data
25   based.

Mark Kiesel
Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 14 of 20
Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 29

```
 1      Q.   Was it on your computer?
 2      A.   No.
 3      Q.   Where was it?
 4      A.   Database is housed on servers.  I no longer had
 5  anything to do with the recordkeeping.
 6      Q.   So after you stopped manually doing it, you were
 7  done with that.
 8      A.   I did not record it manually.
 9      Q.   But when you stopped reporting them manually and
10  it was automated, when you say automated -- and you're much
11  more advanced with computers than I am, when you say
12  automated, does that mean that it automatically showed up
13  instead of somebody having to look at stuff and enter it?
14      A.   I imagine somebody else had to enter it at some
15  point.
16      Q.   But you weren't the one, once it was automated,
17  who entered it.
18      A.   Right.
19      Q.   Did you get involved in looking at those reports?
20      A.   Yes.
21      Q.   And as a financial control person, did you have to
22  do anything with that information?
23      A.   I had to reconcile what was recorded as being sent
24  out as being in the database.
25      Q.   And it was also your function to make sure that if
```

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 15 of 20

Mark Kiesel                                Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 30

```
 1   a loan was funded, that Creditron Financial Services would
 2   receive, eventually, the funds from Brazos, right?
 3        A.   Yes.
 4        Q.   And if the funds didn't come from Brazos, you were
 5   expected to let somebody know.
 6        A.   Yes.
 7        Q.   And who were you supposed to let know?
 8        A.   Mr. Covatto.
 9        Q.   Right.  And did you do that?
10        A.   Yes.
11        Q.   What was the turnaround time for receiving funds
12   from Brazos?
13        A.   It varied in the beginning.  I don't recall
14   specifically.
15        Q.   Well, if you were supposed to report, and did
16   report, to Mr. Brazos (sic) when funds didn't come in from
17   Brazos, how long did -- how long a time did you decide to
18   use, or were you told to use a particular length of time,
19   for, okay, it's been this many days, or weeks, or months and
20   now it's time to let Mr. Covatto know?
21        A.   I think, if I remember correctly, he would
22   initiate.  He would ask me which loans were outstanding.
23        Q.   So it wasn't that -- it wasn't a question that
24   they were outstanding, but how long they were outstanding?
25        A.   We're talking after disbursement took place,
```

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 16 of 20

Mark Kiesel                                      Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 31

1  correct?

2       Q.   After the loan was funded.

3       A.   Right.  I don't know that there's any specific
4  time line before we followed up.

5       Q.   Do you know whether the records that are kept in
6  financial control show how long a period of time it took
7  after a loan funded for the wire to be received?  And we can
8  break that down to make it easier; do your financial control
9  records show the date a loan funded?

10      A.   Yes.

11      Q.   And what do you call those records that reflect
12 that?

13      A.   It's in the database, it gets a date funded.

14      Q.   All right.  And where did that information come
15 from; do you know?

16      A.   We download a file from the PHEAA website.

17      Q.   And do you need a password or something like that?

18      A.   Yes.

19      Q.   And was that done on a daily basis?

20      A.   Weekly.

21      Q.   Weekly basis.  All right.  So we know the records
22 showed a date a loan was funded.  Do the records also show
23 the date that the funds came in from Brazos?

24      A.   Yes.

25      Q.   And was a part of your responsibility to make sure

Mark Kiesel
Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 17 of 20
Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 32

1  that the amount that was received from Brazos was the
2  correct amount?
3      A.   I'm not sure how to answer that. Yes and no,
4  because there was no way to know what the exact right amount
5  was.
6      Q.   All right. So you weren't aware of the amount of
7  the -- and you can tell me, do you call the money that comes
8  in from Brazos a commission or a referral? How do you refer
9  to it?
10     A.   Fees.
11     Q.   There was no way to know at the time a loan funded
12 what the amount of fee would be from Brazos?
13     A.   No, because -- well, a few reasons. The amounts
14 that I had from the PHEAA website sometimes changed on a
15 one-by-one basis to what Brazos had is what actually was
16 disbursed. And it was a calculated amount that they paid us
17 that was based on an average, and it was an average of loans
18 within that group.
19          And there were loans within that group that were
20 already owned by Brazos, which they wouldn't include in the
21 average, and I had no way of knowing what loans those were.
22 They wouldn't supply us with that information.
23     Q.   You answered, I think, yes and no to one of my
24 questions; let me try asking it a little bit differently.
25 Did Mr. Covatto and the companies simply accept as accurate

Mark Kiesel | Case 1:04-cv-00263-SJM  Document 81-11  Filed 11/20/2006  Page 18 of 20
Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 33

1  all of the fees that Brazos sent, or was there some
2  evaluation or checking to make sure that you were getting
3  paid what you were owed?
4      A.  Again, just like I explained it, my accounting was
5  to make sure that all Social Security numbers were accounted
6  for.  And if we receive a payment on a group of loans, we
7  assumed that all loans were paid for within that group.
8      Q.  Does financial control still have to this day the
9  records or the database that shows loans that were funded,
10 the date they were funded, the amounts of the wires from
11 Brazos, and the dates received?
12     A.  I believe so.
13     Q.  Does anybody in the financial control group report
14 directly to you?
15     A.  No.
16          (Kisiel Deposition Exhibit No. 1 marked for
17           identification.)
18     Q.  I'm going to hand you a document that's been
19 marked as Kisiel No. 1.  At the top it says Brazos/Telatron
20 Fee Summary, and it's got a date of 12/18/02.  And I'm just
21 going to ask you a question of one thing on that report; but
22 if you'd like, you can familiarize yourself with it.
23          What I'm specifically interested in, just so you
24 know, towards the bottom of that page there's something in
25 yellow, "To IRS."  Do you see that?

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 19 of 20

Mark Kiesel                                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 36

1  Q. All right. What's your understanding -- let me
2  strike that. Was the money sent from Brazos to the IRS
3  something that Mr. Covatto directed, or was Brazos simply
4  required to do it?
5  A. I don't know.
6  Q. All right. Were you aware that there were other
7  tax liens during this period of time?
8  A. No, not that I recall.
9  Q. All right. Do you recall -- are you able to tell
10 me whether before I showed you Exhibit Nos. 1 and 2, that
11 you had in fact written on a piece of paper that had Brazos'
12 name on it to IRS?
13 A. Did I remember that? No.
14 Q. All right. Do you know whether you wrote that on
15 any other Brazos' documents?
16 A. I don't remember.
17 Q. All right. If you wanted to go back -- or let's
18 say, Mr. Covatto were to say to you, I would like you to
19 look at our records and to the best of your ability tell me
20 how much money Brazos sent to the IRS that would otherwise
21 have come to us but for the Federal tax liens, would you be
22 able to do that?
23 A. Probably.
24 Q. And what records would you look at in order to do
25 that?

Case 1:04-cv-00263-SJM   Document 81-11   Filed 11/20/2006   Page 20 of 20

Mark Kiesel                                                Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 37

1   A.   The same records where I have all the payments
2   from Brazos recorded, the same file.
3   Q.   Okay.  The money that Brazos was wiring to
4   Creditron went into an account titled Creditron Financial
5   Services, Inc., correct?
6   A.   Yes.
7   Q.   Do you know whether those two Exhibits, 1 and 2,
8   reflect tax liens against Creditron Financial Services, Inc.
9   as opposed to Creditron Financial Corporation?
10  A.   I don't know.
11  Q.   Could it have been either?
12  A.   Yes.
13  Q.   I'm going to try to shorten this a little bit, so
14  I need to take a five-minute break so I can make sure if
15  there's anything else that I need to ask you, all right?
16  A.   Yeah.
17       MR. MARKHAM:  Do you want the room?
18       MR. SNYDERMAN: Yes.  If you don't mind, that
19       would be easier.
20       (Recess taken from 3:50 p.m. to 4:03 p.m.)
21  BY MR. SNYDERMAN:
22  Q.   On what's been marked as Kisiel Exhibit No. 1, in
23  addition to IRS and the date just above it, higher up on the
24  page there are various lines and it looks like check marks,
25  and brackets, and amounts.  Is that your handwriting?