Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

    DELAWARE MARKETING              : CA No. 04-263
 3  PARTNERS, LLC, a Delaware       :
    limited liability company,      :
 4        Plaintiff                 :
                                    : JUDGE MCLAUGHLIN AND
                                    : MAGISTRATE JUDGE
 5        v.                        : SUSAN PARADISE BAXTER
                                    :
 6  CREDITRON FINANCIAL             :
    SERVICES, INC., a               :
 7  Pennsylvania corporation        :
    and, TELATRON MARKETING         :
 8  GROUP, INC., a                  :
    Pennsylvania corporation,       :
 9        Defendants                :

10            Deposition of ALFRED D. COVATTO, taken before
    and by Sonya Hoffman, Notary Public in and for the
11  Commonwealth of Pennsylvania on Monday, November
    14, 2006, commencing at 8:38 a.m., at the offices of
12  Elderkin Martin Kelly & Messina, 150 East Eighth
    Street, Erie, PA 16501.
13

14  For the Plaintiff:

15        Charles Snyderman, Esquire
          Charles Snyderman, PA
16        Stoney Batter Office Building
          5301 Limestone Rd., Suite 214
17        Wilmington, DE 19808

18        Brett W. Farrar, Esquire
          Dickie McCamey & Chilcote, P.C.
19        Two PPG Place, Suite 400
          Pittsburgh, PA 15222
20

21  For the Defendants:

22        Craig A. Markham, Esquire
          Elderkin Martin Kelly & Messina
23        150 East Eighth Street
          Erie, PA 16501
24

25                 Reported by Sonya Hoffman
              Ferguson & Holdnack Reporting, Inc.
```

Ferguson & HOLDNACK Reporting, Inc.
814-452-4556

EXHIBIT

Case 1:04-cv-00263-SJM   Document 86-3   Filed 03/29/2007   Page 2 of 12

Alfred D. Covatto                                Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 11

1   and then Exhibit 001 to the agreement.

2       A.   (Witness reviews document.)  Yes.

3       Q.   All right.  Thank you.  Who drafted this
4   agreement?

5       A.   I did.

6       Q.   You'll notice that in the opening paragraph of the
7   agreement, it identifies Academic Lending Center/Creditron
8   Financial Services, Inc. and Telatron Marketing Group, Inc.
9   herein after referred to as Telatron.

10      A.   Uh-huh.

11      Q.   Yes?

12      A.   Yes.

13      Q.   And as the drafter of this agreement, when you
14  said herein after referred to as Telatron, you were
15  indicating that if the name Telatron appears in the
16  agreement somewhere, it's referring to, or could at least
17  refer to, Academic Lending Center, Creditron Financial
18  Services, Inc., and Telatron Marketing Group, Inc.

19      A.   Yes.  We wanted to make sure when this thing
20  was -- we had two different entities, we wanted to make sure
21  that we obligated both entities for this particular
22  agreement.

23      Q.   Why?

24      A.   Principally because we had funds going back and
25  forth and we wanted to make sure that everything was

Case 1:04-cv-00263-SJM   Document 86-3   Filed 03/29/2007   Page 3 of 12

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 14

```
 1   originally developed, we had another name and then I thought
 2   that the attorneys had -- and I thought that it had been
 3   adjusted at that time.  I'm not clear on that,
 4   Mr. Snyderman.  But I am clear on the fact that there are
 5   two entities and the two entities obligated themselves for
 6   whatever the agreement indicates.
 7        Q.   Well, who were the two entities?
 8        A.   Well, one entity was Creditron Financial
 9   Corporation.  Creditron Financial Corporation, doing
10   business as Telatron, T-E-L-A-tron, Marketing Group, Inc,
11   and that was one entity.  So when we say Telatron, here,
12   Marketing, Inc., it really referred to Creditron Financial
13   Corporation.  The other organization was Teletron,
14   T-E-L-E-tron Marketing Group, Inc.  And --
15        Q.   I'm sorry, Teletron --
16        A.   T-E-L-E-tron Marketing Group, Inc. was -- and that
17   was -- we originally quit using that when we found someone
18   else had T-E-L-E-T-R-O-N.  We couldn't use that, so we
19   switched to Creditron Financial Services, Inc.  So what you
20   have here is probably some sloppiness in trying to get the
21   names structured right.
22             But when this agreement was constructed, I just
23   assumed that -- I didn't know the Pennsylvania law that
24   well.  I just assumed if you say Creditron Financial
25   Services, Inc. and the mother company is, that they're all
```

Case 1:04-cv-00263-SJM   Document 86-3   Filed 03/29/2007   Page 4 of 12

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 15

1  incorporated properly.

2     Q.   All right.  So who owns Creditron Financial

3  Corporation?

4     A.   Mrs. Covatto owns about 95 percent of that stock,

5  and I own five percent of that stock.

6     Q.   And who is the president of Creditron Financial

7  Corporation?

8     A.   Mrs. Covatto.

9     Q.   Is there a CEO?

10    A.   I'm the CEO.

11    Q.   Of Creditron Financial Corporation?

12    A.   That is correct.

13    Q.   As the CEO of Creditron Financial Corporation, do

14 you agree that any obligations of the parties who are

15 identified in the agreement that's marked as A. Covatto No.

16 1, any obligations of those parties, who are identified as

17 Telatron, those obligations are the obligations Creditron

18 Financial Corporation?

19    A.   Absolutely.

20    Q.   Are they also the obligations of Telatron

21 Marketing, Inc.?

22    A.   That is correct.

23    Q.   And who are the owners of Telatron Marketing,

24 Inc.?

25    A.   I am.

Case 1:04-cv-00263-SJM   Document 86-3   Filed 03/29/2007   Page 5 of 12

Alfred D. Covatto                              Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 36

1    coming in from other sources, other than Brazos, correct?
2        A.   Uh-huh.
3        Q.   Yes?
4        A.   Yes.
5        Q.   And, certainly, after the agreement with Delaware
6    Marketing was signed, you knew that there was an obligation
7    on the part of Telatron, the Telatron Group, to pay
8    something to Delaware Marketing for its services.
9        A.   Yes.
10       Q.   And the agreement said it would be 28.57 percent.
11       A.   But we didn't pay the 28.57 percent because we
12   didn't get -- they didn't provide the services properly, so
13   we didn't do that.
14       Q.   And that was your decision.
15       A.   That's right.
16       Q.   And when was the first time, or the earliest date,
17   that you became aware that Delaware Marketing was not
18   providing the services that you were expecting from them?
19       A.   In March.
20       Q.   March of 2003?
21       A.   That's right.
22       Q.   All right.  What was the date in March of 2003?
23       A.   I don't know.
24       Q.   You don't know?
25       A.   You're asking me the date that I realized that

Case 1:04-cv-00263-SJM   Document 86-3   Filed 03/29/2007   Page 6 of 12

Alfred D. Covatto                                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 37

1   they weren't doing it, I don't really know the date.

2       Q.   Was it the beginning of March, the end of March,
3   the middle of March?

4       A.   I can't know, unless I have some documentation to
5   find it.  I don't know.

6       Q.   What documentation would you need?

7       A.   I think when the direct mail campaign results were
8   coming in, I started to determine that things weren't right
9   because we weren't getting the revenues that were promised.

10      Q.   And you believe the results from the direct mail
11  campaign were coming in in March of 2003?

12      A.   It's March or April, I'm not sure.

13      Q.   If you look at the document that's previously
14  marked as DeSanti-Boehm No. 1, you'll notice that there were
15  wires, according to that document, received, I think, it's
16  March 6th and March 7th of 2003; is that correct?

17      A.   Uh-huh.

18      Q.   Yes?  What were the amounts of the wires from
19  March 6th and 7th of the 2003?

20      A.   It reads as $3,150 and then $104,332.79.

21      Q.   Now, the results of the direct mail campaign was
22  what caused you to realize that they weren't -- Delaware
23  Marketing wasn't doing what it was supposed to do.  Did you
24  send 28.57 percent of any of the wires from January 31, '02
25  through March 7th of '03?

Page 38

```
 1      A.    Well, why would we send it in January of '02?
 2      Q.    Sorry.  I'm looking at that upside down.  October
 3  of 2002 --
 4      A.    Why would we send them in October of '02, we
 5  didn't have an agreement until the end of February.
 6      Q.    But you had an agreement at the end of February.
 7  Are you suggesting that none of the -- let me back up, I'll
 8  say it a different way.
 9      A.    Sure.
10      Q.    Let's assume that the agreement was signed in
11  February of 2003.  That's what happen, right?
12      A.    February of 2003, right.
13      Q.    Okay.  Once the agreement was signed, did you, at
14  that point, recognize the obligation of Telatron to pay
15  Delaware Marketing 28.57 percent of the wires that came in
16  before the agreement had been signed?  Or were those just
17  yours to keep as a bonus?
18      A.    No.  We accounted for that.
19      Q.    What do you mean, we accounted for it?
20      A.    We accounted for anything that was owed under that
21  agreement.
22      Q.    So 28.57 percent of each of the wires that came in
23  before March 8, 2003, 28.57 percent was owed by Telatron to
24  Delaware Marketing, right?
25      A.    Yes.
```

Case 1:04-cv-00263-SJM   Document 86-3   Filed 03/29/2007   Page 8 of 12

Alfred D. Covatto                                  Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 39

1    Q.    All right.  And it's a fact that you never
2    authorized 28.57 percent of any wire that was received by
3    ALC, you never authorized one of them, to be sent to
4    Delaware Marketing; did you?
5    A.    Well, Mr. Snyderman, we had very difficulties with
6    startup expenses.
7    Q.    Is the answer to my question no?
8    A.    I don't know.  I doubt it.  It -- never mind, you
9    ask the questions.
10   Q.    I know what all the reasons are and all the
11   excuses are.  I'm looking at an agreement that's a legally
12   binding document that you felt should, in fairness, bind two
13   of your entities as opposed as just one.  And it says that
14   within seven days after funds are received from Brazos,
15   Telatron is going to send to Delaware Marketing
16   28.57 percent of that wire, and you never did it once,
17   right?
18        MR. MARKHAM:  Asked and answered.
19   Q.    Right?
20   A.    I don't know if it was 28.5 -- I don't know.
21   Q.    And --
22   A.    The records can speak for itself, Mr. Snyderman.
23   Q.    And the only person in your company who had the
24   authority to have funds wired out of the Creditron Financial
25   Services' account into which the Brazos money had been

Case 1:04-cv-00263-SJM    Document 86-3    Filed 03/29/2007    Page 9 of 12

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 40

1  wired, would have been you.
2      A.   Yes.
3           MR. MARKHAM:  Asked an answered.
4      Q.   Now, when you, for the first time, realized that
5  the results of the direct mail campaign weren't as they were
6  supposed to be and that Delaware Marketing wasn't doing what
7  they were supposed to do, when did you notify Delaware
8  Marketing of that?
9      A.   That wasn't the only thing that came up that we
10 understood.  There were other things, other than direct
11 mail.
12     Q.   Regardless of what it was, when you first
13 determined that Delaware Marketing was not doing what the
14 agreement obligated it to do, did you tell them?
15     A.   Yes.
16     Q.   And who did you tell?
17     A.   Mrs. Covatto worked with Harry.
18     Q.   So you didn't tell them?
19     A.   No.
20     Q.   All right.  Why didn't you tell them?
21     A.   Because Mrs. Covatto handled the relationship.
22     Q.   So if Mrs. Covatto tell Delaware Marketing, then
23 Delaware Marketing wouldn't have been told by you because
24 you didn't tell them.
25     A.   I didn't tell them, no.

Case 1:04-cv-00263-SJM    Document 86-3    Filed 03/29/2007    Page 10 of 12

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 58

1    A.    I don't understand what you mean.

2    Q.    Do you understand what she's referring to when she
3    says that?

4    A.    No. I don't understand. I don't know if it's for
5    marketing expenses or -- I don't understand what she means.

6    Q.    Okay. That's fair enough. Is it your testimony
7    that money that No. 1 and No. 2, or Telatron, owed to
8    Delaware Marketing, the payment of that money was not
9    dependent on whether funds had yet been received from
10    Brazos?

11    A.    From an accounting standpoint, it was not
12    dependent.

13    Q.    What about from any other standpoint?

14    A.    From a cash-flow standpoint, sure, it was
15    dependent. In other words -- but it was dependent along
16    with other expenses. In other words, for payment of the
17    lease expense, it was a payment of these other expenses.

18    Q.    And so we have a situation where over the course
19    of many months, according to documents produced by your
20    attorney, over $9 million in wires is received from Brazos
21    and you were faced with, as the decision-maker, who to pay,
22    what expenses to pay and what expenses not to pay. And
23    based on the amount of cash available, if money was paid to
24    Telatron as opposed to Delaware Marketing Partners, that was
25    your decision, right?

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 59

1    A.    Yes.

2    Q.    And you had the ability and the authority, certainly, to decide, you know what, instead of paying Telatron, we're going to send money to Delaware Marketing Partners. You could have done that, right?

6    A.    Yes, to some degree.

7    Q.    If there were $10,000 in the bank and you believed that $1,000 was owed to Delaware Marketing and $1,000 was owed to Telatron, you had the ability and the authorization to decide whether either of the payments were going to be made or neither, right?

12   A.    There are some things that you consider when looking at that.

14   Q.    Like that?

15   A.    Payroll taxes, Workmen's compensation, relative to that aspect of things. Payroll expense for those employees.

17   Q.    So --

18   A.    You had no control, you had to pay those on a quarterly basis. If the payroll expenses were payroll expenses for those individuals doing work for ALC and the student loan program -- not all the payroll expenses.

22   Q.    Right. But you had lots of bank accounts and you did a lot of -- I don't want to call it "wheeling and dealing", but in my vernacular, you sometimes took money from one source -- or one firm or company and paid it from

Page 61

1  come in.
2    A.  A wire had nothing to do with it.  What had
3  everything to do with it is the accrued income for them --
4  or accrued expenses, I should say, for the organization.
5  And that was determined by the actual transaction sent to
6  Brazos or PHEAA.  And so we ultimately, at a point, would
7  accrue the income.
8    Q.  And when you did that, accrued the income, and
9  knew that money would eventually would be coming in, your
10 company informed Delaware Marketing Partners.
11   A.  There were reports sent out.  I mean, I can't
12 account for the communication in the relationship.  I don't
13 know what was sent out.
14   Q.  Can you account for whether your company had an
15 obligation to communicate that information to Delaware
16 Marketing Partners what was received on an accrued basis?
17   A.  I'm assuming that they did that.
18   Q.  I'm not asking whether they did it.  I'm asking
19 whether you agree that there was an obligation to let
20 Delaware Marketing Partners know about the funds that were
21 coming from Brazos?
22   A.  I'd say yes.
23   Q.  And how often would you be obligated to
24 communicate that to Delaware Marketing Partners?
25   A.  Mr. Snyderman, I don't know.