Case 1:04-cv-00263-SJM   Document 86-4   Filed 03/29/2007   Page 1 of 12

Alfred D. Covatto                                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

```
                                                              Page 1
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
     DELAWARE MARKETING          : CA No. 04-263
 3   PARTNERS, LLC, a Delaware   :
     limited liability company, :
 4       Plaintiff               : JUDGE MCLAUGHLIN AND
                                 : MAGISTRATE JUDGE
 5           v.                  : SUSAN PARADISE BAXTER
                                 :
 6   CREDITRON FINANCIAL         :
     SERVICES, INC., a           :
 7   Pennsylvania corporation    :
     and, TELATRON MARKETING     :
 8   GROUP, INC., a              :
     Pennsylvania corporation,   :
 9       Defendants              :

10              Deposition of ALFRED D. COVATTO, taken before
        and by Sonya Hoffman, Notary Public in and for the
11      Commonwealth of Pennsylvania on Monday, November
        14, 2006, commencing at 8:38 a.m., at the offices of
12      Elderkin Martin Kelly & Messina, 150 East Eighth
        Street, Erie, PA 16501.
13

14   For the Plaintiff:

15       Charles Snyderman, Esquire
         Charles Snyderman, PA
16       Stoney Batter Office Building
         5301 Limestone Rd., Suite 214
17       Wilmington, DE 19808

18       Brett W. Farrar, Esquire
         Dickie McCamey & Chilcote, P.C.
19       Two PPG Place, Suite 400
         Pittsburgh, PA 15222
20

21   For the Defendants:

22       Craig A. Markham, Esquire
         Elderkin Martin Kelly & Messina
23       150 East Eighth Street
         Erie, PA 16501
24

25                  Reported by Sonya Hoffman
              Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT 3

Case 1:04-cv-00263-SJM   Document 86-4   Filed 03/29/2007   Page 2 of 12

Alfred D. Covatto                                      Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 6

1  didn't matter relative to the funds coming in from Brazos
2  overall to pay any expenses. They were paid just like any
3  other expense. It wasn't solely dependent on Brazos.
4      Q.   It wasn't? I'm going to show you the agreement.
5  There's an exhibit attached to it, if you'll please turn to
6  the exhibit. And you'll see on the -- if you turn to the
7  third page of the exhibit, there's a Paragraph No. 4 that's
8  entitled, Allocation of Program Revenues, correct?
9      A.   Uh-huh.
10     Q.   Yes, right?
11     A.   Uh-huh. Yes.
12     Q.   What did you mean by Allocation of Program
13 Revenues when you drafted this?
14     A.   When I drafted it, it meant that we would pay a
15 commission of 28.57 percent based on gross revenues derived
16 from that program.
17     Q.   Where does it say the word "commission" in this
18 agreement?
19     A.   Well, it says commission in different places.
20     Q.   Show me.
21     A.   Right here, commission funds.
22     Q.   The words "commission funds" that your attorney
23 pointed out to you, reflects not the money that was being
24 paid by you to Delaware Marketing, but rather the money that
25 was being paid by Brazos to you, correct -- excuse me,

Case 1:04-cv-00263-SJM   Document 86-4   Filed 03/29/2007   Page 3 of 12

Alfred D. Covatto                                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 7

1  please answer this question, first.

2    A.   Yes, that's true.  I didn't see that.

3    Q.   That's right.  So show me in the agreement --

4    A.   I have to review this for a minute; is that okay?

5    Q.   Take your time, as much time as you want.  Show me
6  in the agreement where it says that any money you're paying
7  to Delaware Marketing is a commission.

8    A.   (Witness reviews document.)

9    Q.   All right you've had -- is it correct that you've
10 had ample opportunity to look through the agreement to find
11 the word "commission"; is that correct?

12   A.   I've had an opportunity to look at this, and I
13 don't know -- I can't see it in there right now.

14   Q.   All right.  And would you agree, since we're
15 talking about the exhibit to this agreement, under No. 4
16 where it says, Allocation of Program Revenues, it starts
17 out, "For the services provided by the parties."  Who are
18 the parties that you intended to refer to when you drafted
19 this?

20   A.   Delaware Marketing.

21   Q.   That's the only one?

22   A.   That's the parties.  There's, let's see, maybe
23 three or four people there, Delaware Marketing.

24   Q.   It says, "For the services provided by the
25 parties, Telatron shall distribute commission funds received

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 8

1   as follows: Delaware Marketing shall be paid 28.57 percent
2   of the gross revenues. Such payment shall be accomplished
3   within seven days after commission funds are received from
4   the lenders. Telatron shall remit payment to Delaware
5   Marketing by wire transfer." Then it says, "Telatron shall
6   be entitled to 71.43 percent of the remaining gross
7   revenues."
8           So the remaining gross revenues, when you wrote
9   this, refers to the funds left over after the 28.57 percent
10  is paid to Delaware Marketing, right?
11       A.   I've answered the question.
12       Q.   Please answer this question.
13       A.   What is your question?
14            MR. SNYDERMAN: Could you read it back, please.
15            (Previous question read back.)
16       A.   Well, the intent of this thing was that they would
17  be entitled to 28.57 percent of the commission from this
18  program. That's what that meant.
19       Q.   And Telatron then was, then, entitled to receive
20  the rest.
21       A.   Telatron received the whole thing and then it
22  would pay off 28.57 percent.
23       Q.   And after Telatron paid --
24       A.   You asked me for the meaning, Attorney Snyderman,
25  I told you what the meaning was.

Case 1:04-cv-00263-SJM    Document 86-4    Filed 03/29/2007    Page 5 of 12

Alfred D. Covatto                                              Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 9

1    Q.    All right. And I'm entitled to follow up with
2    another question.
3    A.    Please do.
4    Q.    The question is: After you, or Telatron, received
5    100 percent of the gross revenues, the agreement that you
6    drafted provides, and was intended to provide, that 28.57
7    percent of those gross revenues gets paid to Delaware
8    Marketing, and what's left gets paid to Telatron, right?
9    A.    Right. You asked me the intent of this thing and
10   the intent was that we would receive 100 percent of the
11   commission from Brazos. And as an expense item, we would
12   send 28.57 percent to Delaware Marketing.
13   Q.    All right. And was it also the intent that the
14   rest of the money would stay with Telatron?
15   A.    All the money stayed with Telatron and we paid an
16   expense from the money that we received from them.
17   Q.    Isn't it a fact that your share --
18   A.    You asked me for the intent, and I have you the
19   intent.
20   Q.    Wasn't it the intent that you would receive the
21   71.43 percent of the remaining gross revenues?
22   A.    If we would have received 100 percent and we would
23   have paid an expense of 28.57 percent, then the difference,
24   whatever that number comes out to, would stay at Telatron.
25   Q.    Why would you prepare an agreement that provides

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 13

1  Q.  Why not?

2  A.  They're just not -- I just can't comprehend this
3  right now.

4  Q.  Why?

5  A.  I'm not feeling well, that's why.

6  Q.  Okay. That's fair enough. Let me ask you another
7  question maybe that you can understand. I'm going to show
8  you a document that's marked as Kisiel No. 2, and you'll
9  notice that it's another Brazos document that refers to the
10 IRS. Do you see that?

11 A.  Uh-huh.

12 Q.  Is that a yes for the court reporter?

13 A.  Yes. I see where it says that.

14 Q.  Okay. Would this be another example, as far as
15 you can tell, of money that Brazos would have sent to the
16 IRS rather than to you?

17 A.  I don't know what they meant. If it's the same
18 thing as the other one, it would be the same.

19 Q.  Did you consider the money that Brazos paid
20 directly to the IRS to fall within the definition of gross
21 revenues received by Telatron?

22 A.  Yeah. They're the same things as what we
23 accounted for as gross revenues.

24 Q.  So the fact that you didn't receive the money
25 doesn't mean that it wasn't part of the gross revenues?

Alfred D. Covatto                                        Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 14

1    A.   Absolutely, because we tracked gross revenues in
2  the general accounting.  I made that point yesterday.
3    Q.   But on an accrual basis.
4    A.   Uh-huh.
5    Q.   Yes?  That's a yes, right?
6    A.   That is correct.
7    Q.   Are you still in the student loan consolidation
8  business?
9    A.   Yes.
10   Q.   Do you offer borrower benefits?
11   A.   Yes -- I would think.
12   Q.   What are borrower benefits?
13   A.   They get, if they pay automatically from their
14 checking account, there's a certain benefit.  And if they
15 pay on time after three or five years, there's a benefit.
16 So there are benefits.  You're limited with respect to
17 Federal laws with respect to what you're allowed to do.
18   Q.   Would you agree that an offer from the company
19 such as yours to a person who has student loans, would be
20 more attractive to that person if there were borrower
21 benefits than if there weren't borrower benefits?
22   A.   That would be -- to the student, yes.
23   Q.   I mean, you're not offering borrower benefits out
24 of the goodness of your heart?
25   A.   Well, within the constraints of the borrower

Page 17

1  that it was you and nobody else who came up with the figure,

2  28.57 percent?

3       A.   I don't remember that.

4       Q.   All right.  It was you who directed that monies be

5  sent to Delaware Marketing, right?  In other words, if

6  Delaware Marketing received a wire from Telatron, it was

7  because you directed Kathy or somebody else to send it.

8       A.   Yes.

9       Q.   And it was you who determined the amount of the

10 wire.

11      A.   Yes.

12      Q.   All right.  What formula did you use to come up

13 with the amount that you directed Kathy to send to Delaware

14 Marketing?

15      A.   I don't remember.

16      Q.   All right.  Well, there were some wires that ended

17 with 45 cents, so it's not like you said, send them $10,000

18 or send them $20,000.  Wouldn't you agree that if you're

19 coming up with, and 45 cents, you're doing some calculation

20 to determine how much to send?

21      A.   I don't remember.

22      Q.   Does that make sense to you, though?

23      A.   You want a different answer, I don't remember.

24 I'm telling you that I don't know.

25      Q.   Does it make sense to you that in your business

Page 29

1   Q. Okay. But because the results were lower than was
2   forecasted, you feel -- felt at the time and feel now that
3   you're not obligated to pay 28.57 percent of all gross
4   revenue and approved expenses, right?
5   A. That is true.
6   Q. Okay. Do you feel that the agreement that you
7   drafted provides for you not having to pay the 28.57 percent
8   and your share of approved expenses if the results are less
9   than expected?
10      MR. MARKHAM: Objection, calls for legal
11      conclusion. You can answer, if you can.
12  A. Would you repeat the question, please.
13  Q. Sure. Did you feel, and do you feel now, that the
14  agreement that you drafted gave you the right to not pay the
15  28.57 percent?
16  A. I don't think you would put that in the agreement,
17  that's a post-agreement type of thing that comes up. In
18  other words, we were supposed to have all this gross income
19  and we didn't get it. Now, you're asking me a different
20  question that comes after the agreement. I don't
21  understand.
22  Q. Well, that would be a nice comeback on your part
23  if the money wasn't owed until 2006. But as far as post is
24  concerned, let's go pre instead of post and look at the fact
25  that not once, never, did you pay 28.57 percent to Delaware

Alfred D. Covatto                                   Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 30

1  Marketing. And let's look at the fact that according to
2  your wife's sworn testimony, it wasn't until November of
3  2003, just two or three months before they terminated the
4  agreement, that they found out for the first time from Joyce
5  Covatto that they weren't going to be received
6  28.57 percent.
7           So based on that -- and you understand what I'm
8  talking about, right? You understand what I've said so far?
9       A.  I think so.
10      Q.  Based on that, why do you feel, sitting here
11 today, that your company could allow Delaware Marketing
12 Partners to continue providing services from September of
13 2002 through September of 2003, October of 2003, and
14 November of 2003, expecting to receive and being told they
15 would receive, 28.57 percent only to then tell them, after
16 they've done the work, guess what, just kidding, we've not
17 going to pay you the 28.57 percent? Do you think that's
18 fair, ethical business practices on your part?
19      A.  It's -- well, fair and equitable business
20 practices are that we relied on forecasts made by these
21 experts, and these forecasts weren't even close.
22      Q.  You knew that in March --
23      A.  Do you thank that's fair?
24      Q.  You knew that in March of 2003.
25      A.  And?

Ferguson & Holdnack Reporting, Inc.
814-452-4556

Case 1:04-cv-00263-SJM  Document 86-4  Filed 03/29/2007  Page 11 of 12

Alfred D. Covatto                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 34

1    Q.    Go ahead.

2    A.    I said we were having difficulties with the
3 numbers prior to March. Everyone knew that.

4    Q.    And in March of 2003, according to your testimony
5 yesterday, that's when you knew that --

6    A.    March or April, I said.

7    Q.    March or April of 2003, that's when you knew and
8 you tied it to the direct mail that the results were not as
9 forecasted.

10    A.    Yeah, that's true.

11    Q.    Why didn't you terminate then?

12    A.    I don't remember.

13    Q.    You had --

14    A.    I'm sure there's some rationalization. You're
15 asking me a question, and I'm trying to be truthful.

16    (A. Covatto Deposition Exhibit No. 9 marked for
17    identification.)

18    Q.    Here's an e-mail from Joyce Covatto to Harry
19 Metcalf dated April of '03.

20    A.    Sure.

21    Q.    "Will wire $30,028 to the account today. It is in
22 process as we speak. We hope to soon be able to catch up as
23 soon as they get payment to us on a regular basis. Have not
24 heard from them yet re the other items."

25    Now, do you know who she's referring to when she

Page 43

```
 1   lien, those things take a long time to get satisfied.  And I
 2   don't know if it was satisfied then or what the deal was.
 3        Q.   And in November 25, 2002, there was another
 4   Federal tax lien of $245,520.  So does that sound about
 5   right?  I mean, I can show you the record, if you want.
 6        A.   I'm sure whatever the record says.
 7        Q.   Would be correct.  And did Creditron Financial
 8   Services, Inc. have its own payroll?
 9        A.   Yes.
10        Q.   So Creditron Financial Services, Inc. and
11   Creditron Financial Corporation had its own payroll.
12        A.   Yes.
13        Q.   Did you feel, as the man in control of the money,
14   that you had the authority to decide which expenses among
15   the series of expenses would get paid at any given time?
16        A.   Yes.
17             MR. SNYDERMAN:  Why don't we conclude now then,
18        because I need to talk with you in the few minutes
19        that remain about what the plans are for the rest
20        of the day and you can leave promptly at 9:30.
21             MR. MARKHAM:  We can do that.
22             (Recess taken from 9:24 to 1:34 p.m.)
23             MR. SNYDERMAN:  As previously agreed, before we
24        recessed at, approximately, 9:30 this morning, I
25        returned to Mr. Markham's office at,
```