Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

    DELAWARE MARKETING PARTNERS, LLC,        :
 3  a Delaware limited liability company,    :
            Plaintiff                        :
 4                                           :
            v.                               : Case No. 04-263 Erie
 5                                           :
    CREDITRON FINANCIAL SERVICES, INC.,      :
 6  a Pennsylvania corporation, and          :
    TELATRON MARKETING GROUP, INC.,          :
 7  a Pennsylvania corporation,              :
            Defendants                       :
 8

 9
            Deposition of JOYCE CAVOTTO, taken before and
10      by Sondra A. Black, Notary Public in and for the
        Commonwealth of Pennsylvania, on Wednesday, May 24,
11      2006, commencing at 12:12 p.m., at the offices of
        Elderkin Martin Kelly & Messina, 150 East Eighth
12      Street, Erie, Pennsylvania 16501.

13

14  For the Plaintiff:

15      Charles Snyderman, Esquire
        Charles Snyderman, PA
16      Stoney Batter Office Building
        5301 Limestone Road, Suite 214
17      Wilmington, DE 19808

18      Douglas M. Grimsley, Esquire
        Dickie McCamey & Chilcote, P.C.
19      Two PPG Place, Suite 400
        Pittsburgh, PA 15222-5402
20
    For the Defendants:
21
        Craig A. Markham, Esquire
22      Elderkin Martin Kelly & Messina
        150 East Eighth Street
23      Erie, PA 16501

24
                   Reported by Sondra A. Black
25            Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT 4
ALL-STATE LEGAL

1    J O Y C E  C A V O T T O, first having
2    been duly sworn, testified as follows:
3
4                    DIRECT EXAMINATION
5    BY MR. SYDERMAN:
6
7        Q.   Could you state your name and address for the
8    record, please.
9        A.   Joyce Cavotto, 1208 St. Mary Drive, Erie,
10   Pennsylvania 16509.
11       Q.   Has Mr. Markham explained to you the phone
12   technology and what we're doing?
13       A.   Yes.
14       Q.   Were you involved in the decision not to send the
15   full 28.57 percent share to Delaware Marketing Partners at
16   any given time?
17       A.   Yes.
18       Q.   When was the first time that you decided that they
19   should not receive 28.5 percent of money that you received?
20       A.   I -- I don't know if it was an actual conscious
21   decision.  It was based on the fact that the funds were not
22   coming in, and there was really not -- not the ability to pay
23   the full 28-point-whatever percent.
24       Q.   Well, when you didn't have the ability to pay, did
25   you not tell them that the reason you weren't paying was

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                                Joyce Cavotto

Page 12

1  point is because of looking at numbers, looking at the
2  results, looking at what was promised, looking at what was
3  actually delivered in terms of what their involvement was.
4           I had alluded to the fact with -- with Harry and --
5  not with Brian. Brian was not my contact. Brian and I had,
6  I think, one brief conversation which -- alone, which was
7  that conversation in November. But we were -- we were
8  sending them funds, and we were discussing -- I just had
9  always said that the program did not perform at the manner
10 which they, as experts, promised that it would. And we
11 agreed to the 28 percent based upon -- based upon what their
12 projections were, and the program never reached that point.
13      Q.   But in 2002, you understood that Delaware Marketing
14 Partners was providing services based on their expectations
15 of receiving 28.57 percent of the funds that you received
16 from Brazos, correct?
17      A.   That is correct. We also agreed to the 28 percent
18 based on expectations that they provided to us. And that is
19 how that agreement was reached.
20      Q.   Right. And in January and February and March of
21 2003, they continued to provide services based on their
22 expectations of receiving 28.57 percent of the gross revenue,
23 correct?
24      A.   Yes.
25      Q.   You didn't tell them, before you continued to work

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                    Joyce Cavotto

Page 13

1  and provide services, we think you ought to know that we're
2  not going to pay you the 28.57 percent?
3      A.   This was at the very beginning of the program, and
4  no one really knew. I did not know that their expertise, as
5  they had alluded to, and their experience within the
6  marketing would not perform until we got more involved in the
7  program and as time went on.
8      Q.   But as far as you know, in 2002 and until sometime
9  in November of 2003, Delaware Marketing Partners was
10 providing services to you based on their understanding that
11 you were going to be paying them 28.57 percent of the gross
12 revenue, correct?
13     A.   That is correct. But that agreement was also based
14 on the understanding that they were to provide services to
15 allow us to meet certain projected results, and that did not
16 happen.
17     Q.   When did it occur to you that they were not
18 providing what you were expecting them to provide?
19     A.   It was, again -- you know, I don't have the results
20 in terms -- results in terms of the actual numbers in front
21 of me. But it's -- it -- the results of their direct mail,
22 we allowed another direct mail program to occur, we thought
23 that the first one, which they had indicated that the revenue
24 would be in excess of $12 million -- at that point there was
25 not a lot of funds coming in.

Ferguson & Holdnack Reporting, Inc.
814-452-4556

Page 14

1  We allowed that to happen, they went and there was a
2  tremendous expenditure, in terms of their agreement with a
3  marketing agency, of $60,000 for creative -- we allowed that
4  to happen based upon their projections of $12 million in
5  revenue coming back to us.  The reality was that that did not
6  happen.
7       We worked with them again in terms of another direct
8  mail program, which did not happen.  So probably by the early
9  part -- in the -- you know, again, I don't have the results.
10 But I -- I -- I would think in the midpart of the year things
11 really started to go sour in terms of how we looked at them
12 in terms of their expertise and -- what they had indicated in
13 terms of their knowledge and their expertise.  It was not --
14 was not going to bring the program around as they had
15 indicated.
16     Q.  After the $142,850 had been paid, you agree that by
17 withholding funds, regardless of when it was -- you don't
18 claim that they still owe you that 142,850 in funds, do you?
19     A.  I can't answer that.  I can't answer that because I
20 would have to go back and look at it.  I honestly do not
21 recall that.  I can't give you the -- I can't give you that
22 answer, as I stated before.
23     Q.  Now, from October of 2002 to January of 2004,
24 according to Desanti-Beohm No. 1, Academic Lending Center
25 received from Brazos $9,402,739.44.  Do you see that?

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                                    Joyce Cavotto

Page 15

1    A.    Yes.
2    Q.    And according to Desanti-Boehm 3, from November of
3    2002 to December 15, 2003, ALC disbursed to Delaware
4    Marketing Partners under 800,000.  Do you see that?
5    A.    I do.
6    Q.    What happened to the difference between
7    $9,402,739.44 and 800,000?  Where'd that money go?
8    A.    That money went for production.  That money, if
9    you -- I had provided Brian with a production -- just
10   production hours that we had produced on this program from
11   September of 2002 to, I believe it was, the first part of
12   October of 2003.  Just in production expense, meaning people
13   on the phones, expenses that were real and actual in terms of
14   hours that were produced, supervisor salaries, plus ALFO,
15   which was our follow-up, averaged to around $35 an hour.  At
16   that point in time our expenses were over $4 million.  That
17   did not include a plethora of other things that we did not
18   anticipate.
19   Q.    Take a look at Desanti-Boehm 4.  Let me know when
20   you have that.
21   A.    Yes, I have it.
22   Q.    If you look at Page 3 of that, is that the document
23   you're referring to?
24   A.    It is.
25   Q.    Please tell me what is represented under the column,

Ferguson & Holdnack Reporting, Inc.
814-452-4556

1   somebody else was going to receive the funds?
2       A.   No.
3       Q.   Was there ever a discussion about an escrow agent
4   being used?
5       A.   No, not that I recall.
6       Q.   When you signed the marketing agreement, did you
7   feel that you had any responsibility to provide an accounting
8   on a regular basis to Delaware Marketing Partners as to the
9   funds received from Brazos?
10      A.   I'm sorry, I don't quite understand where you're --
11  what your question is.  I mean, you're asking me if I --
12      Q.   If you knew -- let me explain.
13      A.   Was it black and white in the agreement?  I really
14  don't recall.
15      Q.   You knew that Delaware Marketing Partners was
16  expecting a certain percentage of the gross revenues that you
17  received from Brazos, correct?
18      A.   That is correct.
19      Q.   And you knew that Delaware Marketing Partners had to
20  rely on you to let them know if money was received, and if
21  so, how much, correct?
22      A.   Yes.
23      Q.   All right.  And you knew that you didn't want Brazos
24  to become involved between any dispute between you and
25  Delaware Marketing Partners; is that right?

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                                           Joyce Cavotto

Page 24

1   A.   Well, there was never an intent of a dispute, that
2   is correct.
3   Q.   Right. I mean, you wouldn't want Delaware Marketing
4   Partners, as this project was moving forward, to be calling
5   Brazos every day asking, did you wire any funds to ALC? You
6   didn't want that, did you?
7   A.   That's correct.
8   Q.   So you knew that, for all practical intents and
9   purposes, the only way that Delaware Marketing Partners would
10  know the bottom-line results of what was being done by you
11  and by them -- and by "bottom-line," I mean what money was
12  received -- was if you told them, correct?
13  A.   That's correct.
14  Q.   And you didn't set up any mechanism or process
15  whereby ALC would be notifying Delaware Marketing Partners
16  every time a wire was received, correct?
17  A.   We did not.
18  Q.   Why not?
19  A.   I don't know. It was never -- it was never set up
20  by either of us.
21  Q.   Never occurred to you that you might do that since
22  you were actually receiving funds that were theirs? Let me
23  strike that question. You knew that you weren't entitled,
24  under the agreement, from Day 1 to 100 percent of the gross
25  revenue, correct?

1  understand that.  We know you're not going to get LVCs for 60
2  days.
3         We came in under the intent that the whole process
4  was much more concise.  The results of every marketing
5  attempt we did, both on the direct mail side and the
6  marketing side, did not produce the same results and
7  certainly not results as quickly as we had -- we all had
8  anticipated.  So I really felt that we could sit down and
9  say, you know what, let's work together.  And, basically,
10 when I approached Brian, he -- he basically laughed at me.
11     Q.    The exhibit to the Student Loan Origination and
12 Marketing Agreement provides that you were to make payments
13 of the 28.57 percent of gross proceeds within seven days
14 after the funds were receiveded by you, correct?
15     A.    Yes.  That's what it says.
16     Q.    Who was it within your organization that was
17 responsible for determining the amount and when payments
18 would be sent by you to Delaware Marketing?
19     A.    In the initial stages of the relationship -- that
20 was a conversation that basically was held between Harry and
21 myself.  In the initial stages of the relationship, they
22 understood that we were expending dollars, and that there
23 were not funds available.  Whether Brazo sent us $5,000 or
24 $30,000, these people, in terms of these production reports
25 that you have in front of you that showed the hours worked,

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                                    Joyce Cavotto

Page 43

1  incorporated, validly existing, and in good standing under
2  the laws of the Commonwealth of Pennsylvania." When you
3  signed the agreement, what was your intention in making that
4  representation, warranty, and covenant?
5      A.   I didn't -- Telatron -- according to the -- whatever
6  it is stated in the contract. I did not write the contract,
7  but, obviously, with my signature it's what's stated in the
8  contract.
9      Q.   Who wrote that language?
10     A.   I do not know.
11     Q.   Somebody on behalf of the Defendant was instructed
12 to draft language, correct?
13     A.   Yes.
14     Q.   And who on behalf of the Defendants was involved in
15 the preparation of the agreement?
16     A.   Again, it was four years ago. This looks very much
17 like a standardized type of an agreement with standardized
18 nomenclature except as it relates pretty much to the
19 addendum. It would be a contract we used for many
20 organizations except for the name. I don't know the answer.
21     Q.   Please look at the last page. The signature page of
22 the agreement.
23     A.   I guess that would be the exhibit to the agreement.
24     Q.   Notice there's a signature line for Delaware
25 Marketing Partners, LLC, and then there's a byline, and then

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                                              Joyce Cavotto

Page 44

1    there's Telatron Marketing Group, Inc., and whose signature
2    is that?
3        A.   Mine.
4        Q.   And it says, "Title." What's it say under that?
5        A.   "President."
6        Q.   And at the time were you president of a company
7    called Telatron Marketing Group, Inc.?
8        A.   Yes.
9        Q.   Below that it says, "Academic Lending
10   Center/Financial Services, Inc." Do you know whose signature
11   that is?
12       A.   Alfred Cavotto.
13       Q.   And he was the president in February of '03?
14       A.   Yes.
15       Q.   Now, did you tell me that Telatron Marketing Group,
16   Inc. is owned by you and Creditron Financial Services, Inc.
17   is owned by Mr. Cavotto?
18       A.   That is correct.
19       Q.   Were there any written agreements between Telatron
20   Marketing Group, Inc. and Creditron Financial Services, Inc.
21   with regard to the services that were to be performed or
22   provided under the marketing agreement?
23       A.   No.
24       Q.   How is it determined how much money was to be paid
25   by Creditron Financial Services, Inc. to Telatron Marketing

Ferguson & Holdnack Reporting, Inc.
814-452-4556

Page 66

1   A.   My understanding is that we were to work very
2   closely together to secure student loan consolidations. It
3   was not to be partnership, but to really, on a formal
4   basis -- but, in reality, to be able to reach the goals that
5   we all wanted to, it really needed to morph into that.
6   Q.   Mrs. Cavotto, I can tell you that we're coming to
7   the end of my questions. I have just a few more.
8        If you'll please take a look again at what's been
9   marked as Desanti-Boehm 1 for identification. The document
10  received by ALC from Brazos.
11  A.   Yes.
12  Q.   And also, Desanti-Boehm 3.
13  A.   I have them.
14  Q.   All right. I believe I covered this in one way with
15  you earlier, but let me get to the exact point that I want to
16  cover with you. In any situation where there's a month
17  that's gone by that's mentioned on the received by ALC
18  document where 28.57 percent was not sent to Delaware
19  Marketing Group, who within the organization determined not
20  to send the full 28.57 percent?
21  A.   Within the organization, there were not the funds
22  available to send the 28.71, or whatever, percent. We were
23  still up until the -- almost the end of the year we were
24  still recoiling from all of the development expenses, the
25  production expenses, the lack of accuracy in terms of

1    production -- or performance, and there was a decision,
2    probably mine, that I had to pay payroll versus sending a
3    total of 28, or whatever, percent to Delaware Marketing.  And
4    for a great period --
5         Q.    When you said "towards the end of the year," is that
6    2002 that you're referring to?
7         A.    No.  Three.
8         Q.    Who determined the exact amounts that were sent to
9    Delaware Marketing?
10        A.    I did.
11        Q.    How did you make that determination?
12        A.    It was what we could afford to send them.
13        Q.    Well, in February of 2003, when I add up the amounts
14   that were sent -- in fact, just to make it simpler, if you
15   look at Document No. 3, disbursed by ALC to Delaware
16   Marketing Partners, it says here, "February 28, '03, wire
17   transfer in the amount of $89,068.45."  The 45 cents would
18   tend to indicate that there was some calculation going on to
19   come to the exact amount to send as opposed to sending an
20   arbitrary amount.  Would you agree with that?
21        A.    As it appears.
22        Q.    How did you determine to send a sum of money plus 45
23   cents?
24        A.    I don't know.
25        Q.    When you directed somebody in the financial control