Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

    DELAWARE MARKETING PARTNERS, LLC,          :
 3  a Delaware limited liability company,      :
              Plaintiff                        :
 4                                             :
              v.                               : Case No. 04-263 Erie
 5                                             :
    CREDITRON FINANCIAL SERVICES, INC.,        :
 6  a Pennsylvania corporation, and            :
    TELATRON MARKETING GROUP, INC.,            :
 7  a Pennsylvania corporation,                :
              Defendants                       :
 8
 9
              Deposition of TRISHA DESANTI-BOEHM, taken
10       before and by Sondra A. Black, Notary Public in
         and for the Commonwealth of Pennsylvania, on
11       Wednesday, May 24, 2006, commencing at 9:32 a.m.,
         at the offices of Elderkin Martin Kelly & Messina,
12       150 East Eighth Street, Erie, Pennsylvania 16501.

13
14  For the Plaintiff:

15       Charles Snyderman, Esquire
         Charles Snyderman, PA
16       Stoney Batter Office Building
         5301 Limestone Road, Suite 214
17       Wilmington, DE 19808

18       Douglas M. Grimsley, Esquire
         Dickie McCamey & Chilcote, P.C.
19       Two PPG Place, Suite 400
         Pittsburgh, PA 15222-5402

20
    For the Defendants:
21
         Craig A. Markham, Esquire
22       Elderkin Martin Kelly & Messina
         150 East Eighth Street
23       Erie, PA 16501

24
                    Reported by Sondra A. Black
25               Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT 5

Page 10

1  Q. Are you saying that either Mr. or Mrs. Cavotto
2  drafted Paragraph 7 of the agreement?
3  A. Yes.
4  Q. Did you review the entire agreement before it was
5  signed?
6  A. No, I didn't.
7  Q. Do you know whether any other counsel was asked to
8  review the agreement?
9  A. No, I don't.
10  Q. In any discussions or other types of communications
11  that you've had with any representative of Delaware Marketing
12  Partners, did you ever tell any of those individuals that
13  Telatron was not a corporation validly existing and in good
14  standing under Pennsylvania law?
15  A. I never had a discussion that encompasses that
16  topic.
17  Q. I'm sorry, just because of the connection I didn't
18  hear your entire answer. You started to -- you did tell me
19  that Telatron was a fictitious name for what company?
20  A. Creditron Financial Corporation.
21  Q. And is Creditron Financial Corporation a different
22  company, a different entity, than Creditron Financial
23  Services, Inc.?
24  A. Yes, it is.
25  Q. Are you familiar with the relationship, if any,

Page 11

1  between Creditron Financial Corporation and Creditron
2  Financial Services, Inc.?
3  A. I am.
4  Q. Could you explain it for me, please.
5  A. They have -- I guess the easiest way to say it is,
6  they have -- they share shareholders. Mr. and Mrs. Cavotto
7  work with both companies. Creditron Financial Services, Inc.
8  basically handles the collection side and things of that
9  nature, whereas Creditron Financial Corporation really
10  concentrates on the marketing of financial products,
11  specifically telemarketing.
12  Q. Can you explain to me, please, the relationship
13  between Academic Lending Center and Creditron Financial
14  Services, Inc.
15  A. Sure. Academic Lending Center is a fictitious name
16  for Creditron Financial Services, Inc., and the purpose is
17  third party marketing of student loan consolidations.
18  Q. I'm a little confused, and I'm hoping you can clear
19  up the confusion that I have. If Creditron Financial
20  Corporation is a marketing-type company and Creditron
21  Financial Services is on the collection side, why would
22  Academic Lending Center be, for want of a better term,
23  affiliated with Creditron Financial rather than Creditron --
24  I'm sorry, Creditron Financial Services, Inc. rather than
25  Creditron Financial Corporation?

Page 12

1  A. It is the only thing that deviates, basically, from
2  the collection aspect of things, and I have no idea why the
3  choice was made to put Academic Lending Center in that
4  category. It wasn't my decision.
5  Q. Who's decision was it?
6  A. Joyce and Al Cavotto I assume, but I have no idea.
7  Q. Do you know how long Academic Lending Center has
8  been in existence?
9  A. August 2002.
10  Q. Do you know why it was created?
11  A. To do a total turnkey operation for the third party
12  marketing of student loan consolidations.
13  Q. And was it solely in anticipation of the arrangement
14  with Delaware Marketing Partners that Academic Lending Center
15  was created?
16  A. No. In fact, the trademarks were requested in --
17  well before the contract was ever entered into.
18  Q. Just to be sure I'm clear, I'm not necessarily
19  limiting the question to when the contract or agreement was
20  entered into, but rather, when discussions first began with
21  Delaware Marketing Partners. So just to be clear, would it
22  be fair to say that the trademark information that you
23  mentioned was sought or started before you even had -- and
24  "you" meaning any of the parties on the Creditron Telatron
25  side -- had any discussions with Delaware Marketing?

Page 13

1  A. No. The trademarks weren't done before that, but
2  Academic Lending Center was not created solely for this
3  relationship.
4  Q. Before the agreement with Delaware Marketing
5  Partners was entered into, did Academic Lending Center
6  actually get involved in the area that it was formed for? In
7  other words, did it do any business?
8  A. No. It hadn't done any business at that point.
9  Q. Was the first business that Academic Lending Center
10  did a part of or a follow-up through the marketing agreement
11  with Delaware Marketing Partners?
12  A. It was the first business we did, but not the first
13  business we actually sought.
14  Q. I'm going to ask local counsel, Mr. Grimsley, to
15  show you a document which I've stamped Pages 246 to 248, and
16  it's entitled, "Received by ALC from Brazos".
17  A. Okay.
18  Q. Have you ever seen this document before?
19  A. Yes.
20  Q. This is one of the documents that you discussed with
21  Terry Smith and Joyce Cavotto?
22  A. Yes.
23  Q. Can you tell me who prepared this document.
24  A. Our financial control department.
25  Q. Any specific individual?

Page 22

1  nonsub INT, and late fees. Does that sound familiar to you
2  at all?
3     A.  It does sound familiar to me, and that would be --
4  that would be the disbursement rosters that Brazos used to
5  create their payments to us, but that's not actually the
6  document I'm talking about.
7     Q.  Then I see a document that says, "64 borrowers and
8  then a dollar amount; total disbursed; a dollar amount,
9  non-Brazos; a dollar amount, Brazos; an amount for AB, it
10 looks like maybe one or I, and then a premium; and then a
11 percentage of non-Brazos; then there's reduced premium; full
12 premium rate times percentage non-Brazos.
13    A.  That's the document.
14    Q.  That's the wire transfer document?
15    A.  Yeah.
16    Q.  Then someone wrote ".50 LOC." Do you know what that
17 might refer to?
18    A.  No. I have no idea.
19    Q.  But you weren't, in your role, writing anything on
20 these wire forms, correct?
21    A.  Correct. The only time I saw them was in compiling
22 discovery.
23    Q.  Good enough. Thank you. Paragraph 7 of the
24 Complaint states, "On September 1, 2002, the parties entered
25 into a Student Loan Origination and Marketing Agreement

Page 23

1  whereby the parties agreed to work together to perform
2  student loan acquisition services." And the answer to the
3  Complaint, Paragraph 7, says, "Denied as stated. The Student
4  Loan Origination and Marketing Agreement was signed by the
5  parties in February 2003," and it has some legal stuff like
6  the agreement speaks for itself. Then there's a sentence
7  that says, "It is admitted that the Plaintiff was hired to
8  perform certain specified services for the Defendant." Do
9  you know what those certain specified services were?
10    A.  Yes.
11    Q.  Did you say yes?
12    A.  Yes.
13    Q.  Would you please describe them for me.
14    A.  List acquisition analysis, direct marketing
15 campaigns, advertise for the ALC program.
16    Q.  Anything else?
17    A.  No. That was primarily all.
18    Q.  Is there any document, other than the Student Loan
19 Origination and Marketing Agreement, along with any exhibits
20 attached to it, that would describe these services that
21 you've just listed?
22    A.  There's no other contracts, but there was a letter
23 from August 20th of 2002 to Delaware Marketing that I think
24 outlined that. But there was no other contractual
25 agreements.

Page 24

1     Q.  Is the August 20, 2002 letter a letter signed by AD
2  Cavotto, CEO?
3     A.  That's correct.
4     Q.  Are there any other documents, other than the August
5  20, 2002 letter and the Student Loan Origination and
6  Marketing Agreement, that would refer to or describe the
7  services to be provided by Delaware Marketing Partners?
8     A.  I don't think so.
9     Q.  In the Answer to the Complaint, in Paragraph 7, the
10 sentence, "It is admitted that the Plaintiff was hired to
11 perform certain specified services for the Defendants." Do
12 you have any understanding of the word "hired" and what it
13 means?
14    A.  That they were to perform certain services and we
15 would give them a portion of the revenue for performing those
16 services.
17    Q.  Paragraph 8 of the Answer states, "It is denied that
18 Plaintiff fulfilled all of its obligations and duties." To
19 your knowledge, are the obligations and duties which it's
20 alleged that the Plaintiff failed to fulfill the obligations
21 and duties that are listed in the Student Loan Origination
22 and Marketing Agreement?
23    A.  The agreement and the corresponding exhibit, yes.
24    Q.  Let's take them one by one. Please tell me what
25 obligation and duty the Plaintiff had that it failed to

Page 25

1  fulfill.
2       MR. MARKHAM: You're speaking about her knowledge
3  of this, right?
4       MR. SNYDERMAN: I couldn't ask for anybody else.
5  Absolutely.
6     A.  I guess the easiest way to start it is --
7       MR. GRIMSLEY: If we're going to show documents, at
8  least discuss it with counsel on the phone.
9       MR. MARKHAM: Wait a minute. We're going to show
10 her the contract and exhibit.
11      MR. SNYDERMAN: That's fine.
12    A.  I guess I'll start with the exhibit. Prospect lead
13 acquisition, it's true that they gave us leads. Our concern
14 was that, beginning in April of 2003, the quality of those
15 leads began to diminish. Additionally, as we hit around the
16 September, October, November, December time frame, the
17 quality of the leads deteriorated quite rapidly and quite
18 significantly. So that would have been one issue.
19      Second was the direct mail campaigns. We did two
20 direct mail campaigns, neither of which came anywhere near
21 the target that was projected to us. So, of course, that was
22 an issue. As was the fact that there was no other direct
23 marketing initiatives that took place after that.
24      There's also a discussion of credit bureau
25 relationships. I guess that was done.

Page 26

1   Analyst recommendations, I'm not really sure what
2   was done on this end. Nothing that we see, I guess.
3       The marketing plan and recommendations, I guess they
4   gave some of those, and we took them.
5       Marketing management assignments, I don't believe we
6   gave them anything else, other than they were to engage in --
7   engage in advertising on behalf of the Academic Lending
8   Center program, which never occurred.
9       And I just want to look at the contract really
10  quick. I guess that would be it in a nutshell.
11  Q.  With respect to the prospect lead acquisition that
12  you mentioned -- again, I want to make sure that I heard you
13  correctly -- did you say that it was April of 2003 when the
14  quality of the leads began to diminish?
15  A.  That's correct. And I guess I should clarify that.
16  April 2003 more so as, I guess, the quality of leads
17  diminished. What I'm talking about there is the fact that
18  the number of leads that we were receiving from Delaware
19  Marketing versus the number of leads that we were actually
20  able to use from what we received continued to diminish. In
21  the beginning months, the first few buys we were able to use
22  90, 95 percent of those leads, and in April, I think we
23  dropped down significantly to about 50 percent of the leads
24  they had provided to us were not able to be used.
25  Q.  Why were they not able to be used?

Page 27

1   A.  A lot of them were duplicates. Meaning, we had
2   already had them, contacted them before, and gotten a
3   response from them.
4   Q.  Do you know whether anyone on behalf of the
5   Defendants' side notified anyone from the Plaintiff's side
6   that there was dissatisfaction with the quality of the leads?
7   A.  I personally did not discuss that with Delaware
8   Marketing until late in the fall of 2003, and that's all I
9   can speak to. I -- but I am aware that others maintain that
10  they have -- they did talk to Delaware Marketing about it.
11  Q.  In reviewing any of the documents in connection with
12  this litigation, did you come across any documents that refer
13  or relate to the issue of the diminishing quality of the
14  leads?
15      MR. MARKHAM: I want to make sure the witness
16      understands that you're asking her about documents
17      that refer to it and documents which relate to it.
18      I mean, there are two different types of records, I
19      think.
20  Q.  The witness can answer.
21  A.  Well, I know that there was reporting that was
22  provided to Delaware Marketing. So those documents would, of
23  course, relate to it. We also sent flash reports, which
24  would have -- that piece of information would have been, you
25  know, ascertained from there if Delaware Marketing was

Page 28

1   analyzing them. But I don't -- I haven't seen any direct
2   documents.
3   Q.  You mentioned direct mail campaigns. And I believe
4   you said that there were two campaigns and neither came close
5   to what had been projected; is that correct?
6   A.  That's correct.
7   Q.  What was projected?
8   A.  Alan had provided us with a projection on the direct
9   mail campaigns that, for instance, our response rate would be
10  somewhere around 1.3, it might even go as high as 2 percent.
11  Also said, I believe -- I want to say 45 percent of the
12  applications for which we took we would actually receive
13  signed documentation back. We didn't come anywhere near 45
14  percent return rate. I believe that the campaigns ended
15  somewhere around .3 and .5.
16  Q.  When did the first campaign end?
17  A.  I don't know when it ended. I know it began in
18  March of 2003.
19  Q.  Do you know when the second campaign started?
20  A.  June of 2003.
21  Q.  I'm sorry?
22  A.  June of 2003.
23  Q.  Do you have any knowledge as to why the Defendants
24  would start a second campaign in June of 2003 if Defendants
25  were aware by April of 2003 that there were problems with the

Page 29

1   leads that were given?
2   A.  No. I have no idea. I don't know how the direct
3   mail worked as far as whether those were -- it was a residual
4   mailing. I don't know.
5   Q.  Paragraph 9 of the Answer states, in part, that, "As
6   a condition precedent to any payment, the Plaintiff was
7   obligated to properly perform certain specified work and
8   services." Can you tell me where, in any of the documents,
9   it states that there's a condition precedent to payment?
10      MR. MARKHAM: Chuck, let me do this: Let me get my
11      copy of the answer. I don't have it here in the
12      room.
13      MR. SNYDERMAN: Sure.
14      MR. MARKHAM: We're back.
15      MR. SNYDERMAN: Let me know when the witness has
16      the answer.
17      MR. MARKHAM: She's looking at it now.
18  Q.  I'm talking about Page 3, Paragraph 9. Feel free to
19  read the entire paragraph if you wish. I'm specifically
20  referring to the third sentence, which begins, "As a
21  condition precedent."
22  A.  Okay.
23  Q.  Can you tell me where, in any of the contractual
24  documents, there's a reference to a condition precedent to
25  payment?

**Page 30**

1  A.  I think it's our -- that's based on our
2  interpretation and understanding of Section 4 in the exhibit,
3  on Page 3, the allocation of program revenues where we
4  outline that the defenses provided -- for the services
5  provided Telatron would distribute funds in the following
6  manner.
7  Q.  And the problem with the lead and the quality of the
8  leads started in April of 2003.  Were there any problems with
9  the services provided by Delaware Marketing Partners prior to
10  April of 2003?
11  A.  I think there was an overall problem with our
12  understanding of the program based on our representations
13  made by Delaware Marketing which put us in a significant cash
14  flow situation.  So much so that in November, a month or so
15  after we started the program, we laid off about 70 employees
16  because we couldn't make payroll.  So I guess, overall, there
17  was a processing problem.
18  Q.  Were the employees that were laid off exclusively
19  working on this campaign?
20  A.  Actually, no, they weren't.  Because, quite frankly,
21  we were trying to generate revenue on this campaign.  So we
22  looked throughout the organization for individuals that we
23  could afford to lose in other areas.  That included MIS
24  areas -- you know, all the way around the board.
25  Administrative areas as well as production.

**Page 31**

1  Q.  You said, "Not able to make payroll."  Which company
2  was not able to make payroll?
3  A.  Creditron Financial Corporation.
4  Q.  Which was not a party to the marketing agreement,
5  correct?
6  A.  Well, Creditron Financial Corporation is the
7  corporation for which Telatron Marketing Group is a
8  fictitious name.
9  Q.  Are you familiar with the federal tax liens that
10  existed with regard to any of the Defendants prior to the
11  start of Campaign No. 1?
12  A.  I'm vaguely aware of them.  I know they existed,
13  that's about it.
14  Q.  Do you know anything about the financial condition
15  of any of the Defendants prior to the start of Campaign 1?
16  A.  No.
17  Q.  I'm sorry?
18  A.  No, I don't.
19  Q.  Is it your testimony that all the financial problems
20  that any of the Defendants had were caused by
21  misrepresentations by Delaware Marketing Partners?
22  A.  No.  It's my testimony that the misrepresentations
23  by Delaware Marketing Partners led us to believe that this
24  was a different base than it was, and therefore, we incurred
25  a great deal of start-up costs that we did not anticipate.

**Page 32**

1  So we were expending a great number of resources on labor and
2  products and processes and services that we didn't anticipate
3  in the beginning given the representations, and that was
4  causing a significant cash flow problem.
5  Q.  Are you aware of who, on behalf of the Defendants,
6  communicated to Delaware Marketing Partners that their --
7  that the Defendants had made the decision not to pay Delaware
8  Marketing Partners for its services?
9  A.  I have -- I have no information on that, no.  I
10  wasn't involved in any discussions.
11  Q.  Are you aware of any communications between anyone
12  on behalf of the Defendants and Delaware Marketing Partners,
13  as the campaigns were ongoing, concerning the amount of
14  wires -- I'm sorry, the amount of money that was wired from
15  Brazos to Creditron?
16  A.  I believe I've seen, maybe in the Defendants'
17  discovery, e-mails.  But, I mean, I had no personal -- I have
18  no personal information on that.  I may have seen -- I
19  believe I saw one e-mail where Mrs. Cavotto had made a
20  comment to Allen that we received 152,000 and payroll was
21  more than that.  But that's -- I mean, that's the extent of
22  it.
23  Q.  Prior to the litigation, just in connection with
24  your responsibilities for Creditron Capital Corporation, were
25  you aware of any communications between the Defendants and

**Page 33**

1  Delaware Marketing Partners as to amounts that were being
2  received from Brazos?
3  A.  Yeah.  I believe that Mrs. Cavotto had provided
4  Brian and Harry with a spreadsheet in November of 2003 that
5  would have outlined that information.
6  Q.  I'm going ask Doug to hand you what's been stamped
7  Pages 250, 251, and 252.  Please let me know when you have
8  that.
9  A.  I have it.
10  Q.  The third page, which is No. 252, is that the
11  document you're referring to?
12  A.  It is.  Yes, it is.
13  Q.  What's your understanding of the column, "Paid ALC"?
14  What do those numbers represent?
15  A.  Apparently what was paid to ALC, I assume, by
16  Brazos.
17  Q.  Still looking at that same page, 252, you'll see on
18  the left-hand column it says, "2003," and then it says,
19  "January."  Do you see that?
20  A.  Yes, I do.
21  Q.  And it indicates $154,780.28 was paid by Brazos to
22  ALC, correct?
23  A.  That's what it says.
24  Q.  Do you know whether that's correct?
25  A.  I know it's not correct.

Page 34
1  Q. Do you know why Delaware Marketing Partners was
2  informed that $154,780 was received?
3  A. I have no idea. And I don't know how this
4  spreadsheet was created, what information was used to create
5  it. I know that the document that was provided to you in
6  discovery was created using the actual wire transfers that we
7  received from Brazos. So, therefore, I know that to be a
8  correct number.
9  Q. And you're aware that there are other numbers in
10 that same paid ALC column that are incorrect, right?
11 A. Yes, I am.
12 Q. Have you ever told Joyce Cavotto that they were
13 incorrect?
14 A. Yes, I did.
15 Q. When did you tell her?
16 A. On Friday.
17 Q. What did she say?
18 A. She said that this was never meant to be a corporate
19 document. That it was something she generated from her
20 e-mails of information received from financial control,
21 and -- she never intended it to be a corporate document, and
22 that she had told Delaware Marketing that during the course
23 of the conversation they had sometime in November.
24 Q. Going back to Desanti-Boehm 1. In October of 2002,
25 when I add the first two amounts together, I get $6,081.78.

Page 35
1  Do you know whether or not Delaware Marketing Partners was
2  paid 28.57 percent of those funds?
3  A. Well, if I look at the -- I have no idea what they
4  were paid in the month of October off the top of my head. I
5  mean, if I look at this spreadsheet, I can assume that they
6  weren't, but I know the spreadsheet is not accurate. So I'm
7  not going to use that for my basis.
8  Q. I'm going to ask Douglas to hand you what's been
9  stamped Page 249. Let me know when you have that.
10 A. I have it.
11 Q. Does that help you answer the question?
12 A. It does.
13 Q. What's the answer to the question?
14 A. They were not paid anything in October.
15 Q. Do you know why?
16 A. I don't.
17 Q. Do you know what work and services that Delaware
18 Marketing Partners was obligated to perform as a condition
19 precedent to their receiving 28.5 percent of the funds that
20 Academic Lending Center received in October of 2002?
21 A. It would have been the items that I had previously
22 identified.
23 Q. Are you testifying that they had not adequately
24 performed as of October of 2002?
25 A. I'm testifying that I don't know the reason the

Page 36
1  decision was made not to pay them. I can assume it was
2  because we received $5,000 and our cost for payroll was more
3  than that. I mean, that's the only information I have.
4     MR. SNYDERMAN: Let's mark Page 249 as
5  Desanti-Boehm 3, if I'm not losing track.
6     MR. GRIMSLEY: Did you want to mark 250 as well?
7     MR. SNYDERMAN: I'm sorry?
8     MR. GRIMSLEY: Did you want to mark 250 through 252
9  as an exhibit as well? You haven't marked that one
10 yet.
11    MR. SNYDERMAN: Why don't we do it. Why don't we
12 make that Desanti-Boehm 4.
13    MR. GRIMSLEY: So 249 will be Exhibit 3, and 250 to
14 252 will be Exhibit 4.
15    (Desanti-Boehm Deposition Exhibit Nos. 3 and 4
16     marked for identification.)
17    MR. SNYDERMAN: Correct.
18 Q. I'm going to ask Doug to give you a document which
19 consists of Pages 283 to 288. Do you have that?
20 A. I do.
21 Q. This is a document from Brazos to Academic Lending
22 Center about funds that were going to be wired to Academic
23 Lending Center, or, I should say, Creditron, correct?
24 A. I assume that's what it is. I'm sorry, can you give
25 me a minute.

Page 37
1  Q. Are you still reviewing that document?
2  A. Yes.
3     Okay. I'm done reviewing it.
4  Q. Would you agree that it's similar to Desanti-Boehm
5  2?
6  A. Yeah. Yes, it is.
7  Q. Does this document, Pages 283 to 288, look like the
8  document that was received from Brazos indicating an amount
9  of money that was going to be wired?
10 A. It does. I'm not really sure what these documents
11 were used for. I know that these were something that were
12 done early in the stage, but I can't tell you what they
13 pertain to. They're not the actual -- they don't show us
14 actually what we receive from Brazos. So I don't know if
15 it's their invoice, their estimate for us, I have no idea.
16 Q. At the bottom of Page 283, in handwriting, it says,
17 "To IRS." Do you see that?
18 A. I do.
19 Q. Whose handwriting is that?
20 A. I have no idea. It's not mine.
21 Q. Are you familiar with the handwriting of Al Cavotto?
22 A. Yes, I am.
23 Q. Are you able to exclude him as being the person who
24 wrote that?
25 A. I don't think I'm able to exclude anyone but myself.

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                                    Trish DeSanti-Boehm

Page 42
1  Creditron?
2     A.  I have no idea where it is. I wouldn't know -- I
3  mean, if you're asking specifically what account this is in,
4  I wouldn't have that knowledge. I don't get into the minute
5  of that. I know it wasn't disbursed anywhere else.
6     Q.  Well, I'm really confused by your answer. You know
7  it wasn't disbursed anywhere else. Under the marketing
8  agreement, a certain percentage of the money that's received
9  from Brazos belongs to Creditron, correct?
10    A.  Correct.
11    Q.  And Creditron is going to use its share to, for
12 example, make payroll, correct?
13    A.  Correct.
14    Q.  And to pay other expenses, correct?
15    A.  Correct.
16    Q.  Are you saying that you don't know whether any of
17 the money that came into Creditron was used to pay payroll
18 and expenses?
19    A.  It was. I guess that wasn't my understanding of the
20 question.
21    Q.  My question is, we have, according to Desanti-Boehm
22 No. 1, $9,402,739.44 being paid by Brazos to ALC. We have a
23 Student Loan Origination and Marketing Agreement that says
24 that 71.43 percent of gross revenue is Telatron's and 28.5
25 percent of gross revenue is Delaware Marketing. And what I'm

Page 43
1  asking you is, how would I find out what happened to the --
2  this is a long question, so bear with me. How would I find
3  out what happened to the 71.43 percent of the gross revenue,
4  and what happened to that portion, the 28.57 percent, of the
5  gross revenue that was not paid by ALC to Delaware Marketing
6  partners?
7     A.  I have no idea at this point. I mean, I guess we
8  could do a -- could provide billing or items of that nature
9  that shows what we paid out for, you know, supplies and
10 things of that nature. I mean, that's obviously something
11 that we possess. But I can't tell you off the top of my head
12 where it went.
13    Q.  And you believe that Joyce Cavotto would know?
14    A.  I believe she would have an idea, yeah. I mean, I
15 can use my -- I can use my knowledge in the program to say
16 that we pay for payroll, we paid for processes that had to
17 come up, we paid for materials. I mean, so, of course, all
18 of those would have been, I guess, under (k), something that
19 was disbursed.
20    Q.  Keeping with the Defendants' Answers to
21 Interrogatories, Interrogatory 2, "Produce copies of all
22 books, records, writings, and other documents which refer or
23 relate in any way to the payments identified in your answers
24 to Interrogatories Nos. 1(j) and (k)." And it says, "See
25 documents produced herewith." Would I be correct in

Page 44
1  assuming, now that we've talked about 1(k), that all of the
2  documents that are requested were produced?
3     A.  I'm sorry, can you repeat the last part of your
4  question.
5     Q.  Can we agree that not all of the books, records,
6  writings, and documents which were requested in Interrogatory
7  2 were produced?
8     A.  With respect to (k), I mean, we can agree that they
9  weren't produced according to your intent under the question.
10 They were produced under -- according to my understanding of
11 it at the time.
12    Q.  Within your authority for the company are you able
13 to agree to produce what's being requested in 1(k) and No. 2?
14    A.  Yes.
15    Q.  Will you agree to do that?
16    A.  Sure.
17         MR. SNYDERMAN: By the way, Craig, I probably
18     should have at the outset -- and I apologize for
19     not having done so. It's just that I'm not really
20     used to telephone depositions. I should have
21     identified that with me in the room are two
22     individuals from Delaware Marketing partner, and
23     again, I can only apologize for not having done
24     that. One is Allen Estes, and the other is Harry
25     Metcalfe. Bear with me a moment.

Page 45
1     Q.  When we look at Desanti-Boehm 1 and we see all of
2  the amounts received by ALC from Brazos, would I be correct
3  if I say that you don't have an understanding as to what each
4  one of those wires -- why 28.5 percent was not, within 7
5  days, paid to Delaware Marketing Partners?
6     A.  No.
7     Q.  I'm not correct?
8     A.  I'm sorry, you are correct. I don't have that
9  understanding with respect to each of the wires.
10    Q.  You may be happy to know that that just shortened
11 your deposition time by probably over an hour.
12    A.  Great.
13    Q.  Let's go back to the Answer to the Complaint. Do
14 you still have access to that?
15         MR. MARKHAM: Yes, we have it.
16    Q.  On Page 3, Paragraph 9, the second sentence states,
17 "The amount of compensation which could be earned by the
18 Plaintiffs is set forth in an exhibit to the agreement
19 entitled Exhibit-001." Could you please tell me, do you have
20 the Student Loan Origination and Marketing Agreement there?
21    A.  I do.
22    Q.  Would you please tell me where, in Exhibit 1, it
23 addresses the amount of compensation.
24    A.  "Section 4, Allocation of Program Revenue."
25    Q.  Now, I notice that the word could be earned is in

12 (Pages 42 to 45)

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc.                           Trish DeSanti-Boehm

Page 46
1  Paragraph 9 of the answer. Do you know why the word "could"
2  was chosen?
3      A.  I guess I don't recall at this moment.
4      Q.  Having gone to law school, do you understand the
5  difference between shall and could?
6      A.  Yeah. I'm aware of the difference.
7      Q.  With regard to the 71.43 percent of the remaining
8  gross revenues, where it says, "Telatron shall be entitled to
9  71.43 percent," do you -- is it your understanding that if
10 Delaware Marketing could be entitled to receive or earn 28.5
11 percent that Telatron also could be entitled to receive 71.43
12 percent as opposed to shall receive it?
13     A.  I suppose that would be an argument that you could
14 make.
15     Q.  Well, I didn't choose the language in the answer to
16 the Complaint. And I'm not trying to be argumentative. I'm
17 just trying to ask you whether there's any difference
18 between -- in this exhibit. A difference between the
19 entitlement of Delaware Marketing to a share and the
20 entitlement to Telatron of a share.
21         MR. MARKHAM: Let me say, the witness didn't choose
22         the language in the Complaint either, and she
23         doesn't recall why it was used. If you're using
24         that as a reference, I don't think she can answer
25         the question.

Page 47
1          MR. SNYDERMAN: Let me ask her.
2      Q.  Can you answer the question?
3      A.  No, I can't.
4      Q.  Also in Paragraph 9 of the answer it states, "It was
5  specifically denied that the Plaintiff has properly performed
6  all of its obligations and duties in this regard." Can you
7  tell me whether this sentence refers to anything other than
8  the obligations that you listed for me before based on the
9  agreement?
10     A.  No. The simple summation I gave you previously
11 would encompass that statement.
12     Q.  Then it goes on to say, "Moreover, the Plaintiff is
13 also responsible for a share of start-up and other costs
14 which are detailed in the agreement as in Exhibit-001." Can
15 you please show me where in the agreement those start-up
16 expenses and costs are detailed?
17     A.  That would be Section 4B.
18     Q.  Are there any other start-up expenses or costs other
19 than 142,850 that Delaware Marketing Partners was responsible
20 for?
21     A.  There were certainly more start-up expenses than the
22 142,000, but I believe that's what we agreed at that moment
23 in time that they would be responsible for.
24     Q.  Then it says, "Furthermore, as an inducement to
25 Defendants, the Plaintiff misrepresented material aspects of

Page 48
1  the loan financing process." Does that refer to anything
2  other than what you've already testified to?
3      A.  I think I gave a brief overview of our
4  understanding, but basically it -- it pertains to the fact
5  that we were led to believe that this was a very simple
6  process. That -- I believe that the initial number that was
7  given to us was 50 to 60 percent of promissory notes were
8  returned, and that's not accurate. It was nowhere near that
9  at any point in the program, or now, as we do it on our own.
10 We were told it was very simple, you get the list, you take
11 the application, 50 to 60 percent of the time you get the
12 application back. By law the applications have to be back
13 within 10 days. You know, done deal. And that is absolutely
14 not how the process works. Theoretically, point by point,
15 that's how the process works, but there's a huge amount of
16 work that goes into each and every one of those components
17 that we were not aware of.
18     Q.  Are you familiar with Al Cavotto's prior experience
19 with student loans?
20     A.  No. All I -- I mean, all I really know is that he
21 managed, you know, certain portfolio's for a bank, and I
22 think within there they had PHEAA loans as one of their
23 portfolios, but other than that, I know nothing about it.
24 And those were -- I'm sorry, those were PHEAA origination --
25 origination loans. They weren't consolidations.

Page 49
1      Q.  In that August 20, 2002 letter that you referred to
2  earlier, Mr. Cavotto refers to four of our lending officers
3  worked with me at a national lending organization. Do you
4  know who those lending officers are?
5      A.  The only one -- well, I know Mary Frick worked with
6  him, and I don't know if that's who he was assuming that to
7  be. She works in my credit department. Doesn't have any
8  knowledge, but I know one of the four individuals was John
9  Pochatko who worked with Mr. Cavotto for, I think, 20 years
10 at the bank.
11     Q.  How do you spell that gentleman's last name?
12     A.  It's P-O-C-H-A-T-K-O. He is now deceased.
13     Q.  The last sentence of Paragraph 9 of the answer says,
14 "As a result, Defendants incurred a substantial increase in
15 the expected cost and financial burden." What information do
16 you have about the increase in costs and burden?
17     A.  I don't think I can speak to exact numbers. In
18 fact, I know I can't speak to exact numbers. But I certainly
19 know what we had to do going into September. In fact, I was
20 removed from my job at the current time, which was running
21 the human resources department, to take over the back end
22 operations because, quite frankly, we were drowning. So we
23 had to implement a number of programs and services and
24 additional calling teams to focus on getting borrowers to
25 return notes that we were told would return 50 to 60 percent

13 (Pages 46 to 49)