Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
    DELAWARE MARKETING        : CA No. 04-263
 3  PARTNERS, LLC, a Delaware :
    limited liability company,:
 4       Plaintiff           : JUDGE MCLAUGHLIN AND
                             : MAGISTRATE JUDGE
 5           v.              : SUSAN PARADISE BAXTER
                             :
 6  CREDITRON FINANCIAL       :
    SERVICES, INC., a         :
 7  Pennsylvania corporation  :
    and, TELATRON MARKETING   :
 8  GROUP, INC., a            :
    Pennsylvania corporation, :
 9       Defendants          :
10              Deposition of KATHERINE LOMBARDOZZI, taken before
    and by Sonya Hoffman, Notary Public in and for the
11  Commonwealth of Pennsylvania on Monday, November
    13, 2006, commencing at 3:24 p.m., at the offices of
12  Elderkin Martin Kelly & Messina, 150 East Eighth
    Street, Erie, PA 16501.
13
14  For the Plaintiff:
15      Charles Snyderman, Esquire
        Charles Snyderman, PA
16      Stoney Batter Office Building
        5301 Limestone Rd., Suite 214
17      Wilmington, DE 19808
18      Brett W. Farrar, Esquire
        Dickie McCamey & Chilcote, P.C.
19      Two PPG Place, Suite 400
        Pittsburgh, PA 15222
20
21  For the Defendants:
22      Craig A. Markham, Esquire
        Elderkin Martin Kelly & Messina
23      150 East Eighth Street
        Erie, PA 16501
24
25              Reported by Sonya Hoffman
            Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT

6

ALL-STATE LEGAL®

1    A.    No.

2    Q.    Is it your testimony that that does not happen or

3    you're just not aware of it?

4    A.    Creditron Financial Services, they pay their own

5    expenses.

6    Q.    So Creditron Financial Services, Inc. has a

7    separate set of financial books and records than the

8    Telatron Group that you're employed by.

9    A.    Correct.

10    Q.    Do you know whether Telatron Marketing Group has

11    ever issued checks to pay for expenses incurred by ALC?

12    A.    I'm sorry, I just lost you there.  Ask me again.

13    Q.    Let me ask it a different way.  If your employer,

14    Telatron, were to issue checks to pay for expenses incurred

15    by Academic Lending Center, would you, in your capacity as

16    vice president of the financial control group, know about

17    it?

18    A.    Yes.

19    Q.    Okay.  Has that happened?

20    A.    Yes.

21    Q.    All right.  In your years of experience -- or let

22    me back up, because I don't think I asked you.  Is it true

23    that Academic Lending Center is a division of Creditron

24    Financial Services, Inc.?

25    A.    Yes.

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 12

1    Q.    And Academic Lending Center is not a division of

2    Telatron Marketing Group, Inc.?

3    A.    No.

4    Q.    And in all of your years of experience, have you

5    ever, before joining Telatron, have you ever seen a

6    situation where a company, like Telatron, would issue checks

7    to pay expenses of a division of a totally separate entity

8    like Creditron?

9    A.    No.

10   Q.    Can you explain to me how that happens with

11   Telatron.

12   A.    Specifically, no, I cannot.

13   Q.    All right.  As vice president of the financial

14   control group of Telatron, have you ever spoken with Mr.

15   Covatto about the propriety of Telatron paying bills of the

16   Academic Lending Center?

17   A.    Propriety, no.

18   Q.    Have you ever discussed it with him at all?

19   A.    Well, he tells me to pay the bill, I pay it.  He

20   tells me to wire-transfer money, I wire-transfer money.

21   Q.    All right.  So let me ask you:  I take it that

22   you've read the papers and you're familiar with accounting

23   firms -- large accounting firms that have gotten into a lot

24   of trouble with the Government for want of a better term

25   ,"cooking the books."  You've heard that, right?

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 13

1      A.   Yes.

2      Q.   All right.  Do you see your job as the vice

3  president in charge of the financial control group of

4  Telatron as being responsible to make sure that your

5  company's financial books and records are handled properly?

6      A.   Yes.

7      Q.   All right.  And as a part of that responsibility

8  that you recognize, does it concern you that you're being

9  directed by Mr. Covatto to write checks out of Telatron's

10 money to pay for expenses that were incurred by Academic

11 Lending Center?

12     A.   Yes.

13     Q.   All right.  And when it concerns you like that,

14 you recognize that there could be repercussions for doing

15 something like that, correct?

16     A.   Yes.

17     Q.   And what do you do about it to avoid those

18 repercussions?  Do you, for example, keep documentation to

19 cover yourself, that on such a such date I was directed from

20 Mr. Covatto to write a check out of Telatron or wire funds

21 out of Telatron to cover an expense of ALC?

22     A.   Everything is documented.

23     Q.   All right.  And where is that documentation?

24     A.   It's at Telatron.

25     Q.   And it's within your control?

Katherine Lombardozzi

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 14

```
 1      A.    Yes.
 2      Q.    All right.  Now, have you spoken with anybody
 3   who's employed by Telatron, other than Mr. Covatto, about
 4   the situation that we just discussed with you being directed
 5   by Mr. Covatto to spend Telatron money for expenses of ALC?
 6      A.    Mark's aware of it.
 7      Q.    All right.  Are you married?
 8      A.    No.
 9      Q.    Have you told any family members about your
10   concerns?
11      A.    No.
12      Q.    Have you told anybody else besides Mark?
13      A.    No.
14      Q.    All right.  Have you spoken to Joyce Covatto about
15   it?
16      A.    No.
17      Q.    So Mark and Mr. Covatto are the only two
18   individuals that you've spoken to about this?
19      A.    Yes.
20      Q.    And what did Mark say when you spoke to him about
21   it?
22      A.    Nothing.  Pretty much what I say, we do what we're
23   told.
24      Q.    All right.  Did you ever tell Mr. Covatto that you
25   felt uncomfortable doing it?
```

Page 15

```
 1      A.    No.

 2      Q.    Do you feel uncomfortable doing it?

 3      A.    No.  I can't -- I really can't explain how the

 4   books are all -- they're tied in to each other.  The

 5   companies are all tied in together.  It's not like Wal-Mart

 6   and Kmart, two separately completely different companies.

 7      Q.    But there are separate bank accounts, correct?

 8      A.    Correct.

 9      Q.    So when you say everything is documented, would I

10   be right in assuming that whenever Telatron pays an expense

11   that was incurred by ALC, that not only is that documented,

12   but at any given time you could look at your records and see

13   how much that was?

14      A.    Correct.

15      Q.    Does Creditron or ALC ever reimburse, or pay back,

16   to Telatron the funds which Telatron paid out on behalf of

17   ALC?

18      A.    They do.

19      Q.    Okay.  And there's a running balance as to how

20   much is owed at any given time?

21      A.    Yes, there is.

22      Q.    All right.  Now, when Telatron -- you, issue a

23   payment, either wire or a check, on behalf of ALC, you

24   designate it in some way that you know it was for ALC,

25   correct?
```

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 16

1    A.    Correct.

2    Q.    And if it were for the collections part of

3    Creditron, would you make a note of that as well?

4    A.    Yes.

5    Q.    So, at any given time, you knew exactly what funds

6    were spent, so to speak, in the ledger column of ALC versus

7    the collection division.

8    A.    Right.

9    Q.    Do you know -- you worked there in 2002,

10   obviously, and 2003 and 2004, can you give me even a

11   ballpark estimate of how much was owed at any given time.

12   Either a range or the highest amount, by ALC back to

13   Telatron for payments that Telatron had made.

14   A.    No, I can't.

15   Q.    All right.  Are we talking about a couple of

16   hundred dollars, or a few thousand, or hundreds of

17   thousands?  You must have some idea.

18   A.    I would say thousands.

19   Q.    All right.  And when ALC would pay the money back,

20   would it be a wire transfer, or a bank transfer, or would

21   there be a check issued?  How did that happen?

22   A.    It could be any of those.

23   Q.    And did ALC have its own checkbook as opposed to

24   Creditron Financial Services, Inc.?

25   A.    Yes, they do.

1      Q.   All right.  When Creditron -- I'm sorry.  When ALC

2  would repay to Telatron money which it owed to Telatron, did

3  it pay that money back with interest?

4      A.   No, I don't believe so.

5      Q.   Were these balances carried on the books of

6  Telatron as loans?

7      A.   Yes, they were.

8      Q.   When Mr. Covatto would direct you, for example, to

9  pay out money from Telatron on behalf of ALC, did anybody at

10  ALC give Telatron a promissory note for that money?

11      A.   I don't think there was anything actually in

12  writing.  It was just understood and it was on the books.

13      Q.   Can you recall in the 2002-to-2004 time period

14  what the usual turn-around time was for a repayment of money

15  from ALC to Telatron?

16      A.   It was usually within a couple of weeks.

17      Q.   All right.  So let me ask you this:  You were

18  aware that back in 2002 and 2003 that ALC and Creditron were

19  working with a company called Delaware Marketing for the

20  student loan consolidations.

21      A.   Vaguely.

22      Q.   Are you familiar with the name Brazos?

23      A.   Yes.

24      Q.   And you're aware that Brazos wired funds from time

25  to time to Creditron Financial Services, Inc.?

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 18

```
 1      A.   Yes.
 2      Q.   I want to make sure I understood an answer before.
 3  Does ALC have a separate -- in the years 2002, 2003, and
 4  2004, did ALC have a separate bank account from Creditron
 5  Financial Services, Inc.?
 6      A.   Yes.
 7      Q.   When funds were wired by Brazos, whose account --
 8  whose bank account did the funds get wired into?
 9      A.   Creditron Financial Services.
10      Q.   Not the bank account that ALC had?
11      A.   Right.
12      Q.   So let's just take for example, hypothetically, a
13  wire comes from Brazos in October of 2002, and let's say
14  it's a $1,000 wire, even, okay?
15      A.   Okay.
16      Q.   And it shows up in the bank account of Creditron
17  Financial Services, Inc., right?  Are you with me so far?
18      A.   Right.
19      Q.   Was it your responsibility or Mark Kisiel's
20  responsibility to keep track of that $1,000 wire that had
21  come in?
22      A.   Mine, usually.
23      Q.   All right.  Now, let's track this.  Help me track
24  this.  Money comes in on a day in October of 2002 -- this is
25  hypothetically now -- from Brazos to the bank account of
```

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    Creditron Financial Services, Inc., what happens to that

2    money?  How is it kept track of and how is that money spent?

3            In other words -- I think this is a two-part

4    question for you and it's not fair.  Are there certain

5    guidelines that you were required to follow back in that

6    2002, 2003 period of time as to restrictions on how that

7    money could be spent or what it could be spent on?

8        A.    No.  When the money came in, we were -- I was told

9    to inform Mr. Covatto that it came in.

10       Q.    And after you informed him that it came in, what

11   would he do next?  He now knows it came in.

12       A.    Then that was up to him how he disbursed it,

13   whether he left it there or whether he used it to transfer

14   to other accounts.

15       Q.    All right.  And those other accounts could be

16   Telatron?

17       A.    Telatron or ALC, if necessary.

18       Q.    Any other accounts that you're aware of besides

19   the Telatron account, the Creditron account, and the ALC

20   account?

21       A.    That's it.

22       Q.    All right.  Now, in the same way that you've

23   explained, pretty clearly, the documentation that you kept

24   when funds of Telatron were spent on expenses of ALC or

25   Creditron, did it work the other way?

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 20

1              In other words, when money came in, say, from

2     Brazos to Creditron and then you were directed by, say,

3     Mr. Covatto to spend that money in a certain way, did you

4     keep track of how it was spent?

5          A.    Yes.

6          Q.    Now, am I correct that the same bank account that

7     the Brazos money came into also received funds from other

8     entities besides Brazos?

9          A.    That particular account, not usually.

10         Q.    All right.  So if the thousand dollars, which is

11    deposited into the account of Creditron from Brazos, gets

12    spent, how did you document what it was spent for?

13         A.    We recorded it in our cashbook.

14         Q.    What's a cashbook?

15         A.    Just a written documentation or on a computer.

16         Q.    All right.  And if it was spent, for example, for

17    a Telatron expense, would Telatron, according to your

18    recordkeeping, owe Creditron the money and eventually pay it

19    back?

20         A.    Yes.

21         Q.    And to your knowledge, was all of the money that

22    Creditron spent on Telatron stuff paid back by Telatron to

23    Creditron?

24         A.    Yes.

25         Q.    Now, do you remember the Federal tax liens

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 24

1    that?

2        A.    No.

3        Q.    And what bank account did the funds come from that

4    you wired to Delaware Marketing Group?

5        A.    Telatron Marketing Group.

6        Q.    And were you aware, when you wired those funds

7    from Telatron Marketing Group, that this was money owed to

8    Delaware Marketing Group by anybody other than Telatron?

9        A.    No.

10       Q.    All right.  So would it be fair to say that when

11   Telatron -- I'm sorry, you, on behalf of Telatron, your

12   employer, wired funds to Delaware Marketing Group, you

13   didn't make a special entry indicating that this was an

14   expense for like Creditron Financial Services.  Which

15   Creditron Financial Services would then have to repay to

16   Telatron like those other expenses we talked about?

17       A.    No.

18       Q.    Now, based on your experience and background, if I

19   were to ask you to assume that the funds that you wired to

20   Delaware Marketing Group were monies that were owed by

21   Creditron Financial Services, Inc., would that cause you any

22   concern?

23           MR. MARKHAM:  Let me object to the question.

24           You're asking her for an opinion on hypothetical

25           facts and she's not an expert witness here.  It

Katherine Lombardozzi

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 25

1   isn't appropriate to ask her opinion questions.

2   MR. SNYDERMAN:  Do we allow talking objections in

3   Erie?

4   MR. MARKHAM:  Sure we do.

5   MR. SNYDERMAN:  Okay.  You can answer the

6   question.

7   MR. MARKHAM:  Well, I'm not sure she can answer

8   the question.  She's --

9   MR. SNYDERMAN:  Why don't we ask her.

10  MR. MARKHAM:  No.  I'm not sure I'm going to

11  permit her to answer the question.  You're asking

12  her an opinion question, she's not an expert

13  witness.  She's here to --

14  MR. SNYDERMAN:  Fine.  Let's get Judge Baxter on

15  the phone.  Can we do that?

16  MR. MARKHAM:  If you want.

17  MR. SNYDERMAN:  I want, because you're not going

18  to get away with instructing people not to answer.

19  MR. MARKHAM:  Call her.

20  (Recess taken from 4:01 p.m. to 4:15 p.m.)

21  THE COURT:  Thank you.  All right.  There's an

22  objection by the defense to a question explaining

23  both that it was irrelevant and that it was asking

24  for an expert opinion by nonexpert.  I'm going to

25  overrule the objection on both grounds and allow

1          the question.  All right.  Anything else?

2          MR. SNYDERMAN:  No, Your Honor.

3          THE COURT:  Let me know if you have any other

4          problems.

5          MR. SNYDERMAN:  Thank you, Your Honor.

6          MR. MARKHAM:  Thank you, Your Honor.

7    BY MR. SNYDERMAN:

8       Q.  We're back on the record.  I'd like to make a

9    statement.  Before we went off the record, I asked you to

10   step out, Mr. Markham had raised an objection to one of my

11   questions and had instructed you not to answer.

12          We just had a telephone conference with the Judge

13   and she overruled Mr. Markham's objection and is saying that

14   you need to answer the question.  So we're going to have the

15   court reporter read back the question to you and see if you

16   can answer it for me.

17      A.  Okay.

18          (Previous question read back.)

19      Q.  And I know you were out for a while, I believe the

20   context of the question -- we can read back past questions

21   so you know where we are; the context was we were talking

22   about --

23          MR. SNYDERMAN:  Well, in fact, rather than doing

24          that, can you go back to, say, three questions

25          before that one.  That's only fair to the witness.

1          (Previous questions read back.)

2      A.    Okay.  The best way I can answer that, after all

3    that, when I was making the wire transfers out of Telatron

4    to Delaware, okay, I would record the transactions.  And

5    like I said, Mark was also involved in the cash

6    transactions.  He would in turn account for these

7    transaction on the books.  He was aware that the recording

8    would have to be made to Creditron Financial.

9      Q.    And how is he aware of that?

10     A.    He knew.

11     Q.    How do you know that?

12     A.    He and I spoke about it.

13     Q.    Okay.  Were you aware?  Because I believe your

14   testimony was no.

15     A.    No, I was not.

16     Q.    Well, if you weren't aware, had you talked about

17   it, wouldn't you be testifying today that you were aware?

18     A.    No.

19     Q.    What was it that you talked about, specifically,

20   that leads you to believe that he was aware?

21     A.    I just told him that I made a transfer to

22   Delaware.

23     Q.    All right.  And did you tell him who you made --

24   what account it came from?

25     A.    No.

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    Q.    All right.  How would he know what account it came

2    from?

3    A.    He just looked at it.

4    Q.    How do you know he looked at it?

5    A.    I assumed.

6    Q.    So you don't know he looked at it.

7    A.    No.

8    Q.    And since you don't know that he looked at it, you

9    don't know that he actually accounted for it.

10    A.    No.

11    Q.    Let's get back to the question I asked before.  If

12    Telatron wired funds to Delaware Marketing Group, and if

13    that was a payment that really was owed by Creditron, there

14    should have been documentation of that, correct?

15    A.    Correct.

16    Q.    Okay.  And if there were not documentation of

17    that, would that concern you in your position as vice

18    president of the financial control group?

19    A.    Yes.

20    Q.    And why would it concern you?

21    A.    It wouldn't be ethical.  It wouldn't be correct.

22    Q.    All right.

23    A.    But, by putting it down in the cashbook, that's

24    documentation right there.

25    Q.    All right.  And you were the one who put it in the

Ferguson & Holdnack Reporting, Inc.
814-452-4556

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 29

1    cashbook?

2        A.    Correct.

3        Q.    So there's documentation that funds were spent by

4    Telatron and sent by you to Delaware?

5        A.    Yes.

6        Q.    All right.  But does that entry alone, without any

7    more, also create a record that Creditron owes that money to

8    Telatron?

9        A.    That entry, in and of itself, no.

10       Q.    All right.  So unless Mark or somebody else --

11   because you didn't do it.  Unless Mark or somebody else then

12   took the next step, and made a record of the fact that that

13   wire that you had sent was on behalf of Creditron, then the

14   system that you were talking about that worked in paying

15   money back and forth would have a problem; wouldn't it?

16       A.    Right.

17       Q.    Okay.

18       A.    I may have done it.  I don't remember, you know.

19       Q.    Well, why would you have done it if you didn't

20   know that it was a Creditron expense?

21            MR. MARKHAM:  I'm go to object, you're saying that

22            you're assuming those facts.

23       A.    Yeah.

24       Q.    Well, you told me before, did you not, that to

25   your knowledge, when you were told by Mr. Covatto to

Ferguson & Holdnack Reporting, Inc.
814-452-4556

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    transfer funds out of Telatron to Delaware Marketing Group,

2    it was your understanding at the time that that was a

3    Telatron Marketing Group expense.

4        A.    Correct.

5        Q.    Right?

6        A.    Right.

7        Q.    So you would not have made any entry indicating

8    that Creditron owes money to Telatron, equal to the amount

9    you wired, because as far as you knew it was a Telatron

10   expense?

11       A.    Right.

12       Q.    So unless Mark Kisiel or someone else in your

13   financial control group knew something that you didn't know,

14   namely that it was a Creditron expense, Telatron -- I'm

15   sorry, Creditron would never have paid back Telatron,

16   because there was no record of it.

17       A.    Correct.

18       Q.    So what documentation exists -- and can I assume

19   that the documentation that exists today is that same

20   documentation that existed back in 2002 and 2003, as opposed

21   to the system changing?

22       A.    Right.

23       Q.    Same records?

24       A.    Yes.

25       Q.    All right.  So if you wanted to go back to the

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 33

1    and Creditron to Telatron, has it been your experience that

2    money is actually transferred from one account to another

3    every time, as opposed to offsetting?  Do you know what I

4    mean by that?

5        A.    Yes.

6        Q.    Tell me what happened.

7        A.    Sometimes it is transferred, sometimes it was just

8    offset.

9        Q.    And if it was actually transferred, there would be

10   documentation of that.

11       A.    Right.

12       Q.    And if it was offset, there'd be documentation of

13   that.

14       A.    Right.

15       Q.    And whose determination was it whether to transfer

16   the funds or use the offset method?

17       A.    That would be Mr. Covatto.

18       Q.    Every time?

19       A.    Yes.

20       Q.    You would never do that on your own?

21       A.    No.

22       Q.    Now, I understand that Mr. Covatto was a

23   consultant to Creditron Financial Services.

24       A.    Yes.

25       Q.    Was he a paid consultant?

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 38

1      Q.    And when you did it, you had to get instruction

2    from somebody before you did it?

3      A.    No.

4      Q.    So you had the authority --

5      A.    Correct.

6      Q.    -- in your position each week to issue paychecks.

7      A.    Right.

8      Q.    All right.  And do you know who issued the

9    paychecks to Creditron employees?

10     A.    That was also Lana.

11     Q.    And did you do that sometimes, too?

12     A.    Occasionally.

13     Q.    Now, was there ever a time in 2002 or 2003 when it

14   came time for payroll, for either Creditron Financial

15   Services, Inc. or Telatron Marketing Group, and there wasn't

16   sufficient funds in the account to make payroll?

17     A.    No.

18     Q.    Did the weekly salaries of the employees of ALC

19   receive their money out of the account of ALC or the bank

20   account of Creditron Financial Services, Inc.?

21     A.    Neither.  They were paid out of Telatron.

22     Q.    All right.  Let me make sure I understand that.

23   ALC is a division of Creditron Financial Services, Inc.

24     A.    Correct.

25     Q.    And Telatron Marketing Group is a separate entity

Page 39

1    from Creditron Financial Services.

2        A.    Yes.

3        Q.    And I asked you before if Telatron ever paid the

4    salary of anybody other than employees of Telatron, and I

5    thought you were saying yes, but then you corrected me and

6    pointed out that Creditron paid Creditron and Telatron paid

7    Telatron.

8        A.    Right.

9        Q.    But now it appears that Telatron Marketing Group,

10   Inc. did, in fact, pay salaries of employees of ALC, which

11   was a division of Creditron Financial Services, Inc., right?

12       A.    Right.

13       Q.    Can you explain to me how it is that a company --

14   strike that.  Who issued the W-2s to the employees of ALC?

15       A.    Telatron.

16       Q.    And these were not employees of Telatron, correct?

17       A.    ALC employees -- or ALC is considered Telatron

18   employees.  They receive Telatron paychecks.

19       Q.    So then Telatron has employees which it directs to

20   provide services to ALC?

21       A.    Yes.

22       Q.    Does ALC have its own employees that it issues

23   W-2s?

24       A.    No.

25       Q.    All right.  So if Telatron provides employees to

Page 40

1    perform services for ALC, a division of Telatron, is there

2    then some record entry made, like we talked about before,

3    that Creditron -- I'm sorry, that ALC owes money to Telatron

4    for having provided employees?

5        A.   Yes, I believe there is.

6        Q.   And Creditron would eventually send money -- I'm

7    sorry, ALC would send money out of its own bank account to

8    Telatron to reimburse Telatron for the payroll of these

9    employees.

10       A.   Correct.

11       Q.   Did these employees of Telatron work at times in a

12   capacity other than for ALC?

13       A.   I don't know.  I suppose they may have.  I don't

14   know.

15       Q.   If a Telatron employee provided services for ALC

16   part of the time and some other entity part of the time,

17   there would be a record of that so each beneficiary of that

18   employee's services would send their share of money back to

19   Telatron.

20       A.   Yes.

21       Q.   What was the annual salary of Mr. Covatto in 2002,

22   2003?

23       A.   I don't know off the top of my head.

24       Q.   Was it under $100,000 or more than $100,000?

25       A.   Under.

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    be paid out of the ALC bank account?

2         A.    For other than the postage?

3         Q.    Yes.

4         A.    That would have been Mr. Covatto.

5         Q.    Anybody else?

6         A.    No.

7         Q.    And every time he directed you to take money out

8    of the ALC bank account, you would document that.

9         A.    Yes.

10        Q.    And when you documented it, other than the fact

11   that you were taking money out of the account, did you also

12   document the fact that Mr. Covatto instructed you to do it?

13        A.    No.

14        Q.    Because you knew that if you did it was because he

15   instructed you to do it.

16        A.    Right.

17        Q.    All right.  Your attorney -- or the attorney for

18   the companies that you work for provided a document in

19   discovery which shows that on February 18, 2003, a couple of

20   wires were received by ALC from Brazos.  Now, those wires

21   went into the ALC bank account, the Telatron bank account,

22   or the Creditron Financial Services bank account?

23        A.    From Brazos?

24        Q.    Yes.

25        A.    Would have gone to Creditron Financial Services.

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 54

1      Q.    And Creditron Financial Services was also

2   receiving funds from companies other than Brazos.

3      A.    Not by wire.

4      Q.    So in 2002 and 2003, every wire that went into the

5   account of Creditron Financial Services, Inc. came from

6   Brazos.

7      A.    To the best of my recollection, yes.

8      Q.    Now, I don't expect you to remember or know the

9   specific answer to this question, but I'm going to give you

10  some information and ask you some questions about it, okay?

11     A.    Okay.

12     Q.    The records that I received show that on

13  February 18, 2003 -- February 18, 2003, a wire transfer came

14  from Brazos in the amount of $487,491.58; so, more than

15  $480,000, okay?

16     A.    Okay.

17     Q.    All right.  If you wanted to, would your systems

18  that you deal with allow you to trace where that money went

19  after it was received?

20     A.    Most likely, yes.

21     Q.    And what records would you look at to see where it

22  went?

23     A.    Cashbook.

24     Q.    Okay.  Do you have any sense for how much money

25  was wired by Brazos to Creditron Financial Services in 2002,

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 61

1    that documentation?

2        A.    It's filed.

3        Q.    And you still have it?

4        A.    Yes.

5        Q.    If a bill for services from anybody was mailed to

6    Creditron Financial Services, Inc., would that bill

7    eventually find its way to the financial control group?

8        A.    Yes.

9        Q.    Are you familiar with an organizational chart with

10   regard to the various companies we've discussed today?

11       A.    No.

12       Q.    Does Telatron Marketing Group, Inc. have any

13   policy relating to retaining e-mails that are received?

14       A.    Not that I'm aware of.

15       Q.    Have you ever deleted e-mails that you received?

16       A.    Sure.  I delete all the time and clean it out.

17       Q.    All right.  And when you delete them, you don't

18   keep any other record of the e-mails having been received?

19       A.    It's up to my discretion, I guess.

20       Q.    You don't know that you don't archive your own

21   e-mails?

22       A.    Some I do, some I don't.  Yeah.  It depends.

23       Q.    When Mr. Covatto would instruct you to disburse

24   funds out of a particular account, did he do that verbally

25   sometimes or orally sometimes?

Katherine Lombardozzi                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 62

```
 1      A.    Yes.

 2      Q.    Did he sometimes do it by e-mail?

 3      A.    On a rare occasion.

 4      Q.    So usually it was orally.

 5      A.    Orally.

 6      Q.    Face to face, or on the phone?

 7      A.    Both.

 8            MR. SNYDERMAN:  Off the record.

 9            (Discussion held off the record.)

10            MR. SNYDERMAN:  I would like the record to reflect

11            that Brian Nelson, one of the officers of the

12            Plaintiff, flew in from Delaware, came to this

13            office for the purpose of sitting in on this

14            deposition, announced his arrival, and that

15            Mr. Markham had said in Mr. Nelson's presence that

16            he would let me know that Mr. Nelson had arrived.

17            And that Mr. Markham did not let me know that

18            Mr. Nelson had arrived, and when asked why,

19            Mr. Markham said he forgot.

20            MR. MARKHAM:  Well, that's not all I said.

21            MR. SNYDERMAN:  What else did you say?

22            MR. MARKHAM:  I said, in the heat of the argument,

23            and getting the phone number, and then dealing

24            with the Judge, yes, I forgot, and I apologize.

25      BY MR. SNYDERMAN:
```

Katherine Lombardozzi                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1      A.    Yes.

2      Q.    And with respect to all three companies, who had

3   the authorization to decide to spend money on a capital

4   investment?

5      A.    Mr. Covatto.

6      Q.    Anybody else?

7      A.    No.

8      Q.    Not even Mrs. Covatto, for the company she was

9   president of?

10     A.    No.

11     Q.    Were you involved in any way with the preparation

12  of a document called Answers to Plaintiff's Third Set of

13  Interrogatories and Request for Production Directed to

14  Defendant?

15     A.    No.

16     Q.    So if I were to ask you to describe in detail each

17  of the capital investments that was made, you'd be able to

18  do that, right?

19     A.    No -- what do you mean?

20     Q.    Well, if I asked you, for the year 2002, to

21  identify each capital investment made by Telatron Marketing

22  Group, Inc., you'd be able to look at your records and tell

23  me; wouldn't you?

24     A.    Oh, yeah.

25     Q.    And the same for each of the other two companies,

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 65

1    right?

2        A.    Right.

3        Q.    And you'd know the exact date it was made.

4        A.    Yes.

5        Q.    And would it be true that if a capital investment

6    was made on behalf of, say, Creditron Financial Services,

7    Inc., but it was initially paid for out of the bank account

8    of Telatron Marketing Group, that there would have been a

9    record of that like the other records?

10       A.    Yes.

11       Q.    At the deposition of Joyce Covatto, I asked her a

12   series of questions.  I asked a question of Mrs. Covatto

13   relating to the subject of records that would show that a

14   particular employee worked a certain number of hours on any

15   given day.

16       A.    Okay.

17       Q.    And I said, "How do we know that they sat at their

18   desk with a phone and actually worked?"

19           Answer:  "Well, because you would have production

20   reports that would show that Joyce Covatto is -- worked

21   eight hours.  She had X number of sales, X number of

22   refusals, X number of -- I mean, it's all part of the

23   production reports."

24           Are you familiar with the production reports that

25   she's referring to?

Katherine Lombardozzi                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 71

1   how much money had been wired from Brazos in any given

2   month, would she have been able to do that?

3        A.    I don't know if this is on her system or not.

4        Q.    So you don't know whether she -- I mean, I know

5   you said that she didn't have the authority -- or the

6   ability today to go on line and see if a wire had been

7   received today, correct?

8        A.    Right.

9        Q.    But after your financial control department

10  created its documents and records and could see all the

11  wires that came in, at any given time in the past, did

12  Mrs. Covatto have the ability on her system at her desk to

13  look at the computer and the records and see what wires had

14  been received?

15       A.    No.  I don't -- I don't know.

16       Q.    Do you recall ever sending e-mails to Mrs. Covatto

17  informing her of wires that had been received from Brazos?

18       A.    Yes.

19       Q.    And did you do that at Mr. Covatto's direction,

20  Mrs. Covatto's direction, on your own?  How did that happen?

21       A.    Both.

22       Q.    And did you do that every time a wire was received

23  from Brazos; you would e-mail and let her know?

24       A.    Yes.

25       Q.    And if two wires were received from Brazos on the

Page 72

1  same day, did you send her two e-mails or one e-mail?

2      A.   It depends on when they came in.

3      Q.   Okay.  Did Mrs. Covatto ever tell you why she

4  wanted you to send her notice that wires had come in from

5  Brazos?

6      A.   Just to be informed.

7      Q.   And how soon after a wire came in would you do

8  that, within 24 hours?

9      A.   Oh, yes, same day.

10      Q.   In your position with Telatron Marketing Group,

11  have you prepared balance sheets?

12      A.   At times.

13      Q.   Have you prepared tax returns?

14      A.   Yes.

15      Q.   For any company other than Telatron Marketing

16  Group, Inc.?

17      A.   Creditron Financial Services.

18      Q.   And am I right that ALC has never filed its own

19  tax return?

20      A.   Right.

21      Q.   I asked you questions about who was employed, I

22  asked you questions about officers and directors; do you

23  know who owns Creditron Financial Services, Inc.?

24      A.   Owns?  No.

25      Q.   Do you know who owns Telatron Marketing Group,