Trisha DeSanti-Boehm                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
      DELAWARE MARKETING        : CA No. 04-263
 3    PARTNERS, LLC, a Delaware :
      limited liability company,:
 4         Plaintiff            : JUDGE MCLAUGHLIN AND
                                : MAGISTRATE JUDGE
 5              v.              : SUSAN PARADISE BAXTER
                                :
 6    CREDITRON FINANCIAL       :
      SERVICES, INC., a         :
 7    Pennsylvania corporation  :
      and, TELATRON MARKETING   :
 8    GROUP, INC., a            :
      Pennsylvania corporation, :
 9         Defendants           :

10              Deposition of TRISHA DESANTI-BOEHM, taken
      before and by Sonya Hoffman, Notary Public in and for
11    the Commonwealth of Pennsylvania on Tuesday, November
      14, 2006, commencing at 4:36 p.m., at the offices of
12    Elderkin Martin Kelly & Messina, 150 East Eighth
      Street, Erie, PA 16501.
13
14    For the Plaintiff:
15         Charles Snyderman, Esquire
           Charles Snyderman, PA
16         Stoney Batter Office Building
           5301 Limestone Rd., Suite 214
17         Wilmington, DE 19808
18         Brett W. Farrar, Esquire
           Dickie McCamey & Chilcote, P.C.
19         Two PPG Place, Suite 400
           Pittsburgh, PA 15222
20
21    For the Defendants:
22         Craig A. Markham, Esquire
           Elderkin Martin Kelly & Messina
23         150 East Eighth Street
           Erie, PA 16501
24
25              Reported by Sonya Hoffman
            Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT

8

ALL-STATE LEGAL®

Trisha DeSanti-Boehm

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1      Q.    And are you aware that you've been designated as

2   the 30(b)(6) witness with regard to the counterclaim that's

3   been filed in the case?

4      A.    Yes.

5      Q.    Were you involved, in any way, in the preparation

6   of Answers to Plaintiff's Third Set of Interrogatories and

7   Request for Production directed to Defendants?

8      A.    I was.

9      Q.    In your answer to Interrogatory No. 2E, if you

10  will take a look at that please.

11     A.    (Witness complies.)  Yes.

12     Q.    All right.  You'll see that, "The Defendants

13  currently know of new writing that's responsive to this

14  request."  Did you search for any documents that would be

15  responsive to that question?

16     A.    I did.

17     Q.    And you found none?

18     A.    I found none.

19     Q.    Who's Sean Bebco identified in the answer to

20  Interrogatory No. 3B?

21     A.    Sean is senior vice president of our IT

22  department.  And he assisted me in getting the dumps for the

23  lists, the names that were provided to us from Delaware

24  Marketing Partners.

25     Q.    What are tape dumps as referred to in answer to

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 5

1    3C?

2        A.    The tape dumps are when the lists would come in

3    from Delaware Marketing Partners, the IT department would go

4    through those and provide a breakdown of certain things; new

5    numbers, numbers on that tape that were do not calls, the

6    numbers that might have been bad numbers, things of that

7    nature.  And what they did was they just kind of give a

8    breakdown of what was in that file, so to speak.

9        Q.    And when you say "numbers", are you referring to

10   telephone numbers?

11       A.    Yes, I am.

12       Q.    If you turn, please, to the answer to

13   Interrogatory No. 4D.  You'll see the Interrogatory, it

14   says, "Please produce each paper writing or document which,

15   if any, records or refers to each such representation or

16   warrantee."

17            And that references the beginning of No. 4, which

18   says, "With regard to the allegation in Paragraph 6 of the

19   counterclaim that the Plaintiff represented and warranted to

20   the Defendants that the lists which were provided to the

21   Plaintiff prior to the signing of the contract, were

22   indicative to the quality of the lists that the Plaintiff

23   would continue to provide."

24            Are you with me?

25       A.    Uh-huh.

Page 6

1      Q.    What is there in the answer to Interrogatory No. 3

2   that is your way of producing the papers, writings, or

3   documents that record or refer to such representations or

4   warrantees?

5      A.    Well, I think what we're referring to there is the

6   tape dumps and the reports that we were provided that showed

7   that the first few lists were of a substantially higher

8   quality than the other lists, the 95 percent.  I think

9   that's what we're referring to.

10     Q.    Are you guessing or --

11     A.    I'm kind of guessing, yeah.

12     Q.    All right.  Well, what other -- did you search for

13  any papers, writings, or documents which record or refer to

14  the representations and warrantees?

15     A.    I did.

16     Q.    Did you find any?

17     A.    I did not find anything that specifically referred

18  to representations and warrantees with respect to the

19  quality of the lists.  What I found, instead, of course,

20  were data pertaining to those lists and the quality of the

21  lists we saw in the early weeks and months of the campaign,

22  versus the latter.

23     Q.    So taking what you just said, would it be fair to

24  say that, as far as you know, there are no written documents

25  that refer to or -- strike refer to.  There are no written

Page 7

1    documents in the possession of the Defendants that would

2    contain the alleged representations and warrantees that were

3    made on behalf of the Plaintiff.

4        A.    With respect to the lists?

5        Q.    Yes.

6        A.    That is correct.

7        Q.    Now, to your knowledge, have the tape dumps been

8    produced?

9        A.    They have been produced.

10       Q.    Can you tell me if any of the documents that I'm

11   putting in front of you are tape dumps?

12       A.    (Witness reviews documents.)  These are not tape

13   dumps.  And there is -- this chart here is information that

14   came from tape dumps, but they're not the tape dumps.

15       Q.    All right.  What do the tape dumps look like?

16       A.    They're probably -- I mean, they're broken down by

17   each tape that came in.  They're -- each packet is maybe

18   about four or five pages in length.  On the left-hand side,

19   there will be a segment that shows the total counts for the

20   entire tape with respect to the total numbers that were in

21   that tape; how many were DNCs, how many were bad states, how

22   many -- it will talk about the zone counts, the gender

23   counts, the state counts, the area code counts.

24            MR. SNYDERMAN:  Mr. Markham, do you know whether

25            those were produced?

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 8

1     A.   I put them in the box.  I know they were produced.

2   I separated them.

3     Q.   They were in paper?

4     A.   They were in paper.  And they totaled a stack

5   probably this high (indicating).  They were broken down by

6   each specific tape that was sent to us.

7     Q.   Does the word "tape dump" appear anywhere on

8   there?

9     A.   I don't think so.

10    Q.   All right.  Interrogatory No. 5 says, "Describe

11  the particularity each of the capital investments refer to

12  in Paragraph 9 of the counterclaim.  And as to each such

13  capital investment, state the following."  And the very

14  first one is the date the capital investment was made.

15         The answer is, "Exact dates are unknown, but the

16  largest number of purchases would have been incurred in

17  September and October of 2002 and June to August of 2003."

18         Now, can you explain to me why the exact dates are

19  unknown?

20    A.   I worked directly with Mark Kisiel in financial

21  control to ascertain this information, and I was told very

22  clearly that is not information that is available to us.  We

23  do not have an exact listing of the date of such an

24  investment or how they're put down, but I can give you a

25  list of what they might be and a time range.

Trisha DeSanti-Boehm                                                Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 9

1          And I know that we provided a chart and some

2    documentation back in, I think, June that would also show

3    expenses and disbursements.

4       Q.   But were any of those that were produced in June

5    described, as or designated as, capital investments?

6       A.   I don't know if they were or not.

7       Q.   So it's your testimony that the Defendants are

8    unable to tell me the exact dates when any capital

9    investment was made.

10      A.   I'm telling you that I don't have that

11   information.  That's correct.  And I do know that there was

12   a -- I mean, if you're talking strictly about a capital

13   investment in terms of, you know, appreciation, and

14   depreciation, and things like that, I don't know.  I can

15   tell you the things we expended our resources on.

16      Q.   Well, let's do this --

17      A.   Okay.

18      Q.   -- Paragraph 9 of the counterclaim states that,

19   "In reliance upon the Plaintiff's representations and

20   promises, the Defendants also made capital investments and

21   hired and trained personnel based upon the levels of

22   production and the levels of revenue promised by the

23   Plaintiff."

24          What capital investments were made?

25      A.   The capital investments that I'm referring to, as

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    to August of 2003?

2         A.    We were committed to this program.  We knew that

3    it was a program that was not going to be magic in the first

4    few months that we went up on it.  We expected that to some

5    extent, so we were committed to it.  Even though that we

6    were going through a difficult time, we were committed to

7    making it work.  Which is why even though we were

8    dissatisfied, I guess, with Delaware Marketing to some

9    extent, Mrs. Covatto still sat down with Brian in November

10   and said, look, there's still a way that we can get through

11   this.  That's why I talked to him in December and said,

12   look --

13        Q.    December of when?

14        A.    2003.

15        Q.    Okay.

16        A.    There's still -- you know, we still -- we're not

17   ready to cut off the relationship, there may still be a way

18   to make this work.  We had absolutely no intent on just

19   cutting and running on the program.  We were continuously

20   looking for ways to make the program less burdensome with

21   respect to expenditures and financial requirements to make

22   it more profitable for everyone.

23        Q.    In answer to Interrogatory No. 5B, where the

24   question was the dollar amount of the capital investments,

25   the answer, instead of giving a dollar amount, is, "See

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    documents previously produced."

2         How would I be able to determine from documents

3    previously produced what you are contending are capital

4    investments?

5    A.    As I understand it, you received a chart that

6    outlined expenses and disbursements made from the Academic

7    Lending Center.  In looking at that chart, I think it's very

8    clear to see where purchases were made, what month, what

9    costs we felt were incurred as a result of those purchases.

10   Q.    So any purchase was a capital investment?

11   A.    That's -- in loose terms, that's the way I looked

12   at it.  Yes.

13   Q.    And the answer to Interrogatory 5D, the question

14   was, "Which of the Defendants actually paid for the capital

15   investment?"  And the answer is, "It is believed the final

16   payment would have been made by Creditron Financial

17   Services, Inc."

18        How would we know which of the Defendants made the

19   actual payment, even in final payment, would have been.by

20   Creditron Financial Services?

21   A.    Well, I think that's probably something that

22   financial control could better speak to you, and probably

23   already has spoken to, in their depositions from the last

24   few days.  I don't know.  I just know in speaking with

25   financial control they told me that, you know, although a

Trisha DeSanti-Boehm                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    A.    I was not.

2    Q.    So you don't know the tone of voice that was used

3    in those discussions.

4    A.    No, I do not.

5    Q.    And you don't know what specific questions were

6    asked, right?

7    A.    I don't.

8    Q.    And you don't know what the answers were given,

9    right?

10    A.    I can see Alan's e-mail in response ot it.

11    Q.    Other than the e-mail?

12    A.    Other than the e-mail, no.

13    Q.    And the e-mail contains the word in the subject,

14    "estimate", right?

15    A.    Sure.  And then it goes on to say it's fairly

16    conservative.

17    Q.    And does it say that it's a representation and

18    warrantee?

19    A.    It does not.

20    Q.    Can you explain why an estimate that you

21    considered to be a representation and warrantee wasn't

22    included in the written contract between the parties as a

23    representation and warrantee if it was something that was so

24    important that you and Terry Smith were relying on it in

25    order to go forward?

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 18

1       A.    I can't.  I didn't write the contract, so I can't.

2       Q.    Well, you're talking about things that you weren't

3   involved in other respects, why can't you talk about this?

4       A.    I cannot give you an answer.  I don't know.

5       Q.    Did you ever talk with Mr. Covatto about why that

6   representation and warrantee wasn't in the contract?

7       A.    I don't believe I did, no.

8       Q.    Even in the context of the litigation?

9       A.    In all honesty, I haven't had many conversations

10  with Mr. Covatto in anticipation of this litigation in the

11  last year.  So, no, I haven't.

12      Q.    The answer to Interrogatory -- or the

13  Interrogatory, itself, No. 6D says on Page No. 7, "Identify,

14  by name, each individual you contend was hired and trained

15  in reliance upon the Plaintiff's representations and

16  promises.  And as to each such individual, state the

17  following: Date of hire."  And the answer is, "See

18  documents produced to wit."

19          What documents were produced that would give me

20  that information?

21      A.    I provided those on a password protected CD.

22      Q.    And each of those individuals was hired and

23  trained and worked solely in connection with telemarketing

24  of student loan consolidations?

25      A.    No, they didn't.

Trisha DeSanti-Boehm

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 19

```
 1      Q.    They did other things?

 2      A.    Yeah, they did.  And the reason for that is --

 3      Q.    I didn't ask you the reason.

 4      A.    That's fine.

 5      Q.    Are there records kept by the Defendants that show

 6   what else these individuals, who were hired and trained in

 7   reliance upon the Plaintiff's representations and promises,

 8   what other work they were doing that was not related to

 9   student loan consolidations?

10      A.    I don't know if there are records, but I could

11   attest to it today.

12      Q.    You can tell me what each single person did at any

13   given time that wasn't related to Academic Lending Center?

14      A.    No, but I can give you an overview of everyone

15   that's included on there.

16      Q.    The Interrogatory asks for each individual.

17      A.    And that's included.

18      Q.    So give me the name of one of the individuals.

19      A.    Pick someone out of there -- I mean --

20      Q.    I'm asking --

21      A.    I guess the easiest way to explain this is --

22            MR. MARKHAM:  Answer his question.  Read back his

23            question, please.

24            (Previous question read back.)

25      A.    One of the individuals on that list?
```

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1     Q.   Yes.

2     A.   Mary Frick.

3     Q.   Mary Frick?

4     A.   Sure.

5     Q.   All right.  And how long was Mary -- when was Mary

6   hired?

7     A.   Actually, I need to qualify that, she wasn't

8   hired.  Melissa Hlwati, H-L-W-A-T-I.

9     Q.   When was the date that she was hired?

10    A.   I don't remember that off the top of my head.

11  It's included in the documents produced.

12    Q.   And what was she -- was she trained to do work

13  specifically relating to student loan consolidations?

14    A.   She was.

15    Q.   And is she still employed?

16    A.   She is.

17    Q.   Was she ever trained to do anything unrelated to

18  student loan consolidations?

19    A.   She was.

20    Q.   And when did she receive that training?

21    A.   She came on, I believe, either one of our other

22  inbound programs to backfill for someone who had been

23  promoted to --

24    Q.   The question was:  When was she trained?

25    A.   On her date of hire.

Trisha DeSanti-Boehm

Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

1    Q.    So on her date of hire, she was trained to do some

2    things relating to the Academic Lending Center, student loan

3    consolidations, and she was trained to do some other stuff.

4    A.    No.  She was trained to do other stuff to begin

5    with.

6    Q.    So how can you identify her as someone who was

7    hired and trained in reliance upon the Plaintiff's

8    representations and promises?

9    A.    Because she took the place of someone who was

10   promoted to the ALC program.  In promoting that other

11   individual to ALC, we had to backfill and hire for those

12   other programs.  Additionally, Melissa was trained on a

13   go-forward basis and now works in the administrative area of

14   ALC, which she began working in November of 2002.

15   Q.    Who hired -- who was the company that hired or

16   employed Melissa?

17   A.    Melissa would have hired from Telatron Marketing

18   Group.

19   Q.    And when she was hired, was she first hired to do

20   anything relating to these student loan consolidations?

21   A.    No.

22   Q.    And when was she put into a position that related

23   to student loan consolidations?

24   A.    I want to say late fall, early January.

25   Q.    Late fall of 2003?

Page 22

1       A.    2002, or early January of 2003.

2       Q.    Can you name another individual.

3       A.    Let's see, Diana Ball.

4       Q.    Let's go back to Melissa for a moment.  Does the

5  information that was produced on the CD show, in terms of

6  date hired, the date that she was initially hired or the

7  date she was put into the position in late fall of 2002 or

8  early 2003?

9       A.    Initially hired.

10      Q.    Do you consider that to be somewhat misleading --

11      A.    No.

12      Q.    -- to -- let me finish -- to provide the Plaintiff

13  with a date of hire for someone who was hired in reliance

14  upon the Plaintiff's representations and warrantees when, in

15  fact, her initial hire had nothing to do with the

16  Plaintiff's representations and warrantees?

17      A.    No.

18      Q.    Why not?

19      A.    Because it would be very misleading to not have

20  provided the information.  As we started up this program, we

21  couldn't go out and hire 250 people off the street in two

22  weeks to launch a program.  So, therefore, what we had to do

23  was pull from our internal workings.

24            So we had to pull some people who were currently

25  running other programs, put them through training programs

1    to put them on the Academic Lending program.    That, in fact,

2    left holes on other programs.

3             So, although, we weren't hiring externally to fill

4    in the ACL program, we were hiring so that we could put

5    people onto the ACL program.    So I couldn't just provide a

6    listing of the people we hired for the ALC program because

7    the way that we managed the ALC program internally was we

8    used it to promote people from within.    The best of the

9    best, the cream of the crop, they got promoted to the ALC

10   program.    We then hired for the more baseline telemarketing

11   positions.

12        Q.    So you responded to a question that wasn't asked.

13        A.    I responded in the best way that I could to the

14   question that was asked.    I wanted to make sure I gave the

15   most thorough response.

16        Q.    Okay.    If you to go through your records and

17   provide me with the names of each individual who was hired

18   and trained based on what you contend are Plaintiff's

19   representations and promises, how would you go about doing

20   that?

21        A.    I'm not sure that I could do it based strictly on

22   who was hired for the Academic Lending Center program

23   because it's three years old.    The information that I got

24   was strictly from database, it's not a reporting that we

25   keep in a -- I guess, the best method.    It's strictly from

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 24

1    our database.

2         So I'm not sure that I could go back and do that

3    based on the ID -- or based on the position numbers and

4    identification.

5    Q.   To make sure we understand one another, there's

6    going to be a trial in this case and your attorney, probably

7    with your help, is going to attempt to prove in court that

8    you hired and trained personnel based upon the levels of

9    production and the levels of revenue.  And the documents

10   that you're going to use to prove that, are the documents

11   that you produced on the CD, correct?

12   A.   I don't know what he'll use.  I assume so.  I

13   don't know.

14   Q.   Well, there aren't any other documents that you're

15   going to come up with that haven't been shown to me; are

16   there?

17   A.   There aren't, no.

18   Q.   And so you're unable to provide the names of the

19   individuals who you contend were hired and trained.

20   A.   I'm unable to provide a complete listing, yeah.

21   That's correct.

22   Q.   And, in fact, some of the names that you did

23   provide, in fact, were not hired initially and trained based

24   upon the Plaintiff's representations and promises.

25   A.   I think I answered what my understanding of that

Trisha DeSanti-Boehm                                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 25

1   was.  They were.  I took people from other programs to

2   launch this program.  And, therefore, those other

3   individuals had to be used to backfill those individuals.

4   So I answered it the best way that I could.

5        Q.    Is there any explanation in connection with the

6   information that you provided as to what you were providing

7   as opposed to what was being asked?

8        A.    No.

9        Q.    So unless I took the time to depose you and ask

10  you that question, I wouldn't know the explanation that you

11  just gave me, correct?

12       A.    Correct.

13       Q.    The answer to Interrogatory D4 is blank.  Can you

14  explain why.

15       A.    We didn't provide their last known address.

16       Q.    Why?

17       A.    Because I didn't see the -- I have no idea.

18       Q.    Because you didn't think it was necessary.

19       A.    I didn't want to give a full listing of our

20  employees with their address.

21       Q.    So you just decided to ignore it, right?

22       A.    I wouldn't call it ignoring it, Mr. Snyderman.  I

23  provided a great deal of information to you.

24       Q.    What would you call --

25       A.    I didn't provide it.

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 29

1    Defendants."  When you use the word "secretly", what do you

2    mean?

3        A.   Well, it wasn't something that was made public.

4    It certainly wasn't told to us.

5        Q.   Are you suggesting that there was some requirement

6    on their part to tell you?

7        A.   Well, I think if we have a noncompete with them

8    and they're forming another business to compete with us,

9    yeah, I think we would assume they would have talked to us

10   about it.

11       Q.   And why would that be?

12       A.   Why would they have talked to us?

13       Q.   Yeah.  Why would you expect them to talk to you

14   about that?

15       A.   Well, we had a noncompete with them.  I mean, we

16   had an exclusive agreement with them.  So if they were going

17   to form a company to compete with us, I would think they

18   would have let us know they were going in another direction.

19       Q.   So you feel that the terms of the contract bound

20   the parties?

21       A.   Sure.

22       Q.   It says, "Presumably, this had been in process for

23   some period before the registration documents were filed."

24   How long had it been in process?

25       A.   I don't know.  I know in September of 2003, we

Trisha DeSanti-Boehm                                          Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 30

1    received a curious call from Harry where he was asking us

2    for our training materials and our scripts, and they were

3    telling us that they were bringing somebody new on board.

4    So that kind of raised a red flag for us at that point in

5    time.

6        Q.   Is that responsive to my question of how long

7    before the registration were prepared and filed had they

8    been doing this?

9        A.   I gave you my understanding, I said September.

10   That's where we got our information from, that's what we

11   thought.

12       Q.   And what was your understanding -- or what is your

13   understanding of -- based on all the wires that had been

14   received from Brazos in connection with the student loan

15   consolidation program, if you were to add up all the

16   28.57 percents of each of those wires and compare that with

17   the amounts that were actually sent by your company to

18   Delaware Marketing, what was the difference in those two

19   numbers; do you know?

20       A.   I don't know.  It was significant.

21       Q.   Millions?

22       A.   Sure.

23       Q.   All right.  So your testimony is that at a time

24   when millions of dollars had not been paid to Delaware

25   Marketing for whatever reason, they were making a decision

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 31

1    to, perhaps, not do business with you anymore, right?

2         A.    Sure.

3         Q.    And you find some fault with that, right?

4         A.    The secret nature of it, yeah.

5         Q.    When did Delaware -- when did Creditron inform

6    Delaware Marketing that it was not going to be paid

7    28.57 percent of all the wires that were received?

8         A.    I don't know.  I wasn't -- I was not someone who

9    communicated that ever.  I never spoke to Brian about that,

10   I never communicated it.  I know from Mrs. Covatto's

11   testimony, she attested to the fact that that was not until

12   November.  I don't know.

13        Q.    And in the same respect that you feel that the

14   Plaintiff shouldn't keep a secret from the Defendants, do

15   you think it was okay for the Defendant not to tell the

16   Plaintiff that for all those months that they weren't going

17   to send them 28.57 percent as specified in a written

18   contract?

19        A.    I think -- sure.  Sure, that was a problem.

20        Q.    So there were secrets on both sides, right?

21        A.    Sure.

22        Q.    What is there about the contract that prevents or

23   precludes the principals of Delaware Marketing from forming

24   another company and competing with the Defendants?

25        A.    Well, the noncompete.  And I think the purpose

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 32

1    behind that is the fact that the principals forming another

2    company just was a way to get around the noncompete clause

3    that was in the Delaware Marketing/Telatron agreement.

4        Q.    So when you say "get around," that's another way

5    of saying that the contract, as far as you know, didn't

6    prevent or preclude the principals of the company from

7    forming another company.

8            MR. MARKHAM:  Objection, calls for legal

9            conclusion.

10       Q.    Well, in a nonlegal sense, do you believe that the

11   language of the agreement, which I'm sure you've read more

12   than once, has a provision that says that neither Delaware

13   Marketing, or its principals, shall compete with the

14   Defendants?

15       A.    The specific language in there, no.  That was my

16   understanding.

17       Q.    Right.  What business, or proprietary information,

18   list information, and analysis do you contend Plaintiff

19   wrongfully used and/or permitted the use of?

20       A.    Well, I think, first and foremost, it was curious

21   that they were asking us for our scripts and our training

22   manuals, so any information that we provided on that end.

23       Q.    I thought you didn't provide that because it

24   raised a red flag.

25       A.    I didn't say that Terry didn't provide it, I said

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 33

1    it raised a red flag up.

2         Q.   Was it provided?

3         A.   I believe Terry did provide the scripts, yeah.

4    Additionally, I mean, any of the analysis they were doing

5    for us -- the same people who were doing the analysis for us

6    on a product are launching a product for somebody -- you

7    know, a competing business, it only goes to show that the

8    information that they're gleaning from the relationship with

9    us was probably used in the owner relationship, as well.

10        Q.   Other than speculation and assumptions, do you

11   have any direct evidence that would support the statement in

12   the Answer to Interrogatories that there was wrongful use of

13   Defendant's business and proprietary information?

14        A.   At this time, no.  I think we're still working

15   that out.

16        Q.   Is it your testimony that after the red flag was

17   raised, based on Mr. Metcalf's request for materials, that

18   the materials were, not withstanding the red flag, were

19   provided?

20        A.   Yeah.  Mrs. Covatto told Terry Smith to go ahead

21   and provide them.  And we had already, at one time or

22   another, sent them the scripts for their review, so there

23   was no issue there.

24        Q.   Right.  They already had the scripts.

25        A.   One time at the beginning of the relationship,

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 35

1      Q.    It says, "The Defendants have not yet determined

2   the documents and/or writings which will be produced at the

3   time of trial supportive of any allegations made in the

4   counterclaim."

5           Now, my question is the next sentence, "However,

6   the Defendants may offer any of the source documents which

7   have been produced herewith, including, but not limited to,

8   the tape dump reports and the production reports."  Were

9   production reports produced?

10     A.    Yes.

11     Q.    What do they look like?

12     A.    They're right there.

13     Q.    Okay.  And what other documents would be included

14  in source documents besides the tape dump reports and

15  production reports?

16     A.    I don't know.  I didn't write that paragraph.  I

17  can't speak to it.

18     Q.    Do you know if the direct mail campaigns that the

19  Plaintiff acted on were approved by the Defendants in

20  advance?

21     A.    Yes.

22     Q.    Are you familiar with the language in the written

23  agreement that states that the Defendants will fund the

24  direct mail campaign?

25     A.    I am.

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 41

1       Q.    The answer to Interrogatory 11, the question is:

2    "Describe the particularity of the proprietary and

3    confidential information of the Defendants which you allege

4    in Paragraph 15 of the counterclaim that the Plaintiff

5    disclosed and/or provided to others."

6           What specific evidence do you have that lists

7    procured for purposes of telemarketing and/or mail

8    campaigns, and the analysis of these lists, and the

9    selection criteria used to secure the lists was disclosed by

10   the Plaintiff to others?

11      A.    I think we're still trying to work that out.

12   We're curious about the date of the last list that was

13   provided to us and information we had gleaned from other

14   sources that other lists might have been provided elsewhere.

15   So I think that we're still trying to find the information

16   on that.

17      Q.    Is the answer to my question, none?

18      A.    None as of right now, correct.

19      Q.    In the answer to Interrogatory No. 13 --

20      A.    Yes.

21      Q.    -- there are what appears to be two paragraphs.

22   The second paragraph of the answer states, "What records the

23   Defendants would have if there was a sale," correct?

24      A.    Correct.

25      Q.    Were those records produced?

Page 48

1              you're presenting to her now is misleading.

2        Q.    The question is:  Do you know who the directors,

3   officers, shareholders/owners are of Creditron Financial

4   Services, Inc.?

5        A.    Prior to today, no.

6        Q.    And there was no one available in the Defendants'

7   organizational structure who knew the answer to that?

8        A.    That's correct.

9        Q.    Mr. Covatto knew; didn't he?

10       A.    Yes, he did.

11       Q.    Did you call him and ask him?

12       A.    I have attempted to talk to Mr. Covatto about it.

13   You saw --

14       Q.    Did you call him and ask him?

15       A.    I did.

16       Q.    All right.  And others have been calling

17   Mr. Covatto, right?

18       A.    Correct.

19             MR. MARKHAM:  Let's take five minutes.  I need to

20             make a call.

21             (Brief recess taken.)

22   BY MR. SNYDERMAN:

23       Q.    Please take a look at the answer to Interrogatory

24   17B.  Can you tell me what documents were produced that

25   would disclose the names of persons having knowledge of the

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 49

1    facts.

2        A.    Can I see the counterclaim?  I don't remember off

3    the top of my head what 26 was about.

4        Q.    "The Plaintiffs secretly conspired, planned, and

5    assisted others to develop and operate a business

6    that compete directly with the Defendants."

7        A.    Well, the individuals would be the same

8    individuals as B.

9        Q.    My question is regarding the documents.

10       A.    Okay.  And the documents would be the documents

11   that -- the documents that we have in response to C are the

12   only documents that we have at this point.

13       Q.    In response to --

14       A.    I'm sorry, 8C.  The documents that reflect the

15   creation of K2 Financial, the affidavit of Karen Keller,

16   contact between K2 Financial and ChoicePoint, and the

17   contract between K2 Financial and its customers.  Actually,

18   the fourth one wouldn't be on there, so it would just be the

19   documents reflected in the creation -- you know what, let me

20   start over.

21           8A -- or 8B is the people and -- the same people

22   that would be in 17A.  And then C would be the affidavit of

23   Karen Keller and that would be the only thing that we would

24   have produced.

25       Q.    But you didn't produce the affidavit of Karen

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 50

1    Keller.

2         A.    I don't know that we didn't produce that.  I don't

3    know.  Those are the documents that I know of.

4         Q.    Does the affidavit of Karen Keller provide the

5    names of any persons other than Karen Keller?

6         A.    No.

7         Q.    All right.  So Karen Keller has knowledge of what

8    facts that are set out in Paragraph 26 of the counterclaim?

9    Does she know that there was a secret conspiracy?

10        A.    No.  She doesn't know that there was a secret

11   conspiracy.  She knows that a contract was entered into

12   between K2 and ChoicePoint and the date.  So I guess she

13   doesn't know that there was a secret conspiracy.

14        Q.    Does she know that the Plaintiffs planned and

15   assisted others to develop and operate a business that

16   compete directly with the Defendants?

17        A.    No.  The only thing she -- information she knows

18   is that there was a contract between ChoicePoint and K2.

19        Q.    So she doesn't know any of the facts that are

20   alleged in Paragraph 26 of the counterclaim, and yet you

21   just said that she was the one that does.

22        A.    No, I misspoke.  She doesn't have a clue.  And

23   that doesn't reference 26.

24        Q.    So 17C, should we strike the words "and documents

25   produced," and the entire answer is, "See answer to No. 8."

Trisha DeSanti-Boehm                              Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 51

1      A.   You know, I didn't write the exact language of the

2  interrogatories.  I don't know if my attorney has something

3  more that I'm not aware of.

4      Q.   Are you aware of any documents?

5      A.   I'm not at this time.

6      Q.   All right.  And to your knowledge, you're the only

7  30(b)(6) witness that's going to testify today, right?

8      A.   Yes.

9      Q.   Okay.  Are you familiar with the law firm, Young,

10 Conaway --

11     A.   I don't think so, no.

12     Q.   Never heard of them?

13     A.   I don't think so.

14     Q.   Do you know for a fact that Karen E. Keller is an

15 attorney for ChoicePoint?

16     A.   I don't know.  I'm not sure.

17     Q.   Does the affidavit say she's employed anywhere?

18     A.   I haven't look at the affidavit, honestly, since

19 probably when it was produced, so I don't know.

20     Q.   When was it produced?

21     A.   Sometime this summer, maybe July or August.  I

22 don't know.

23     Q.   When you say "produced," you don't mean produced

24 to the Plaintiff, you mean prepared.

25     A.   Prepared, correct.

1    analyzing the data.

2        Q.    Can you give me an explanation as to why some of

3    the information that would appear all the way to the left

4    on, at least, the first page is not there.

5        A.    It's just printed that way.  I don't know.  I

6    mean, it's there.  I can see -- for instance, the tape

7    numbers are four digits, so I can see that the last three

8    digits are there, it's the first one that's cut off.  I

9    don't know.  Obviously, it was during copying or during

10   printing.

11       Q.    Can you explain what the typewritten words are

12   that appear upside down at the bottom of first page.

13       A.    Processed flow for initial credit bureau, I think.

14   Processed -- that's what it says.

15       Q.    Do you know what that means?

16       A.    I don't know why she would name it that way, no.

17       Q.    Do you know whether the Defendants ever questioned

18   the Plaintiff about why direct mails were not being sent on

19   a monthly basis?

20       A.    Do I know if they did?  I don't know the answer to

21   that.

22       Q.    Well, is there a claim that the Defendants were

23   somehow harmed because the Plaintiff indicated that it would

24   make such mailings on a monthly basis and that those

25   generate this gross income monthly?

Trisha DeSanti-Boehm                                      Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 56

1        A.    Yes.

2        Q.    How were the Defendants harmed?

3        A.    Well, because the projections that were provided

4    to us were that we were going to get this huge amount of

5    income on a monthly basis and that would basically keep the

6    program going.  That would provide the income that would

7    keep everything going smoothly.  When we were having a lot

8    of problems, I know, at the very beginning, when we were

9    encountering a lot of cash-flow problems, when they came

10   back with the projections that we basically received $1.9

11   million from a campaign of 200,000 leads.

12          I know that Mr. Covatto had voiced that that was

13   great, that would get us out of this problem immediately if

14   we can see that kind of, you know, revenue on a monthly

15   basis -- on a consistent basis.

16       Q.    Does the contract, to your knowledge, obligate the

17   Plaintiff to make monthly mailings of the new solicitations?

18       A.    No.  It doesn't say anything about monthly

19   mailings.

20       Q.    How was the approval of either of the direct mail

21   campaigns communicated to the Plaintiff?

22       A.    I'm not -- I know Terry provided it.  Off the top

23   of my head right now, I can't remember if she provided it by

24   e-mail or she actually -- I think she actually picked up the

25   phone and talked to Alan.

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 57

```
 1        Q.   The allegation in Paragraph 11 in the counterclaim

 2   says, "For the first campaign in March of 2003, the

 3   Plaintiffs sent out only 129,760 individual solicitations

 4   instead of the promised 200,000 solicitations."  Didn't the

 5   Defendants approve sending out 129,760?

 6        A.   They approved -- we approved the direct mail

 7   campaign -- going forward with the direct mail campaign.  I

 8   mean, that was the approval that was needed.  I don't know

 9   that they ever came back and said, hey, we're only going to

10   send 129,000, is that all right.  I don't know the answer to

11   that.

12        Q.   Who would know the answer to that?

13        A.   Terry Smith.

14        Q.   Would your answer be the same with respect to the

15   second mailing in June of 2003?

16        A.   Yes.

17        Q.   Paragraph 15 of the counterclaim concludes with

18   the words, "In a further effort and plan to damage and

19   weaken Defendant's competitive advantage, the Plaintiff,

20   then, abruptly and without warning terminated the parties'

21   contract on January 9, 2004."

22        A.   That's correct.

23        Q.   Were you involved at all in the communications

24   from the Plaintiff to the Defendants about entering into

25   some sort of agreement in the fall of 2003?
```

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 58

 1        A.   I wasn't at the very beginning, the first

 2   presentation of that proposal, but I did, then, pick it up

 3   in November and December; Brian and I began talking.

 4        Q.   And did those discussions and the documents that

 5   were presented give you any reason to suspect that if you

 6   didn't agree to what the Plaintiffs wanted that the deal

 7   would be done?

 8        A.   I certainly didn't get that from discussing that

 9   with Brian.  In fact, I specifically said to him, you know,

10   we want to give a good-faith effort to provide X amount of

11   dollars on a weekly basis to see what we could work out with

12   this relationship.  So he never said there's nothing to work

13   out, you can either accept it or not accept it, we're going

14   to terminate the contract.

15        Q.   My --

16        A.   And I don't remember the exact terms of that

17   proposal, so.

18        Q.   What good-faith effort was used to send monies on

19   a weekly basis?

20        A.   We sent $30,000 a day or two after Brian and I

21   spoke.  And then another $30,000, I think, a week -- or two

22   weeks later.  Two weeks later.

23        Q.   So in the six weeks after you told Brian that you

24   would make a good-faith effort to send $30,000 a week, how

25   much money did you send?

Trisha DeSanti-Boehm                                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 59

1      A.    We sent $60,000.  And I don't know that it was six

2   weeks, but in the month of December is when Brian and I were

3   talking.  I don't know when we picked up that conversation,

4   but we sent two payments of $30,000 each, I believe.

5      Q.    Why wasn't $30,000 sent each week?

6      A.    The second week, it was just my error that it

7   wasn't sent.  It wasn't an intentional decision not to send

8   them $30,000.

9      Q.    How about the next week?

10      A.    The next week, we sent them $30,000.

11      Q.    What about the week after that?

12      A.    The week after that, we had started having

13   significant problems with the final lists that they

14   provided.  In fact, our conversion was the lowest it had

15   ever been, you know, of the lists they had provided to us.

16   At that point we realized that there was a disconnect.  And

17   even though we were talking with Brian, even though we had

18   voiced our concerns over the last set of lists we had

19   received; these lists were performing absolutely no better.

20   And it appeared apparent to us at that point that we're

21   probably not going to be able to go further.

22      Q.    And when it appeared that you weren't probably

23   going to go further, does that mean that you were going to

24   terminate the contract?

25      A.    No.  It meant that we were providing a response to

Trisha DeSanti-Boehm                                    Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 60

1    their proposal.  We had -- there was never a discussion

2    about terminating the agreement on our end.  Brian had

3    provided a settlement proposal of source, I guess, and

4    Mr. Covatto was working on a response to that.

5        Q.   And when you decided to stop sending the $30,000 a

6    week, did you notify the Plaintiff that you weren't going to

7    be doing that?

8        A.   I did not, no.

9        Q.   Why not?

10       A.   I wasn't in the office at the end of December and

11   then we had a few days to work on it.  I don't know.  I just

12   didn't pick up the phone and call him.

13       Q.   Another secret?

14       A.   It wasn't a secret.  I just didn't --

15       Q.   You just didn't tell them.

16       A.   I didn't have any communication with Brian at that

17   point.  He wasn't calling me, I wasn't calling him.  He was

18   waiting for our response that I told him we would send him

19   on the 9th or 10th.

20       Q.   You knew his e-mail address.

21       A.   Sure, I did, and he knew mine.

22       Q.   And you did not e-mail him to tell him, by the

23   way, I told you I was going to send $30,000 a week, I missed

24   one by mistake, and now we're not going to do it anymore?

25       A.   No, I didn't.  I didn't e-mail.

Trisha DeSanti-Boehm                                        Delaware Marketing Partners, LLC v. Creditron Financial Services, Inc., et al.

Page 61

```
 1        Q.   And after you stopped sending $30,000 a week,

 2   shortly after that is when the contract was terminated,

 3   right?

 4        A.   I don't know that last date we sent --

 5        Q.   It was January 9th.

 6        A.   Maybe three weeks later, two weeks later,

 7   something like that.

 8        Q.   Do you think there was any connection there?  Did

 9   that ever occur to you?

10        A.   Sure, there was.

11             MR. SNYDERMAN:   I'm done.

12             MR. MARKHAM:   She'll read.

13

14             (Deposition concluded at 6:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```