UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DELAWARE MARKETING                )
PARTNERS, LLC, a Delaware         )
limited liability company,        )
      Plaintiff                   )   C.A. No.:  04 - CV - 263
                                  )
      v.                          )
                                  )
CREDITRON FINANCIAL SERVICES,     )
INC., a Pennsylvania corporation, and )
TELATRON MARKETING GROUP,         )
INC., a Pennsylvania corporation, )
      Defendants                  )

## **DEFENDANTS' APPENDIX IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

ELDERKIN, MARTIN, KELLY & MESSINA


By   /s/ Craig A. Markham, Esq.
      Craig A. Markham, Esquire
      Attorney for Defendants
      150 East Eighth Street
      Erie, Pennsylvania 16501
      (814) 456-4000

## TABLE OF CONTENTS

Ex. 1        Excerpts of deposition of Trish DeSanti-Boehm

Ex. 2        Defendants' Answer to Interrogatory No. 10 of Plaintiff's Third Set of
             Interrogatories

Ex. 3        Excerpts of deposition of Alfred Covatto

Ex. 4        Excerpts of deposition of Alan Estes

Ex. 5        Excerpts of deposition of Harry Metcalfe

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    DELAWARE MARKETING PARTNERS, LLC,    :
a Delaware limited liability company,   :
        Plaintiff                 :

4
                                      :
        v.                           : Case No. 04-263 Erie

5
                                       :
CREDITRON FINANCIAL SERVICES, INC.,   :

6    a Pennsylvania corporation, and       :
TELATRON MARKETING GROUP, INC.,       :

7    a Pennsylvania corporation,          :
        Defendants               :

8

9

10          Deposition of TRISHA DESANTI-BOEHM, taken
before and by Sondra A. Black, Notary Public in

11   and for the Commonwealth of Pennsylvania, on
Wednesday, May 24, 2006, commencing at 9:32 a.m.,

12   at the offices of Elderkin Martin Kelly & Messina,
150 East Eighth Street, Erie, Pennsylvania 16501.

13

14   For the Plaintiff:

15       Charles Snyderman, Esquire
Charles Snyderman, PA

16       Stoney Batter Office Building
5301 Limestone Road, Suite 214

17      Wilmington, DE 19808

18      Douglas M. Grimsley, Esquire
Dickie McCamey & Chilcote, P.C.

19      Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402

20

21   For the Defendants:

22      Craig A. Markham, Esquire
Elderkin Martin Kelly & Messina

23      150 East Eighth Street
Erie, PA 16501

24

25         Reported by Sondra A. Black
Ferguson & Holdnack Reporting, Inc.

EXHIBIT

1

tabbies

1

1    A.    It does sound familiar to me, and that would be --

2    that would be the disbursement rosters that Brazos used to

3    create their payments to us, but that's not actually the

4    document I'm talking about.

5    Q.    Then I see a document that says, "64 borrowers and

6    then a dollar amount; total disbursed; a dollar amount,

7    non-Brazos; a dollar amount, Brazos; an amount for AB, it

8    looks like maybe one or I, and then a premium; and then a

9    percentage of non-Brazos; then there's reduced premium; full

10   premium rate times percentage non-Brazos.

11   A.    That's the document.

12   Q.    That's the wire transfer document?

13   A.    Yeah.

14   Q.    Then someone wrote ".50 LOC."  Do you know what that

15   might refer to?

16   A.    No.  I have no idea.

17   Q.    But you weren't, in your role, writing anything on

18   these wire forms, correct?

19   A.    Correct.  The only time I saw them was in compiling

20   discovery.

21   Q.    Good enough.  Thank you.  Paragraph 7 of the

22   Complaint states, "On September 1, 2002, the parties entered

23   into a Student Loan Origination and Marketing Agreement

24   whereby the parties agreed to work together to perform

25   student loan acquisition services."  And the answer to the

1    Complaint, Paragraph 7, says, "Denied as stated.  The Student

2    Loan Origination and Marketing Agreement was signed by the

3    parties in February 2003," and it has some legal stuff like

4    the agreement speaks for itself.  Then there's a sentence

5    that says, "It is admitted that the Plaintiff was hired to

6    perform certain specified services for the Defendant."  Do

7    you know what those certain specified services were?

8         A.   Yes.

9         Q.   Did you say yes?

10        A.   Yes.

11        Q.   Would you please describe them for me.

12        A.   List acquisition analysis, direct marketing

13   campaigns, advertise for the ALC program.

14        Q.   Anything else?

15        A.   No.   That was primarily all.

16        Q.   Is there any document, other than the Student Loan

17   Origination and Marketing Agreement, along with any exhibits

18   attached to it, that would describe these services that

19   you've just listed?

20        A.   There's no other contracts, but there was a letter

21   from August 20th of 2002 to Delaware Marketing that I think

22   outlined that.  But there was no other contractual

23   agreements.

24        Q.   Is the August 20, 2002 letter a letter signed by AD

25   Cavotto, CEO?

1    A.    That's correct.

2    Q.    Are there any other documents, other than the August

3  20, 2002 letter and the Student Loan Origination and

4  Marketing Agreement, that would refer to or describe the

5  services to be provided by Delaware Marketing Partners?

6    A.    I don't think so.

7    Q.    In the Answer to the Complaint, in Paragraph 7, the

8  sentence, "It is admitted that the Plaintiff was hired to

9  perform certain specified services for the Defendants."  Do

10  you have any understanding of the word "hired" and what it

11  means?

12    A.    That they were to perform certain services and we

13  would give them a portion of the revenue for performing those

14  services.

15    Q.    Paragraph 8 of the Answer states, "It is denied that

16  Plaintiff fulfilled all of its obligations and duties."  To

17  your knowledge, are the obligations and duties which it's

18  alleged that the Plaintiff failed to fulfill the obligations

19  and duties that are listed in the Student Loan Origination

20  and Marketing Agreement?

21    A.    The agreement and the corresponding exhibit, yes.

22    Q.    Let's take them one by one.  Please tell me what

23  obligation and duty the Plaintiff had that it failed to

24  fulfill.

25         MR. MARKHAM:  You're speaking about her knowledge

1   of this, right?

2   MR. SNYDERMAN:  I couldn't ask for anybody else.

3   Absolutely.

4   A.   I guess the easiest way to start it is --

5   MR. GRIMSLEY:  If we're going to show documents, at

6   least discuss it with counsel on the phone.

7   MR. MARKHAM:  Wait a minute.  We're going to show

8   her the contract and exhibit.

9   MR. SNYDERMAN:  That's fine.

10   A.   I guess I'll start with the exhibit.  Prospect lead

11   acquisition, it's true that they gave us leads.  Our concern

12   was that, beginning in April of 2003, the quality of those

13   leads began to diminish.  Additionally, as we hit around the

14   September, October, November, December time frame, the

15   quality of the leads deteriorated quite rapidly and quite

16   significantly.  So that would have been one issue.

17   Second was the direct mail campaigns.  We did two

18   direct mail campaigns, neither of which came anywhere near

19   the target that was projected to us.  So, of course, that was

20   an issue.  As was the fact that there was no other direct

21   marketing initiatives that took place after that.

22   There's also a discussion of credit bureau

23   relationships.  I guess that was done.

24   Analyst recommendations, I'm not really sure what

25   was done on this end.  Nothing that we see, I guess.

1        The marketing plan and recommendations, I guess they

2    gave some of those, and we took them.

3        Marketing management assignments, I don't believe we

4    gave them anything else, other than they were to engage in --

5    engage in advertising on behalf of the Academic Lending

6    Center program, which never occurred.

7        And I just want to look at the contract really

8    quick.  I guess that would be it in a nutshell.

9    Q.    With respect to the prospect lead acquisition that

10   you mentioned -- again, I want to make sure that I heard you

11   correctly -- did you say that it was April of 2003 when the

12   quality of the leads began to diminish?

13   A.    That's correct.  And I guess I should clarify that.

14   April 2003 more so as, I guess, the quality of leads

15   diminished.  What I'm talking about there is the fact that

16   the number of leads that we were receiving from Delaware

17   Marketing versus the number of leads that we were actually

18   able to use from what we received continued to diminish.  In

19   the beginning months, the first few buys we were able to use

20   90, 95 percent of those leads, and in April, I think we

21   dropped down significantly to about 50 percent of the leads

22   they had provided to us were not able to be used.

23   Q.    Why were they not able to be used?

24   A.    A lot of them were duplicates.  Meaning, we had

25   already had them, contacted them before, and gotten a

26

1   A.   Well, if I look at the -- I have no idea what they

2   were paid in the month of October off the top of my head.  I

3   mean, if I look at this spreadsheet, I can assume that they

4   weren't, but I know the spreadsheet is not accurate.  So I'm

5   not going to use that for my basis.

6   Q.   I'm going to ask Douglas to hand you what's been

7   stamped Page 249.  Let me know when you have that.

8   A.   I have it.

9   Q.   Does that help you answer the question?

10   A.   It does.

11   Q.   What's the answer to the question?

12   A.   They were not paid anything in October.

13   Q.   Do you know why?

14   A.   I don't.

15   Q.   Do you know what work and services that Delaware

16   Marketing Partners was obligated to perform as a condition

17   precedent to their receiving 28.5 percent of the funds that

18   Academic Lending Center received in October of 2002?

19   A.   It would have been the items that I had previously

20   identified.

21   Q.   Are you testifying that they had not adequately

22   performed as of October of 2002?

23   A.   I'm testifying that I don't know the reason the

24   decision was made not to pay them.  I can assume it was

25   because we received $5,000 and our cost for payroll was more

ANSWER:    The Defendants have not yet determined the documents and/or writings which will be produced at the time of trial in support of any allegation made in the counterclaim. However, the Defendants may offer any of the source documents which have been produced herewith, including but not limited to the tape dump reports and the production reports.

10.    Provide a detailed explanation of the calculations which support your demand for $16,288,863.00.

ANSWER:    From March, 2003 through December, 2003, the Plaintiff had promised to make and should have made a total of ten mailings with each generating gross revenues of approximately $1,977,025.00 for total combined gross revenues of approximately $19,770,250.00. Defendants' net gross revenues, after paying Plaintiff 28.57%, would have been approximately $14,121,889.00. Instead, Plaintiff's mailings produced gross revenues calculated as only approximately $479,484.00 ($326,604.00 + $152,880.00) during this period of time. Of this amount, Defendants' net revenue after paying Plaintiff would be approximately $342,495.00. Thus, Defendants lost approximately $13,779,394.00 in combined net revenues for all of the promised mailings.

The Plaintiff also breached its promises and obligations with regard to the quality of the telemarketing lists by providing to Defendants deficient lists of poor quality such that the usable names and telephone numbers declined from a pre-contract average of approximately 95% to a post-contract result of 53.3% for the list supplied in April, 52.9% for the list supplied in May, 57.5% for the list supplied in July, 70% for the list supplied in August, 35.2% for the list supplied in September, 66.8% for the list supplied in October and 40.5% for the list supplied in December, 2003. If the quality of these lists supplied by Plaintiff were of the same as they were in the pre-contract time frame, the gross revenues from these lists would have been in the combined total of approximately $7,903,633.00. Defendants' net revenues, after paying Plaintiff, would then have been approximately $5,645,565.00. In contrast, as a result of the substantial drop in usable names, the actual combined revenue of these lists is calculated to have been approximately $4,390,446.00 resulting in a deficit of approximately $3,513,187.00 in gross revenues. Of this deficit, Defendants lost approximately $2,509,469.50 in expected net revenues after deducting the percentage which would have been payable to Plaintiff.

9.

**EXHIBIT**

tablies'

2

**The total losses, therefore, is the sum of $2,509,469.50 and
$13,779,394.00, which is $16,288,863.50.**

11.    Describe with particularity the proprietary and confidential information of the
Defendants which you allege in paragraph 15 of the Counterclaim Plaintiff disclosed and/or
provided to others.

ANSWER:    **Business operations, processes and procedures; Lists procured for
purposes of telemarketing and/or mail campaigns and the analysis of
these lists and the selection criteria used to secure the lists.**

12.    Prior to signing the contract with the Plaintiff, did the Defendants create or
receive any written projections of the expenses they would or might incur and/or the revenues
that would or might be generated by the telemarketing calls to the individuals whose names and
telephone numbers would be provided by the Plaintiff? If your answer to this interrogatory is
"yes," please produce all documents which contain these written projections. If you no longer
have these documents, state what happened to them..

ANSWER:    **Other than the documents identified in response to interrogatory
number 1, the Defendants are aware of no other records or writings.
During one or more of the meetings held in Erie, PA, Plaintiff
provided such projections and used a chalk board to illustrate the
same.**

13.    With regard to each list of names provided by the Plaintiff, as well as the
individual names on such lists, state precisely what activity you tracked from the time you
received the names until the final disposition of these lists and individuals. By way of
explanation, this interrogatory is intended to determine whether you kept track of the activity as
to each individual, or whether you kept track of activity for an entire list. This Interrogatory is
further intended to determine the information you tracked, such things as the date you received
the name, the date and time you called the individual, the name of the employee who made the
call, the results of the call, the mailing of an application, follow-up calls, receipt of a signed
application, the loan application process, approval of the loan, funding of the loan, receipt of
payment from Brazos, etc.

ANSWER:    **If a name provided did not result in a sale, the Defendants currently
maintain information regarding the date on which that record was
received, the first and last name of the individual, the final sales
status, the final enroll date and the ID number of the agent who
placed the last call.**

10.

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
    DELAWARE MARKETING        : CA No. 04-263
 3  PARTNERS, LLC, a Delaware :
    limited liability company,:
 4       Plaintiff           : JUDGE MCLAUGHLIN AND
                             : MAGISTRATE JUDGE
 5          v.               : SUSAN PARADISE BAXTER
                             :
 6  CREDITRON FINANCIAL       :
    SERVICES, INC., a         :
 7  Pennsylvania corporation  :
    and, TELATRON MARKETING   :
 8  GROUP, INC., a            :
    Pennsylvania corporation, :
 9       Defendants          :

10          Deposition of ALFRED D. COVATTO, taken before
    and by Sonya Hoffman, Notary Public in and for the
11  Commonwealth of Pennsylvania on Tuesday, November
    14, 2006, commencing at 8:38 a.m., at the offices of
12  Elderkin Martin Kelly & Messina, 150 East Eighth
    Street, Erie, PA 16501.
13
14  For the Plaintiff:

15       Charles Snyderman, Esquire
         Charles Snyderman, PA
16       Stoney Batter Office Building
         5301 Limestone Rd., Suite 214
17       Wilmington, DE 19808

18       Brett W. Farrar, Esquire
         Dickie McCamey & Chilcote, P.C.
19       Two PPG Place, Suite 400
         Pittsburgh, PA 15222
20
21  For the Defendants:

22       Craig A. Markham, Esquire
         Elderkin Martin Kelly & Messina
23       150 East Eighth Street
         Erie, PA 16501
24
25          Reported by Sonya Hoffman
         Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT

3

Everything was done through Creditron Financial Services.

Q.  Now, Creditron Financial Services, Inc. had monies
coming in from other sources, other than Brazos, correct?

A.  Uh-huh.

Q.  Yes?

A.  Yes.

Q.  And, certainly, after the agreement with Delaware
Marketing was signed, you knew that there was an obligation
on the part of Telatron, the Telatron Group, to pay
something to Delaware Marketing for its services.

A.  Yes.

Q.  And the agreement said it would be 28.57 percent.

A.  But we didn't pay the 28.57 percent because we
didn't get -- they didn't provide the services properly, so
we didn't do that.

Q.  And that was your decision.

A.  That's right.

Q.  And when was the first time, or the earliest date,
that you became aware that Delaware Marketing was not
providing the services that you were expecting from them?

A.  In March.

Q.  March of 2003?

A.  That's right.

Q.  All right.  What was the date in March of 2003?

A.  I don't know.

36

was the reason -- to be fair, are you telling me that she said the reason we're not sending you money, even though we just got money from Brazos, is because we have problems with the program?

A.   Yes.

Q.   All right.  Before I ask the next follow-up question to that, I want to switch gears for a second.

A.   Okay.

Q.   Whose idea was it that Brazos would send a 100 percent of the wire to Creditron Financial Services as opposed to 28.57 percent to Delaware Marketing and the rest to you?

A.   Normal business practice.  We hired them.  And if they did what they were going to do and we did what we were going to do, they would get 28.57 of the gross.  But on the direct mail campaign alone, they were short about 1.5 million.

Q.   Hang on, please, unless you need to explain your answer.  I don't want to cut you short.  I want to give you a chance to answer something if you were going to keep talking.

            MR. MARKHAM:  Do you want to take a short break?

            THE WITNESS:  Yes.

            MR. SNYDERMAN:  Sure.

            (Recess taken from 9:58 a.m. to 10:14 a.m.)

A.    We would what?

Q.    If you had received all of the money that was forecasted in terms of what to expect from Brazos -- in other words, if gross revenues were significantly higher than what actually happened --

A.    We wouldn't be sitting here.

Q.    Right.  And Delaware Marketing would have received from you 28.57 percent of the gross revenues?

A.    We would have paid a commission of 28.57.

Q.    And would have paid all the approved expenses.

A.    All the approved expenses.

Q.    Okay.  But because the results were lower than was forecasted, you feel -- felt at the time, and feel now, that you're not obligated to pay 28.57 percent of all gross revenue and approved expenses, right?

A.    That is true.

Q.    Okay.  Do you feel that the agreement that you drafted provides for you not having to pay the 28.57 percent and your share of approved expenses if the results are less than expected?

        MR. MARKHAM:  Objection, calls for legal conclusion.  You can answer, if you can.

A.    Would you repeat the question, please.

Q.    Sure.  Did you feel, and do you feel now, that the agreement that you drafted gave you the right to not pay the

96

Page 1

```
 1                UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
     DELAWARE MARKETING          :
 3   PARTNERS, LLC, a Delaware   :
     limited liability company,  :
 4        Plaintiff              :
                                 :
 5            v.                 : C. A. No.: 04-263-Erie
                                 :
 6   CREDITRON FINANCIAL         :
     SERVICES, INC., a           :
 7   Pennsylvania corporation,   :
     TELATRON MARKETING          :
 8   GROUP, INC., a              :
     Pennsylvania corporation,   : TRIAL BY JURY
 9        Defendants             : DEMANDED

10

11

12           Deposition of ALAN ESTES, taken before
          and by Sonya Hoffman, Notary Public in and for the
13        Commonwealth of Pennsylvania on Thursday, May 18,
          2006, commencing at 1:15 p.m., at the offices of
14        Elderkin Martin Kelly & Messina, 150 East Eighth
          Street, Erie, PA 16501.

15

16

17   For the Plaintiff:

18        Brett W. Farrar, Esquire
          Dickie McCamey & Chilcote, P.C.
19        Two PPG Place, Suite 400
          Pittsburgh, PA 15222

20

21   For the Defendant:

22        Craig A. Markham, Esquire
          Elderkin Martin Kelly & Messina
23        150 East Eighth Street
          Erie, PA 16501

24

25            Reported by Sonya Hoffman
          Ferguson & Holdnack Reporting, Inc.
```

**EXHIBIT**

tabbies®

4

1      A.   The phone number requirement wasn't -- you

2  obviously don't need that if you want to mail them.

3      Q.   Would there be any other differences between the

4  two lists?

5      A.   Not that I can recall.

6      Q.   Were you involved in preparing projections on

7  likely results of the mailings?

8      A.   Yes.

9      Q.   What was your involvement in that?

10     A.   Communicating to Telatron what we expected the

11  call -- the call volumes and the program -- the program

12  results might have looked like.

13     Q.   And had you calculated or come up with the

14  projections?

15     A.   Based on our experience and financial services

16  marketing and direction from the agency about their

17  experience with the product and direct mail.

18     Q.   What agency was that?

19     A.   Creative Solutions.

20     Q.   Let me show you what we marked previously as

21  Exhibit No. 2.  Have you seen this before?

22     A.   It appears it's an e-mail that I drafted.

23     Q.   And it's address to Terry Smith at Telatron.

24     A.   Yes.

25     Q.   Would it have been sent the date indicated here,

1    January 7, 2003?

2        A.    Yes.

3        Q.    And you started off by saying, "Here's how we see

4    the mail campaign shaking out."  Does this table provide us

5    with your projection on what the results would likely be?

6        A.    From the direct mail perspective?

7        Q.    Right.

8        A.    Right.  So I think we were -- yes.

9        Q.    So you had anticipated, in this chart anyway, a

10   response rate of 1.33 percent.

11       A.    Right.

12       Q.    What did you characterize or define as a response?

13       A.    Someone calling in who received the mail piece.

14       Q.    Okay.  In the body of the e-mail, you say the

15   response rate could conceivably be as high as 2 percent.

16   Where did you get that figure from?

17       A.    Experience from the agency and our work -- from

18   our work in financial services marketing.

19       Q.    The next thing the table states, "Return," an

20   abbreviation for promissory, and, "Note."  That's a signed

21   note from the consumer; is that correct?

22       A.    Uh-huh, yes.

23       Q.    And you have 45 percent.  Again, that percentage

24   was from the same source as you've identified before.

25       A.    Correct.

1      Q.    And then funding, meaning that the loan actually

2  funds, the person is qualified and the bank lent the money,

3  70 percent, correct?

4      A.    Correct.

5      Q.    And then it has a line for, "Average Loan Amount,

6  $65,000."  Do you know where that number came from?

7      A.    From the instruction that we were going to

8  coordinate with the credit bureau when we solicited the

9  names.

10      Q.    Mr. Metcalf had indicated, I think, that a part of

11  this analysis is missing dealing with unqualified responses.

12      A.    Correct.

13      Q.    Is he correct that that aspect or that component

14  is not factored in here?

15      A.    That's correct.

16      Q.    Do you know why that was?

17      A.    No -- an oversight.

18      Q.    He indicated that that could be as high as 20 to

19  30 percent.  Would you agree with that statement?

20      A.    Uh-huh, yes.

21      Q.    After you sent this -- well, strike that.  When

22  did you recognize that that component had not been factored

23  into this projection?

24      A.    I don't believe I recognized it until today.

25      Q.    Now, Exhibit No. 3 is a copy of another e-mail

Page 1

```
 1                 UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
    DELAWARE MARKETING        :
 3  PARTNERS, LLC, a Delaware :
    limited liability company,:
 4       Plaintiff           :
                             :
 5            v.              : C. A. No.: 04-263-Erie
                             :
 6  CREDITRON FINANCIAL       :
    SERVICES, INC., a         :
 7  Pennsylvania corporation, :
    TELATRON MARKETING        :
 8  GROUP, INC., a            :
    Pennsylvania corporation, : TRIAL BY JURY
 9       Defendants          : DEMANDED

10

11

12           Deposition of HARRY METCALF, taken before
        and by Sonya Hoffman, Notary Public in and for the
13      Commonwealth of Pennsylvania on Thursday, May 18,
        2006, commencing at 9:00 a.m., at the offices of
14      Elderkin Martin Kelly & Messina, 150 East Eighth
        Street, Erie, PA 16501.

15

16

17  For the Plaintiff:

18      Brett W. Farrar, Esquire
        Dickie McCamey & Chilcote, P.C.
19      Two PPG Place, Suite 400
        Pittsburgh, PA 15222

20

21  For the Defendant:

22      Craig A. Markham, Esquire
        Elderkin Martin Kelly & Messina
23      150 East Eighth Street
        Erie, PA 16501

24

25              Reported by Sonya Hoffman
            Ferguson & Holdnack Reporting, Inc.
```

**EXHIBIT**

tabbies®

5

1   II, Direct Mail, under Subparagraph F, there's a heading of

2   Expectations stating about 2 percent response expected,

3   should mail out about 4,000 promissory notes. About 1,200

4   promissory notes should be returned. About 840 loans should

5   be funded. Do you know where that information came from?

6       A.   I don't recall the specific meeting that was

7   referenced or whether I was one of the individuals that

8   couldn't attend. It's likely that I did not attend that

9   meeting, my daughter had just been born. So I don't know

10  what the specific source of these -- it's not my e-mail.

11      Q.   Okay.

12      A.   But I'd like to point out one thing about the

13  mailings that's referenced that never happened.

14      Q.   On that date, you mean?

15      A.   Yeah. This mailing campaign didn't happen. The

16  first mailing wasn't until later in 2003.

17      Q.   March.

18      A.   I don't know that this was March or April -- late

19  March or earlier April, I don't know the specific date.

20      Q.   Would the -- in your view, the expectations change

21  from January '03 to March '03?

22      A.   As I mentioned before, I believe there's a line

23  that's missing, which is the qualification.

24      Q.   What significance does that have to you?

25      A.   It would reduce the performance, the expectation

1   of the campaign.  You'd mail out fewer promissory notes

2   because you have fewer people that would actually qualify.

3       Q.   Well, you're assuming that that qualification was

4   not applied to these numbers?

5       A.   Based on my experience, I don't believe it is.  I

6   don't see it within the document.

7       Q.   In your experience, it's not likely then that that

8   qualification rate was applied, but just not stated to get

9   to these numbers.

10      A.   No.  I think it was omitted.

11      Q.   But is there a standard qualification rate that

12   would apply to this type of --

13      A.   It would be -- 20 to 30 percent would be a

14   reasonable expectation given the time frame.

15      Q.   20 or 30 percent would qualify or not qualify.

16      A.   Would qualify.

17      Q.   Would qualify?

18      A.   Correct.

19      Q.   So if that rate was applied to these, we would

20   have 20 or 30 percent fewer promissory notes?

21      A.   No.  You'd have significantly fewer promissory

22   notes.  Only 20 to 30 percent would be qualified of the

23   call-in response.

24      Q.   And even -- you're saying more than 20 to 30 fewer

25   promissory notes then?

1    A.    Yes.

2    Q.    Do you know what the results of the first mailing

3    were in terms of percentage of promissory notes?

4    A.    I don't know the specifics.

5    Q.    Do you know if it met expectations?

6    A.    I believe it was under expectations.

7    Q.    Do you know how much?

8    A.    No.

9    Q.    Do you know why it was under expectations?

10    A.    No, I do not.

11    Q.    And we know that the first mailing in March of

12    2003 was less than 200,000 pieces.

13    A.    Correct.

14    Q.    It was like 129,000 or so, that's my recollection.

15    Is that consistent with your recollection 126,000, 129,000?

16    A.    There were two campaigns.  I don't recall the

17    specifics, which was the bigger of the two, the first or the

18    second, I don't recall.

19    Q.    Do you recall why for the first one there was not

20    200,000 pieces dropped?

21    A.    I believe it was related to funding of the

22    campaign.

23    Q.    You mean there wasn't enough money?

24    A.    Yeah.  It wasn't agreed upon to fund that large of

25    a campaign.