IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DELAWARE MARKETING PARTNERS, LLC, a Delaware limited liability company<br>　　　Plaintiff | ) ) ) ) | CA No. 04-263 |
| v. | ) ) | JUDGE McLAUGHLIN AND<br>MAGISTRATE JUDGE |
| CREDITRON FINANCIAL SERVICES, INC., a Pennsylvania corporation and, | ) ) | 　　　SUSAN PARADISE BAXTER |
| TELATRON MARKETING GROUP, INC., a Pennsylvania Corporation,<br>　　　Defendants | ) ) ) | TRIAL BY JURY DEMANDED |

**DEFENDANTS' PRETRIAL NARRATIVE STATEMENT**

I.　　　FACTUAL BACKGROUND

　　　This action arises out of a Student Loan Origination and Marketing Agreement between Plaintiff and Defendants, which was executed on February 24, 2003 (the "Agreement"). Defendants are in the business of, among other things, finding customers for a lender for purposes of issuing new loans to consolidate existing multiple student loans. Defendants perform this service by engaging in telemarketing and mail solicitations of individuals who have outstanding student loans. Under the parties' Agreement, the Defendants hired the Plaintiff to perform two tasks which are at issue here. First, Plaintiff was to obtain lists of names and telephone numbers to be used by Defendants in the telemarketing efforts. This involved the Plaintiff's development and submission of list selection criteria to ChoicePoint, a business which collects and sells data

from credit bureaus. Second, Plaintiff was to develop and dispatch mail solicitations, which involved obtaining mailing lists from ChoicePoint, creating the mail pieces and mailing the solicitations.  In exchange for its performance of these contractual obligations, Plaintiff was to be paid 28.57% of the gross revenue generated by the loan consolidation work.

Plaintiff terminated the Agreement on January 9, 2004 and filed this action alleging that it had fulfilled its obligations to Defendants but that it has not been paid in full. Plaintiff conceded that it had been paid $755,007.45 for its work.  Defendants filed an Answer and later, an Amended Answer and Counterclaim asserting that Plaintiff did not perform as promised or as required and that Plaintiff had breached various provisions of the Agreement, including the non-compete and confidentiality provisions.

In Count I of the Counterclaim, it was alleged that the Plaintiff committed "various breaches of the contractual obligations owed by the Plaintiff to the Defendants."  These breaches including Plaintiff's failure to perform its contractual obligations which resulted in a substantial loss of income to Defendants.  Additionally, Plaintiff breached the non-compete and confidentiality provisions of the Agreement.  Count II alleged that the parties "were operating under a mutual mistake of fact regarding the revenues to be generated by the mail campaigns such that the terms and conditions of the contract were not enforceable against Defendants."  In Count III, it was alleged that the Defendants had been induced into entering into the Agreement due to "Plaintiff's fraud and/or misrepresentations."  Count IV alleged that the Plaintiff had "secretly conspired, planned and assisted others to develop and operate a business to compete directly with

the Defendants" and that the Plaintiff had "utilized, disclosed and/or revealed confidential and proprietary information of the Defendants and the Plaintiff had failed to supply to the Defendants the nature and quality of the lists and services which the Plaintiff had promised and agreed to supply."

With regard to Plaintiff's failure to perform its obligations, from March, 2003 through December, 2003, the Plaintiff had promised to make and should have made a total of ten mailings with each generating gross revenues of approximately $1,977,025.00 for total combined gross revenues of approximately $19,770,250.00. The Plaintiff had provided detailed calculations to Defendant to support these revenue figures. Under Plaintiff's calculations, Defendants' net gross revenues, after paying Plaintiff 28.57%, would have been approximately $14,121,889.00. Instead, Plaintiff made only two mailings, not ten, which produced gross revenues calculated as only approximately $479,484.00 ($326,604.00 + $152,880.00) during this period of time. Of this amount, Defendants' net revenue after paying Plaintiff would be approximately $342,495.00. Thus, Defendants lost approximately $13,779,394.00 in combined net revenues for all of the promised mailings.

The Plaintiff also breached its promises and obligations with regard to the quality of the telemarketing lists by providing to Defendants deficient lists of poor quality such that the usable names and telephone numbers declined from a pre-contract average of approximately 95% to a post-contract result of 53.3% for the list supplied in April, 52.9% for the list supplied in May, 57.5% for the list supplied in July, 70% for the list supplied in August, 35.2% for the list supplied

in September, 66.8% for the list supplied in October and 40.5% for the list supplied in December, 2003.  If the quality of these lists supplied by Plaintiff were generally of the same quality as they were in the pre-contract time frame, the gross revenues from these lists would have been in the combined total of approximately $7,903,633.00.  Defendants' net revenues, after paying Plaintiff, would then have been approximately $5,645,565.00.  In contrast, as a result of the substantial drop in usable names, the actual combined revenue of these lists is calculated to have been approximately $4,390,446.00 resulting in a deficit of approximately $3,513,187.00 in gross revenues.  Of this deficit, Defendants lost approximately $2,509,469.50 in expected net revenues after deducting the percentage which would have been payable to Plaintiff.

Based upon Plaintiff's representations of the revenue to be generated and representations regarding the quality of its solicitation lists, Defendants invested a great deal in time and personnel to handle the expected volume of work.  Although revenues did not meet the Plaintiff's promises, the expenses continued to mount.

The Plaintiff also breached the non-compete provision of the Agreement.  Prior to the January 9, 2004 termination of the Agreement, the Plaintiff took substantial steps and measures to form and operate a business which competed directly with the Defendants.  This business, K2 Financial, LLC, was formed in October, 2003.  K2 Financial was secretly formed by the principals of the Plaintiff.  One of the founding members of the Plaintiff, Brian Nelson, became K2's director of operations.  It was Nelson who signed the Agreement.  Harry Metcalfe, another founding member of the Plaintiff became the president and chief operating officer of K2.  The

third founding member of the Plaintiff (Alan Estes) became K2's director of business development.

Beginning in the late summer, early fall of 2003, the Plaintiff positioned itself to effectively compete against the Defendants. Contracts with vendors and customers were negotiated and eventually signed. Personnel and the equipment was secured and put into place. When the Plaintiff was adequately prepared to begin its competing operations as K2, it terminated the Agreement without any advanced warning or notice. As such, the Defendants were left with a severe competitive disadvantage because they did not have a vendor for its solicitation lists and they had to begin from scratch the process of obtaining its own lists. In contrast, the Plaintiff positioned itself to begin solicitations almost immediately.

On July 20, 2007, the Court adopted the Magistrate Judge's report and recommendation and dismissed Defendants' counterclaim. The Court rejected the Magistrate Judge's Report and Recommendation to the extent of the Magistrate Judge's denial of Plaintiff's motion for summary judgment on Plaintiff's contract claim. Thus, the Court entered summary judgment in favor of Plaintiff on Plaintiff's contract claim.

II.     LIABILITY

The Defendants dispute all claims of liability asserted by the Plaintiff due to Plaintiff's failure to perform its contractual obligations. To the extent that the Court has found, or

the jury may find that Defendants owe any amounts under the Agreement, the calculation of those amounts must take into account the fact that the Defendants have already paid the Plaintiff the sum of approximately $755,007.00.  Additionally, Plaintiff was obligated to pay Defendants $142,850.00 as Plaintiff's share of start-up expenses.  Moreover, the gross receipts during the applicable time period were $9,329,953.00, which would result in a maximum commission payment to Plaintiff in the amount of no more than $2,665,567.50.  When the previous payment of $755,007.00 and the $142,850.00 of start-up costs are subtracted from this amount, the maximum net amount which could be owed to the Plaintiff would be $1,767,710.50.

III.     WITNESSES

The Defendants may call any or all of the following witnesses at the time of trial:

| Name | Damage | Liability |
|---|---|---|
| 1. Mr. Alfred Covatto | X | X |
| 2. Mrs. Joyce Covatto | X | X |
| 3. Ms. Trish DeSanti-Boehm | X | X |
| 4. Ms. Terry Smith | X | X |
| 5. Mr. Mark Kisiel | X | X |

6. All witnesses identified in the Plaintiff's pretrial narrative statement

The Defendants reserve the right to call any witnesses identified or called by the Plaintiff.

IV.   EXHIBITS

The Defendants may offer any or all of the following exhibits at the time of trial:

1. Disposition reports regarding results of Defendants' use of the telemarketing lists furnished by the Plaintiff.

2. Tape dump reports reflecting results of Defendants' use of telemarketing lists provided by Plaintiff.

3. Stage aging reports reflecting status of loan consolidation applications.

4. Flash reports reflecting results of Defendants' use of telemarketing lists provided by Plaintiff.

5. Expense reports reflecting costs and expenses of operating Academic Learning Center.

6. Reports and documents reflecting receipts of payments from Brazos.

7. Reports and documents reflecting payments to Plaintiff.

8. K2 Financial LLC corporate documents reflecting the creation of that limited liability corporation.

9. Attorney Snyderman letter of January 9, 2004.

10. Invoices from ChoicePoint to Plaintiff and/or Precision Direct Analytics.

11. Estes' e-mail of 8/6/02 to Nelson.

12. Estes' e-mail of 10/9/02 to Terry Smith, including e-mail string.

13. Estes' e-mail of 12/18/02 to Metcalfe, Nelson, Terry Smith, Al Covatto and Joyce Covatto.

14. Estes' e-mail of 12/19/02 to Joyce Covatto, Metcalfe, Nelson and Terry Smith.

15. Estes' e-mail of 1/3/03 to Nelson and Metcalfe, including e-mail string.

16. Estes' e-mail of 1/7/03 to Terry Smith.

17. Joyce Covatto e-mail to Al Covatto of 1/9/03 regarding Estes' e-mail of 1/7/03, including e-mail string.

18. Estes' e-mail of 1/10/03 to Terry Smith.

19. Estes' e-mail of 1/17/03 to Joyce Covatto.

20. Estes' e-mail of 1/20/03 to Joyce Covatto.

21. Estes' e-mail of 2/4/03 to Metcalfe and Nelson sending copy of Estes' 2/4/03 e-mail, including e-mail string.

22. Metcalfe e-mail of 3/4/03 to Joyce Covatto and Terry Smith.

23. Estes' e-mail of 4/10/03 to John McKenna.

24. Metcalfe e-mail 4/16/03 to Estes, including e-mail string.

25. Metcalfe e-mail of 5/2/03 to Terry Smith.

26. Nelson e-mail of 5/4/03 to Kevin Foley.

27. Joyce Covatto e-mail of 5/22/03 to Estes, including e-mail string.

28. Metcalfe e-mail of 6/11/03 to Estes and Nelson.

29. Joyce Covatto e-mail of 6/26/03 to Metcalfe.

30. Nelson e-mail of 7/18/03 to Metcalfe, including e-mail string.

31. Al Covatto e-mail of 8/8/03 to Metcalfe, including e-mail string.

32. Metcalfe e-mail of 8/11/03 to Joyce Covatto, including e-mail string.

33. Metcalfe e-mail of 8/19/03 to Nelson, including e-mail string.

34. Estes e-mail of 10/10/03 to Metcalfe and Nelson.

35. Brian Nelson fax of 10/13/03 to Terry Smith.

36. Terry Smith e-mail of 10/13/03 to Metcalfe, including e-mail string.

37. Nelson e-mail of 10/13/03 to Terry Smith, including e-mail string.

38. Nelson e-mail of 10/14/03 to Terry Smith, including e-mail string.

39. Trish DeSanti-Boehm letter of 10/15/03 to Jennifer Reinhart.

40. Estes e-mail of 10/22/03 tp Attorney Snyderman.

41. Nelson e-mail of 11/4/03 to Estes and Metcalfe.

42. Joyce Covatto memo 11/10/03.

43. Estes e-mail of 11/11/03 to Nelson and Metcalfe.

44. Nelson e-mail of 11/12/03 to Joyce Covatto.

45. Nelson e-mail of 11/12/03 to Estes and Metcalfe.

46. Foley e-mail of 11/21/03 to Metcalfe.

47. Nelson e-mail of 12/4/03 to Foley.

48. Nelson e-mail of 12/26/03 to DeSanti-Boehm.

49. Precision Direct Analytics, LLC web page documents as of 2/19/04.

50. Precision Direct Analytics, Inc. mail response curve 3/12/04.

51. Metcalfe e-mail of 8/18/03 to Estes and Nelson, with e-mail string.

52. Estes e-mail of 7/8/03 to Metcalfe.

53. ChoicePoint Master Marketing Services agreement signed 12/29/03.

54. Telemarketing Script.

55. K2 letter of 10/21/03 to Affinity Direct, LLC.

56. Estes' e-mail to William Keenan of 9/5/03.

57. Non-Disclosure Agreement with Affinity Direct.

58. Estes e-mail to Metcalfe of 10/15/03.

59. Metcalfe e-mail to Rita Miller of 10/24/03.

60. Metcalfe e-mail of 8/29/03.

Defendants reserve the right to offer into evidence any of the documents which have been identified in the Plaintiff's pretrial narrative statement, as well as any documents or records which have been released by any party during the course of discovery in this matter.

        Respectfully submitted,

        ELDERKIN, MARTIN, KELLY & MESSINA

        By   /s/ Craig A. Markham, Esquire
           Craig A. Markham, Esquire
           Attorney for Defendants
           150 East Eighth Street
           Erie, Pennsylvania 16501
           (814) 456-4000