1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   DELAWARE MARKETING PARTNERS,   :
    LLC, a Delaware limited        :
4   liability company,            :
         Plaintiff                :
5                                  :
              v.                   :    CA No.: 04 - 263
6                                  :
    CREDITRON FINANCIAL SERVICES,  :
7   INC., a Pennsylvania           :
    corporation, and TELATRON      :
8   MARKETING GROUP, INC., a       :
    Pennsylvania corporation,      :
9        Defendants               :

10

11          Argument held in the above-captioned matter

12      on Friday, July 20, 2007, commencing at 9:52 a.m.,

13      before the Honorable Sean J. McLaughlin, in the

14      United States Federal Court House, 17 South Park Row,

15      Erie, Pennsylvania 16501.

16

17   For the Plaintiff:

18        Brett W. Farrar, Esquire
          Dickie McCamey & Chilcote, PC
19        Two PPG Place, Suite 400
          Pittsburgh, PA 15222
20
     For the Defendants:
21
          Craig A. Markham, Esquire
22        Elderkin Martin Kelly & Messina
          150 East Eighth Street
23        Erie, PA 16501

24

25              Reported by Sondra A. Black
            Ferguson & Holdnack Reporting, Inc.

                                                              -1

1          THE COURT:  This is the time we set for argument on

2    objections to the Magistrate Judge's R&R.  Why don't we

3    start with Mr. Markham.

4              MR. MARKHAM:  Morning, Your Honor.

5              THE COURT:  Morning.

6              MR. MARKHAM:  We've raised objections to

7    Magistrate Judge's recommendations on two motions.  One is

8    the Motion to Dismiss our Counterclaim and the other is

9    Motion For Summary Judgment on the aspects that were

10   remaining after she made recommendations on the Motion to

11   Dismiss.  Unless the Court has another order, I'll take

12   them with the Motion to Dismiss first.

13             THE COURT:  That'll be fine.

14             MR. MARKHAM:  The Motion to Dismiss sought to

15   dismiss Count 1 of our counterclaim, which is a breach of

16   contract counterclaim.  And the breaches which were

17   encompassed in Count 1 included the Plaintiff's failure to

18   produce the quality of list --

19             THE COURT:  And quantity.

20             MR. MARKHAM:  And quantity, as well as

21   Plaintiff's breach of noncompete provisions of the contract

22   and confidentiality provisions.  Magistrate Judge

23   recommended that the first two, which is quality and

24   quantity, be dismissed as a basis for the counterclaim

25   based upon application of the parol evidence rule.  It's

```
 1     our position that the parol evidence rule would not

 2     prohibit us from proving or asserting breaches of contract

 3     dealing with quality and quantity.  Although those matters

 4     are not set forth in the written agreement, the precontract

 5     representations do not contradict, nor alter, any written

 6     terms of the agreement.  And they are necessary, I would --

 7               THE COURT:  Actually, in a sense they do.  And

 8     let me -- let me backtrack a little bit and ask you a

 9     couple questions now that we're on this parol evidence

10     aspect.  In your brief -- put a finer point on it.  In your

11     brief in opposition to the Plaintiff's Motion For Summary

12     Judgment -- I'm all the way back there now -- you say, at

13     Page 4 -- you say, "Even more surprising, it seems that

14     Plaintiff has taken the remarkable position that there was

15     no condition precedent to Plaintiff's entitlement to

16     payment."  And then you go on to say, "Apparently, the

17     Plaintiff would have this Court believe that there was no

18     requirement that Plaintiff perform any services or at least

19     that it perform any services of value in order to earn its

20     payment."  But, as a matter of fact, in this case services

21     of value were provided, because it's indisputable that

22     gross profits were generated and you took a percentage of

23     it; isn't that right?

24               MR. MARKHAM:  It's correct for --

25               THE COURT:  I mean, if they had done nothing,
```

1    you would owe them nothing.  But it's indisputable that

2    they did something, right?

3            MR. MARKHAM:  That's correct, they did

4    something.  And the question that we've presented, and I

5    think our counterclaim presents on this point, is, did they

6    do what they promised to do.  And in that do -- I mean, did

7    they produce the lists of the quality and nature that

8    justified the 28.57 percent share of these revenues.

9            THE COURT:  Let me ask this question, this

10   hypothetical:  Your position is that, and I'll use your

11   term, as a condition precedent, if you will -- and I think

12   it's the wrong term, but I understand what you're talking

13   about -- that in order for them to earn their keep, their

14   percentage of the agreement, the 27 or 28 percent, they had

15   to supply lists of a quality of about 95 percent, and they

16   had to produce, for instance, with respect to monthly

17   mailings, mailings in the vicinity of 200,000, as I

18   remembered the part of the claim.  Now, let's just assume

19   for the sake -- and I know there's a contention that over

20   the period of time the quality diminished to the point

21   there was 57 percent or 60 percent -- you know, diminution

22   in that nature.  And there was a -- rather than getting

23   200,000 at times, there'd be 120,000 or 126,000.  But my

24   question would be this:  Let's assume, for the sake of

25   discussion, that rather than providing you lists uniformly

1        of 95 percent quality, they provided you lists uniformly of

2        85 percent quality, or monthly numbers of 180,000.  Would

3        you not have to pay them their respective percentage at

4        that point?  My question is, your client became the final

5        arbitrator of where on this sliding scale he would choose

6        to reimburse them; didn't he?

7               MR. MARKHAM:  I guess, in a way, from the way

8        that this relationship developed, that's what happened.

9        But our point is, this is an issue that eventually the jury

10       has to determine, whether what they produced for us was of

11       the nature and quality that they had promised to produce.

12              THE COURT:  Here's my problem, Craig -- and I

13       spent a lot of time with this file and looking at it from

14       all different angles.  It's kind of a walking tour of a

15       contracts class, to a certain extent -- it is undeniable

16       that a benefit was conferred on you, in the sense that you

17       made money.  You simply didn't make as much money as you

18       hoped you were going to make.  And it's also undeniable

19       that you have not turned over, back to the person who

20       precipitated this gross profit, much of the profit that you

21       made.

22              Now, if you strip everything else away, isn't

23       there almost an unjust enrichment aspect on this thing?

24              MR. MARKHAM:  I disagree with the Court's

25       characterization of what happened with the money aspect of

1    all this.  First, let me make sure we understand, too, that

2    the Plaintiff has been paid three quarters of a million

3    dollars so far.

4            THE COURT:  Can I ask a factual question before

5    you go on.  Do you know, or do you have some sense, on a

6    percentage basis, what percentage of the gross profit that

7    was generated as a result of whatever lists were given to

8    you by the Plaintiff -- what percentage you kept and what

9    percentage you gave back to the Plaintiff?  I know you

10   gave -- what was the figure you paid them?

11           MR. MARKHAM:  755,000, I think.

12           THE COURT:  What percentage is that of the total

13   amount generated?

14           MR. MARKHAM:  I don't know.  But I'll tell you

15   it's much less than the 28 percent that the contract would

16   provide.

17           THE COURT:  You have no idea at all how much it

18   is?

19           MR. MARKHAM:  I have the raw numbers, but I just

20   can't do the math in my head.

21           THE COURT:  Give me just a raw figure.

22           MR. MARKHAM:  I think the raw numbers, in terms

23   of gross revenues -- this is gross revenues -- for the time

24   period that we're looking at is around $9 million.  Now,

25   that's not profit.  That's not income over expenses.

1    That's just gross revenues.  So they're paid less than a

2    ninth of that amount.  And I think we can't lose sight of

3    the fact --

4          THE COURT:  So less than a ninth.  So we're

5    talking something about, what?  10 -- no.  What would that

6    be?  What is the percentage basis?

7          MR. MARKHAM:  It's less than 10 percent.  This

8    is where my math is failing me, Judge.

9          THE COURT:  I was terrible at it.  So, in other

10   words, under the agreement -- if the agreement obtained in

11   this case, rather than the 10 percent of that -- is it $9

12   million?

13         MR. MARKHAM:  Yes.

14         THE COURT:  They'd be getting 27 percent of the

15   9 million; is that right?

16         MR. MARKHAM:  28.57.

17         THE COURT:  Okay.  I appreciate that.  Go ahead.

18         MR. MARKHAM:  But when we look at the financial

19   issues, we can't lose sight of the fact of the expenses

20   that were incurred based upon representations that the

21   revenue would be much, much greater than it was.  My client

22   invested a lot in personnel, time, and training to ramp up

23   for a project volume that did not come to be.  And the

24   training was very expensive.  And these people just

25   couldn't be let go or laid off.  They held them on for a

1    long time.  Eventually a lot of them were laid off, in

2    light of the low revenue that was coming in.

3              So it's not just that --

4              THE COURT:  But your -- who's the -- I want to

5    use the word "comptroller," but that might be the wrong

6    word.  Who is the woman that was deposed for your side?

7              MR. MARKHAM:  There was three of them:

8    Mrs. Cavato, who is part owner; Mrs. Desanti-Boehm was vice

9    president; and we have Terry Smith who was also a vice

10   president.  None of them were financial people.

11             THE COURT:  On the issue of -- and I guess, to a

12   certain extent, this ties in with your inducement claim,

13   but on the issue of ramping up by way of additional capital

14   investment, I looked at the transcripts, such as they are,

15   and from what I could see -- but I'm going to give you an

16   opportunity to disabuse me of it -- nobody in your

17   organization was able to delineate with even -- with any

18   specificity what damages actually were sustained in

19   reliance upon the perception that you were going to make

20   more money than you did.  And this is the end of the case.

21   I mean, where is that in the record?

22             MR. MARKHAM:  You know, that was not an issue

23   that was raised in the motions, but there is evidence --

24             THE COURT:  Magistrate addressed it in her R&R.

25   She didn't use the phrase, but it was kind of "this is put

1      up or shut up time" on this question of ramping up.  On

2      this question of consequential loss or reliance lost.  And

3      she said you didn't prove it.  You didn't raise a triable

4      issue of fact.

5             MR. MARKHAM:  I don't think she was looking at

6      that aspect of it, Judge.  And, on summary judgment, she

7      concluded that there was insufficient evidence to support

8      the claim that there was a breach of a noncompete.  That's

9      what she was talking about.

10            THE COURT:  Well, I guess that's just a question

11     of going back and looking at the thing.

12            MR. MARKHAM:  With regard to the issue that you

13     have raised, there is evidence of record that they did hire

14     additional people to handle what they understood to be the

15     volume of -- the volume of this program.  And they had to

16     train them, which was a long process, and they had them

17     sitting by the phones waiting for the -- you know, making

18     calls or waiting for these calls, and it just didn't come

19     to pass.  So that's the nature of the expense side.

20            THE COURT:  Let me ask you a question about

21     fraud in the inducement.

22            MR. MARKHAM:  Okay.

23            THE COURT:  I looked at some Pennsylvania law on

24     this, and I'm going to quote you from a -- this is a -- the

25     Pennsylvania Superior Court.  And this is what the Court

1        says:  It says, "In sum, Bardwell," talking about another

2        case, a Pennsylvania case, "permits the admission of parol

3        evidence of representations concerning a subject, dealt

4        with in an integrated written agreement, and made prior to

5        or contemporaneous with the execution of the agreement, to

6        modify or void the terms of that agreement only" -- and

7        "only" is highlighted -- "only where it is alleged that the

8        parties agreed that those representations would be included

9        in the written agreement, but were omitted by fraud,

10       accident, or mistake.  This is commonly referred to as

11       'fraud in the execution' because the party proffering the

12       evidence contends that he or she executed the agreement

13       because he or she was defrauded by being led to believe

14       that the document he or she was signing contained terms

15       that were actually omitted therefrom.  Such a case is to be

16       distinguished from a 'fraud in the inducement case' such as

17       the instant one, where the party proffering evidence of

18       additional prior representations does not contend that the

19       parties agreed that the additional representations would be

20       in the written agreement, but rather claims that the

21       representations were fraudulently made and that, but for

22       then, he or she never would have entered into the

23       agreement."

24            The court goes on on to say that the parol

25       evidence bars that type of fraud in the inducement.  That's

1        precisely what your claim here is about; isn't it?  You're

2        not claiming fraud in the execution of the agreement;

3        you're claiming there were fraudulent inducements.  And the

4        Pennsylvania Superior Court and Commonwealth Court says the

5        parol evidence bars that.

6                    MR. MARKHAM:  Well, let me just say this, Judge:

7        That isn't why the fraudulent inducement claim was

8        dismissed here.  Or that's not why the recommendation

9        was --

10                   THE COURT:  It was actually dismissed on the

11       basis of the statute of limitations.  And I'm going to talk

12       about that, but I'm not entirely convinced that you're not

13       entitled to a relation back relief.  But this is on the

14       merits.  I do not see, under Pennsylvania law, how a

15       fraud -- as a matter of fact, put even a finer point on it,

16       this is a case called Greylock, and it's 879 A.2nd 864,

17       this is a Commonwealth Court Case, 2005, and it says,

18       "Greylock correctly points out that the parol evidence rule

19       bars proof of fraudulent inducement to a contract where the

20       contract is fully integrated."  Here we have not only a

21       fully integrated contract but we have a situation where the

22       very party who's claiming fraud in the inducement is the

23       party who drafted it.  Now, how does your fraud claim --

24       forget about the statute of limitations; I'm onto the

25       merits.  How does your fraud claim survive that

1    elemental -- apparently element principle of Pennsylvania

2    contract law?

3         MR. MARKHAM:  Well, of course, I'm not prepared

4    to go into detail on that point because it wasn't raised in

5    any of the motions.

6         THE COURT:  But it's part of the broader parol

7    evidence rule that's floating through the case.

8         MR. MARKHAM:  The fraud and inducement issue

9    here is that, first, the contract, although it contains an

10   integration clause, does not deal with nor address the

11   issues relating to the fraud.  And the fraud we're

12   suggesting is this mathematical formula that was provided

13   to us to calculate the revenues to be generated --

14        THE COURT:  How can that be a fraud?  I thought

15   the fraud here, either negligently -- it could be negligent

16   misrepresentation, I think you plead it both ways,

17   intentional or negligent.  I thought, conceptually, the

18   contention was the fraud was the misrepresentations either

19   intentional or negligent as to the quality and quantity

20   that would be supplied.  But under Count 2 of your

21   counterclaim, you've alleged mutual mistake of fact with

22   respect to the formula that the -- the mathematical formula

23   upon which profits could be computed.  So as a conceptual

24   matter -- and I think you also argue that it wasn't until

25   very late in the depositions that, you know, this tumbled

1    out, even to the Plaintiff.  How can that form the basis

2    for a misrepresentation made at the -- at the outset if

3    your contention is there was a mutual mistake of fact?

4            MR. MARKHAM:  Well, it's quite the alternative,

5    Your Honor, with regard to that formula.  Either it's a

6    mutual mistake of fact, which, based upon the record, maybe

7    it's more of that than it was of negligent

8    misrepresentation.

9            THE COURT:  Could you explain that formula.  I

10   mean, I don't understand it.  Can you just give me kind of

11   a quick layman's overview as to what the formula was, when

12   it was supplied, and what was missing from it in order to

13   make it accurate.

14           MR. MARKHAM:  Yes.  The Plaintiff's area of

15   expertise included mail solicitation campaigns; creating

16   those, analyzing those, and sending those out.  They

17   represented to the Defendants that here, based upon our

18   experience, is what you can expect from a certain number of

19   mailings, 200,000 mailings.  You get so many that are not

20   returned, you get so many returned.  Of those -- or some

21   interest is shown.  Of those, a smaller percentage actually

22   goes through with the deal, and another percentage results

23   in a funding of the source -- of the loan.

24           And the e-mail that was sent to us, and there

25   was a number of them, are made part of the record which

1    lays out the mathematical steps that were followed by the

2    Plaintiff to explain -- or to represent, hey, this mailing

3    campaign is going to be very, very profitable.  In fact,

4    it's going to be able to fund the entire venture here.

5            What was missing was, a deduction whereby the

6    borrower who responds is really ineligible for whatever

7    reason.  And a good number of people who respond are

8    ineligible for loan consolidation.  So that deduction was

9    not included in the mathematical formula, thereby

10   overstating by a large percentage --

11           THE COURT:  What your expected profit margin

12   would be.

13           MR. MARKHAM:  Yes.  What the expected revenue

14   would be.

15           THE COURT:  Revenue would be.  From which your

16   profit would be taken after overhead.

17           MR. MARKHAM:  Yes.  And in depositions in this

18   case, the Plaintiff's representatives who gave us this

19   formula said that -- in fact, that very day he came to

20   realize that that component was missing.

21           THE COURT:  By how much?

22           MR. MARKHAM:  I think it reduced the likely

23   revenue by -- or likely recipients by something like 70

24   percent.  It was a huge reduction.  So that's the formula,

25   that's what was missing, and that was the basis of our

1    claim of mutual mistake of fact.  We went into this, all of

2    us, giving him the benefit of the doubt thinking --

3              THE COURT:  Mutual mistake of fact -- going back

4    to basic Hornbook contract law.  If there's a mutual

5    mistake of fact, among other things, it has to represent a

6    material aspect of the contract, a sine qua non of the

7    contract, which was critical to parties entering into it.

8              But the remedy, it seems to me, for a mutual --

9    if, in fact, there was one or wasn't one, the remedy for

10   mutual mistake of fact that you're looking for is, I

11   gather -- the remedy can be two-fold:  One can be a

12   reformation of the contract to try to put the parties in

13   the -- to try to put the parties in the position they would

14   have been if the mistake had not been made -- that's not a

15   viable remedy here, correct?

16             MR. MARKHAM:  I don't think so.

17             THE COURT:  But in your pleading, you're looking

18   for rescission of the contract based upon a mutual mistake

19   of fact; is that correct?

20             MR. MARKHAM:  Yes.

21             THE COURT:  But it still leaves one with this

22   question:  If the contract has already been terminated, it

23   was terminated by the Plaintiff, and as we discussed

24   earlier, it is undeniable that a -- albeit perhaps a

25   smaller one than you anticipated, but a monetary benefit

1    was conferred on your client by virtue of its performance

2    under that contract.  Whether it be under a quantum meruit

3    theory or an implied contract theory, why isn't the

4    Plaintiff entitled to its percentage under that contract?

5        MR. MARKHAM:  I guess our view, Judge, is that

6    if the contract is rescinded only on the basis of some

7    other theory, quantum meruit, for instance, could the jury

8    find that they're entitled to that amount.  The jury may

9    find, correctly, that they're entitled to much less.  The

10   Plaintiff may argue that they're entitled to much more.

11   But the contract percentage was based upon a mutual mistake

12   of fact of what revenues would be generated.

13       So we're not saying that necessarily they get

14   nothing more than they received.  We're saying that -- we

15   would argue that they shouldn't, but we're saying it's now

16   up to the jury, under some other theory, perhaps, what

17   value --

18       THE COURT:  What would be the benchmark for

19   that?  The problem in this case -- this isn't a case where

20   a workman supplies material and labor to someone and then

21   isn't paid.  And you can -- you know, there's a certain

22   concrete aspect to that.  And you bring in other laborers

23   in the area and they say, well, this is what I charge.

24   This isn't that.  Against what backdrop, absent a contract

25   which indicates what the percentages are -- against what

1    backdrop would a jury determine what was a fair and

2    equitable distribution as to the profits between you and

3    the Plaintiff?  What would be the -- what would I tell them

4    in a jury charge on that?  How would that work out in the

5    real world?

6            MR. MARKHAM:  Well, although I haven't thought

7    this through, I would suggest that the jury can look at

8    what was promised in terms of revenue, and, therefore,

9    profit to both sides, and what actually happened.  How --

10   what was delivered. What was delivered, what was promised,

11   and, if so, are they then entitled to the 28 percent.  If

12   it wasn't what was promised, delivery was deficient, maybe

13   they're entitled to something less given the reduction in

14   income and revenues that the Defendants received.

15           THE COURT:  Tell me if this is true:  I mean, in

16   terms of 27 -- what is it?  28 percent versus -- what are

17   the relative percentages?  28.5?

18           MR. MARKHAM:  It's --

19           MR. FARRAR:  It's 28.57 percent.

20           THE COURT:  Versus the balance -- see, he

21   remembers.  He knows what his client is supposed to get.

22           Here is, fundamentally, the problem I'm having

23   with this:  Whether you're on the equity side, kind of in

24   the quantum meruit side, or just on the straight contract

25   side, what difference does it make, in terms of what the

1    relative percentages should be, based upon the size of the

2    pot at any given point in time?  I mean, if they made any

3    money for you, why wouldn't you owe the percentage that was

4    in the contract?  I mean, they make less because there's

5    less gross profit; you make less because there's less --

6    there's less revenue generated; and then, maybe, on another

7    month the boat goes up a little bit.  So you both make out

8    better.  On another month it comes down.  But the

9    percentages never change, what is wrong with that?  I just

10   can't get it through my head.

11            MR. MARKHAM:  Maybe it's my lack of explaining

12   it more clearly.  The Defendants spent a lot of money

13   getting this project up and running and operating.  And

14   that --

15            THE COURT:  What were some of the particulars of

16   that ramping up?

17            MR. MARKHAM:  It was basically employee time,

18   salaries and training, and working on computer programs to

19   follow and track payments and applications and each step of

20   this multi-step process to get loan consolidation.  So it

21   wasn't as if they have no expenses so everything that comes

22   in is just gravy.  They have huge expenses.  I mean, they

23   testified that it wasn't until close to the end of the

24   first year that they were seeing some daylight of revenues

25   over expenses.  Now, there's a lot of disputes about that,

1          but that's their view of what was happening at this point.

2                    So it wasn't as if we have the same expenses as

3          the Plaintiff, or we have no expenses and it's just money

4          rolling in.  That's not the situation.  We incurred

5          expenses in development and planning and operations at a

6          certain level based upon what we were informed this would

7          bring in.  And that promise, representation, justified the

8          investment in time and money that we made.

9                    THE COURT:  Let me ask you this, a little off

10         the question of ramping up, but of what significance is it

11         that you people continue to perform under the contract for

12         a considerable period of time when allegedly you were aware

13         that the contract in some particulars that you considered

14         material such as quality and quantity, were not being

15         adhered to?  Is that a waiver?

16                   MR. MARKHAM:  No.  I don't think so.  The

17         testimony was that the Defendants were committed to the

18         program, they made all these investments, they wanted to

19         work.  They were hoping against hope that it would turn

20         out, that they'd turn the corner and this project would be

21         as profitable as they had been promised it would be.

22         So it never waived any rights.  They, in fact, were hoping

23         that what they were seeing was an exception to the rule and

24         that things would turn around for them.

25                   THE COURT:  The Magistrate Judge, on this mutual

1    mistake of fact, if I remember the R&R correctly, cites

2    Pennsylvania law for the accurate proposition that mutual

3    mistake of fact cannot be based on -- cannot be predictive

4    in terms of events that may or may not occur in the future.

5           What's your -- and in this case, the amount of

6    profit that might be generated in the future, as would be

7    true of any enterprise, whether it would be lists or car

8    sales or anything else, is an element of some speculation

9    and uncertainty; isn't it?

10          MR. MARKHAM:  Yes.  As a -- by its nature, a

11   prediction is that.  Our point is that we're not talking

12   about a prediction.  We're talking about the accuracy of

13   this formula, whether it contained all the components it

14   should have contained.  That's the existing fact, as of the

15   time the contract was formed, that we relied upon.  Here's

16   the formula, and we know -- according to the Plaintiffs,

17   they were saying, we know this is an accurate way to

18   calculate.  Turned out to be not an accurate way to

19   calculate.

20          THE COURT:  Where does your $16 million damage

21   claim come from?

22          MR. MARKHAM:  That comes from what would have

23   received if the project performed as promised by the

24   Plaintiff, compared to what actually happened.  If the

25   Plaintiff made the mailings that they had promised, if the

1    Plaintiff's list quality was in the nature of what they

2    represented before the contract was signed, that would have

3    been the income based upon those factors.

4         THE COURT:  Would it also have been the income

5    based upon the incorrect profit margin formula or the

6    correct profit margin formula?

7         MR. MARKHAM:  It's the incorrect profit margin.

8         THE COURT:  Well, what possible sense does that

9    make?  How can you be the beneficiary of a formula that is

10   patently incorrect?

11        MR. MARKHAM:  Well, this is what they sold us.

12   So if they adhered to their promises, this is what we would

13   have received.  It's as if they sell us a car and say

14   there's radio in it, and there's no radio in it.  We didn't

15   get the radio, but we're entitled to the value of the

16   vehicle with the radio, as they promised.

17        THE COURT:  When things went south and the

18   contract was terminated, for lack of a better term -- this

19   is not really germane to our discussion on the objections,

20   but it's just filling in some gaps for me -- did you folks

21   go out and cover?

22        MR. MARKHAM:  Yes.

23        THE COURT:  What did you do?

24        MR. MARKHAM:  We started buying lists on our

25   own.  And we -- the contract was terminated without any

1    advance notice.  We didn't have someone to step into the

2    place of Delaware Marketing to get the lists for us, so we

3    started doing the work ourselves.

4         And after we went through a learning curve, we

5    were getting results better than we had with Delaware

6    Marketing.

7         THE COURT:  In retrospect, you say to yourself,

8    we should have done it ourselves?

9         MR. MARKHAM:  Hindsight is pretty good, I guess.

10        THE COURT:  I understand full well that you do

11   not agree with the Magistrate Judge's dismissal of your

12   contract claim, in part, on the basis -- where she

13   dismissed it, in part, on the basis of parol evidence rule.

14   I understand that.  But I'm going to ask you this question

15   anyway, and I'm not asking you to fall on your own sword,

16   but I'm just going to ask your impression.  Is there an

17   inconsistency between the Magistrate Judge's dismissal of

18   your counterclaim in part on the basis of the operative

19   effect of the parol evidence rule and the Magistrate

20   Judge's failure to have granted summary judgment to the

21   Plaintiff on its contract claim on the basis that there

22   were -- that there was parol evidence that precluded it?

23   Do you understand my question?

24        MR. MARKHAM:  I think you lost me.

25        THE COURT:  Do you understand my question, Mr.

1   Farrar?

2          MR. FARRAR:  I do, Your Honor.

3          THE COURT:  You're not up yet.  Let me come at

4   it this way:  On the question of parol evidence, just as a

5   matter of symmetry, if the parol evidence rule does not

6   bar -- let me put it this way:  If the parol evidence rule

7   would operate in such a fashion as to defeat your contract

8   claim in part, insofar as quality and quantity are

9   concerned, then it would have to be, as a matter of logic,

10  that the parol evidence rule could not be -- that the

11  issues of quality and quantity could not be used to defeat

12  the Plaintiff's contract claim; isn't that right?

13         MR. MARKHAM:  Now I understand what you're

14  saying, Judge.

15         THE COURT:  There's a disconnect between those.

16  Either one's right or one's -- they have to be the same,

17  don't they, to be intellectually consistent?

18         MR. MARKHAM:  I don't know if they need to be

19  the same.

20         THE COURT:  Can you distinguish -- I know you

21  disagree with the reasoning in the one, but can you -- is

22  there any basis upon which to distinguish the other?  The

23  way it was resolved.

24         MR. MARKHAM:  Well, I think, in terms of the

25  Plaintiff's motion to be granted summary judgment --

1           THE COURT:  Plaintiff's motion would be this:

2     The percentages are set forth in the agreement; parol

3     evidence is not admissible on that, in terms of quality and

4     quantity; and the Plaintiff gets a judgment of liability

5     with the only issue left of damages.

6           MR. MARKHAM:  That's the Plaintiff's position.

7           THE COURT:  That's the Plaintiff's position.

8           MR. MARKHAM:  Our position is, it doesn't make

9     sense to us that there be no requirement imposed upon the

10    Plaintiff, either expressly, through parol evidence, or

11    impliedly, as we've argued, that there be some level of

12    performance required, and there has to be some value for

13    what it has done to earn its payment.  The fact that income

14    came in is not the sole or determinative factor of whether

15    the Plaintiff is entitled to be paid for what it did.

16          THE COURT:  Doesn't the the evidence show -- and

17    this might be oversimplifying it by a quarter or a half,

18    but there's certainly some truth to it -- that Mr. Covato,

19    during the term of this agreement, he decided, based upon

20    his own gut instinct, at any given point in time how much

21    money should be forwarded to the Plaintiff and how much he

22    was going to retain for overhead expenses among his various

23    companies?

24          MR. MARKHAM:  I think, in part, you're correct,

25    Judge.  And to give a full explanation of that, his

1    priority was to make sure the expenses are covered, because

2    if we can't pay the people making the calls, nothing is

3    going to come in.  So his focus was, first, pay that.  And

4    for many, many, many months there was not enough to pay

5    anybody anything more, despite the promises going into this

6    project.  So you're correct that he decided that instead of

7    paying Delaware Marketing, we have to pay the workers to

8    continue making the calls; and that's what he did.  And

9    that's what the testimony would be.

10              THE COURT:  Is there anything else you want to

11   tell me?  I'm going to give you a chance to come back up

12   after we hear from --

13              MR. MARKHAM:  That may be a more efficient way

14   to --

15              THE COURT:  Why don't we do that.  It'll sharpen

16   the discussion.  All right.  Thank you.

17              Yes, sir.  Shall we begin with mutual mistake of

18   fact?  I notice you didn't address that in your papers, at

19   least insofar as he has T'ed up this issue, and that is the

20   formula mistake.  Is that a mutual mistake of fact?

21              MR. FARRAR:  Brett Farrar, Your Honor.  If I

22   could just -- I will address that point, but I wanted to

23   clarify one thing that he said with respect to the revenues

24   generated.  He indicated $9 million, Mr. Markham did,

25   during the discussion.  I brought a document with us today

1    that has been identified in the pretrial statement, and

2    this shows that the amounts of money that were wired to the

3    Defendants by a company by the name of Brazos, and the

4    revenues, when you tally all this up --

5          THE COURT:  Tell me again, I read it, but what's

6    Brazos?

7          MR. FARRAR:  That's an independent third party

8    entity that was utilized for -- in this loan consolidation

9    program to provide funds back.

10         THE COURT:  All right.

11         MR. FARRAR:  The total amount of money on that

12   document is $16,308,094.30.  I just wanted to correct that

13   statement.  It's over $16 million.

14         THE COURT:  How much have you been paid?

15         MR. FARRAR:  Nothing.

16         THE COURT:  They say you've been paid --

17   800-and-some thousand --

18         MR. FARRAR:  $750,000, or thereabout.  This

19   involves the amount of money that was based upon the

20   percentages beyond that.  Of the money that hasn't been

21   paid, is my understanding, Your Honor.

22         THE COURT:  Let me see if I have this right.

23   You say that revenues of $16 million were generated; is

24   that right?

25         MR. FARRAR:  That is correct

```
 1              THE COURT:  And he used the figure 9 million;

 2    you believe it's 16 million.  But of that 16 million, what

 3    percentage of that 16 million, if, in fact, it was 16

 4    million, does your discovery or research reveal you were

 5    paid?

 6              MR. FARRAR:  Yes.  Beyond that $750,000 amount,

 7    the discovery has revealed that they weren't paid any

 8    percentage of the amount beyond that.

 9              THE COURT:  So you're telling me that you were

10    paid 750,000 on gross revenues of 16 million?  Is that what

11    you're telling me?

12              MR. FARRAR:  Your Honor, if I could refer to the

13    Complaint.

14              THE COURT:  Yes.

15              MR. FARRAR:  There's a paragraph in the

16    Complaint -- Paragraph 14 of the Complaint, Your Honor,

17    states that --

18              THE COURT:  This is your Complaint?

19              MR. FARRAR:  That's correct.  Of the

20    Plaintiff's, Delaware Marketing Partners', initial

21    Complaint that started this action.  Paragraph 14, "As of

22    the date of filing this complaint, Defendants have paid

23    Plaintiffs $755,007.45.  Leaving a balance due of

24    $834,490.49, plus 28.57 percent of all gross revenues

25    received by Defendants after October 31 , 2003."  So that
```

1      amount of money, if I'm correct on this, actually involved

2      some costs that were to be divided among the parties

3      initially.  And then --

4              THE COURT:  Well, you terminated the contract as

5      of what?

6              MR. FARRAR:  January of '04.

7              THE COURT:  '04.  So you're not entitled to any

8      things beyond that?

9              MR. FARRAR:  Well, the thing is is that some of

10     this revenue that came in --

11             THE COURT:  Trickled in after --

12             MR. FARRAR:  -- stems from work -- exactly.

13     Stems from work that occurred before that.

14             THE COURT:  Let me try one more time this way:

15     You contend that you were entitled to 28.57 percent of the

16     revenue that was generated, right?

17             MR. FARRAR:  Yes.

18             THE COURT:  Under the contract, right?

19             MR. FARRAR:  Yes.

20             THE COURT:  My question to you is, it's your

21     position you were not paid 28.57 percent, correct?

22             MR. FARRAR:  That is correct.

23             THE COURT:  Have you taken the time to figure

24     out, as a matter of arithmetic, what percentage of the

25     revenue that you generated for these people you, in fact,

1     were paid?

2              MR. FARRAR:  No, Your Honor.  But what we did do

3     is, we took the amount of money that was obtained -- or

4     discovered through discovery, and multiplied that by the

5     percentage.  And that's how you come up with the money --

6     the amount, I should say.

7              THE COURT:  Mr. Markham said roughly 10 percent.

8              MR. FARRAR:  I don't know if that's correct

9     given the fact that he based his number on a $9 million

10    figure.

11             THE COURT:  Go ahead.

12             MR. FARRAR:  I don't know if you would like --

13             THE COURT:  No.  For present purposes I don't

14    need it.

15             MR. FARRAR:  Okay.  Back to the mutual mistake

16    of fact, Your Honor.

17             THE COURT:  Let's talk about that.

18             MR. FARRAR:  And your question, I'm sorry?

19             THE COURT:  Well, my question is this -- but

20    first of all, at the inception -- was that information, the

21    formula, provided at the inception of the contract, or did

22    it find its way into the contract?  Was it part of the

23    contract?

24             MR. FARRAR:  No.  The formula is not part of the

25    contract.

1          THE COURT:  Explain this formula to me.  How it

2     arose on the scene, preliminary to the execution of the

3     contract; who came up with it; and why, if it is, it's

4     wrong.

5          MR. FARRAR:  Yes, Your Honor.  There was an

6     e-mail, and I believe that -- and Mr. Markham can correct

7     me if I'm wrong, but there was an e-mail in January of 2003

8     from Allen Estes, who was an individual with Delaware

9     Marketing Partners, to Terry Smith, who is an individual at

10    Teletron, one of the Defendants, that discusses an

11    estimated performance of a mail campaign.  And that's

12    where, I do believe -- and correct me if I'm wrong, Mr.

13    Markham -- I do believe that is where they are claiming

14    that this formula comes from.

15         THE COURT:  All right.  Now, is it true, per Mr.

16    Markham's contention, that there was a defect in the

17    formula?  There was something that was missing from the

18    formula?

19         MR. FARRAR:  My understanding, that is correct.

20         THE COURT:  What is it?

21         MR. FARRAR:  There was a percentage that was

22    missing from the formula itself.

23         THE COURT:  Would the upshot or would the effect

24    of that missing piece of the puzzle be to reduce the amount

25    of revenue that one could expect to generate with a certain

1     number of lists?

2          MR. FARRAR:  The upshot is is that it would

3     reduce the amount, yes, Your Honor.

4          THE COURT:  All right.  Then run now to the

5     merits -- address the merits of Mr. Markham's argument that

6     the Magistrate Judge was incorrect in granting summary

7     judgment on Count 2 of the counterclaim, which is the

8     mutual mistake.

9          MR. FARRAR:  It is our position that the

10    Magistrate Judge was correct.  And, No. 1, this -- from a

11    mutual mistake perspective, mistake of fact perspective,

12    that amount -- or formula, let's say -- that formula was an

13    estimation purely.  A purely estimated guess, if you will.

14    Speculation of performance under a contract.  And the case

15    law is clear that that type of an estimate cannot form the

16    basis for a mutual mistake of fact argument.  And the

17    Magistrate Judge correctly recognized that, and based upon

18    well-established case law.

19          Also, what we have here is we have two

20    sophisticated business entities discussing amongst

21    themselves an estimation for future performance.  I think

22    that the Defendants know what a projection is or an

23    estimation of future performance is as opposed to fact.  I

24    mean, they're in the business of this.

25          As well, also, this -- the upshot of this is

1      that there is no indication that the mathematical formula

2      was the end-all, be-all of the discussion.  What the

3      discussion was about was revenue being generated, and a

4      projected estimate of revenue.  And as a result, the

5      Magistrate Judge was correct in saying that if this case is

6      about a mathematical formula, as Defendants are arguing,

7      that is much too narrow a position --

8                THE COURT:  He says the fact on the grounds that

9      it was wrong was the mathematical formula.

10               MR. FARRAR:  Your Honor, that is clearly shown

11     to be in the documentation, and it is not disputed that it

12     is an estimate.  And that alone does not form the basis of

13     a mutual mistake.

14               THE COURT:  Now, assuming that it did, for

15     purposes of my question, and the contract -- do you agree

16     with me that the remedy for mutual mistake is either

17     reformation or rescission?

18               MR. FARRAR:  My understanding, it is.

19               THE COURT:  What, if anything, does that do to

20     your damage claim if the contract were rescinded?

21               MR. FARRAR:  Well, the damages -- we would still

22     have the same damages.

23               THE COURT:  How so?

24               MR. FARRAR:  Because, assume for a moment

25     that -- and we disagree with that --

1          THE COURT:  And I mean it in this sense -- and I

2    understand that your position is that, for all the reasons

3    you said and the reasons the Magistrate Judge indicated in

4    her R&R that there is no mutual mistake.  But here's

5    conceptually what I'm having trouble with, if the contract

6    is rescinded, and I know you terminated it, but a

7    declaration of rescission by me would essentially be the

8    same as saying, there never was a mutual meeting of the

9    minds on a material point necessary.  If that was the case,

10   then there would have been no contract and the 28.5 percent

11   and the other percentage would really no longer exist.  So

12   where would you get your -- upon what basis would you then

13   seek your damages?

14          MR. FARRAR:  Well, we would have to seek the

15   damages upon some type of an equitable theory, such as

16   unjust enrichment or something along those lines.

17          But at the end of the day, the revenues

18   generated would be the same.  And the documentation, the

19   contract that does exist -- did exist, would certainly be

20   evidence of intent of the parties, with respect to a claim

21   for unjust enrichment, to show the intent of the parties

22   throughout the performance of this relationship.  And that

23   would establish the percentages, Your Honor, obviously.

24          THE COURT:  What would establish the

25   percentages?

1            MR. FARRAR:  The documentation.  Whether you

2    call it, at that point, a contract or not.  For example,

3    even if it were just a letter between the parties, that --

4            THE COURT:  In other words, it would be some

5    evidence as to what the party's belief was as to what was

6    an appropriate distribution?

7            MR. FARRAR:  Yes, Your Honor.  And, also, it's

8    been clearly testified in the deposition testimony of Mr.

9    Covato -- and I know I'm going to say who drafted the

10   contract, and that sort of gets out of your question a

11   little bit.  But Mr. Covato, the person who formulated this

12   relationship, admitted that that was supposed to be the

13   percentage of revenues paid to Delaware Marketing Partners.

14   That would also be evidence.

15           So I don't see how that percentage is not going

16   to be applied to the gross revenue even if you assume, and,

17   again, I agree with the Magistrate Judge's Report and

18   Recommendation, that's correct.  But to answer your

19   specific question, even if you assume the contract is

20   rescinded.

21           THE COURT:  What else do you want to tell me?

22   Let's move on to your -- I take it your objection -- I take

23   it you have one objection to the Magistrate Judge's R&R,

24   and that is her failure to have granted you summary

25   judgment as to liability on your contract claim; is that

1    right?

2          MR. FARRAR:  That's right.  With respect to

3    everything else of the Magistrate's ruling, we agree.  And

4    with respect to what I will call Delaware Marketing

5    Partners' affirmative summary judgment motion to its

6    Complaint, we believe that, as Your Honor has discussed

7    this morning, with the examples of the boat on the water,

8    et cetera, that the contract itself does not require a

9    qualitative assessment of the performance of either

10   parties' work.  And to do so in the Magistrate's

11   Recommendation and Report is in error on that fact.  And

12   simply put, what we're saying is that any revenue generated

13   and collected by the Defendants from work and services

14   performed under the contract, Delaware Marketing Partners

15   is entitled to 28.57 percent of that amount.  Whether the

16   revenues generated are greater than anticipated or lower

17   than anticipated.

18         THE COURT:  What about this relation back

19   argument.  You know, there's a ton of case law out there

20   that stands for the proposition that where you have a

21   compulsory counterclaim -- and I'm beyond this issue about

22   it not being raised with the Magistrate Judge.  I can look

23   at it de novo if I want to.  But isn't there a fair amount

24   of case law out there that, basically, in a relationship

25   back situation with compulsory counterclaim, relates you

 1    back to the original answer that was filed?  And I guess I

 2    simply ask rhetorically, but substantively, if that is the

 3    case, then those claims that were dismissed as untimely

 4    would be timely by virtue of the date of the answer; is

 5    that right?  Counterclaim was not filed until 2006.

 6            MR. FARRAR:  September 22, 2006.

 7            THE COURT:  The answer would have been filed --

 8    the precise date is escaping me, but it would have been in

 9    under the two-year statute of limitations applicable to

10    those misrepresentation claims; would it not?

11            MR. FARRAR:  Aside from the waiver that we

12    raised in our --

13            THE COURT:  I've never been a big waiver fan on

14    either side of the fence.

15            MR. FARRAR:  If you look at the main case that

16    they rely upon, it's actually distinguishable from the

17    other case that we cited.  In the case that we cited -- and

18    I'm looking for that right now.

19            THE COURT:  Was it Davis?

20            MR. FARRAR:  That's correct, Your Honor.

21    There's a discussion about this Perfect Plastics case, and

22    the discussion in Davis indicates that they weren't

23    attempting to file a first counterclaim, they were trying

24    to amend a counterclaim.  And if that's the case -- we know

25    that this didn't occur in this case until September 22,

1    2006 -- it would be late.

2         Also, we cite the other case in there that

3    discusses the fact that under Rule 13F, the statute of

4    limitations would -- involving the state law would bar

5    recovery in this matter.

6         THE COURT:  Why was it, with respect to your

7    performance under the contract, that, if memory serves,

8    there was only two months where you supplied those monthly

9    lists?

10        MR. FARRAR:  Yes, Your Honor.

11        THE COURT:  Is there a dispute as to whether the

12   quality of your lists fluctuated over a period of time?

13        MR. FARRAR:  I don't know if there's a dispute

14   as to whether the quality did change over time.  I -- I

15   think what we're saying is it doesn't matter.  Based upon

16   the contract that they wrote, the parol evidence rule, and

17   the integration clause in the contract itself.

18        THE COURT:  Is there anything else you want to

19   tell me?

20        MR. FARRAR:  Would I have a chance to respond if

21   he says anything?

22        THE COURT:  Well, we could be here forever.

23        MR. FARRAR:  I understand.  I don't think so,

24   Your Honor, at this time.  What was stated in the papers

25   and the Magistrate's Report and Recommendation, I think,

1    sums it up.

2              THE COURT:  All right.

3              MR. FARRAR:  Thank you.

4              THE COURT:  Mr. Markham -- actually, why don't

5    you sit down for a second, and I'm going to give my court

6    reporter a short little break, and we'll come out and

7    we'll -- before I get off, though, one thing is -- getting

8    off the liability horse here and just talking about

9    damages, there are disputed issues of material fact as to

10   how much money you have or have not been paid as between

11   the parties; is that right?

12             MR. FARRAR:  With respect to purely damages,

13   Your Honor?

14             THE COURT:  Yes.

15             MR. FARRAR:  It sounds as if there is.

16             THE COURT:  You dispute their claims in that

17   regard; don't you?

18             MR. MARKHAM:  Yes.  I'm not sure what time frame

19   he's looking at to come up with 16 million as an example of

20   a dispute.  I got 9 million as of January 9, 2004.

21             THE COURT:  All right.  That sounds like a

22   material dispute to me.  We'll take a short recess.

23             (Recess taken from 10:47 a.m. to 10:57 a.m.)

24             THE COURT:  Before you come up here, Craig, let

25   me ask you one other question here.  This formula that was

1    sent in the e-mail, that said estimate --

2         MR. FARRAR:  Correct.

3         THE COURT:  -- when does the record reflect, if

4    it does reflect, that the Defendant became aware that there

5    was an error in the formula?

6         MR. FARRAR:  The Defendants are stating that

7    they became aware of it during the deposition that occurred

8    in this case.  Aside from that, I don't see anything else

9    in the record that indicates that they are or are not aware

10   of it.  They are saying that they became aware of it during

11   a deposition that occurred in May of 2006.

12        THE COURT:  Anyway, getting back to this mutual

13   mistake of fact, it's your position that the formula was

14   sent, and it was sent as an estimate; is that what your

15   point is?

16        MR. FARRAR:  That's correct.  In fact, on the

17   e-mail itself it's identified as such.  It's identified as

18   an estimated performance.  I mean, it is what it is.  It

19   says it's an estimated mail campaign performance.

20        THE COURT:  All right.  Let me hear from Mr.

21   Markham.

22        MR. MARKHAM:  Just on that point, Judge , the

23   e-mail, which is attached to our counterclaim as Exhibit B,

24   dated January 7, 2003, it wasn't told to us that the

25   formula is an estimate of what the formula should be.  It

1    was, here is the formula.  If you apply it to certain

2    assumed facts, this is what the outcome should be.  So,

3    again, our point is the formula is what the mistake was.

4    Not what the future held, but the formula was an inaccurate

5    statement.

6           On the issue of relation back, just to briefly

7    state it, the one case we cited, Perfect Plastics, stands

8    for the proposition that if you want -- if the Defendant

9    wants to add a counterclaim, and that's granted, then it

10   relates back under Rule 15(c), it relates back to the

11   original answer.  And in that case, clearly as reported in

12   the Court's decision, the Defendant was adding something.

13   It was adding a counterclaim; it wasn't modifying an

14   existing counterclaim.

15          And the Davis case, which came after, doesn't

16   say that.  It doesn't say that in Perfect Plastics they

17   already had a counterclaim, and they were just amending it.

18   In fact, I think the footnote, they've been talking about

19   about Footnote 16 in the Davis case, accurately states that

20   in Perfect Plastics they were adding a new counterclaim.

21   So I don't think those two cases distinguish ours to the

22   general rule that an amendment would relate back.

23          The only thing we haven't talked about deals

24   with the Magistrate Judge's recommendation for summary

25   judgment on our counterclaim, to the extent it survived her

1    recommendations in the Motion to Dismiss, and that would

2    leave us with the claim of the violation of noncompete. The

3    Magistrate Judge concluded there was insufficient evidence

4    to support a claim that the noncompete was violated.

5    However, in her own opinion, the Magistrate Judge cites

6    from the record and quotes from the record that supports

7    the conclusion that the noncompete was, in fact, violated.

8    And there was evidence of record, through deposition

9    testimony, attached to our Motion to Dismiss, which

10   confirmed what the Magistrate Judge was citing to.  That

11   being that the principals of the Plaintiff, in the winter

12   of '03, were creating a new company and getting everything

13   in place to start competing with us.  And by that I mean

14   actually negotiating contract, paying customers, setting up

15   its operations, so that when they terminated our contract,

16   they could open the doors immediately and begin competing,

17   which is what they did.  So our point is that there's

18   certainly evidence of record, and, in fact, the Magistrate

19   cited to it, which would support our counterclaim on the

20   breach of noncompete.

21            THE COURT:  All right.  Does someone have that

22   e-mail handy?  Let me see it.  So it says, "Estimated

23   commission"; is that what you're talking about?

24            MR. FARRAR:  Your Honor, in the "RE:" line --

25            THE COURT:  In the what?

```
 1              MR. FARRAR:  In the "RE:" line to the e-mail,

 2     the subject line --

 3              THE COURT:  Yes.

 4              MR. FARRAR:  It's an estimated mail campaign

 5     performance.  So that e-mail is dealing with an estimated

 6     performance.

 7              THE COURT:  Where is the formula on here?  Is

 8     there some kind of formula on here?

 9              MR. MARKHAM:  It's in the box.  There's

10     percentages, the formula components are there in the middle

11     box, and the outcome applying formula to the 200,000 piece

12     universe is in the right-hand box.  So, for instance -- if

13     I may, Your Honor, explain this a little more, if you would

14     like.  The response, at 1.33 percent, that's someone

15     actually responding in some way to the mailing.  The next

16     line is the -- actually -- when they respond, they're then

17     sent a promissory note to sign.  Of those responding, of

18     those 1.33 percent, 45 percent will actually sign the

19     promissory note and return it.

20              Then the fund line, that means once the

21     promissory note comes back as signed, we send it on to the

22     lender.  The lender then reviews all the documentation and

23     decides whether or not to fund the loan.  So of those who

24     respond and, then, of those who sign the note, the lender

25     would fund or accept as a borrower 70 percent.
```

1           Then we have the average loan amount and then

2      the estimated commission on the average loan amount apply

3      to those other factors which are derived from the formula.

4           THE COURT:  But where is the formula?

5           MR. MARKHAM:  I'm sorry, Judge.  The formula is,

6      you take 200,000 mailings, you multiply that by 1.33

7      percent first.  That tells you how many will respond.

8      That's 2,660 will respond.  Then you multiply that by 45

9      percent, and then you multiply that by 70 percent.  So at

10     the end of applying those mathematical factors, you'll have

11     838 people out of 200,000 who will actually result in a

12     loan being funded.

13          THE COURT:  How did they eventually tinker with

14     that?

15          MR. MARKHAM:  What happened was, they left out a

16     reduction number, a percentage of like 70 percent, who,

17     although they signed the promissory note, are not eligible.

18     So you take that off before you get to the funding

19     percentage of 70 percent.

20          THE COURT:  All that does is it -- I guess it --

21     it will reduce, by a certain percentage, the number of

22     people that will be eligible to participate, right?

23          MR. FARRAR:  That's right, Your Honor.  And,

24     again, it goes back to your understanding of the case.

25          Before I jump to that point, clearly this

1    document says it's an estimated performance.  I mean,

2    that's not even in dispute.  This is an estimate of future

3    performance of revenue.

4              But your point is correct.  All it's going to

5    do is either lower or raise, however this is going to work

6    out, the end result, which is what we talked about this

7    morning already.

8              THE COURT:  All right.

9              MR. FARRAR:  There's one other thing, Your

10   Honor.  Mr. Markham raised, in his final argument there, a

11   discussion with respect to the summary judgment as to the

12   breaches of contract with respect to the covenant not to

13   compete and the proprietary information.

14             THE COURT:  Yes.

15             MR. FARRAR:  Would you like me to respond --

16             THE COURT:  Is the contract silent on -- let me

17   put it this way:  Does the contract contain any provisions

18   relative to noncompete?

19             MR. FARRAR:  Your Honor, the contract doesn't

20   say that these individuals could create another company.

21   It doesn't say that.  The contract -- first of all, there's

22   no evidence of record generated through discovery that

23   shows that they, in fact, took proprietary information and

24   distributed it to some third party.  It's true that they

25   created another company, and it's true that this contract

1    was terminated in January of '04, the contract we've been

2    discussing this morning.  But beyond that, those two facts,

3    there isn't anything else of record -- and this has been

4    described fully in the briefing, and the Magistrate Judge

5    understood this and did an analysis in the Report and

6    Recommendation.  Beyond those facts there is nothing else,

7    and that does not form the basis for such a claim.

8              THE COURT:  All right.  I'm going to take a few

9    minutes and look at this thing, and either I'm going to

10   come out and get an order on the record or not.  I'm just

11   not exactly sure what I'm going to do yet.  But stick

12   around here for a few minutes until I come back out.

13             (Recess taken from 11:07 a.m. to 11:12 p.m.)

14             THE COURT:  This is going to be an order.

15             Presently pending before the Court are

16   objections filed with respect to the Report and

17   Recommendation of the Magistrate Judge.  After careful

18   consideration of the written objections, as well as oral

19   argument, I adopt the Magistrate Judge's Report and

20   Recommendation with the following exceptions:

21             First, I find that the basis upon which summary

22   judgment was granted as to various claims set forth in

23   Count 3, fraud in the inducement, that is the basis of

24   summary judgment -- that is the basis of the statute of

25   limitations, was inappropriate.  Specifically, as stated in

1    Banco, B-A-N-C-O, Para El Comercio Exterior,

2    E-X-T-E-R-I-O-R, versus First National City Bank, 744 F.2d,

3    237, Second Circuit 1984:

4          "The federal rules are to be construed so as to

5    secure the just determination of every action.  Fed Rule

6    Civ Pro 1, the trial courts in this circuit have

7    accordingly ruled that a counterclaim amended pursuant to

8    Rule 13(f) may relate back to the date of the original

9    answer when the counterclaim arises out of the same

10   transaction it was pleaded in the answer and there is no

11   prejudice to the opposing party's ability to defend the

12   merits of the counterclaim citing cases.  The court

13   continued, this practice 'is approved by the leading

14   commentators,' citing Moore's Federal Practice."  That's at

15   Page 244.

16         See also Rodriguez -- that's wrong.  See also

17   Rosenzweig, R-O-S-E-N-Z-W-E-I-G versus Suburban

18   Orthopaedics Associates, 1988 Westlaw 65905, -- wherein the

19   court cited numerous cases, holding that, "Where an omitted

20   counterclaim is compulsory under Federal Rule Civ Pro

21   13(a), it will relate back to the date the answer in

22   accordance with Federal Civ Pro 15(c) when subsequently

23   added by amendment under Federal Civ Pro 13(f)."  That's at

24   Page 7.  And Perfect Plastics entries versus Cars and

25   Concepts, 758 F sup 1080, WDPA 1991.

1          That said, however, the misrepresentation claims

2     under Count 3 failed, in my view, for another reason.  As

3     stated in 1726 Cherry Street Partnership, 439 (PA Super.)

4     141 (1995):

5          "The parol evidence rule has had a checkered

6     career in Pennsylvania.  Now that it has been well and

7     wisely settled, we will not permit it to be evaded and

8     undermined by such tactics.  Fraudulent misrepresentations

9     may be proved to modify or avoid a written contract if it

10    is averred and proved that they were omitted," highlight

11    omitted, "from the (complete) written contract by fraud,

12    accident, or mistake.

13         "In sum, Bardwell permits the admission of parol

14    evidence of representations concerning a subject dealt with

15    in an integrated written agreement and made prior to or

16    contemporaneous with the execution of the agreement to

17    modify or avoid the terms of this agreement only where it

18    is alleged that the parties agreed that those

19    representations would be included in the written agreement,

20    but were omitted by fraud, accident, or mistake.  This is

21    commonly referred to as 'fraud in the execution' because

22    the party offering the evidence contends that he or she

23    executed the agreement because he or she was defrauded by

24    being led to believe that the document that he or she was

25    signing contained terms that were actually omitted

1    therefrom.  Such a case is to be distinguished from a

2    'fraud in the inducement' case such as the instant one

3    where the party proffering evidence of additional prior

4    representations does not contend that the parties agree

5    that the additional representations will be in the written

6    agreement, but rather claims that the representations were

7    fraudulently made and that, but for them, he or she never

8    would have enter into the agreement."  That's at Page 147.

9    See also Greylock, G-R-E-Y-L-O-C-K, Arms versus Kroiz,

10   K-R-O-I-Z, 879 A2nd 864 (Commonwealth of PA 2005), "Parol

11   evidence rule bars proof of fraudulent inducement to a

12   contract where the contract is fully integrated."

13        In this case, the Defendant, under Count 3,

14   asserts claims for fraud in the inducement in the contract,

15   not relative to the execution of the contract itself.

16   Furthermore, not only does the contract in this case

17   contain an integration clause, but it, in fact, was drafted

18   by the Defendant.  Thus the misrepresentation claims, in my

19   view, are barred under the previously described controlling

20   Pennsylvania Appellate authority.

21        Let me also say a brief word at this point with

22   respect to the Magistrate Judge's discussion of mutual

23   mistake of fact.  First, based upon my review of the R&R

24   and the discussion here today, I remain of the opinion that

25   the Magistrate Judge was correct in concluding that the

1    mutual mistake of fact claim fails, in part, based upon the

2    predictive nature of the future performance and for the

3    other reasons set forth in her R&R.

4         I also note, to the extent that it may not have

5    been included in the R&R, that the relevant e-mail in

6    question -- where is that?  Did you take that back or do I

7    still have it?

8         MR. FARRAR:  Your Honor, I believe you still

9    have it.

10        THE COURT:  Uses the term "estimated" at the

11   top.  In my opinion, it is an estimate of future

12   performance.  The very formula upon which it is based -- or

13   was based, whether containing all the components or not,

14   was, by its very nature, speculative.  And the case law is

15   clear that mutual mistakes of fact do not and cannot

16   appropriately apply to future speculative performance.

17        Finally, given the Magistrate Judge's conclusion

18   that the -- that the parol evidence bars the Plaintiff's

19   contract claim, a conclusion with which I agree, it must

20   follow, in my view, that parol evidence cannot be used to

21   defeat the Plaintiff's contract claim.

22        On that point, in addition to the Magistrate

23   Judge's discussion of parol evidence, insofar as it relates

24   to the counterclaim, let me say this:  I disagree with the

25   Defendant's contention that the parol evidence rule should

1    not bar evidence of alleged discussions concerning quality

2    and quantity, because they would not contradict the terms

3    of the agreement.  In my view, that is precisely the type

4    of information that classically should have been integrated

5    in the integrated agreement if it was to be operative.

6         As a matter of fact, it would, in fact,

7    potentially contradict the agreement because the clear

8    agreement, on its face, makes no provision for payment

9    depending upon either the quality or quantity of the lists

10   that were produced.

11        In short, then, I find that the Plaintiff is

12   entitled to Summary Judgment, as a matter of law, on its

13   contract claim.

14        The only remaining material -- to put a finer

15   point on it then, the only remaining material issue of fact

16   that I see between the parties is a dispute over the amount

17   of money that either was or was not paid pursuant to the

18   terms of the contract.  And that will be -- in the event

19   that this case goes to trial, that will be the issue for

20   the jury.

21        We're going to set a pretrial conference in this

22   case, which is now limited solely to the issue of damages,

23   for August 30th, at 10:00 a.m.  Jury selection and trial

24   will commence on September the 4th, at 9:00 a.m.

25        Let's go off the record here for a second.

1                    (Hearing concluded at 11:26 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$16** [3] - 20:20, 26:13, 26:23
**$16,308,094.30** [1] - 26:12
**$750,000** [2] - 26:18, 27:6
**$755,007.45** [1] - 27:23
**$834,490.49** [1] - 27:24

## '

**'03** [1] - 41:12
**'04** [3] - 28:6, 28:7, 45:1
**'fraud** [4] - 10:11, 10:16, 47:21, 48:2
**'is** [1] - 46:13

## 0

**04** [1] - 1:5

## 1

**1** [4] - 2:15, 2:17, 31:10, 46:6
**1.33** [3] - 42:14, 42:18, 43:6
**10** [4] - 7:5, 7:7, 7:11, 29:7
**1080** [1] - 46:25
**10:00** [1] - 50:23
**10:47** [1] - 38:23
**10:57** [1] - 38:23
**11:07** [1] - 45:13
**11:12** [1] - 45:13
**11:26** [1] - 51:1
**120,000** [1] - 4:23
**126,000** [1] - 4:23
**13(a** [1] - 46:21
**13(f** [1] - 46:8
**13(f)** [1] - 46:23
**13F** [1] - 37:3
**14** [2] - 27:16, 27:21
**141** [1] - 47:4
**147** [1] - 48:8
**15(c** [2] - 40:10, 46:22
**150** [1] - 1:22
**15222** [1] - 1:19
**16** [7] - 27:2, 27:3, 27:10, 38:19, 40:19
**16501** [2] - 1:15, 1:23
**17** [1] - 1:14
**1726** [1] - 47:3
**180,000** [1] - 5:2
**1984** [1] - 46:3
**1988** [1] - 46:18
**1991** [1] - 46:25
**1995** [1] - 47:4

## 2

**2** [2] - 12:20, 31:7
**2,660** [1] - 43:8
**200,000** [6] - 4:17, 4:23, 13:19, 42:11, 43:6, 43:11
**2003** [3] - 27:25, 30:7, 39:24
**2004** [1] - 38:20
**2005** [2] - 11:17, 48:10
**2006** [4] - 36:5, 36:6, 37:1, 39:11
**2007** [1] - 1:12
**22** [1] - 36:6, 36:25
**237** [1] - 46:3
**244** [1] - 46:15
**263** [1] - 1:5
**27** [3] - 4:14, 7:14, 17:16
**28** [4] - 4:14, 6:15, 17:11, 17:16
**28.5** [2] - 17:17, 33:10
**28.57** [7] - 4:8, 7:16, 17:19, 27:24, 28:15, 28:21, 35:15

## 3

**3** [3] - 45:23, 47:2, 48:13
**30th** [1] - 50:23
**31** [1] - 27:25

## 4

**4** [1] - 3:13
**400** [1] - 1:19
**439** [1] - 47:3
**45** [2] - 42:18, 43:8
**4th** [1] - 50:24

## 5

**57** [1] - 4:21

## 6

**60** [1] - 4:21
**65905** [1] - 46:18

## 7

**7** [2] - 39:24, 46:24
**70** [5] - 14:23, 42:25, 43:9, 43:16, 43:19
**744** [1] - 46:2
**750,000** [1] - 27:10
**755,000** [1] - 6:11
**758** [1] - 46:25

## 8

**800-and-some** [1] - 26:17
**838** [1] - 43:11
**85** [1] - 5:2
**864** [2] - 11:16, 48:10
**879** [2] - 11:16, 48:10

## 9

**9** [8] - 6:24, 7:11, 7:15, 25:24, 27:1, 29:9, 38:20
**95** [2] - 4:15, 5:1
**9:00** [1] - 50:24
**9:58** [1] - 1:12

## A

**A.2nd** [1] - 11:16
**a.m** [7] - 1:12, 38:23, 45:13, 50:23, 50:24, 51:1
**A2nd** [1] - 48:10
**ability** [1] - 46:11
**able** [2] - 8:17, 14:4
**above-captioned** [1] - 1:11
**absent** [1] - 16:24
**accept** [1] - 42:25
**accident** [3] - 10:10, 47:12, 47:20
**accordance** [1] - 46:22
**according** [1] - 20:16
**accordingly** [1] - 46:7
**accuracy** [1] - 20:12
**accurate** [4] - 13:13, 20:2, 20:17, 20:18
**accurately** [1] - 40:19
**action** [2] - 27:21, 46:5
**add** [1] - 40:9
**added** [1] - 46:23
**adding** [3] - 40:12, 40:13, 40:20
**addition** [1] - 49:22
**additional** [6] - 8:13, 9:14, 10:18, 10:19, 48:3, 48:5
**address** [4] - 12:10, 25:18, 25:22, 31:5
**addressed** [1] - 8:24
**adhered** [2] - 19:15, 21:12
**admissible** [1] - 24:3
**admission** [2] - 10:2, 47:13
**admitted** [1] - 34:12
**adopt** [1] - 45:19
**advance** [1] - 22:1
**agree** [6] - 22:11, 32:15, 34:17, 35:3, 48:4, 49:19
**agreed** [3] - 10:8, 10:19, 47:18

**agreement** [26] - 3:4, 3:6, 4:14, 7:10, 10:4, 10:5, 10:6, 10:9, 10:12, 10:20, 10:23, 11:2, 24:2, 24:19, 47:15, 47:16, 47:17, 47:19, 47:23, 48:6, 48:8, 50:3, 50:5, 50:7, 50:8
**ahead** [2] - 7:17, 29:11
**albeit** [1] - 15:24
**alleged** [4] - 10:7, 12:21, 47:18, 50:1
**allegedly** [1] - 19:12
**Allen** [1] - 30:8
**almost** [1] - 5:23
**alone** [1] - 32:12
**alter** [1] - 3:5
**alternative** [1] - 13:4
**amend** [1] - 36:24
**amended** [1] - 46:7
**amending** [1] - 40:17
**amendment** [2] - 40:22, 46:23
**amount** [19] - 6:13, 7:2, 16:8, 20:5, 26:11, 26:19, 27:6, 27:8, 28:1, 29:3, 29:6, 30:24, 31:3, 31:12, 35:15, 35:23, 43:1, 43:2, 50:16
**amounts** [1] - 26:2
**analysis** [1] - 45:5
**analyzing** [1] - 13:16
**angles** [1] - 5:14
**answer** [8] - 34:18, 36:1, 36:4, 36:7, 40:11, 46:9, 46:10, 46:21
**anticipated** [2] - 15:25, 35:16, 35:17
**anyway** [1] - 22:15
**Anyway** [1] - 39:12
**Appellate** [1] - 48:20
**applicable** [1] - 36:9
**application** [1] - 2:25
**applications** [1] - 18:19
**applied** [1] - 34:16
**apply** [3] - 40:1, 43:2, 49:16
**applying** [2] - 42:11, 43:10
**appreciate** [1] - 7:17
**appropriate** [1] - 34:6
**appropriately** [1] - 49:16
**approved** [1] - 46:13
**arbitrator** [1] - 5:5
**area** [3] - 13:14, 16:23
**argue** [3] - 12:24, 16:10, 16:15
**argued** [1] - 24:11
**arguing** [1] - 32:6
**argument** [6] - 2:1, 31:5, 31:16, 35:19, 44:10, 45:19

1

**Argument** [1] - 1:11
**arises** [1] - 46:9
**arithmetic** [1] - 28:24
**Arms** [1] - 48:9
**arose** [1] - 30:2
**Aside** [2] - 36:11, 39:8
**aspect** [6] - 3:10, 5:23, 5:25, 9:6, 15:6, 16:22
**aspects** [1] - 2:9
**asserting** [1] - 3:2
**asserts** [1] - 48:14
**assessment** [1] - 35:9
**Associates** [1] - 46:18
**assume** [5] - 4:18, 4:24, 32:24, 34:16, 34:19
**assumed** [1] - 40:2
**assuming** [1] - 32:14
**attached** [2] - 39:23, 41:9
**attempting** [1] - 36:23
**August** [1] - 50:23
**authority** [1] - 48:20
**average** [2] - 43:1, 43:2
**averred** [1] - 47:10
**avoid** [2] - 47:9, 47:17
**aware** [5] - 19:12, 39:4, 39:7, 39:9, 39:10

**B**

**backdrop** [2] - 16:24, 17:1
**backtrack** [1] - 3:8
**balance** [2] - 17:20, 27:23
**Banco** [1] - 46:1
**BANCO** [1] - 46:1
**Bank** [1] - 46:2
**bar** [3] - 23:6, 37:4, 50:1
**Bardwell** [2] - 10:1, 47:13
**barred** [1] - 48:19
**bars** [5] - 10:25, 11:5, 11:19, 48:11, 49:18
**Based** [1] - 37:15
**based** [19] - 2:25, 7:20, 13:6, 13:17, 15:18, 16:11, 18:1, 19:6, 20:3, 21:3, 21:5, 24:19, 26:19, 29:9, 31:17, 48:23, 49:1, 49:12, 49:13
**basic** [1] - 15:4
**basis** [19] - 2:24, 6:6, 7:6, 11:11, 13:1, 14:25, 16:6, 22:12, 22:13, 22:18, 22:21, 23:22, 31:16, 32:12, 33:12, 45:7, 45:21, 45:23, 45:24
**be-all** [1] - 32:2
**became** [4] - 5:4, 39:4, 39:7, 39:10
**begin** [2] - 25:17, 41:16
**belief** [1] - 34:5

**benchmark** [1] - 16:18
**beneficiary** [1] - 21:9
**benefit** [3] - 5:16, 15:2, 15:25
**better** [3] - 18:8, 21:18, 22:5
**between** [6] - 17:2, 22:17, 23:15, 34:3, 38:10, 50:16
**beyond** [5] - 26:20, 27:8, 28:8, 35:21, 45:2
**Beyond** [2] - 27:6, 45:6
**big** [1] - 36:13
**bit** [3] - 3:8, 18:7, 34:11
**Black** [1] - 1:25
**boat** [2] - 18:7, 35:7
**Boehm** [1] - 8:8
**borrower** [2] - 14:6, 42:25
**box** [3] - 42:9, 42:11, 42:12
**Brazos** [2] - 26:3, 26:6
**breach** [4] - 2:15, 2:21, 9:8, 41:20
**breaches** [2] - 2:16, 3:2, 44:12
**break** [1] - 38:6
**Brett** [2] - 1:18, 25:21
**brief** [3] - 3:10, 3:11, 48:21
**briefing** [1] - 45:4
**briefly** [1] - 40:6
**bring** [2] - 16:22, 19:7
**broader** [1] - 12:6
**brought** [1] - 25:25
**business** [2] - 31:20, 31:24
**buying** [1] - 21:24

**C**

**CA** [1] - 1:5
**calculate** [3] - 12:13, 20:18, 20:19
**campaign** [4] - 14:3, 30:11, 39:19, 42:4
**campaigns** [1] - 13:15
**cannot** [5] - 20:3, 31:15, 49:15, 49:20
**capital** [1] - 8:13
**captioned** [1] - 1:11
**car** [2] - 20:7, 21:13
**career** [1] - 47:6
**careful** [1] - 45:17
**Cars** [1] - 46:24
**Case** [1] - 11:17
**case** [39] - 3:20, 7:11, 8:20, 10:2, 10:15, 11:16, 12:7, 14:18, 16:19, 20:5, 31:14, 31:18, 32:5, 33:9, 35:19, 35:24, 36:3, 36:15, 36:17, 36:21, 36:24, 36:25, 37:2, 39:8, 40:7, 40:11, 40:15, 40:19, 43:24, 48:1, 48:2, 48:13, 48:16, 49:14,

50:19, 50:22
**case'** [1] - 10:16
**cases** [3] - 40:21, 46:12, 46:19
**Cavato** [1] - 8:8
**certain** [6] - 5:15, 8:12, 13:18, 16:21, 19:6, 30:25, 40:1, 43:21
**certainly** [3] - 24:18, 33:19, 41:18
**cetera** [1] - 35:8
**chance** [2] - 25:11, 37:20
**change** [2] - 18:9, 37:14
**characterization** [1] - 5:25
**charge** [2] - 16:23, 17:4
**checkered** [1] - 47:5
**Cherry** [1] - 47:3
**Chilcote** [1] - 1:18
**choose** [1] - 5:5
**Circuit** [1] - 46:3
**circuit** [1] - 46:6
**cite** [1] - 37:2
**cited** [5] - 36:17, 40:7, 41:19, 46:19
**cites** [2] - 20:1, 41:5
**citing** [3] - 41:10, 46:12, 46:14
**City** [1] - 46:2
**Civ** [4] - 46:6, 46:20, 46:22, 46:23
**claim** [23] - 4:18, 8:12, 9:8, 11:1, 11:7, 11:23, 11:25, 15:1, 20:21, 22:12, 22:21, 23:8, 23:12, 32:20, 33:20, 34:25, 41:2, 41:4, 45:7, 49:1, 49:19, 49:21, 50:13
**claiming** [4] - 11:2, 11:3, 11:22, 30:13
**claims** [10] - 10:20, 36:3, 36:10, 38:16, 45:22, 47:1, 48:6, 48:14, 48:18
**clarify** [1] - 25:23
**class** [1] - 5:15
**classically** [1] - 50:4
**clause** [3] - 12:10, 37:17, 48:17
**clear** [3] - 31:15, 49:15, 50:7
**clearly** [5] - 18:12, 32:10, 34:8, 40:11, 43:25
**client** [4] - 5:4, 7:21, 16:1, 17:21
**close** [1] - 18:23
**collected** [1] - 35:13
**Comercio** [1] - 46:1
**coming** [1] - 8:2
**commence** [1] - 50:24
**commencing** [1] - 1:12
**commentators** [1] - 46:14
**commission** [2] - 41:23,

43:2
**committed** [1] - 19:17
**commonly** [2] - 10:10, 47:21
**Commonwealth** [3] - 11:4, 11:17, 48:10
**companies** [1] - 24:23
**company** [5] - 1:4, 26:3, 41:12, 44:20, 44:25
**compared** [1] - 20:24
**compete** [1] - 44:13
**competing** [2] - 41:13, 41:16
**Complaint** [6] - 27:13, 27:16, 27:18, 27:21, 35:6
**complaint** [1] - 27:22
**complete** [1] - 47:11
**component** [1] - 14:20
**components** [2] - 20:13, 42:10, 49:13
**comptroller** [1] - 8:5
**compulsory** [3] - 35:21, 35:25, 46:20
**computed** [1] - 12:23
**computer** [1] - 18:18
**Concepts** [1] - 46:25
**conceptual** [1] - 12:23
**conceptually** [2] - 12:17, 33:5
**concerned** [1] - 23:9
**concerning** [3] - 10:3, 47:14, 50:1
**concluded** [3] - 9:7, 41:3, 51:1
**concluding** [1] - 48:25
**conclusion** [3] - 41:7, 49:17, 49:19
**concrete** [1] - 16:22
**condition** [2] - 3:15, 4:11
**conference** [1] - 50:21
**conferred** [2] - 5:16, 16:1
**confidentiality** [1] - 2:22
**confirmed** [1] - 41:10
**consequential** [1] - 9:2
**considerable** [1] - 19:12
**consideration** [1] - 45:18
**considered** [1] - 19:13
**consistent** [1] - 23:17
**consolidation** [3] - 14:8, 18:20, 26:8
**construed** [1] - 46:4
**contain** [2] - 44:17, 48:17
**contained** [4] - 10:14, 20:13, 20:14, 47:25
**containing** [1] - 49:13
**contains** [1] - 12:9
**contemporaneous** [2] - 10:5, 47:16
**contend** [3] - 10:18, 28:15,

48:4
**contends** [2] - 10:12, 47:22
**contention** [5] - 4:19, 12:18, 13:3, 30:16, 49:25
**continue** [2] - 19:11, 25:8
**continued** [1] - 46:13
**contract** [75] - 2:16, 2:21, 3:2, 6:15, 11:19, 11:20, 11:21, 12:2, 12:9, 15:4, 15:6, 15:7, 15:12, 15:18, 15:22, 16:2, 16:3, 16:4, 16:6, 16:11, 16:24, 17:24, 18:4, 19:11, 19:13, 20:15, 21:2, 21:18, 21:25, 22:12, 22:21, 23:7, 23:12, 28:4, 28:18, 29:21, 29:22, 29:23, 29:25, 30:3, 31:14, 32:15, 32:20, 33:5, 33:10, 33:19, 34:2, 34:10, 34:19, 34:25, 35:8, 35:14, 37:7, 37:16, 37:17, 41:14, 41:15, 44:12, 44:16, 44:17, 44:19, 44:21, 44:25, 45:1, 47:9, 47:11, 48:12, 48:14, 48:15, 48:16, 49:19, 49:21, 50:13, 50:18
**contracts** [1] - 5:15
**contradict** [3] - 3:5, 50:2, 50:7
**controlling** [1] - 48:19
**convinced** [1] - 11:12
**corner** [1] - 19:20
**corporation** [2] - 1:7, 1:8
**Correct** [1] - 39:2
**correct** [24] - 3:24, 4:3, 15:15, 15:19, 21:6, 24:24, 25:6, 26:12, 26:25, 27:19, 28:1, 28:21, 28:22, 29:8, 30:6, 30:12, 30:19, 31:10, 32:5, 34:18, 36:20, 39:16, 44:4, 48:25
**correctly** [4] - 11:18, 16:9, 20:1, 31:17
**costs** [1] - 28:2
**Count** [7] - 2:15, 2:17, 12:20, 31:7, 45:23, 47:2, 48:13
**Counterclaim** [2] - 2:8, 36:5
**counterclaim** [24] - 2:15, 2:16, 2:24, 4:5, 12:21, 22:18, 31:7, 35:21, 35:25, 36:23, 36:24, 39:23, 40:9, 40:13, 40:14, 40:17, 40:20, 40:25, 41:19, 46:7, 46:9, 46:12, 46:20, 49:24
**couple** [1] - 3:9
**course** [1] - 12:3
**COURT** [119] - 1:1, 2:1, 2:5, 2:13, 2:19, 3:7, 3:25, 4:9,

5:12, 6:4, 6:12, 6:17, 6:21, 7:4, 7:9, 7:14, 7:17, 8:4, 8:11, 8:24, 9:10, 9:20, 9:23, 11:10, 12:6, 12:14, 13:9, 14:11, 14:15, 14:21, 15:3, 15:17, 15:21, 16:18, 17:15, 17:20, 18:15, 19:9, 19:25, 20:20, 21:4, 21:8, 21:17, 21:23, 22:7, 22:10, 22:25, 23:3, 23:15, 23:20, 24:1, 24:7, 24:16, 25:10, 25:15, 26:5, 26:10, 26:14, 26:16, 26:22, 27:1, 27:9, 27:14, 27:18, 28:4, 28:7, 28:11, 28:14, 28:18, 28:20, 28:23, 29:7, 29:11, 29:13, 29:17, 29:19, 30:1, 30:15, 30:20, 30:23, 31:4, 32:8, 32:14, 32:19, 32:23, 33:1, 33:24, 34:4, 34:21, 35:18, 36:7, 36:13, 36:19, 37:6, 37:11, 37:18, 37:22, 38:2, 38:4, 38:14, 38:16, 38:21, 38:24, 39:3, 39:12, 39:20, 41:21, 41:25, 42:3, 42:7, 43:4, 43:13, 43:20, 44:8, 44:14, 44:16, 45:8, 45:14, 49:10
**court** [4] - 10:24, 38:5, 46:12, 46:19
**Court** [9] - 1:14, 2:11, 3:17, 9:25, 11:4, 11:17, 45:15
**Court's** [2] - 5:24, 40:12
**courts** [1] - 46:6
**Covato** [3] - 24:18, 34:9, 34:11
**covenant** [1] - 44:12
**cover** [1] - 21:21
**covered** [1] - 25:1
**Craig** [3] - 1:21, 5:12, 38:24
**create** [1] - 44:20
**created** [1] - 44:25
**creating** [2] - 13:15, 41:12
**CREDITRON** [1] - 1:6
**critical** [1] - 15:7
**curve** [1] - 22:4
**customers** [1] - 41:14

**D**

**damage** [2] - 20:20, 32:20
**damages** [9] - 8:18, 24:5, 32:21, 32:22, 33:13, 33:15, 38:9, 38:12, 50:22
**date** [5] - 27:22, 36:4, 36:8, 46:8, 46:21
**dated** [1] - 39:24
**Davis** [4] - 36:19, 36:22,

40:15, 40:19
**daylight** [1] - 18:24
**de** [1] - 35:23
**deal** [2] - 12:10, 13:22
**dealing** [3] - 3:3, 42:5
**deals** [1] - 40:23
**dealt** [2] - 10:3, 47:14
**decided** [2] - 24:19, 25:6
**decides** [1] - 42:23
**decision** [1] - 40:12
**declaration** [1] - 33:7
**deduction** [2] - 14:5, 14:8
**defeat** [3] - 23:7, 23:11, 49:21
**defect** [1] - 30:16
**defend** [1] - 46:11
**Defendant** [5] - 39:4, 40:8, 40:12, 48:13, 48:18
**Defendant's** [1] - 49:25
**Defendants** [14] - 1:9, 1:20, 13:17, 17:14, 18:12, 19:17, 26:3, 27:22, 27:25, 30:10, 31:22, 32:6, 35:13, 39:6
**deficient** [1] - 17:12
**defrauded** [2] - 10:13, 47:23
**DELAWARE** [1] - 1:3
**Delaware** [9] - 1:3, 22:2, 22:5, 25:7, 27:20, 30:8, 34:13, 35:4, 35:14
**delineate** [1] - 8:17
**delivered** [1] - 17:10
**delivery** [1] - 17:12
**deposed** [1] - 8:6
**deposition** [4] - 34:8, 39:7, 39:11, 41:8
**depositions** [2] - 12:25, 14:17
**derived** [1] - 43:3
**Desanti** [1] - 8:8
**Desanti-Boehm** [1] - 8:8
**described** [2] - 45:4, 48:19
**despite** [1] - 25:5
**detail** [1] - 12:4
**determination** [1] - 46:5
**determinative** [1] - 24:14
**determine** [2] - 5:10, 17:1
**developed** [1] - 5:8
**development** [1] - 19:5
**Dickie** [1] - 1:18
**difference** [1] - 17:25
**different** [1] - 5:14
**diminished** [1] - 4:20
**diminution** [1] - 4:21
**disabuse** [1] - 8:16
**disagree** [4] - 5:24, 23:21, 32:25, 49:24
**disconnect** [1] - 23:15

**discovered** [1] - 29:4
**discovery** [4] - 27:4, 27:7, 29:4, 44:22
**discussed** [2] - 15:23, 35:6
**discusses** [2] - 30:10, 37:3
**discussing** [2] - 31:20, 45:2
**discussion** [12] - 4:25, 21:19, 25:16, 25:25, 32:2, 32:3, 36:21, 36:22, 44:11, 48:22, 48:24, 49:23
**discussions** [1] - 50:1
**Dismiss** [6] - 2:8, 2:11, 2:12, 2:14, 41:1, 41:9
**dismiss** [1] - 2:15
**dismissal** [2] - 22:11, 22:17
**dismissed** [5] - 2:24, 11:8, 11:10, 22:13, 36:3
**dispute** [7] - 37:11, 37:13, 38:16, 38:20, 38:22, 44:2, 50:16
**disputed** [2] - 32:11, 38:9
**disputes** [1] - 18:25
**distinguish** [3] - 23:20, 23:22, 40:21
**distinguishable** [1] - 36:16
**distinguished** [2] - 10:16, 48:1
**distributed** [1] - 44:24
**distribution** [2] - 17:2, 34:6
**DISTRICT** [2] - 1:1, 1:1
**divided** [1] - 28:2
**document** [5] - 10:14, 25:25, 26:12, 44:1, 47:24
**documentation** [4] - 32:11, 33:18, 34:1, 42:22
**dollars** [1] - 6:3
**done** [3] - 3:25, 22:8, 24:13
**doors** [1] - 41:16
**doubt** [1] - 15:2
**down** [2] - 18:8, 38:5
**drafted** [3] - 11:23, 34:9, 48:17
**due** [1] - 27:23
**during** [4] - 24:19, 25:25, 39:7, 39:10

**E**

**e-mail** [10] - 13:24, 30:6, 30:7, 39:1, 39:17, 39:23, 41:22, 42:1, 42:5, 49:5
**earn** [3] - 3:19, 4:13, 24:13
**East** [1] - 1:22
**effect** [2] - 22:19, 30:23
**efficient** [1] - 25:13
**Eighth** [1] - 1:22
**Either** [2] - 13:5, 23:16
**either** [10] - 12:15, 12:18, 24:10, 32:16, 35:9, 36:14,

44:5, 45:9, 50:9, 50:17
**EI** [1] - 46:1
**Elderkin** [2] - 1:22
**element** [2] - 12:1, 20:8
**elemental** [1] - 12:1
**eligible** [2] - 43:17, 43:22
**employee** [1] - 18:17
**encompassed** [1] - 2:17
**end** [6] - 8:20, 18:23, 32:2, 33:17, 43:10, 44:6
**end-all** [1] - 32:2
**enrichment** [3] - 5:23, 33:16, 33:21
**enter** [1] - 48:8
**entered** [1] - 10:22
**entering** [1] - 15:7
**enterprise** [1] - 20:7
**entire** [1] - 14:4
**entirely** [1] - 11:12
**entities** [1] - 31:20
**entitled** [13] - 11:13, 16:4, 16:8, 16:9, 16:10, 17:11, 17:13, 21:15, 24:15, 28:7, 28:15, 35:15, 50:12
**entitlement** [1] - 3:15
**entity** [1] - 26:8
**entries** [1] - 46:24
**equitable** [2] - 17:2, 33:15
**equity** [1] - 17:23
**Erie** [2] - 1:15, 1:23
**error** [2] - 35:11, 39:5
**escaping** [1] - 36:8
**Esquire** [2] - 1:18, 1:21
**essentially** [1] - 33:7
**establish** [2] - 33:23, 33:24
**established** [1] - 31:18
**Estes** [1] - 30:8
**estimate** [8] - 31:15, 32:4, 32:12, 39:1, 39:14, 39:25, 44:2, 49:11
**Estimated** [1] - 41:22
**estimated** [9] - 30:11, 31:13, 39:18, 39:19, 42:4, 42:5, 43:2, 44:1, 49:10
**estimation** [3] - 31:13, 31:21, 31:23
**et** [1] - 35:8
**evaded** [1] - 47:7
**event** [1] - 50:18
**events** [1] - 20:4
**Eventually** [1] - 8:1
**eventually** [2] - 5:9, 43:13
**evidence** [41] - 2:25, 3:1, 3:9, 8:23, 9:7, 9:13, 10:3, 10:12, 10:17, 10:25, 11:5, 11:18, 12:7, 22:13, 22:19, 22:22, 23:4, 23:5, 23:6, 23:10, 24:3, 24:10, 24:16, 33:20, 34:5, 34:14, 37:16,

41:3, 41:8, 41:18, 44:22, 47:5, 47:14, 47:22, 48:3, 48:11, 49:18, 49:20, 49:23, 49:25, 50:1
**exactly** [2] - 28:12, 45:11
**example** [2] - 34:2, 38:19
**examples** [1] - 35:7
**exception** [1] - 19:23
**exceptions** [1] - 45:20
**executed** [2] - 10:12, 47:23
**execution** [5] - 10:5, 11:2, 30:2, 47:16, 48:15
**execution'** [2] - 10:11, 47:21
**Exhibit** [1] - 39:23
**exist** [3] - 33:11, 33:19
**existing** [2] - 20:14, 40:14
**expect** [2] - 13:18, 30:25
**expected** [2] - 14:11, 14:13
**expense** [1] - 9:19
**expenses** [10] - 6:25, 7:19, 18:21, 18:22, 18:25, 19:2, 19:3, 19:5, 24:22, 25:1
**expensive** [1] - 7:24
**experience** [1] - 13:18
**expertise** [1] - 13:15
**Explain** [1] - 30:1
**explain** [3] - 13:9, 14:2, 42:13
**explaining** [1] - 18:11
**explanation** [1] - 24:25
**expressly** [1] - 24:10
**extent** [4] - 5:15, 8:12, 40:25, 49:4
**Exterior** [1] - 46:1
**EXTERIOR** [1] - 46:2

## F

**F.2d** [1] - 46:2
**face** [1] - 50:8
**fact** [48] - 3:20, 7:3, 7:19, 9:4, 11:15, 12:21, 13:3, 13:6, 14:3, 14:19, 15:1, 15:3, 15:5, 15:9, 15:10, 15:19, 16:12, 19:22, 20:1, 20:3, 20:14, 24:13, 25:18, 25:20, 27:3, 28:25, 29:9, 29:16, 31:11, 31:16, 31:23, 32:8, 35:11, 37:3, 38:9, 39:13, 39:16, 40:18, 41:7, 41:18, 44:23, 48:17, 48:23, 49:1, 49:15, 50:6, 50:15
**factor** [1] - 24:14
**factors** [3] - 21:3, 43:3, 43:10
**facts** [3] - 40:2, 45:2, 45:6
**factual** [1] - 6:4

**failed** [1] - 47:2
**failing** [1] - 7:8
**fails** [1] - 49:1
**failure** [3] - 2:17, 22:20, 34:24
**fair** [2] - 17:1, 35:23
**fall** [1] - 22:15
**fan** [1] - 36:13
**far** [1] - 6:3
**FARRAR** [59] - 17:19, 23:2, 25:21, 26:7, 26:11, 26:15, 26:18, 26:25, 27:6, 27:12, 27:15, 27:19, 28:6, 28:9, 28:12, 28:17, 28:19, 28:22, 29:2, 29:8, 29:12, 29:15, 29:18, 29:24, 30:5, 30:19, 30:21, 31:2, 31:9, 32:10, 32:18, 32:21, 32:24, 33:14, 34:1, 34:7, 35:2, 36:6, 36:11, 36:15, 36:20, 37:10, 37:13, 37:20, 37:23, 38:3, 38:12, 38:15, 39:2, 39:6, 39:16, 41:24, 42:1, 42:4, 43:23, 44:9, 44:15, 44:19, 49:8
**Farrar** [3] - 1:18, 23:1, 25:21
**fashion** [1] - 23:7
**Fed** [1] - 46:5
**Federal** [5] - 1:14, 46:14, 46:20, 46:22, 46:23
**federal** [1] - 46:4
**fence** [1] - 36:14
**Ferguson** [1] - 1:25
**few** [2] - 45:8, 45:12
**figure** [5] - 6:10, 6:21, 27:1, 28:23, 29:10
**file** [2] - 5:13, 36:23
**filed** [4] - 36:1, 36:5, 36:7, 45:16
**filing** [1] - 27:22
**filling** [1] - 21:20
**final** [2] - 5:4, 44:10
**Finally** [1] - 49:17
**financial** [2] - 7:18, 8:10
**FINANCIAL** [1] - 1:6
**fine** [1] - 2:13
**finer** [3] - 3:10, 11:15, 50:14
**first** [9] - 2:12, 2:23, 12:9, 18:24, 25:3, 29:20, 36:23, 43:7, 44:21
**First** [4] - 6:1, 45:21, 46:2, 48:23
**floating** [1] - 12:7
**fluctuated** [1] - 37:12
**focus** [1] - 25:3
**fold** [1] - 15:11
**folks** [1] - 21:20
**follow** [2] - 18:19, 49:20
**followed** [1] - 14:1

**following** [1] - 45:20
**footnote** [1] - 40:18
**Footnote** [1] - 40:19
**FOR** [1] - 1:1
**forever** [1] - 37:22
**forget** [1] - 11:24
**form** [4] - 13:1, 31:15, 32:12, 45:7
**formed** [1] - 20:15
**formula** [43] - 12:12, 12:22, 13:5, 13:9, 13:11, 14:9, 14:19, 14:24, 20:13, 20:16, 21:5, 21:6, 21:9, 25:20, 29:21, 29:24, 30:1, 30:14, 30:17, 30:18, 30:22, 31:12, 32:1, 32:6, 32:9, 38:25, 39:5, 39:13, 39:25, 40:1, 40:3, 40:4, 42:7, 42:8, 42:10, 42:11, 43:3, 43:4, 43:5, 49:12
**formulated** [1] - 34:11
**forth** [4] - 3:4, 24:2, 45:22, 49:3
**forwarded** [1] - 24:21
**frame** [1] - 38:18
**fraud** [18] - 9:21, 10:9, 10:25, 11:2, 11:15, 11:22, 11:23, 11:25, 12:8, 12:11, 12:14, 12:15, 12:18, 45:23, 47:11, 47:20, 48:14
**Fraudulent** [1] - 47:8
**fraudulent** [4] - 11:3, 11:7, 11:19, 48:11
**fraudulently** [2] - 10:21, 48:7
**Friday** [1] - 1:12
**full** [2] - 22:10, 24:25
**fully** [4] - 11:20, 11:21, 45:4, 48:12
**fund** [4] - 14:4, 42:20, 42:23, 42:25
**fundamentally** [1] - 17:22
**funded** [1] - 43:12
**funding** [2] - 13:23, 43:18
**funds** [1] - 26:9
**Furthermore** [1] - 48:16
**future** [9] - 20:4, 20:6, 31:21, 31:23, 40:4, 44:2, 49:2, 49:11, 49:16

## G

**gaps** [1] - 21:20
**gather** [1] - 15:11
**general** [1] - 40:22
**generate** [1] - 30:25
**generated** [16] - 3:22, 6:7, 6:13, 12:13, 16:12, 18:6,

4

20:6, 25:24, 26:23, 28:16, 28:25, 32:3, 33:18, 35:12, 35:16, 44:22

**germane** [1] - 21:19

**given** [6] - 6:7, 17:13, 18:2, 24:20, 29:9, 49:17

**granted** [5] - 22:20, 23:25, 34:24, 40:9, 45:22

**granting** [1] - 31:6

**gravy** [1] - 18:22

**greater** [2] - 7:21, 35:16

**Greylock** [3] - 11:16, 11:18, 48:9

**GREYLOCK** [1] - 48:9

**gross** [10] - 3:22, 5:20, 6:6, 6:23, 7:1, 18:5, 27:10, 27:24, 34:16

**grounds** [1] - 32:8

**GROUP** [1] - 1:8

**guess** [8] - 5:7, 8:11, 9:10, 16:5, 22:9, 31:13, 36:1, 43:20

**gut** [1] - 24:20

### H

**half** [1] - 24:17

**hand** [1] - 42:12

**handle** [1] - 9:14

**handy** [1] - 41:22

**head** [2] - 6:20, 18:10

**hear** [2] - 25:12, 39:20

**Hearing** [1] - 51:1

**held** [3] - 1:11, 7:25, 40:4

**highlight** [1] - 47:10

**highlighted** [1] - 10:7

**Hindsight** [1] - 22:9

**hire** [1] - 9:13

**holding** [1] - 46:19

**Holdnack** [1] - 1:25

**Honor** [25] - 2:4, 13:5, 23:2, 25:21, 26:21, 27:12, 27:16, 29:2, 29:16, 30:5, 31:3, 32:10, 33:23, 34:7, 35:6, 36:20, 37:10, 37:24, 38:13, 41:24, 42:13, 43:23, 44:10, 44:19, 49:8

**Honorable** [1] - 1:13

**hope** [1] - 19:19

**hoped** [1] - 5:18

**hoping** [2] - 19:19, 19:22

**Hornbook** [1] - 15:4

**horse** [1] - 38:8

**House** [1] - 1:14

**huge** [2] - 14:24, 18:22

**hypothetical** [1] - 4:10

### I

**idea** [1] - 6:17

**identified** [3] - 26:1, 39:17

**immediately** [1] - 41:16

**implied** [1] - 16:3

**impliedly** [1] - 24:11

**imposed** [1] - 24:9

**impression** [1] - 22:16

**IN** [1] - 1:1

**inaccurate** [1] - 40:4

**inappropriate** [1] - 45:25

**Inc** [1] - 1:25

**INC** [2] - 1:7, 1:8

**inception** [2] - 29:20, 29:21

**included** [6] - 2:17, 10:8, 13:15, 14:9, 47:19, 49:5

**income** [5] - 6:25, 17:14, 21:3, 21:4, 24:13

**inconsistency** [1] - 22:17

**incorrect** [4] - 21:5, 21:7, 21:10, 31:6

**incurred** [2] - 7:20, 19:4

**independent** [1] - 26:7

**indicated** [2] - 25:24, 33:3

**indicates** [3] - 16:25, 36:22, 39:9

**indication** [1] - 32:1

**indisputable** [2] - 3:21, 4:1

**individual** [2] - 30:8, 30:9

**individuals** [1] - 44:20

**inducement** [11] - 8:12, 9:21, 10:16, 10:25, 11:7, 11:19, 11:22, 12:8, 45:23, 48:11, 48:14

**inducement'** [1] - 48:2

**inducements** [1] - 11:3

**ineligible** [2] - 14:6, 14:8

**information** [4] - 29:20, 44:13, 44:23, 50:4

**informed** [1] - 19:6

**initial** [1] - 19:16

**insofar** [2] - 23:8, 25:19, 49:23

**instance** [3] - 4:16, 16:7, 42:12

**instant** [2] - 10:17, 48:2

**instead** [1] - 25:6

**instinct** [1] - 24:20

**insufficient** [2] - 9:7, 41:3

**integrated** [7] - 10:4, 11:20, 11:21, 47:15, 48:12, 50:4, 50:5

**integration** [3] - 12:10, 37:17, 48:17

**intellectually** [1] - 23:17

**intent** [2] - 33:20, 33:21

**intentional** [2] - 12:17, 12:19

**interest** [1] - 13:21

**invested** [1] - 7:22

**investment** [2] - 8:14, 19:8

**investments** [1] - 19:18

**involved** [1] - 28:1

**involves** [1] - 26:19

**involving** [1] - 37:4

**issue** [14] - 5:9, 8:11, 8:13, 8:22, 9:4, 9:12, 12:8, 24:5, 25:19, 35:21, 40:6, 50:15, 50:19, 50:22

**issues** [4] - 7:19, 12:11, 23:11, 38:9

**It'll** [1] - 25:15

**itself** [5] - 30:22, 35:8, 37:17, 39:17, 48:15

### J

**January** [5] - 28:6, 30:7, 38:20, 39:24, 45:1

**Judge** [22] - 2:22, 7:8, 9:6, 11:6, 16:5, 19:25, 23:14, 24:25, 31:6, 31:10, 31:17, 32:5, 33:3, 35:22, 39:22, 41:3, 41:5, 41:10, 43:5, 45:4, 45:17, 48:25

**Judge's** [12] - 2:2, 2:7, 22:11, 22:17, 22:20, 34:17, 34:23, 40:24, 45:19, 48:22, 49:17, 49:23

**judgment** [11] - 9:6, 22:20, 23:25, 24:4, 31:7, 34:25, 35:5, 40:25, 44:11, 45:22, 45:24

**Judgment** [3] - 2:9, 3:12, 50:12

**July** [1] - 1:12

**jump** [1] - 43:25

**Jury** [1] - 50:23

**jury** [8] - 5:9, 16:7, 16:8, 16:16, 17:1, 17:4, 17:7, 50:20

**justified** [2] - 4:8, 19:7

### K

**keep** [1] - 4:13

**Kelly** [1] - 1:22

**kept** [1] - 6:8

**kind** [5] - 5:14, 8:25, 13:10, 17:23, 42:8

**knows** [1] - 17:21

**Kroiz** [1] - 48:9

**KROIZ** [1] - 48:10

### L

**labor** [1] - 16:20

**laborers** [1] - 16:22

**lack** [2] - 18:11, 21:18

**laid** [2] - 7:25, 8:1

**large** [1] - 14:10

**late** [2] - 12:25, 37:1

**law** [12] - 9:23, 11:14, 12:2, 15:4, 20:2, 31:15, 31:18, 35:19, 35:24, 37:4, 49:14, 50:12

**layman's** [1] - 13:11

**lays** [1] - 14:1

**leading** [1] - 46:13

**learning** [1] - 22:4

**least** [2] - 3:18, 25:19

**leave** [1] - 41:2

**leaves** [1] - 15:21

**Leaving** [1] - 27:23

**led** [2] - 10:13, 47:24

**left** [2] - 24:5, 43:15

**lender** [3] - 42:22, 42:24

**less** [11] - 6:15, 7:1, 7:4, 7:7, 16:9, 17:13, 18:4, 18:5, 18:6

**letter** [1] - 34:3

**level** [2] - 19:6, 24:11

**liability** [4] - 1:4, 24:4, 34:25, 38:8

**light** [1] - 8:2

**likely** [2] - 14:22, 14:23

**limitations** [5] - 11:11, 11:24, 36:9, 37:4, 45:25

**limited** [2] - 1:3, 50:22

**line** [5] - 41:24, 42:1, 42:2, 42:16, 42:20

**lines** [1] - 33:16

**list** [2] - 2:18, 21:1

**lists** [12] - 4:7, 4:15, 4:25, 5:1, 6:7, 20:7, 21:24, 22:2, 31:1, 37:9, 37:12, 50:9

**LLC** [1] - 1:3

**loan** [8] - 13:23, 14:8, 18:20, 26:8, 42:23, 43:1, 43:2, 43:12

**logic** [1] - 23:9

**look** [5] - 7:18, 17:7, 35:22, 36:15, 45:9

**looked** [2] - 8:14, 9:23

**looking** [8] - 5:13, 6:24, 9:5, 9:11, 15:10, 15:17, 36:18, 38:19

**lose** [2] - 7:2, 7:19

**loss** [1] - 9:2

**lost** [2] - 9:2, 22:24

**low** [1] - 8:2

**lower** [2] - 35:16, 44:5

## M

**Magistrate** [28] - 2:2, 2:7, 2:22, 8:24, 19:25, 22:11, 22:17, 22:19, 31:6, 31:10, 31:17, 32:5, 33:3, 34:17, 34:23, 35:22, 40:24, 41:3, 41:5, 41:10, 41:18, 45:4, 45:17, 45:19, 48:22, 48:25, 49:17, 49:22
**Magistrate's** [3] - 35:3, 35:10, 37:25
**mail** [14] - 13:15, 13:24, 30:6, 30:7, 30:11, 39:1, 39:17, 39:19, 39:23, 41:22, 42:1, 42:4, 42:5, 49:5
**mailing** [2] - 14:2, 42:15
**mailings** [6] - 4:17, 13:19, 20:25, 43:6
**main** [1] - 36:15
**margin** [4] - 14:11, 21:5, 21:6, 21:7
**Marketing** [4] - 22:2, 22:6, 25:7, 27:20, 30:9, 34:13, 35:4, 35:14
**MARKETING** [2] - 1:3, 1:8
**Markham** [9] - 1:21, 2:3, 25:24, 29:7, 30:6, 30:13, 38:4, 39:21, 44:10
**MARKHAM** [57] - 2:4, 2:6, 2:14, 2:20, 3:24, 4:3, 5:7, 5:24, 6:11, 6:14, 6:19, 6:22, 7:7, 7:13, 7:16, 7:18, 8:7, 8:22, 9:5, 9:12, 9:22, 11:6, 12:3, 12:8, 13:4, 13:14, 14:13, 14:17, 14:22, 15:16, 15:20, 16:5, 17:6, 17:18, 18:11, 18:17, 19:16, 20:10, 20:22, 21:7, 21:11, 21:22, 21:24, 22:9, 22:24, 23:13, 23:18, 23:24, 24:6, 24:8, 24:24, 25:13, 38:18, 39:22, 42:9, 43:5, 43:15
**Markham's** [2] - 30:16, 31:5
**Martin** [1] - 1:22
**material** [8] - 15:6, 16:20, 19:14, 33:9, 38:9, 38:22, 50:14, 50:15
**math** [2] - 6:20, 7:8
**mathematical** [8] - 12:12, 12:22, 14:1, 14:9, 32:1, 32:6, 32:9, 43:10
**matter** [11] - 1:11, 3:20, 11:15, 12:24, 23:5, 23:9, 28:24, 37:5, 37:15, 50:6, 50:12
**matters** [1] - 3:3

**McCamey** [1] - 1:18
**McLaughlin** [1] - 1:13
**mean** [13] - 3:25, 4:6, 8:21, 13:10, 17:15, 18:2, 18:4, 18:22, 31:24, 33:1, 39:18, 41:13, 44:1
**means** [1] - 42:20
**meeting** [1] - 33:8
**memory** [1] - 37:7
**merits** [5] - 11:14, 11:25, 31:5, 46:12
**meruit** [3] - 16:2, 16:7, 17:24
**Messina** [1] - 1:22
**middle** [1] - 42:10
**might** [3] - 8:5, 20:6, 24:17
**million** [17] - 6:2, 6:24, 7:12, 7:15, 20:20, 25:24, 26:13, 26:23, 27:1, 27:2, 27:3, 27:4, 27:10, 29:9, 38:19, 38:20
**minds** [1] - 33:9
**minutes** [2] - 45:9, 45:12
**misrepresentation** [6] - 12:16, 13:2, 13:8, 36:10, 47:1, 48:18
**misrepresentations** [2] - 12:18, 47:8
**missing** [7] - 13:12, 14:5, 14:20, 14:25, 30:17, 30:22, 30:24
**mistake** [30] - 10:10, 12:21, 13:3, 13:6, 15:1, 15:3, 15:5, 15:10, 15:14, 15:18, 16:11, 20:1, 20:3, 25:17, 25:20, 29:15, 31:8, 31:11, 31:16, 32:13, 32:16, 33:4, 39:13, 40:3, 47:12, 47:20, 48:23, 49:1
**mistakes** [1] - 49:15
**modify** [3] - 10:6, 47:9, 47:17
**modifying** [1] - 40:13
**moment** [1] - 32:24
**monetary** [1] - 15:25
**money** [18] - 5:17, 5:25, 8:20, 18:3, 18:12, 19:3, 19:8, 24:21, 26:2, 26:11, 26:19, 26:20, 28:1, 29:3, 29:5, 38:10, 50:17
**month** [2] - 18:7, 18:8
**monthly** [3] - 4:16, 5:2, 37:8
**months** [2] - 25:4, 37:8
**Moore's** [1] - 46:14
**morning** [3] - 35:7, 44:7, 45:2
**Morning** [2] - 2:4, 2:5
**motion** [3] - 23:25, 24:1, 35:5
**Motion** [8] - 2:8, 2:9, 2:10,

2:12, 2:14, 3:11, 41:1, 41:9
**motions** [3] - 2:7, 8:23, 12:5
**move** [1] - 34:22
**MR** [116] - 2:4, 2:6, 2:14, 2:20, 3:24, 4:3, 5:7, 5:24, 6:11, 6:14, 6:19, 6:22, 7:7, 7:13, 7:16, 7:18, 8:7, 8:22, 9:5, 9:12, 9:22, 11:6, 12:3, 12:8, 13:4, 13:14, 14:13, 14:17, 14:22, 15:16, 15:20, 16:5, 17:6, 17:18, 17:19, 18:11, 18:17, 19:16, 20:10, 20:22, 21:7, 21:11, 21:22, 21:24, 22:9, 22:24, 23:2, 23:13, 23:18, 23:24, 24:6, 24:8, 24:24, 25:13, 25:21, 26:7, 26:11, 26:15, 26:18, 26:25, 27:6, 27:12, 27:15, 27:19, 28:6, 28:9, 28:12, 28:17, 28:19, 28:22, 29:2, 29:8, 29:12, 29:15, 29:18, 29:24, 30:5, 30:19, 30:21, 31:2, 31:9, 32:10, 32:18, 32:21, 32:24, 33:14, 34:1, 34:7, 35:2, 36:6, 36:11, 36:15, 36:20, 37:10, 37:13, 37:20, 37:23, 38:3, 38:12, 38:15, 38:18, 39:2, 39:6, 39:16, 39:22, 41:24, 42:1, 42:4, 42:9, 43:5, 43:15, 43:23, 44:9, 44:15, 44:19, 49:8
**multi** [1] - 18:20
**multi-step** [1] - 18:20
**multiplied** [1] - 29:4
**multiply** [3] - 43:6, 43:8, 43:9
**must** [1] - 49:19
**Mutual** [1] - 15:3
**mutual** [25] - 12:21, 13:3, 13:6, 15:1, 15:4, 15:8, 15:10, 15:18, 16:11, 19:25, 20:2, 25:17, 25:20, 29:15, 31:8, 31:11, 31:16, 32:13, 32:16, 33:4, 33:8, 39:12, 48:22, 49:1, 49:15

## N

**name** [1] - 26:3
**narrow** [1] - 32:7
**National** [1] - 46:2
**nature** [8] - 4:7, 4:22, 5:11, 9:19, 20:10, 21:1, 49:2, 49:14
**necessarily** [1] - 16:13
**necessary** [2] - 3:6, 33:9

**need** [2] - 23:18, 29:14
**negligent** [4] - 12:15, 12:17, 12:19, 13:7
**negligently** [1] - 12:15
**negotiating** [1] - 41:14
**never** [6] - 10:22, 18:9, 19:22, 33:8, 36:13, 48:7
**new** [2] - 40:20, 41:12
**next** [1] - 42:15
**ninth** [1] - 7:2, 7:4
**nobody** [1] - 8:16
**non** [1] - 15:6
**noncompete** [7] - 2:21, 9:8, 41:2, 41:4, 41:7, 41:20, 44:18
**None** [1] - 8:10
**note** [6] - 42:17, 42:19, 42:21, 42:24, 43:17, 49:4
**Nothing** [1] - 26:15
**nothing** [5] - 3:25, 4:1, 16:14, 25:2, 45:6
**notice** [2] - 22:1, 25:18
**novo** [1] - 35:23
**number** [7] - 13:18, 13:25, 14:7, 29:9, 31:1, 43:16, 43:21
**numbers** [3] - 5:2, 6:19, 6:22
**numerous** [1] - 46:19

## O

**objection** [2] - 34:22, 34:23
**objections** [5] - 2:2, 2:6, 21:19, 45:16, 45:18
**obtained** [2] - 7:10, 29:3
**obviously** [1] - 33:23
**occur** [2] - 20:4, 36:25
**occurred** [3] - 28:13, 39:7, 39:11
**October** [1] - 27:25
**OF** [1] - 1:1
**offering** [1] - 47:22
**omitted** [7] - 10:9, 10:15, 46:19, 47:10, 47:11, 47:20, 47:25
**once** [1] - 42:20
**one** [16] - 10:17, 15:9, 15:21, 15:25, 23:21, 25:23, 28:14, 30:10, 30:25, 34:23, 38:7, 38:25, 40:7, 44:9, 48:2
**One** [2] - 2:7, 15:11
**one's** [1] - 23:16
**open** [1] - 41:16
**operate** [1] - 23:7
**operating** [1] - 18:13
**operations** [2] - 19:5, 41:15
**operative** [2] - 22:18, 50:5

**opinion** [3] - 41:5, 48:24, 49:11
**opportunity** [1] - 8:16
**opposed** [1] - 31:23
**opposing** [1] - 46:11
**opposition** [1] - 3:11
**oral** [1] - 45:18
**order** [6] - 2:11, 3:19, 4:13, 13:12, 45:10, 45:14
**organization** [1] - 8:17
**original** [3] - 36:1, 40:11, 46:8
**Orthopaedics** [1] - 46:18
**ourselves** [2] - 22:3, 22:8
**outcome** [2] - 40:2, 42:11
**outset** [1] - 13:2
**overhead** [2] - 14:16, 24:22
**oversimplifying** [1] - 24:17
**overstating** [1] - 14:10
**overview** [1] - 13:11
**owe** [2] - 4:1, 18:3
**own** [4] - 21:25, 22:15, 24:20, 41:5
**owner** [1] - 8:8

**P**

**p.m** [1] - 45:13
**PA** [4] - 1:19, 1:23, 47:3, 48:10
**Page** [3] - 3:13, 46:15, 46:24, 48:8
**paid** [17] - 6:2, 6:10, 7:1, 16:21, 24:15, 26:14, 26:16, 26:21, 27:5, 27:7, 27:10, 27:22, 28:21, 29:1, 34:13, 38:10, 50:17
**papers** [2] - 25:18, 37:24
**Para** [1] - 46:1
**paragraph** [1] - 27:15
**Paragraph** [2] - 27:16, 27:21
**Park** [1] - 1:14
**Parol** [1] - 48:10
**parol** [24] - 2:25, 3:1, 3:9, 10:2, 10:24, 11:5, 11:18, 12:6, 22:13, 22:19, 22:22, 23:4, 23:5, 23:6, 23:10, 24:2, 24:10, 37:16, 47:5, 47:13, 49:18, 49:20, 49:23, 49:25
**part** [12] - 4:18, 8:8, 12:6, 13:25, 22:12, 22:13, 22:18, 23:8, 24:24, 29:22, 29:24, 49:1
**participate** [1] - 43:22
**particulars** [2] - 18:15, 19:13
**parties** [13] - 10:8, 10:19,

15:7, 15:12, 15:13, 28:2, 33:20, 33:21, 34:3, 38:11, 47:18, 48:4, 50:16
**parties'** [1] - 35:10
**PARTNERS** [1] - 1:3
**Partners** [3] - 30:9, 34:13, 35:14
**Partners'** [2] - 27:20, 35:5
**Partnership** [1] - 47:3
**party** [8] - 10:11, 10:17, 11:22, 11:23, 26:7, 44:24, 47:22, 48:3
**party's** [2] - 34:5, 46:11
**pass** [1] - 9:19
**patently** [1] - 21:10
**pay** [5] - 5:3, 25:2, 25:3, 25:4, 25:7
**paying** [2] - 25:7, 41:14
**payment** [4] - 3:16, 3:20, 24:13, 50:8
**payments** [1] - 18:19
**PC** [1] - 1:18
**pending** [1] - 45:15
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania** [12] - 1:7, 1:8, 1:15, 9:23, 9:25, 10:2, 11:4, 11:14, 12:1, 20:2, 47:6, 48:20
**people** [9] - 7:24, 8:10, 9:14, 14:7, 19:11, 25:2, 28:25, 43:11, 43:22
**per** [1] - 30:15
**percent** [30] - 4:8, 4:14, 4:15, 4:21, 5:1, 5:2, 6:15, 7:7, 7:11, 7:14, 14:24, 17:11, 17:16, 17:19, 27:24, 28:15, 28:21, 29:7, 33:10, 35:15, 42:14, 42:18, 42:25, 43:7, 43:9, 43:16, 43:19
**percentage** [26] - 3:22, 4:14, 5:3, 6:6, 6:8, 6:9, 6:12, 7:6, 13:21, 13:22, 14:10, 16:4, 16:11, 18:3, 27:3, 27:8, 28:24, 29:5, 30:21, 33:11, 34:13, 34:15, 43:16, 43:19, 43:21
**percentages** [9] - 16:25, 17:17, 18:1, 18:9, 24:2, 26:20, 33:23, 33:25, 42:10
**perception** [1] - 8:19
**Perfect** [5] - 36:21, 40:7, 40:16, 40:20, 46:24
**perform** [3] - 3:18, 3:19, 19:11
**performance** [18] - 16:1, 24:12, 30:11, 31:14, 31:21, 31:23, 33:22, 35:9,

37:7, 39:18, 39:19, 42:5, 42:6, 44:1, 44:3, 49:2, 49:12, 49:16
**performed** [2] - 20:23, 35:14
**perhaps** [2] - 15:24, 16:16
**period** [4] - 4:20, 6:24, 19:12, 37:12
**permit** [1] - 47:7
**permits** [2] - 10:2, 47:13
**person** [2] - 5:19, 34:11
**personnel** [1] - 7:22
**perspective** [2] - 31:11
**phones** [1] - 9:17
**phrase** [1] - 8:25
**piece** [2] - 30:24, 42:11
**Pittsburgh** [1] - 1:19
**place** [2] - 22:2, 41:13
**Place** [1] - 1:19
**Plaintiff** [24] - 1:4, 1:17, 3:14, 3:17, 3:18, 6:2, 6:8, 6:9, 13:1, 14:2, 15:23, 16:4, 16:10, 17:3, 19:3, 20:24, 20:25, 22:21, 24:4, 24:10, 24:15, 24:21, 41:11, 50:11
**Plaintiff's** [15] - 2:17, 2:21, 3:11, 3:15, 13:14, 14:18, 21:1, 23:12, 23:25, 24:1, 24:6, 24:7, 27:20, 49:18, 49:21
**Plaintiffs** [2] - 20:16, 27:23
**planning** [1] - 19:5
**Plastics** [5] - 36:21, 40:7, 40:16, 40:20, 46:24
**plead** [1] - 12:16
**pleaded** [1] - 46:10
**pleading** [1] - 15:17
**plus** [1] - 27:24
**point** [23] - 3:10, 4:5, 4:20, 5:4, 5:9, 11:15, 12:4, 18:2, 19:1, 20:11, 24:20, 25:22, 33:9, 34:2, 39:15, 39:22, 40:3, 41:17, 43:25, 44:4, 48:21, 49:22, 50:15
**points** [1] - 11:18
**position** [12] - 3:1, 3:14, 4:10, 15:13, 24:6, 24:7, 24:8, 28:21, 31:9, 32:7, 33:2, 39:13
**possible** [1] - 21:8
**pot** [1] - 18:2
**potentially** [1] - 50:7
**PPG** [1] - 1:19
**practice** [1] - 46:13
**Practice** [1] - 46:14
**precedent** [2] - 3:15, 4:11
**precipitated** [1] - 5:20
**precise** [1] - 36:8
**precisely** [2] - 11:1, 50:3

**precluded** [1] - 22:22
**precontract** [1] - 3:4
**prediction** [2] - 20:11, 20:12
**predictive** [2] - 20:3, 49:2
**prejudice** [1] - 46:11
**preliminary** [1] - 30:2
**prepared** [1] - 12:3
**present** [1] - 29:13
**presented** [1] - 4:4
**Presently** [1] - 45:15
**presents** [1] - 4:5
**president** [2] - 8:9, 8:10
**pretrial** [2] - 26:1, 50:21
**pretty** [1] - 22:9
**previously** [1] - 48:19
**principals** [1] - 41:11
**principle** [1] - 12:1
**priority** [1] - 25:1
**Pro** [4] - 46:6, 46:20, 46:22, 46:23
**problem** [3] - 5:12, 16:19, 17:22
**process** [2] - 9:16, 18:20
**produce** [4] - 2:18, 4:7, 4:16, 5:11
**produced** [2] - 5:10, 50:10
**proffering** [3] - 10:11, 10:17, 48:3
**profit** [12] - 5:20, 6:6, 6:25, 14:11, 14:16, 17:9, 18:5, 20:6, 21:5, 21:6, 21:7
**profitable** [2] - 14:3, 19:21
**profits** [3] - 3:22, 12:23, 17:2
**program** [3] - 9:15, 19:18, 26:9
**programs** [1] - 18:18
**prohibit** [1] - 3:2
**project** [5] - 7:23, 18:13, 19:20, 20:23, 25:6
**projected** [1] - 32:4
**projection** [1] - 31:22
**promise** [1] - 19:7
**promised** [9] - 4:6, 5:11, 17:8, 17:10, 17:12, 19:21, 20:23, 20:25, 21:16
**promises** [2] - 21:12, 25:5
**promissory** [4] - 42:17, 42:19, 42:21, 43:17
**proof** [2] - 11:19, 48:11
**proposition** [3] - 20:2, 35:20, 40:8
**proprietary** [2] - 44:13, 44:23
**prove** [1] - 9:3
**proved** [2] - 47:9, 47:10
**provide** [2] - 6:16, 26:9
**provided** [4] - 3:21, 5:1,

7

12:12, 29:21
**providing** [1] - 4:25
**proving** [1] - 3:2
**provision** [1] - 50:8
**provisions** [3] - 2:21, 2:22, 44:17
**purely** [3] - 31:13, 38:12
**purposes** [2] - 29:13, 32:15
**pursuant** [2] - 46:7, 50:17
**put** [9] - 3:10, 8:25, 11:15, 15:12, 15:13, 23:6, 35:12, 44:17, 50:14
**puzzle** [1] - 30:24

## Q

**qua** [1] - 15:6
**qualitative** [1] - 35:9
**quality** [19] - 2:18, 2:23, 3:3, 4:7, 4:15, 4:20, 5:1, 5:2, 5:11, 12:19, 19:14, 21:1, 23:8, 23:11, 24:3, 37:12, 37:14, 50:1, 50:9
**quantity** [11] - 2:19, 2:20, 2:24, 3:3, 12:19, 19:14, 23:8, 23:11, 24:4, 50:2, 50:9
**quantum** [3] - 16:2, 16:7, 17:24
**quarter** [1] - 24:17
**quarters** [1] - 6:2
**questions** [1] - 3:9
**quick** [1] - 13:11
**quite** [1] - 13:4
**quote** [1] - 9:24
**quotes** [1] - 41:6

## R

**R&R** [8] - 2:2, 8:24, 20:1, 33:4, 34:23, 48:23, 49:3, 49:5
**radio** [4] - 21:14, 21:15, 21:16
**raise** [2] - 9:3, 44:5
**raised** [7] - 2:6, 8:23, 9:13, 12:4, 35:22, 36:12, 44:10
**ramp** [1] - 7:22
**ramping** [4] - 8:13, 9:1, 18:16, 19:10
**rather** [5] - 4:22, 4:25, 7:11, 10:20, 48:6
**raw** [4] - 6:19, 6:21, 6:22
**RE** [2] - 41:24, 42:1
**read** [1] - 26:5
**real** [1] - 17:5
**realize** [1] - 14:20
**really** [3] - 14:6, 21:19,

33:11
**reason** [2] - 14:7, 47:2
**reasoning** [1] - 23:21
**reasons** [3] - 33:2, 33:3, 49:3
**received** [5] - 16:14, 17:14, 20:23, 21:13, 27:25
**recess** [1] - 38:22
**Recess** [2] - 38:23, 45:13
**recipients** [1] - 14:23
**recognized** [1] - 31:17
**recommendation** [2] - 11:8, 40:24
**Recommendation** [6] - 34:18, 35:11, 37:25, 45:6, 45:17, 45:20
**recommendations** [3] - 2:7, 2:10, 41:1
**recommended** [1] - 2:23
**record** [14] - 8:21, 9:13, 13:6, 13:25, 39:3, 39:9, 41:6, 41:8, 41:18, 44:22, 45:3, 45:10, 50:25
**recovery** [1] - 37:5
**reduce** [3] - 30:24, 31:3, 43:21
**reduced** [1] - 14:22
**reduction** [3] - 14:24, 17:13, 43:16
**refer** [1] - 27:12
**referred** [2] - 10:10, 47:21
**reflect** [2] - 39:3, 39:4
**reformation** [2] - 15:12, 32:17
**regard** [3] - 9:12, 13:5, 38:17
**reimburse** [1] - 5:6
**relate** [3] - 40:22, 46:8, 46:21
**relates** [4] - 35:25, 40:10, 49:23
**relating** [1] - 12:11
**relation** [3] - 11:13, 35:18, 40:6
**relationship** [4] - 5:8, 33:22, 34:12, 35:24
**relative** [4] - 17:17, 18:1, 44:18, 48:15
**relevant** [1] - 49:5
**reliance** [2] - 8:19, 9:2
**relied** [1] - 20:15
**relief** [1] - 11:13
**rely** [1] - 36:16
**remain** [1] - 48:24
**remaining** [3] - 2:10, 50:14, 50:15
**remarkable** [1] - 3:14
**remedy** [5] - 15:8, 15:9, 15:11, 15:15, 32:16
**remember** [1] - 20:1

**remembered** [1] - 4:18
**remembers** [1] - 17:21
**Report** [6] - 34:17, 35:11, 37:25, 45:5, 45:16, 45:19
**Reported** [1] - 1:25
**reported** [1] - 40:11
**reporter** [1] - 38:6
**Reporting** [1] - 1:25
**represent** [2] - 14:2, 15:5
**representation** [1] - 19:7
**representations** [12] - 3:5, 7:20, 10:3, 10:8, 10:18, 10:19, 10:21, 47:14, 47:19, 48:4, 48:5, 48:6
**representatives** [1] - 14:18
**represented** [2] - 13:17, 21:2
**require** [1] - 35:8
**required** [1] - 24:12
**requirement** [2] - 3:18, 24:9
**rescinded** [4] - 16:6, 32:20, 33:6, 34:20
**rescission** [3] - 15:18, 32:17, 33:7
**research** [1] - 27:4
**resolved** [1] - 23:23
**respect** [12] - 4:16, 12:22, 25:23, 33:20, 35:2, 35:4, 37:6, 38:12, 44:11, 44:12, 45:16, 48:22
**respective** [1] - 5:3
**respond** [7] - 14:7, 37:20, 42:16, 42:24, 43:7, 43:8, 44:15
**responding** [2] - 42:15, 42:17
**responds** [1] - 14:6
**response** [1] - 42:14
**result** [4] - 6:7, 32:4, 43:11, 44:6
**results** [1] - 13:22, 22:5
**retain** [1] - 24:22
**retrospect** [1] - 22:7
**return** [1] - 42:19
**returned** [1] - 13:20
**reveal** [1] - 27:4
**revealed** [1] - 27:7
**Revenue** [1] - 14:15
**revenue** [15] - 7:21, 8:2, 14:13, 14:23, 17:8, 18:6, 28:10, 28:16, 28:25, 30:25, 32:3, 32:4, 34:16, 35:12, 44:3
**revenues** [16] - 4:8, 6:23, 7:1, 12:13, 16:12, 17:14, 18:24, 25:23, 26:4, 26:23, 27:10, 27:24, 33:17, 34:13, 35:16
**review** [1] - 48:23
**reviews** [1] - 42:22

**rhetorically** [1] - 36:2
**right-hand** [1] - 42:12
**rights** [1] - 19:22
**Rodriguez** [1] - 46:16
**rolling** [1] - 19:4
**Rosenzweig** [1] - 46:17
**ROSENZWEIG** [1] - 46:17
**roughly** [1] - 29:7
**Row** [1] - 1:14
**Rule** [5] - 37:3, 40:10, 46:5, 46:8, 46:20
**rule** [15] - 2:25, 3:1, 11:18, 12:7, 19:23, 22:13, 22:19, 23:5, 23:6, 23:10, 37:16, 40:22, 47:5, 48:11, 49:25
**ruled** [1] - 46:7
**rules** [1] - 46:4
**ruling** [1] - 35:3
**run** [1] - 31:4
**running** [1] - 18:13

## S

**sake** [2] - 4:19, 4:24
**salaries** [1] - 18:18
**sales** [1] - 20:8
**scale** [1] - 5:5
**scene** [1] - 30:2
**Sean** [1] - 1:13
**Second** [1] - 46:3
**second** [2] - 38:5, 50:25
**secure** [1] - 46:5
**see** [8] - 8:15, 11:14, 17:20, 26:22, 34:15, 39:8, 41:22, 50:16
**See** [3] - 46:16, 48:9
**seeing** [2] - 18:24, 19:23
**seek** [2] - 33:13, 33:14
**selection** [1] - 50:23
**sell** [1] - 21:13
**send** [1] - 42:21
**sending** [1] - 13:16
**sense** [6] - 3:7, 5:16, 6:5, 21:8, 24:9, 33:1
**sent** [5] - 13:24, 39:1, 39:14, 42:17
**September** [3] - 36:6, 36:25, 50:24
**serves** [1] - 37:7
**services** [4] - 3:18, 3:19, 3:20, 35:13
**SERVICES** [1] - 1:6
**set** [6] - 2:1, 3:4, 24:2, 45:22, 49:3, 50:21
**setting** [1] - 41:14
**settled** [1] - 47:7
**Shall** [1] - 25:17
**share** [1] - 4:8
**sharpen** [1] - 25:15

**short** [3] - 38:6, 38:22, 50:11
**show** [2] - 24:16, 33:21
**shown** [2] - 13:21, 32:10
**shows** [2] - 26:2, 44:23
**shut** [1] - 9:1
**side** [6] - 8:6, 9:19, 17:23, 17:24, 17:25, 36:14
**sides** [1] - 17:9
**sight** [2] - 7:2, 7:19
**sign** [3] - 42:17, 42:18, 42:24
**signed** [3] - 21:2, 42:21, 43:17
**significance** [1] - 19:10
**signing** [2] - 10:14, 47:25
**silent** [1] - 44:16
**simply** [3] - 5:17, 35:12, 36:2
**sine** [1] - 15:6
**sit** [1] - 38:5
**sitting** [1] - 9:17
**situation** [3] - 11:21, 19:4, 35:25
**size** [1] - 18:1
**sliding** [1] - 5:5
**smaller** [2] - 13:21, 15:25
**Smith** [2] - 8:9, 30:9
**sold** [1] - 21:11
**sole** [1] - 24:14
**solely** [1] - 50:22
**solicitation** [1] - 13:15
**someone** [4] - 16:20, 22:1, 41:21, 42:14
**Sondra** [1] - 1:25
**sophisticated** [1] - 31:20
**sorry** [2] - 29:18, 43:5
**sort** [1] - 34:10
**sought** [1] - 2:14
**sounds** [2] - 38:15, 38:21
**source** [1] - 13:23
**south** [1] - 21:17
**South** [1] - 1:14
**specific** [1] - 34:19
**Specifically** [1] - 45:25
**specificity** [1] - 8:18
**speculation** [1] - 20:8
**Speculation** [1] - 31:14
**speculative** [2] - 49:14, 49:16
**spent** [2] - 5:13, 18:12
**stands** [2] - 35:20, 40:7
**start** [2] - 2:3, 41:13
**started** [3] - 21:24, 22:3, 27:21
**state** [2] - 37:4, 40:7
**statement** [3] - 26:1, 26:13, 40:5
**STATES** [1] - 1:1

**states** [2] - 27:17, 40:19
**States** [1] - 1:14
**stating** [1] - 39:6
**statute** [5] - 11:11, 11:24, 36:9, 37:3, 45:24
**stems** [1] - 28:12
**Stems** [1] - 28:13
**step** [3] - 18:19, 18:20, 22:1
**steps** [1] - 14:1
**stick** [1] - 45:11
**still** [4] - 15:21, 32:21, 49:7, 49:8
**straight** [1] - 17:24
**Street** [1] - 1:22, 47:3
**strip** [1] - 5:22
**subject** [3] - 10:3, 42:2, 47:14
**subsequently** [1] - 46:22
**substantively** [1] - 36:2
**Suburban** [1] - 46:17
**suggest** [1] - 17:7
**suggesting** [1] - 12:12
**Suite** [1] - 1:19
**sum** [2] - 10:1, 47:13
**Summary** [3] - 2:9, 3:11, 50:12
**summary** [10] - 9:6, 22:20, 23:25, 31:6, 34:24, 35:5, 40:24, 44:11, 45:21, 45:24
**sums** [1] - 38:1
**sup** [1] - 46:25
**Super** [1] - 47:3
**Superior** [2] - 9:25, 11:4
**supplied** [3] - 12:20, 13:12, 37:8
**supplies** [1] - 16:20
**supply** [1] - 4:15
**support** [3] - 9:7, 41:4, 41:19
**supports** [1] - 41:6
**supposed** [2] - 17:21, 34:12
**surprising** [1] - 3:13
**survive** [1] - 11:25
**survived** [1] - 40:25
**sustained** [1] - 8:18
**sword** [1] - 22:15
**symmetry** [1] - 23:5

**T**

**T'ed** [1] - 25:19
**tactics** [1] - 47:8
**tally** [1] - 26:4
**TELATRON** [1] - 1:7
**Teletron** [1] - 30:10
**term** [5] - 4:11, 4:12, 21:18, 24:19, 49:10
**terminated** [8] - 15:22,

15:23, 21:18, 21:25, 28:4, 33:6, 41:15, 45:1
**terms** [14] - 3:6, 6:22, 10:6, 10:14, 17:8, 17:16, 17:25, 20:4, 23:24, 24:3, 47:17, 47:25, 50:2, 50:18
**terrible** [1] - 7:9
**Terry** [2] - 8:9, 30:9
**testified** [2] - 18:23, 34:8
**testimony** [4] - 19:17, 25:9, 34:8, 41:9
**That'll** [1] - 2:13
**THE** [120] - 1:1, 1:1, 2:1, 2:5, 2:13, 2:19, 3:7, 3:25, 4:9, 5:12, 6:4, 6:12, 6:17, 6:21, 7:4, 7:9, 7:14, 7:17, 8:4, 8:11, 8:24, 9:10, 9:20, 9:23, 11:10, 12:6, 12:14, 13:9, 14:11, 14:15, 14:21, 15:3, 15:17, 15:21, 16:18, 17:15, 17:20, 18:15, 19:9, 19:25, 20:20, 21:4, 21:8, 21:17, 21:23, 22:7, 22:10, 22:25, 23:3, 23:15, 23:20, 24:1, 24:7, 24:16, 25:10, 25:15, 26:5, 26:10, 26:14, 26:16, 26:22, 27:1, 27:9, 27:14, 27:18, 28:4, 28:7, 28:11, 28:14, 28:18, 28:20, 28:23, 29:7, 29:11, 29:13, 29:17, 29:19, 30:1, 30:15, 30:20, 30:23, 31:4, 32:8, 32:14, 32:19, 32:23, 33:1, 33:24, 34:4, 34:21, 35:18, 36:7, 36:13, 36:19, 37:6, 37:11, 37:18, 37:22, 38:2, 38:4, 38:14, 38:16, 38:21, 38:24, 39:3, 39:12, 39:20, 41:21, 41:25, 42:3, 42:7, 43:4, 43:13, 43:20, 44:8, 44:14, 44:16, 45:8, 45:14, 49:10
**themselves** [1] - 31:21
**theory** [5] - 16:3, 16:7, 16:16, 33:15
**there'd** [1] - 4:23
**thereabout** [1] - 26:18
**thereby** [1] - 14:9
**therefore** [1] - 17:8
**therefrom** [2] - 10:15, 48:1
**they've** [1] - 40:18
**thinking** [1] - 15:2
**third** [2] - 26:7, 44:24
**thousand** [1] - 26:17
**three** [2] - 6:2, 8:7
**throughout** [1] - 33:22
**ties** [1] - 8:12
**timely** [1] - 36:4
**tinker** [1] - 43:13

**today** [2] - 25:25, 48:24
**ton** [1] - 35:19
**took** [3] - 3:22, 29:3, 44:23
**top** [1] - 49:11
**total** [2] - 6:12, 26:11
**tour** [1] - 5:14
**track** [1] - 18:19
**train** [1] - 9:16
**training** [3] - 7:22, 7:24, 18:18
**transaction** [1] - 46:10
**transcripts** [1] - 8:14
**triable** [1] - 9:3
**trial** [3] - 46:6, 50:19, 50:23
**Trickled** [1] - 28:11
**trouble** [1] - 33:5
**true** [5] - 17:15, 20:7, 30:15, 44:24, 44:25
**truth** [1] - 24:18
**try** [3] - 15:12, 15:13, 28:14
**trying** [1] - 36:23
**tumbled** [1] - 12:25
**turn** [3] - 19:19, 19:20, 19:24
**turned** [1] - 5:19
**Turned** [1] - 20:18
**two** [8] - 2:7, 2:23, 15:11, 31:19, 36:9, 37:8, 40:21, 45:2
**Two** [1] - 1:19
**two-fold** [1] - 15:11
**two-year** [1] - 36:9
**type** [4] - 10:25, 31:15, 33:15, 50:3

**U**

**uncertainty** [1] - 20:9
**undeniable** [3] - 5:15, 5:18, 15:24
**Under** [1] - 28:18
**under** [19] - 7:10, 11:14, 12:20, 16:2, 16:4, 16:16, 19:11, 31:14, 35:14, 36:9, 37:3, 37:7, 40:10, 46:20, 46:23, 47:2, 48:13, 48:19
**undermined** [1] - 47:8
**understood** [2] - 9:14, 45:5
**uniformly** [2] - 4:25, 5:1
**UNITED** [1] - 1:1
**United** [1] - 1:14
**universe** [1] - 42:12
**unjust** [3] - 5:23, 33:16, 33:21
**Unless** [1] - 2:11
**untimely** [1] - 36:3
**up** [20] - 7:22, 8:13, 9:1, 16:16, 18:7, 18:13, 18:16, 19:10, 23:3, 25:11, 25:19,

26:4, 29:5, 30:3, 38:1,
38:19, 38:24, 41:14
**upshot** [3] - 30:23, 31:2,
31:25
**Uses** [1] - 49:10
**utilized** [1] - 26:8

| **Y** |
|---|

**year** [2] - 18:24, 36:9
**yourself** [1] - 22:7

| **V** |
|---|

**value** [5] - 3:19, 3:21,
16:17, 21:15, 24:12
**various** [2] - 24:22, 45:22
**vehicle** [1] - 21:16
**venture** [1] - 14:4
**versus** [5] - 17:16, 46:2,
46:17, 46:24, 48:9
**Versus** [1] - 17:20
**viable** [1] - 15:15
**vice** [2] - 8:8, 8:9
**vicinity** [1] - 4:17
**view** [6] - 16:5, 19:1, 47:2,
48:19, 49:20, 50:3
**violated** [2] - 41:4, 41:7
**violation** [1] - 41:2
**virtue** [2] - 16:1, 36:4
**void** [1] - 10:6
**volume** [3] - 7:23, 9:15

| **W** |
|---|

**waiting** [2] - 9:17, 9:18
**waived** [1] - 19:22
**waiver** [3] - 19:15, 36:11,
36:13
**walking** [1] - 5:14
**wants** [1] - 40:9
**water** [1] - 35:7
**ways** [1] - 12:16
**WDPA** [1] - 46:25
**well-established** [1] - 31:18
**WESTERN** [1] - 1:1
**Westlaw** [1] - 46:18
**whereby** [1] - 14:5
**wherein** [1] - 46:18
**winter** [1] - 41:11
**wired** [1] - 26:2
**wisely** [1] - 47:7
**woman** [1] - 8:6
**word** [3] - 8:5, 8:6, 48:21
**words** [2] - 7:10, 34:4
**workers** [1] - 25:7
**workman** [1] - 16:20
**world** [1] - 17:5
**written** [11] - 3:4, 3:5, 10:4,
10:9, 10:20, 45:18, 47:9,
47:11, 47:15, 47:19, 48:5
**wrote** [1] - 37:16

10