IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DELAWARE MARKETING PARTNERS,   )
LLC.,                         )
           Plaintiff     )
                        )
       v.              )   CIVIL ACTION NO. 04-263 ERIE
                        )
CREDITRON FINANCIAL SERVICES,   )
INC., et al.,             )
           Defendants    )

## HEARING ON DEFENDANTS' MOTION IN LIMINE

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, August 30, 2007.

APPEARANCES:

        CHARLES SNYDERMAN, Esquire, (via Phone),
        appearing on behalf of the Plaintiff.

        BRETT W. FARRAR, Esquire, (via Phone), appearing
        on behalf of the Plaintiff.

        CRAIG A. MARKHAM, Esquire, (via Phone),
        appearing on behalf of the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

P R O C E E D I N G S

     (Whereupon, the proceedings began at 10:00 a.m.,
on Thursday, August 30, 2007, in Judge's Chambers.)

     THE COURT:  We have the defendants' motion in
limine.  Go ahead there, Mr. Markham.

     MR. MARKHAM:  Thank you, judge.  Our motion, of
course, deals with the introduction of evidence of the
plaintiff's entitlement to commissions on revenues which we
received after the contract was terminated by the plaintiff on
January 9, 2004.  It's our position, basically, as reflected in
our papers, that after the termination the plaintiff did not
earn any commissions.  It did not do any of the work necessary
in order to earn its commissions.

     THE COURT:  What did it have to do beyond -- let me
ask a couple of preliminary questions.  Who drafted this
document?

     MR. MARKHAM:  The contract was drafted by the
defendants, your Honor.

     THE COURT:  All right.  Was this Mr. Covatto
personally or some other non-lawyer on his behalf, do you know?

     MR. MARKHAM:  I do not know.

     THE COURT:  Let me ask this question.  If the
plaintiff would not be entitled to its percentage of gross

1  revenues after the termination of the contract in January of

2  what, 2004?

3        MR. MARKHAM:  Yes.

4        THE COURT:  Wouldn't that just be a huge windfall to

5  the defendant who was the breaching party?

6        MR. MARKHAM:  No.

7        THE COURT:  Why not?

8        MR. MARKHAM:  In this contract the plaintiff had to

9  perform six different -- in order to be entitled to its

10  commission payments.  One of those duties, not the only one,

11  only one of them, was the procurement of the telemarketing

12  lists.  There were other duties, which included analyzing the

13  results on the use of the lists.  Helping my client to refocus

14  or ingest its telemarketing activities in regard to

15  performance, which that is a very important task.  As well as

16  to refine the list for procurement activity.  The plaintiff

17  would submit to the list provider certain criteria of the

18  universe of people we want to close on.  After seeing the

19  results, the plaintiff would then take the steps necessary to

20  adjust that to make sure it's done most efficiently to give us

21  the most, the largest universe of good potential borrowers

22  here.

23        THE COURT:  But unless I'm missing how this works,

24  isn't the old maxim the proof is in the pudding is applicable

25  here.  If the names they did in fact provide ultimately did do

4

1    what the hope or end game was and that produced revenue, what

2    more needed to be done?

3            MR. MARKHAM:  There were five other tours and duties

4    that they agreed to do in this contract after the list was

5    provided.  Their only job was not to provide the list.  And

6    that clearly is stated in this contract.  They had other things

7    they had to do in order to entitle them to payment.  If they

8    didn't, none of these other things, they were not entitled to

9    what they bargained for.  We had bargained for services, in

10   addition to the provision of lists.

11           THE COURT:  Let me ask you this.  All those other

12   services you're talking about, they were services, broadly

13   speaking, that were designed to enhance the possibility that

14   the name or names that were supplied would in fact produce

15   revenue, is that right?

16           MR. MARKHAM:  Well, yes, ultimately that was the

17   goal of the arrangement.  Not only revenue, but revenue at the

18   most cost-efficient manner.  To make sure that the work that

19   was being done focused properly and efficiently, to obtain the

20   most profitable returns.

21           THE COURT:  Let's talk a little bit about the

22   contract itself here.  Now, so I'm clear, it's your position

23   that paragraph 11(b), which says "both parties shall be

24   responsible for paying any compensation set forth in program

25   exhibits through the effective date of termination, including

5

1    any notice period."  Your position essentially is that that

2    compensation is synonymous with commissions earned, is that

3    right?

4            MR. MARKHAM:  Yes, that is true.  The contract

5    itself, the main body of the contract has a paragraph entitled

6    "compensation,' which is paragraph number 8 of the main

7    contract.  Which indicates that compensation will be

8    established and agreed upon by a program by program basis and

9    outlined in program exhibits.  And compensation shall include a

10   share of startup expenses.

11           THE COURT:  Here's my question for you on this

12   11(b).  It says both parties shall be responsible for paying

13   any compensation.  But insofar as commissions were concerned,

14   the only party responsible for paying commissions would have

15   been your client, right, so doesn't that suggest that

16   compensation means compensation, and commission means something

17   else?

18           MR. MARKHAM:  No.  My client is responsible --

19           THE COURT:  Do you understand the upshot of my

20   question, though.  Both parties shall, I'm reading from this

21   thing, "both parties shall be responsible for paying any

22   compensation."  Only one party under the agreement was

23   responsible for paying the commission?

24           MR. MARKHAM:  Right.

25           THE COURT:  So if compensation is synonymous with

1    commission, what sense does it make to refer to both parties?

2            MR. MARKHAM:  It's not synonymous.  It's the broader

3    category within which commissions fits.  Compensation,

4    according to paragraph (a), also includes the payment of

5    startup expenses.  And the plaintiff had responsibilities for

6    paying part of those.  So compensation is the broad category

7    within which a number of different things fit, including

8    commissions and startup expenses.

9            THE COURT:  Okay.

10           MR. MARKHAM:  The contract in paragraph 11(b)

11   reflects the parties agreement that when this contract ends, so

12   does any obligation to pay anything that fits in the category

13   of compensation, which would include commissions.

14           THE COURT:  Now, if I can find it here, the

15   plaintiff cites to that, paragraph 11(a), which says that it

16   doesn't, the termination of the agreement doesn't impair any

17   rights, obligations or liabilities of Delaware or Telatron that

18   may accrue or have accrued prior to such termination.  And put

19   a lot of their eggs in that basket.  What do you say about

20   that?

21           MR. MARKHAM:  Well, that kind of begs the question

22   of what has accrued.  It's our position that as of the

23   termination, their rights to commissions on future revenues did

24   not accrue.  And, in fact, under the agreement and by the logic

25   of it, the plaintiff didn't perform the services necessary

7

1   after termination that would entitle them to commissions.

2         THE COURT:  Haven't I already ruled on that,

3   essentially, in the liability part of this case?

4         MR. MARKHAM:  No, it's completely different.  In the

5   liability part of the case, the question is what is the quality

6   of what they provided, something that the parties had agreed to

7   would be -- required before payment was due.  Whether they

8   performed the quality of work is different than here where they

9   performed no work.  And there is no dispute about that.  That

10   after the contract is terminated, not a single thing was done

11   by them under the agreement.  So it's not a question of whether

12   the contract includes a provision on quality, this contract

13   includes expressly a provision about what happens on

14   termination.  And there's no question about the fact that they

15   did nothing after termination, they end the relationship and

16   did no further work.  So it's completely different, a

17   completely different claim and situation and a completely

18   different analysis.  One that has nothing to do with the other.

19         THE COURT:  Finally, the theme that runs through

20   your paper, just to make it clear on the record, is that

21   paragraph -- paragraph 11(b) is clear and unambiguous, and your

22   position is that the contract unambiguously precludes -- a

23   commission percentage after the termination date?

24         MR. MARKHAM:  Yes, that's our position.

25         THE COURT:  What do you say about this, Mr. Farrar?

1    MR. FARRAR:  There are a number of points in
2    opposition to, as set forth in our papers.  One, there is a
3    difference between commission and compensation.  Inherently in
4    the document there's a difference between those items.  Mr.
5    Markham, to just say compensation is more broad than commission
6    and arguing that point, that's just not written anywhere in the
7    agreement.  Compensation is defined in the agreement --
8    THE COURT:  But compensation -- bear with me one
9    second.  I'm looking at Exhibit 1.  Under allocation of program
10   revenues, paragraph 4, don't they lump both commission -- they
11   lump both compensation and commission under that, don't they --
12   excuse me.  4(b), "Delaware Marketing shall share in the
13   initial organization expenses."  That's the startup costs,
14   right?
15   MR. FARRAR:  Yes.
16   THE COURT:  All right.  What other "compensation,"
17   could there possibly be under this agreement, what else could
18   compensation refer to besides startup costs?
19   MR. FARRAR:  Well, that's what's specifically
20   defined in the agreement as startup costs.  But commissions are
21   not startup costs.  I guess that's what we're saying.
22   Commissions are something that occur after the revenues have
23   been generated, provided to the defendants, and then there's
24   distribution of those commissions at that point in time.  That
25   is not a startup cost.

1          THE COURT:  I'm just looking at the compensation

2     section, paragraph 8 that you cite.

3          MR. FARRAR:  Yes.

4          THE COURT:  It says "specific compensation will be

5     established and agreed upon on by a program by program basis

6     and outlined in program exhibits.  Included within this

7     compensation section is Delaware's agreement to share in

8     startup expenses for each major program undertaken."  It says

9     "included within this compensation section."  Does that mean

10    that there's other items of compensation other than startup

11    expenses?

12         MR. FARRAR:  The way it's drafted, it appears that

13    would be a fair reading, that yes, there is more than that.

14         THE COURT:  What are they?

15         MR. FARRAR:  Although, quite frankly, I don't know

16    what else would be, that happens to be the specific one that's

17    itemized.

18         THE COURT:  Well, let me ask you this, the $64,000

19    question.  Is this contract read as a whole ambiguous or not?

20         MR. FARRAR:  Well, I think, I mean our position in

21    the papers is that it's not ambiguous with respect to the

22    commission aspects that we're talking about.  If it is

23    ambiguous, then it would be construed against the drafter,

24    which is the defendants.

25         THE COURT:  What do you say about Mr. Markham's

1    position on accrual.  He says, in any event, if you apply

2    11(a), that which says you are entitled to any benefits that

3    accrued prior to the termination date, he says your commission,

4    your entitlement to your percentage of gross proceeds didn't

5    accrue prior to the termination; what's your position on that?

6         MR. FARRAR:  The position on that is that whatever

7    work that was done that resulted in the revenue being

8    generated, was done prior to the termination of the agreement.

9    And at that point in time when the work was performed, which

10   enabled the revenue to be generated -- a commission right in

11   that revenue accrued.

12        THE COURT:  Say that one more time?

13        MR. FARRAR:  Sure.  Whatever work was done prior to

14   the termination of the agreement, that generated a commission

15   at some point in time, the accrual rights in that commission

16   occurred prior to the termination, and accrued at a time the

17   work was done that ultimately resulted in a commission.

18        THE COURT:  Accrued at the time the name was sent or

19   names that were sent on that ultimately proved successful?

20        MR. FARRAR:  Yes.  Yes, that's right.  And because

21   this idea, again, this idea of this qualitative assessment of

22   work being done, qualitative, that has already been decided.

23   That was part of prior motions for summary judgment.  At this

24   point we're talking about the damages.  It's assumed that work

25   was done and we know that revenues were generated.  The work

1   that resulted in the gross revenues that they received, is a

2   right in the commission by the terms of how commission is

3   defined in this contract, which would have accrued when that

4   work was done by Delaware Marketing Partners.

5           THE COURT:  Let me ask Mr. Markham this and ask a

6   couple of other factual questions and maybe get to the point

7   where I can make a ruling on this.  What about the Horn book

8   maxim that if indeed there is an ambiguity here, it's construed

9   against you?

10          MR. MARKHAM:  I don't think there is an ambiguity

11  here.  I mean the reasonable reading of the contract --

12          THE COURT:  Are you saying there's not two

13  reasonable readings of this contract?

14          MR. MARKHAM:  Not on the point dealing with whether

15  they're entitled to revenues, commissions on revenues received

16  after the termination.  The contract is clear on that point,

17  that they're not.  And the ability of one side to kind of

18  fabricate or argue a different reading, doesn't mean it's

19  ambiguous.

20          THE COURT:  It has to be a reasonable

21  interpretation?

22          MR. MARKHAM:  Right.  I think under the

23  circumstances and the language used, it makes it clear that

24  right to compensation -- that compensation is defined to

25  include things other than startup costs.

1          THE COURT:  Did Mr. Covatto negotiate the agreement

2    on behalf of the defendant?

3          MR. MARKHAM:  I believe he did.

4          THE COURT:  Who, on behalf of your client, Mr.

5    Farrar, was involved in the back and forth on this contract?

6          MR. FARRAR:  I think it was Brian Nelson, and I

7    believe he signed it.  And probably also would have included

8    Harry Metcalfe.  Brian Nelson is the person who signed the

9    document.

10          THE COURT:  As both of you sit here, I'm not

11    suggesting this is the way it would go, I'm trying to get the

12    big picture here, let me direct this to Mr. Farrar first.  If

13    this were a parole evidence case, is there parole evidence,

14    that you are aware of or you would intend to present, that

15    would shed light on the alleged ambiguity, I said alleged

16    ambiguity, as to whether or not you were entitled to

17    commissions post-termination?

18          MR. FARRAR:  Assuming that alleged ambiguity?

19          THE COURT:  Yes.

20          MR. FARRAR:  Could I ask the court a question?

21          THE COURT:  Sure.

22          MR. FARRAR:  I guess if you could be a little

23    clearer, what type of evidence?

24          THE COURT:  Let me put it this way.  Let's assume

25    for the sake of discussion as once I get to the end of this

1    argument and have an opportunity to reflect on this a little

2    bit, there's only two ways I can go here.  Either I construe

3    the contract as unambiguous and therefore in favor of one side

4    here.  Or I find under Pennsylvania rules of contract

5    construction that there is an ambiguity and that is to say that

6    both sides interpretation is reasonable.  If I were to find

7    that, then the appropriate approach is to leave that issue up

8    to the jury but permit both sides, as is appropriate in a

9    parole evidence case, to present evidence, be it documentary or

10   testimonial, as to what the parties' intent was.  My question

11   is, assuming that this case went to a jury on that issue, do

12   you have, would you have testimony or documentary evidence that

13   you would present that would buttress your position that your

14   interpretation was reasonable?

15          MR. FARRAR:  I think the parties would testify, not

16   the parties, either Mr. Nelson or Mr. Metcalfe would testify

17   that it was their understanding that they would be paid

18   whatever commissions came in within a seven-day time period.

19          THE COURT:  Irrespective of the termination?

20          MR. FARRAR:  Right.  That's what -- I mean, really

21   that's what ultimately, that's what this case is about.  You

22   know what I mean.

23          THE COURT:  Right.  What about you, Mr. Markham?

24          MR. MARKHAM:  Well, I would anticipate that Mr.

25   Covatto would testify about his understanding, I guess even in

1    the absence of testimony if it's ambiguous, the jury could

2    reach its own conclusions I guess based upon the context of the

3    agreement.  Although, I have not talked to him specifically

4    about whether there were give and take discussions on this

5    precise point, certainly since he drafted it, he had something

6    in mind.

7            THE COURT:  Let's go off the record for a second.

8            (Discussion held off the record.)

9            THE COURT:  Let's go back on the record and talk

10   about this a little bit.  What documents are you talking about?

11           MR. MARKHAM:  I'm told from plaintiff's counsel,

12   principally Mr. Snyderman, that they have taken some of the

13   data produced in discovery and have submitted it to third

14   parties for analysis and comparison as to permit them to prove

15   that lists provided before termination that resulted in a

16   specific dollar revenue after termination.  And he's working on

17   getting that to me, but he hasn't done so yet.  I don't know

18   whether it's available to him or not available to him.

19           THE COURT:  Is this in the nature of an expert

20   report?

21           MR. MARKHAM:  I don't know if it's expert reports, I

22   don't know what it is, frankly.  Other than some third party is

23   doing or has done this comparison analysis of some kind.

24           THE COURT:  What will it reportedly show?

25           MR. MARKHAM:  It will show that X dollars in revenue

1    was received by us through our use of telemarketing lists which

2    were provided by the plaintiff prior to contract termination.

3                THE COURT:  So you're waiting for that?

4                MR. MARKHAM:  I'm waiting for that.

5                THE COURT:  What do you know about that, Mr. Farrar?

6                MR. FARRAR:  Mr. Snyderman is the individual who is

7    putting that together.

8                THE COURT:  The short answer is you really don't

9    know much about it, you don't know anything about where it is

10   or when he's supposed to get it?

11               MR. FARRAR:  No, I do not.

12               THE COURT:  First of all, on the main point that

13   brought us here today, is there anything else that anybody

14   needs to say about that or do you feel you got your say?

15               MR. MARKHAM:  Nothing from us, your Honor.

16               THE COURT:  Then let me do this.  I want to take a

17   few minutes and take a look at my notes and glance at the

18   briefs.  Are both of you going to be at your desks there for

19   the next 15 or 20 minutes?

20               MR. MARKHAM:  Yes.

21               MR. FARRAR:  Yes.

22               THE COURT:  Who initiated this call?

23               MR. MARKHAM:  I did, your Honor.

24               THE COURT:  All right, would you ring back about

25   ten to 11, at that point I ought to be able a get a ruling on

1    the record here.  In the meantime, Mr. Farrar, if possible,

2    make an effort so can we patch Mr. Snyderman in here.

3            MR. FARRAR:  I'm going to make every effort I can to

4    do that.

5            THE COURT:  I think that would be very helpful.  All

6    right, thank you.

7            (Recess from 10:26 a.m.; until 10:50 a.m.)

8            THE COURT:  This is the judge, do I have Mr.

9    Snyderman on the line?

10           MR. SNYDERMAN:  Yes, your Honor.

11           THE COURT:  Counsel, the first thing I'm going to do

12   is get an order on the record, then we're going to talk about

13   where we go from here.  This is an order.

14                        ORDER

15           Presently pending before the court is the

16   defendants' motion in limine.  The background to this matter is

17   well-known to the parties, so I'm not going to recite it in any

18   detail now.  Suffice it to say, the court previously granted

19   summary judgment in favor of Delaware Marketing on the issue of

20   liability.  The defendant now seeks an order preventing the

21   plaintiff from recovering its commission on moneys received by

22   the defendant after the contract was terminated on January 9,

23   2004.  The defendants' position as set forth in its papers and

24   I'm quoting, it is essentially as follows:

25           "The Agreement provides that either party may

1    terminate the contract due to a material breach of

2    the Agreement.  Agreement, paragraph 10(a)(iv).  The

3    contract also deals expressly with the issue of

4    compensation owed to the plaintiff upon such a

5    termination.

6    11.  RESPONSIBILITIES UPON TERMINATION ...

7    (a) ...

8    (b)  Both parties shall be responsible for paying

9    any compensation set forth in the Program Exhibits

10   through the effective date of termination (including

11   any notice period).  Payment shall be described in

12   Section 8 above."

13   The defendant then continues:

14   "It is the plaintiff's position that, despite this

15   clear contractual limitation, the plaintiff is

16   entitled to full commissions for those revenues

17   received by defendants after the termination.

18   However, plaintiff cannot point to any express

19   contract provision which provides such a right.

20   The court would have to not only add provisions to

21   the contract, but it would also have to ignore

22   paragraph 11(b) of the Agreement (or conclude that

23   this provision is meaningless) in order to grant the

24   plaintiff the relief it demands."

25   And that's at defendants' brief pages 5 and 6.

1  Finally, the defendant concludes:

2          "The Agreement states that compensation is to be

3          paid up 'through the effective date of termination.'

4          The reasonable reading of this contractual

5          limitation is that no compensation is owed unless

6          the right to compensation has accrued before the

7          date of termination."  That's at page 6 of

8          defendants' brief.

9          The defendant argues that the right to compensation

10 has not accrued because defendant had not actually received the

11 revenues.

12          Plaintiff, on the other hand, argues that when the

13 contract is read as a whole, it unambiguously supports its

14 contention that it is entitled to its share of all commissions

15 generated even after the effective date of termination.  In

16 this regard plaintiff points to paragraph 11(a) of the

17 Agreement, which provides in pertinent part:

18          "The termination of this Agreement, however

19          occasioned, shall not terminate, affect or impair

20          any rights, obligations or liabilities of Delaware

21          Marketing or Telatron that may accrue or have

22          accrued prior to such termination or that, under the

23          terms of this Agreement, continue after the

24          termination.  Each party shall return all

25          property and confidential information belonging

to the other party which is in its possession at the time of termination."  Plaintiff's brief, page 4.

The plaintiff argues, essentially, that the defendant confuses the concept of compensation and distributed commission funds.  Specifically, plaintiff argues as follows:

"Defendants argue that paragraph 11(b) of the Agreement prevents Delaware Marketing Partners, LLC from recovering 28.57 percent of all gross revenues received by defendants after January 9, 2004, the date of the termination of the Agreement, arising from services provided by Delaware Marketing Partners, LLC.  Paragraph 11(b) states, in relevant part:  'Both parties shall be responsible for paying any compensation set forth in the Program Exhibits through the effective date of termination (including any notice period).'  Contrary to defendants' argument, this provision says nothing about limiting Delaware Marketing Partners, LLC's right to payment of its 28.57 percent gross revenue amount.  In fact, when reading paragraph 11(b) together with paragraph 11(a), as this court should do, it is readily apparent that 11(b) merely supplements 11(a) and that 11(a) actually controls this damage dispute. Paragraph 11(a) controls the parties' relationship post-termination, while 11(b) addresses the narrow

1    issue of compensation during performance of the
2    Agreement through the effective date of termination.
3    Defendants' argument which relies upon paragraph
4    11(b) is without merit."
5        Finally, the plaintiff argues relative to the
6  alleged difference between compensation and commission as
7  follows:
8    "Defendants confuse the term 'compensation' found in
9    paragraph 11(b) with the concept of distributing
10   commission funds regarding gross revenues found at
11   paragraph 4 of Exhibit-001 of the Agreement.
12   'Compensation' under the Agreement is discussed in
13   paragraph 11(b) and paragraph 8.  (Exhibit 1, pages
14   4 and 5).  In paragraph 8 the only cost specifically
15   relating to the payment of compensation is startup
16   expense.  Further, paragraph 8 states that startup
17   expense should be deducted from future commissions,
18   thereby indicating that startup expense, the only
19   item identified in connection with compensation, is
20   something different than commissions.  (Exhibit 1,
21   paragraph 8).  Clearly, the contract contemplates
22   that compensation and commissions are two different
23   things; compensation being the payment of money that
24   each party owes to the other in exchange for work
25   done, specifically including connection with startup

1      expense, and commission being moneys shared between

2      the parties derived gross revenues received from

3      operation of the program with 28.57 percent of gross

4      revenues distributed to Delaware Marketing Partners,

5      LLC."  That is plaintiff's brief, pages 6 and 7.

6      The law in Pennsylvania relative to the issue of

7      contract interpretation was succinctly summarized in

8      Bohler-Uddeholm America, Inc. v. Ellwood Group, 247 F.3d 79

9      (3rd Cir. 2001) as follows:

10      "Under Pennsylvania law on contract interpretation

11      and ambiguity is somewhat complicated; while the

12      broad principles are clear, it is not a seamless

13      web, and hence we will have to review some of the

14      relevant Pennsylvania cases before applying the law

15      to the facts at bar.  Pennsylvania contract law

16      begins with the 'firmly settled' point that 'the

17      intent of the parties to a written contract is

18      contained in the writing itself'."  Krizovensky v.

19      Krizovensky, 425 Pa.Super. 204 (1993).  Citing

20      Steuart v. McChesney, 498 Pa. 45 (1982).  "'Where

21      the intention of the parties is clear, there is no

22      need to resort to extrinsic aids or evidence,'

23      instead, the meaning of a clear and unequivocal

24      written contract 'must be determined by its contents

25      alone'."  Steuart, 444 A.2d at 661.  "Where language

1    is clear and unambiguous, the focus of

2    interpretation is upon the terms of the agreement as

3    manifestly expressed, rather than as, perhaps,

4    silently intended." Id.  "Clear contractual terms

5    that are capable of one reasonable interpretation

6    must be given effect without reference to matters

7    outside the contract." Krizovensky, 624 A.2d at

8    642.

9    The Bohler court also observed:

10    "A court may, however, look outside the 'four

11    corners' of a contract if the contract's terms are

12    unclear:  'Where the contract's terms are ambiguous

13    and susceptible of more than one reasonable

14    interpretation ... the court is free to receive

15    extrinsic evidence, i.e., parole evidence, to

16    resolve the ambiguity'." Id.  "But because

17    Pennsylvania law presumes that the writing conveys

18    the parties' intent, a contract will be found

19    ambiguous if, and only if, it is a reasonably or

20    fairly susceptible of different constructions

21    and is capable of being understood in more senses

22    than one and is obscure in meaning through

23    indefiniteness of expression or has a double

24    meaning.  A contract is not ambiguous if the court

25    can determine its meaning without any guide other

than a knowledge of the simple facts on which, from
the nature of the language in general, its meaning
depends; and a contract is not rendered ambiguous
by the mere fact that the parties do not agree on
the proper construction."  Citing <u>Duquesne Light Co.</u>
<u>v. Westinghouse</u>, 66 F.3d 604.  "To determine whether
ambiguity exists in a contract, the court may
consider 'the words of the contract, the alternative
meaning suggested by counsel, and the nature of the
objective evidence to be offered in support of that
meaning'."  <u>Mellon Bank, NA v. Aetna Business</u>
<u>Credit</u>, 619 F.2d 1001, 1011 (3rd Cir. 1980).  That's
at pages 92 and 93.

Here, based upon a careful review of the contract,
as well as the written submissions by the parties, in addition
to the oral argument, I find consistent with the above rules of
contractual construction that the contract is not ambiguous and
that the interpretation put forward by the plaintiff is the
only reasonable interpretation.

I find this for a number of reasons.  First, the
defendants' interpretation, in my view, would represent a
windfall to the breaching party in this case.  That is to say
after having supplied the names which subsequently resulted in
student loans and therefore commissions, it would represent a
windfall if defendant were permitted to retain one-hundred

1  percent of the revenues without accounting for 28.57 percent of

2  the gross revenue.

3          Further, I find under the contract that there is a

4  difference between "compensation" and "commissions."  Paragraph

5  8 of the contract specifically references that startup expense

6  should be deducted from future expenses, future commissions,

7  rather, then reinforcing the concept that the two terms have

8  different meanings.  Moreover, I note that paragraph 11(b) of

9  the contract states that "both parties shall be responsible for

10  paying any compensation.  Indeed, since only the defendant was

11  responsible for paying plaintiff its commission, it further

12  demonstrates that the term "compensation" does not subsume the

13  term "commission funds."

14          For all of the above reasons, I find that the

15  defendants' motion in limine should be denied.

16          Now, Mr. Snyderman, before you got on the phone

17  here, I was talking to these fellows, specifically Mr. Markham,

18  and Mr. Markham says that he has been awaiting a document from

19  you that is important to the damage issue.  Mr. Markham, rather

20  than me try to say what it is, why don't you do it?

21          MR. MARKHAM:  Okay.  My understanding is that the

22  plaintiff has engaged a third party to conduct some type of

23  analysis --

24          THE COURT:  We're getting a bad hum from your phone,

25  are you on a speaker phone or a regular line or what?

1          MR. MARKHAM:  I'm on a regular line.

2          THE COURT:  Well, try to keep your voice up.  Go

3   ahead, Mr. Markham.

4          MR. MARKHAM:  It is my understanding that the

5   plaintiff has engaged the services of a third party to conduct

6   some type of analysis on data that the plaintiff will attempt

7   to prove what revenues post-termination were derived from lists

8   provided after termination.  Which is now one of the main

9   centerpieces of what remains of the case.  I haven't received

10  those documents or whatever that information may be.

11         THE COURT:  All right.  What about it, Mr.

12  Snyderman?

13         MR. SNYDERMAN:  Your Honor, I don't have it yet,

14  either.

15         THE COURT:  It's getting pretty late in the day.

16         MR. SNYDERMAN:  Well, Mr. Markham has the same

17  information, the same data that I have.  And the issue is

18  simply matching what's in one list to what's on another list.

19         THE COURT:  This isn't expert testimony --

20         MR. SNYDERMAN:  It's not expert testimony.  Your

21  Honor, I might add that it would be, except for the fact that

22  the volume is larger, it's no different than having a list on

23  one piece of paper containing names and a list on another piece

24  of paper having names and showing which names are identical on

25  the same two pieces of paper.

26

1           THE COURT:  It's just a more extensive mechanical

2    exercise, is that what you're telling me?

3           MR. SNYDERMAN:  Yes, your Honor.

4           THE COURT:  Well, do you have the raw data, Mr.

5    Markham?

6           MR. MARKHAM:  I don't know.  I haven't seen his

7    comparison, I haven't seen what documents he intends to offer,

8    in addition to the raw data.  They're not able to make those

9    comparisons.

10          THE COURT:  Put it this way.  If you have the raw

11   data and if he has the raw data and if he's simply farther

12   ahead of the curve in terms of making the analysis complete,

13   that's one thing.  If it should come to pass for some reason

14   you haven't been given data that he has, well then, that's

15   something else.  For present purposes I'd simply say this.  And

16   this is, to state the obvious.  Your ability, Mr. Snyderman, to

17   put on proof relative to any aspects of your damage is going to

18   depend in part upon whether the necessary information upon

19   which the calculation was made was shared with the defendant.

20   Now you're telling me that, to your knowledge, you have shared

21   everything with the defendant that you have in your possession,

22   is that what you're telling me?

23          MR. SNYDERMAN:  Yes.  For Mr. Markham's benefit, I

24   can point out what we're talking about, the subpoena to PHEA

25   and the documentation we received from PHEA was certainly

1    provided to Mr. Markham.  And Mr. Markham's client certainly

2    knows what names we've supplied to them because they had the

3    names and used them.  That's all the information we're talking

4    about.

5              THE COURT:  Then --

6              MR. MARKHAM:  I'm not sure if I have the PHEA

7    documents that you got by subpoena.

8              THE COURT:  What I'm going to tell you folks to do

9    is when we get off the phone here, you spend some time on the

10   phone yourself and simply confirm that.  Under the general

11   rubric that a word to the wise is sufficient.  I would simply

12   encourage the plaintiff to make sure the defendant, to the

13   extent that you can, Mr. Snyderman, that you're both on the

14   same wavelength, that he in fact has what you have and in your

15   possession upon which you based your damage calculations.  All

16   right.  Now, that having been said, let me turn to the issue of

17   the trial on Tuesday.  From your perspective, Mr. Snyderman --

18   what facts am I going to have a jury brought all the way from

19   the 13 counties in northwest Pennsylvania come in and what

20   material facts are they going to pass on?

21             MR. SNYDERMAN:  May I say that we're perfectly

22   willing to have this tried by the court without a jury.

23             THE COURT:  I know, the court isn't willing to do

24   that.

25             MR. SNYDERMAN:  I sorry, I didn't know that.

1    THE COURT:  Let's just say hypothetically, whatever

2 fact finder would do the fact finding, what fact finding is

3 there to do?

4    MR. SNYDERMAN:  The only fact finding would be

5 coming up with the total amount of gross revenues which the

6 defendants received after January 9th or 10th, 2004.  Which

7 resulted from names that Delaware Marketing Partners supplied

8 before that date.

9    THE COURT:  Do both sides already agree on the

10 amount of revenues that were generated prior to January 9,

11 2004?

12    MR. SNYDERMAN:  I believe so, your Honor.  Your

13 Honor, I believe we're also in agreement on the total gross

14 revenues received and through January 9th, the only issue is

15 did the revenue that the defendants received after that date

16 come from defendants' own efforts, in other words, using names

17 that we didn't supply or what portion of it was from the names

18 we did supply.

19    THE COURT:  You perceive that is perhaps a factual

20 dispute?

21    MR. SNYDERMAN:  Yes, your Honor.

22    THE COURT:  Do you as well, Mr. Markham?

23    MR. MARKHAM:  Yes, I think we haven't talked about

24 what were relatively minor issues dealing with startup cost and

25 things like that.

1          THE COURT:  That's the big issue, that is how you

2     see it as well?

3          MR. MARKHAM:  Yes.

4          THE COURT:  What are the subsidiary minor issues

5     that might impact on the damage claim, what other issues need

6     to be addressed?

7          MR. SNYDERMAN:  Well, your Honor, we're going to

8     show that due to the fact -- paid all the front expenses, they

9     were deducted from the commissions we received in the

10    beginning.  But there is one other damage issue that, as the

11    defendants had agreed to reimburse the plaintiff for some of

12    its expenses in connection with direct mail campaigns.  The

13    plaintiff actually sent the defendant an invoice, maybe two

14    invoices and they have never been paid.

15         THE COURT:  How much money are we talking about for

16    this discreet item of damage?

17         MR. SNYDERMAN:  Less than $100,000.

18         THE COURT:  What's the defendants' position on that

19    item of damage, alleged damage?

20         MR. MARKHAM:  Well, they're entitled to

21    reimbursement of part of the mailing expense.  It's a question

22    of whether it has been factored into the overall calculation of

23    damages.

24         THE COURT:  Is it conceivable that with respect to

25    that discreet, albeit much smaller claim loss, you might be

1    able to come to some kind of agreement on that figure?

2            MR. MARKHAM:  I mean it's possible, sure.

3            THE COURT:  Explore that, that will be the second

4    issue.  Is there yet a third discreet item of damage that we

5    need to talk about or does that pretty much cover it?

6            MR. SNYDERMAN:  Your Honor, I believe that covers

7    it.

8            THE COURT:  All right.  Now, what I'm going to need,

9    I got some points for charge from you or suggested jury

10   instructions.  I'm not being critical when I say this because

11   you didn't really know how this thing was going to be teed up

12   until right now.  Those aren't very, in fact those aren't

13   useful to me at all.  I would suggest that both sides and I'm

14   going to give you an opportunity to submit new requested jury

15   instructions consistent with the ruling that has been made and

16   the discussion about damages we just had.  And I'd like you to

17   get those in before the end of the business day tomorrow.  I

18   already have your voir dire.  So that's that.  Now, let's go

19   off the record.

20           (Discussion held off the record.)

21           THE COURT:  Then we will see you -- are you trying

22   this case, Mr. Snyderman?

23           MR. SNYDERMAN:  Yes, your Honor.

24           THE COURT:  I will see you here, I'd like you here

25   in my chambers at a quarter to nine.  I'll take up the voir

1   dire questions and any other dangling issues that anybody needs

2   to call to my attention.  And as I said at the beginning of our

3   discussion, I encourage you to, when we get off the phone, to

4   make sure Mr. Markham is on the same page in terms of these

5   damage documents.  That having been said, does anybody have

6   anything else they need to call to my attention -- then we'll

7   see you on Tuesday.  Thank you, counsel.

8

9           (Whereupon, at 11:16 a.m., the proceedings were

10  concluded.)

11

12                                  -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>C E R T I F I C A T E</u>

2

3

4

5        I, Ronald J. Bench, certify that the foregoing is a

6    correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11

12    _____

13    Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25